# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:** <br> *(AVISO AL DEMANDADO):* <br> ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., a Florida corporation; Please see attached page for additional parties. <br><br> **YOU ARE BEING SUED BY PLAINTIFF:** <br> *(LO ESTÁ DEMANDANDO EL DEMANDANTE):* <br> RECONSTRUCTION EXPERTS, INC., a Colorado corporation, | *FOR COURT USE ONLY* <br> *(SOLO PARA USO DE LA CORTE)* <br><br> **Electronically FILED by** <br> **Superior Court of California,** <br> **County of Los Angeles** <br> **7/07/2025 7:43 PM** <br> **David W. Slayton,** <br> **Executive Officer/Clerk of Court,** <br> **By M. Aguirre, Deputy Clerk** |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* <br> Superior Court of California - County of Los Angeles <br> Stanley Mosk Courthouse <br> 111 North Hill Street <br> Los Angeles, CA 90012 | CASE NUMBER: <br> *(Número del Caso):* <br> 25STCV20083 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Timothy C. Earl / Alexa K. Smith   SBN 174967 / 357360
FENNEMORE LLP
600 B Street, Suite 1700, San Diego, CA 92101 (619) 233-4100

DATE: July 7, 2025                            Clerk, by _____ , Deputy
*(Fecha)*                                      *(Secretario)*                                *(Adjunto)*

David W. Slayton, Executive Officer/Clerk of Court
M. Aguirre

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 (Rev. July 1, 2009) | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> *www.courtinfo.ca.gov* |

MC-025

| SHORT TITLE: RECONSTRUCTION EXPERTS, INC. v. ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC, et al. | CASE NUMBER: 25STCV20083 |
|---|---|

**ATTACHMENT** (Number): ___/___

*(This Attachment may be used with any Judicial Council form.)*

BERKLEY RISK INDEMNITY COMPANY, a Minnesota corporation;
GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, a New York corporation;
IRONSHORE SPECIALTY INSURANCE COMPANY, an Arizona corporation;
NAUTILUS INSURANCE COMPANY; an Arizona corporation;
OBSIDIAN SPECIALTY INSURANCE COMPANY, a Delaware corporation;
TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation;
UNITED SPECIALTY INSURANCE COMPANY, a Delaware Corporation;
and DOES 1 through 50,

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page ___1___ of ___1___

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov
Westlaw Doc & Form Builder

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Timothy C. Earl / Alexa K. Smith<br>FENNEMORE, LLP<br>600 B Street, Suite 1700<br>San Diego, CA 92101<br><br>TELEPHONE NO.: (619) 233-4100    FAX NO. (Optional): (619) 231-4372<br>E-MAIL ADDRESS (Optional): tearl@fennemorelaw.com / alexa.smith@fennemorelaw.com<br>ATTORNEY FOR (Name): Plaintiff RECONSTRUCTION EXPERTS, INC. | STATE BAR NUMBER<br>174967/357360 | FOR COURT USE ONLY<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>08/07/2025<br><br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ T. Le _____ Deputy |
|---|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
111 North Hill Street, Los Angeles, California 90012

PLAINTIFF:
RECONSTRUCTION EXPERTS, INC.

DEFENDANT:
ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., et al.

| AMENDMENT TO COMPLAINT<br>(Fictitious/Incorrect Name) | CASE NUMBER:<br>25STCV20083 |
|---|---|

☐ **FICTITIOUS NAME** *(No Order required)*

Upon the filing of the complaint, the plaintiff, being ignorant of the true name of the defendant and having designated the defendant in the complaint to be:

FICTITIOUS NAME

and having discovered the true name of the defendant to be:

TRUE NAME

amends the complaint by substituting the true name for the fictitious name wherever it appears in the complaint.

| DATE | TYPE OR PRINT NAME | SIGNATURE OR ATTORNEY |
|---|---|---|
| | | |

☑ **INCORRECT NAME** *(Order required)*

The plaintiff, having designated a defendant in the complaint by the incorrect name of:

INCORRECT NAME
Berkley Risk Indemnity Company, a Minnesota corporation

and having discovered the true name of the defendant to be:

TRUE NAME
Berkley Assurance Company, an Iowa corporation

amends the complaint by substituting the true name for the incorrect name wherever it appears in the complaint.

| DATE<br>July 29, 2025 | TYPE OF PRINT NAME<br>Timothy C. Earl | SIGNATURE OF ATTORNEY<br>*[signature]* |
|---|---|---|

**ORDER**

THE COURT ORDERS the amendment approved and filed.

08/07/2025
_____
Dated

*[signature]*

Christopher K. Lui / Judge
Judicial Officer

**AMENDMENT TO COMPLAINT**
**(Fictitious / Incorrect Name)**

LASC CIV 105 Rev. 09/23
For Optional Use

Code of Civ. Proc., §§ 471.5
472, 473, 474

FENNEMORE LLP
Timothy C. Earl, Esq. – SBN 174967
 *tearl@fennemorelaw.com*
Alexa Smith, Esq. – SBN 357360
 *alexa.smith@fennemorelaw.com*
600 B Street, 17th Floor
San Diego, CA 92101
Tel. (619) 233-4100 / Fax (619) 231-4372

Attorneys for Plaintiff RECONSTRUCTION
EXPERTS, INC.

Electronically FILED by
Superior Court of California,
County of Los Angeles
7/07/2025 7:43 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By M. Aguirre, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| RECONSTRUCTION EXPERTS, INC., a Colorado corporation, <br><br> Plaintiff, <br><br> v. <br><br> ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., a Florida corporation; BERKLEY RISK INDEMNITY COMPANY, a Minnesota corporation; GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, a New York corporation; IRONSHORE SPECIALTY INSURANCE COMPANY, an Arizona corporation; NAUTILUS INSURANCE COMPANY; an Arizona corporation; OBSIDIAN SPECIALTY INSURANCE COMPANY, a Delaware corporation; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation; UNITED SPECIALTY INSURANCE COMPANY, a Delaware Corporation; and DOES 1 through 50, <br><br> Defendants. | Case No. 25STCV20083 <br><br> COMPLAINT FOR: <br><br> 1. BREACH OF WRITTEN CONTRACT; <br><br> 2. DECLARATORY RELIEF; <br><br> 3. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BAD FAITH); AND <br><br> 4. UNLAWFUL BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200 <br><br> JURY TRIAL DEMAND |

Plaintiff RECONSTRUCTION EXPERTS, INC. ("REI" or "Plaintiff") hereby alleges:

### **THE PARTIES**

1.      Plaintiff at all times mentioned herein, was and is incorporated in the state of Colorado with its principal place of business in the City of Lakewood, County of Jefferson, State of Colorado. Plaintiff is a duly licensed contractor in the State of California, CSLB License No. 750511.

1

COMPLAINT

52228044.4

2.      Plaintiff is informed and believes and thereon alleges that Defendant ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC. ("AIIC") is a Florida corporation conducting business in the State of California.

3.      Plaintiff is informed and believes and thereon alleges that Defendant BERKLEY RISK INDEMNITY COMPANY ("BERKLEY") is a Minnesota corporation conducting business in the State of California.

4.      Plaintiff is informed and believes and thereon alleges that Defendant GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA ("GSICA") is a New York corporation conducting business in the State of California.

5.      Plaintiff is informed and believes and thereon alleges that Defendant IRONSHORE SPECIALTY INSURANCE COMPANY ("IRONSHORE") is a New York corporation conducting business in the State of California.

6.      Plaintiff is informed and believes and thereon alleges that Defendant NAUTILUS SPECIALTY INSURANCE COMPANY ("NAUTILUS") is an Arizona corporation conducting business in the State of California.

7.      Plaintiff is informed and believes and thereon alleges that Defendant OBSIDIAN SPECIALTY INSURANCE COMPANY ("OBSIDIAN") is a Delaware corporation conducting business in the State of California.

8.      Plaintiff is informed and believes and thereon alleges that Defendant TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA ("TRAVELERS") is a Connecticut corporation conducting business in the State of California.

9.      Plaintiff is informed and believes and thereon alleges that Defendant UNITED SPECIALTY INSURANCE COMPANY ("USIC") is a Delaware corporation conducting business in the State of California.

10.     Plaintiff is informed and believes and thereon alleges that Defendants DOES 1 through 50, inclusive, and each of them, are admitted insurers and/or are surplus lines insurers which have obtained authorization from the California Department of Insurance to issue insurance policies in the State of California to residents and business entities in California.  Plaintiff is further

2

52228044.4

informed and believes and thereon alleges that Defendants utilize the services of a managing general agent, excess, and/or surplus lines brokers, who each have authority to bind coverage in California on behalf of Defendants.

11. Plaintiff is informed and believes and thereon alleges that Defendants DOES 1 through 50, inclusive, and each of them, whether individuals, corporations, partnerships, or otherwise, are fictitious names of Defendants who provided primary, excess, and/or umbrella general liability insurance to Plaintiff but whose true names are, at this time, unknown to Plaintiff. Plaintiff is informed and believes and thereon alleges that Defendants and DOES 1 through 50, inclusive, are liable for the acts and/or omissions hereinafter alleged, including the issuance of insurance policies to Plaintiff. A reference to Defendants herein includes the DOE Defendants. At such time as Defendants' true names become known to Plaintiff, Plaintiff will ask leave of this Court to amend this Complaint (hereinafter "Complaint") to insert said true names.

12. Plaintiff is informed and believes and thereon alleges that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, were and are agents, servants, venturers, partners, representatives, employees, coinsurers, coconspirators, and/or members of the other Defendants identified herein, and each of them, and were acting with the full knowledge, consent, permission, and ratification of each of their Co-Defendants with respect to the denial of insurance policy benefits owed to Plaintiff.

13. Plaintiff is informed and believes and thereon alleges that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, issued a Commercial General Liability Policy(s), Professional Liability Policy(s), Directors and Officers Liability Policy, or policies of insurance (the "Policies") which potentially provide and/or provide coverage to Plaintiff at issue herein.

## **VENUE**

14. At all times relevant herein, the Plaintiff performed general contracting services in the State of California, including in the City of Glendale, County of Los Angeles, State of California, for, among other things, the construction project at issue in the underlying action.

15.     Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, issued insurance policies and/or additional insured endorsements to insurance policies to Plaintiff affording coverage for construction projects within the State of California.

16.     Plaintiff is informed and believes and thereon alleges that the construction project and alleged resulting property damage at issue is located in the City of Glendale, County of Los Angeles, State of California, and that the pending underlying action which is the subject of the insurance coverage disputes in the above-captioned matter is pending in the County of Los Angeles, State of California.

## THE UNDERLYING ACTION

17.     Plaintiff is informed and believes and thereon alleges that on or about July 12, 2021, Plaintiff entered into a written agreement with the Excelsior at The Americana at Brand Homeowners Association ("Excelsior"), a non-profit mutual benefit corporation organized and existing under and by virtue of the laws of the State of California, and the homeowners association for the real property and improvement thereto commonly known as The Excelsior at the Americana at Brand, located south of Caruso Avenue, west of South Brand Boulevard, east of Orange Street (vacated), and north of Colorado Street in the City of Glendale, County of Los Angeles, State of California 91920, including but not necessarily limited to Lot 10 of Tract 68602 in Book 1350, pages 45-63 in the Office of the County Recorder for Los Angeles County (the "Excelsior Property"), entitled "Pre-Construction Agreement" to, among other things, perform consulting services relating to certain specified repairs to the Excelsior Property (the "Project") following the settlement of a prior construction defect action by Excelsior (hereinafter the "Pre-Construction Contract").  The Pre-Construction Contract included, among other things, the following scope of services:

- Initial planning and consulting to identify repairs to be made by the Association following a construction defect lawsuit;
- Assist Excelsior in conjunction with its design professionals;

4

52228044.4

- Assist the Association in prioritizing repairs;

- Project planning/processes/documentation; and

- Final product:  bid package/qualification requirements & project details/review.

18.    Plaintiff is informed and believes and thereon alleges that on or about May 13, 2022, Plaintiff entered into a written agreement with Excelsior to perform certain repair work to the Project which Plaintiff alleges resulted in a revised contract amount of no less than $23,063,765.23 (hereinafter referred to as the "Repair Contract").  Notably, the Repair Contract required major renovation/repair work to existing buildings which meant Plaintiff and any subcontractors Plaintiff retained had to be careful to avoid damaging existing building components, and in many cases, integrate its work into pre-existing building components constructed by others.

19.    Plaintiff is informed and believes and thereon alleges that Plaintiff entered written subcontract agreements (collectively referred to as "Subcontracts") with certain subcontractors to supply labor, materials and/or services to the Project for certain scopes of work identified within the Repair Contract. Plaintiff is further informed and believes and thereon alleges that the Subcontracts required subcontractors working on the Project to (1) defend and indemnify Plaintiff against property damage and construction defect claims arising out of the subcontractors' work, and (2) procure and maintain general liability insurance naming Plaintiff as an additional insured for said subcontractors' ongoing and completed operations at the Project.  These subcontractors included, but were not limited to:

a.  Sierra Commercial Plumbing, Inc. ("Sierra") who performed plumbing repairs and installation at the Project.

b.  Danny Ryan Precision Contracting, Inc. dba ADEP Precision Contracting ("ADEP") performed certain fire sprinkler repair/reinstallation work at the Project;

c.  Mark Beamish Waterproofing, Inc. ("MBW") who performed certain waterproofing work at the Project; and

d.  Richard Delgado dba Lion's Demolition ("Lion's") who performed certain demolition work at numerous locations within the building interiors and on areas

1    exterior to the buildings the Project beginning, on or about June 14, 2022, said work

2    involved work to the common areas of the Project owned by Excelsior.

3    20.    Plaintiff is further informed and believes and thereon alleges that payment disputes

4    arose between Plaintiff and Excelsior with respect to the work being performed by Plaintiff at the

5    Project.  On or about March 23, 2023, Plaintiff filed a complaint against Excelsior for breach of

6    contract, rescission, and various other causes of action in a matter entitled *Reconstruction Experts,*

7    *Inc. v. The Excelsior at the Americana at Brand Homeowners Association et al.*, Los Angeles

8    Superior Court Case No. 23GDCV00580 (hereinafter referred to as the "Underlying Action").

9    Plaintiff filed a First Amended Complaint ("FAC") in the Underlying Action on May 18, 2023,

10    which named the individual homeowners as defendants and added a cause of action for foreclosure

11    of mechanic's lien, but otherwise contained substantially similar allegations.  Plaintiff is further

12    informed and believes and thereon alleges that Excelsior filed an answer to Plaintiff's FAC in the

13    Underlying Action that included an affirmative defense of set-off, among others, based upon

14    Excelsior's claims of construction defects and design defects, and property damage resulting

15    therefrom.

16    21.    Plaintiff is informed and believes and thereon alleges that on or about March 24,

17    2023, Excelsior demanded that Plaintiff cease all labor at the Project.

18    22.    Plaintiff is informed and believes and thereon alleges that on April 3, 2023,

19    Excelsior, through counsel Scott D. Levine, APC, sent a letter to Plaintiff's litigation counsel

20    identifying claims arising out of the Pre-Construction Contract and Repair Contract, and for

21    performance-related claims and construction defect/property claims at the Project, and demanding

22    mediation ("Mediation Demand").  The Mediation Demand expressly stated that Plaintiff should

23    put its professional liability and general liability insurance carriers on notice.  Plaintiff promptly

24    placed Defendants GSICA and IRONSHORE on notice of the Mediation Demand, and Excelsior

25    mediated their disputes at issue in the Underlying Action at that time but were unable to informally

26    resolve said disputes.

27    23.    Plaintiff is further informed and believes and thereon alleges that on or about

28    January 12, 2024, Excelsior filed a cross-complaint against Plaintiff in the Underlying Action for

6

COMPLAINT

52228044.4

eleven (11) causes of action including, but not limited, to negligence and breach of contract arising out of the Pre-Construction Contract between Excelsior and Plaintiff, and negligence and breach of contract arising out of the Prime Contract. Individual homeowners of units in the Project also filed a cross-complaint against Plaintiff for, among other causes of action, negligence and resulting physical property damage arising out of the work performed by Plaintiff under the Pre-Construction Contract and the Prime Contract (Excelsior's cross-complaint and the homeowners' cross-complaint described herein are hereinafter collectively referred to as the "Cross-Complaints"). These claims were substantially expanded beyond the claims asserted in the Mediation Demand. On or about June 14, 2024, Excelsior and the individual homeowners filed amended Cross-Complaints containing substantially similar allegations as the original Cross-Complaints. Thereafter, Excelsior filed a Second Amended Cross-Complaint against Plaintiff in the Underlying Action containing substantially the same allegations. Among other things, one or more versions of the Cross-Complaints allege that: (a) Plaintiff negligently carried out the requirements of the Pre-Construction Contract by, among other things, negligently providing a deficient scope of work and/or plans and specifications that were deficient, and failing to provide a proper budget and schedule for the reconstruction Project; (b) Plaintiff negligently failed to timely and correctly waterproof the podium deck at the Project per the requirements of the Repair Contract resulting in significant physical property damage to the retail establishments below the podium, including but not limited to the Din Tai Fung restaurant; (c) the plumbing repaired by Plaintiff in the showers of units leaked, causing severe water damage to the residences and club room below; (d) Plaintiff and its subcontractors failed to correctly repair/install fire sprinklers leading to a failure of the fire sprinkler and resulting water intrusion with resulting damage to adjacent building components which occurred on January 12, 2023; (e) and (f) Plaintiff furnished Excelsior with false and misleading payment applications, and misrepresented its commitment to take care of the relationship between Excelsior and the individual unit owners. Plaintiff is further informed and believes and thereon alleges that the Cross-Complaints are the first time that Excelsior and the individual homeowners had made "Claims" for "Wrongful Acts" against Plaintiff as defined under the TRAVELERS' Directors & Officers Policy described below.

7

COMPLAINT

## THE INSURANCE POLICIES

24.     Plaintiff is informed and believes and thereon alleges that Defendant IRONSHORE issued a professional liability insurance policy to Plaintiff effective November 1, 2022 through November 1, 2023, IRONSHORE Policy No. DCP7BABWAMI004, with primary limits of $5 million per claim and $5 million in the aggregate (hereinafter referred to as the "IRONSHORE E&O Policy"). A copy of the IRONSHORE E&O Policy is attached hereto as Exhibit 1. Plaintiff is further informed and believes and thereon alleges that the insuring agreement and defense provisions in the IRONSHORE E&O Policy provides, in relevant as follows:

I. INSURING AGREEMENTS

A. COVERAGE

The **Company** will pay on behalf of the **Insured** those sums in excess of the **Retention** and up to the applicable Limit of Insurance specified in Item 5. of the Declarations that the **Insured** becomes legally obligated to pay as **Damages,** including **Claim Expenses,** because of a **Claim** for a **Wrongful Act** in the performance or non-performance of **Professional Services** rendered to others by the **Insured** or by any person or entity for whom the **Insured** is legally liable and to which this insurance applies.

For this coverage to apply, all of the following conditions must be satisfied:

a. the **Wrongful Act** forming the basis of any **Claim** must first take place on or after the **Retroactive Date** specified in the Retroactive Period Table shown in Item 3. of the Declarations and prior to the expiration date of the **Policy Period** specified in Item 2. of the Declarations;

b. subject to the Policy Aggregate Limit shown in Item 5b. of the Declarations, which is the maximum amount payable under this policy, the Each Claim limit and Aggregate limit corresponding to each Retroactive Period shown in the Retroactive Period Table shown in Item 3. of the Declarations applies to **Wrongful Acts** that first take place during such Retroactive Period;

c. prior to the effective date of this policy, no officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any **Insured** had knowledge of any actual or alleged **Wrongful Act** or circumstance that reasonably could give rise to a **Claim** under this policy;

d. **Claims** must first be made against the **Insured** during the **Policy Period** or any applicable **Extended Reporting Period;** and

e. the Insured must report the **Claim** to the **Company,** in writing, during the **Policy Period** or within sixty (60) days after the expiration of the **Policy Period** or during any applicable **Extended Reporting Period.**

. . .

8

COMPLAINT

## C. DEFENSE PROVISIONS

1. **Claims** brought within the United States of America, its territories or possessions or Puerto Rico:

a. For all **Claims** brought within the United States of America, its territories or Puerto Rico, for which coverage is provided under this policy, the **Company** has the right to investigate such **Claim** and the duty to defend such **Claim** with defense counsel selected by the **Company,** even if the allegations of the **Claim** are groundless, false or fraudulent. **Claim Expenses** reduce the Limit of Insurance and shall be applied against the **Retention.** The **Company** shall not defend any **Claim** or pay any **Claim Expenses** or **Damages:**

i. after the applicable Limit of Insurance has been exhausted by payment of **Claim Expenses** or **Damages** or both;

ii. after the applicable Limits of Insurance has been exhausted by the payment of **Claim Expenses** or a tender of **Damages** into a court of applicable jurisdiction or both; or

iii. upon the **Insured's** refusal to consent to a settlement offer as provided in paragraph D., subparagraph 2. Below.

b. Should any of the preceding listed items in I., ii., or iii. occur, the **Company** shall have the right to withdraw from further defense of such **Claim** and control of the defense shall be ceded to the **Insured.**

25.    Plaintiff is informed and believes and thereon alleges that the terms "Claim," "Professional Services" and "Wrongful Act" are defined as follows in the IRONSHORE E&O Policy:

C. **Claim** means any demand received by an **Insured** alleging a **Wrongful Act** in the performance or nonperformance of **Professional Services** on the part of the **Insured** or persons for whose conduct the **Insured** is legally liable.

O. **Professional Services** means those services the **Insured,** or any person or entity for whom the **Insured** is legally liable, is qualified to perform for others as an architect, engineer, **Construction Manager,** land surveyor, landscape architect, scientist, or technical consultant, including when such services are performed on projects seeking LEED Certification and/or utilizing Building Information Modeling "(BIM)" or as specifically defined by endorsement to this policy. **Professional Services** also includes those design services provided under a written contract to facilitate the construction process whether performed by the **Insured** or anyone for whom the **Insured** is legally liable.

R. **Wrongful Act** means negligence, which is the failure to meet the professional standard of care legally required or reasonably expected, under the same or similar circumstances, in the performance or non-performance of **Professional Services** rendered to others by the **Insured** which results in **Damages** for which the **Insured** is legally liable.

9

COMPLAINT

52228044.4

26.     Plaintiff is informed and believes and thereon alleges that the retroactive date in the IRONSHORE E&O Policy is November 1, 2011, and that the IRONSHORE E&O Policy contains a per claim retention of $100,000 which provides, in relevant part, as follows:

C. RETENTION
. . .
2. The **Retention** shall be satisfied by monetary payments by the **Named Insured** for **Damages** and **Claim Expenses** resulting from **Claims** first made during the **Policy Period** . . . Satisfaction of the **Retention** is a condition precedent to payment by the **Company** of any amounts hereunder, and the **Company** shall be liable only for the amounts in excess of the **Retention,** and subject to the Limit of Insurance specified in Item 5. of the Declarations.

27.     Plaintiff is informed and believes and thereon alleges that GSICA issued, *inter alia*, commercial general liability ("CGL") insurance policies to Plaintiff, including (a) GSICA Policy no. GSA4639119825-00 effective November 1, 2021 to November 1, 2022, (b) GSICA Policy No. GSA4639119825-01, effective December 1, 2022 to November 1, 2023, and (c) GSICA Policy No. GSA4639119825-02, November 1, 2023 to November 1, 2024, which afford primary insurance coverage to Plaintiff for various construction projects, including but not limited to the Project and the Underlying Action (collectively referred to as the "GSICA POLICIES").  A copy of GSICA Policy No. GSA4639119825-01, effective December 1, 2022 to November 1, 2023, is attached hereto as Exhibit 2, and the other GSICA POLICIES, with minor exceptions, contain substantially similar terms.  Plaintiff is further informed and believes and thereon alleges that the limits of each of the GSICA Policies are $1 million per occurrence, and $2 million in the aggregate, and the GSICA POLICIES each contain a per occurrence self-insured retention of $100,000 per occurrence, and the language of the self-insured retention endorsements in GSICA Policies provides, in relevant part, as follows:

1. **Self-insured Retention and Defense Costs – Your Obligations**

A. The 'self-insured retention' amounts stated in the Schedule of this endorsement apply as follows:

B. If a Per Occurrence "self-insured retention" amount is shown in the Schedule of this endorsement, you shall be responsible for payment of all damages and "defense costs" for each "occurrence" or offense, until you have paid "self-insured retention" amounts and "defense

10

52228044.4

costs" equal to the Per Occurrence amount shown in the Schedule, subject to the provisions of A.2. below, if applicable.

The Per Occurrence "amount" is the most you will pay for self-insured retention amounts and "defense costs" arising out of any one "occurrence" or offense, regardless of the number of persons or organizations making claims or bringing suits because of the "occurrence" or offense.

28.    Plaintiff is informed and believes and thereon alleges that the insuring agreement contained within each of the GSICA POLICIES provide, in relevant part, as follows:

**1.   Insuring Agreement**

C.   We will pay those sums that the insured becomes "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

29.    Plaintiff is informed and believes and thereon alleges that an "occurrence" is defined in the GSICA POLICIES as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "property damage" is further defined in the GSICA POLICIES as follows:

D.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

30.    Plaintiff is informed and believes and thereon alleges that Defendant TRAVELERS issued, *inter alia*, a Directors & Officers Liability insurance policy to Johns Lyng USA, LLC, under which Plaintiff qualifies as a Named Insured, effective November 1, 2023 through November 1, 2024, TRAVELERS Policy No. 019-LB-107756394, with primary limits of $3 million per claim (hereinafter referred to as the "TRAVELERS D&O POLICY"), and a $25,000 deductible that applies to both defense expenses and indemnity payments.  A copy of the TRAVELERS D&O Policy is attached hereto as Exhibit 3.  Plaintiff is further informed and believes and thereon alleges that the insuring agreement and defense provisions within the Private Company and Directors and

11

52228044.4

Officers Liability coverage section within the TRAVELERS D&O Policy provides, in relevant part as follows:

I.      INSURING AGREEMENTS

The Company shall pay on behalf of:

1.  the Insured Persons Loss for Wrongful Acts, except for Loss which the Insured Organization pays to or on behalf of the Insured Persons as indemnification;

2.  the Insured Organization Loss for Wrongful Acts which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; and

3.  the Insured Organization Loss for Wrongful Acts;

resulting from any Claim first made during the Policy Period, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

Plaintiff is informed and believes and thereon alleges that the TRAVELERS D&O POLICY contains the following definitions of the terms "Claim," "Wrongful Act" and "Loss":

Claim means

1.  a written demand other than a Security Holder Derivative Demand for monetary damages or non-monetary relief.

2.  a civil proceeding commenced by services of a complaint or similar pleading.

3.  A criminal proceeding commenced by the filing of charges.

4.  a formal administrative or regulatory proceeding commenced by a filing of a formal investigative order, service of summons or similar document.

5.  an arbitration, mediation, or similar alternative dispute resolution proceeding if the insured is obligated to participate in such proceeding or if the insured agrees to participate in such proceeding, with the Company's written consent, such consent will not be unreasonably withheld.

6.  a Security Holder Derivative Demand solely with respect to Investigation Expenses and subject to the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations.

7.  The service of a subpoena if an Insured Person identified by is name if served upon such person pursuant to a formal administrative proceeding or regularity proceeding, or

8.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding against an Insured for a Wrongful Act provided that Claim does not include any labor or grievance arbitration pursuant to a collective bargaining agreement.

12

COMPLAINT

Wrongful Act means:

    1. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an Insured Person in his or her capacity as such;

    2. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an Insured Person in his or her Outside Position;

    3. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the Insured Organization; or

    4. any matter asserted against an Insured Person solely by reason of his or her status as such.

    "Loss" means Defense Expenses and money which an Insured is legally obligated to pay as a result of a Claim, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of the punitive, exemplary, or multiplied damages, prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment.

    31.    Plaintiff is informed and believes and thereon alleges that Defendant BERKLEY issued the following commercial general liability ("CGL") insurance policy to Sierra Commercial Plumbing, Inc. ("Sierra"): BERKLEY Policy Nos. VUMA024430, effective 5/11/2021 through 5/11/2022, and VUMA024431, effective 5/11/2023 through 5/11/2023, which afford primary insurance coverage to Sierra and additional insureds including Plaintiff for various construction projects, including but not limited to the Project and the Underlying Action (hereinafter referred to as the "BERKLEY POLICIES"). Plaintiff does not currently have complete copies of the BERKLEY POLICIES in its possession; it is common practice in the construction industry for subcontractors to furnish general contractors like Plaintiff with certificates of insurance indicating Plaintiff's additional insured status on subcontractor policies rather than furnishing complete copies of subcontractors' commercial general liability policies. Plaintiff is further informed and believes and thereon alleges that the limits of the BERKLEY POLICIES are $1 million per occurrence, and $2 million in the aggregate, and the BERKLEY POLICIES contain a "blanket" or "automatic" additional insured endorsement which provides, in relevant part, as follows:

**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. **Section II – Who is An Insured** is amended to include as an additional insured the person(s) or organizations(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

32.     Plaintiff is informed and believes and thereon alleges that the insuring agreement in the BERKLEY Policy provides, in relevant part, as follows:

**INSURING AGREEMENT**

a.    We will pay the sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.

33.     Plaintiff is informed and believes and thereon alleges that Defendant NAUTILUS issued the following CGL insurance policies to Danny Ryan Precision Contracting, Inc. dba ADEP Precision Contracting ("ADEP"): NAUTILUS CGL Policy Nos. ECP203163712, effective 4/1/2022 to 4/1/2023, and ECP203163713, effective 4/1/2023 through 4/1/2024, which afford primary insurance coverage to ADEP and additional insureds for various construction projects, including but not limited to the Project and the Underlying Action (hereinafter referred to as the "NAUTILUS POLICIES").  Plaintiff does not currently have complete copies of the NAUTILUS POLICIES in its possession; it is common practice in the construction industry for subcontractors to furnish general contractors like Plaintiff with certificates of insurance indicating Plaintiff's

14

COMPLAINT

52228044.4

additional insured status on subcontractor policies rather than furnishing complete copies of subcontractors' commercial general liability policies. Plaintiff is further informed and believes and thereon alleges that the limits of the NAUTILUS POLCIES are $1 million per occurrence, and $2 million in the aggregate, and the NAUTILUS POLICIES contain a "blanket" or "automatic" additional insured endorsement which provides, in relevant part, as follows:

1. Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement, in effect during this policy period, that such person or organization be added as an additional insured policy; and

2. Any other person or organization you are explicitly required to add as an additional insured under the contract or agreement described in Paragraph 1. above. Such contract or agreement must be executed and in effect prior to the performance of your work which is the subject of such contract or agreement. Such person(s) or organization(s) is an additional insured only with respect to liability for bodily injury or property damage under SECTION I – COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Coverage D.1 – Contractors Pollution Legal Liability and Coverage D.4 – Microbial Substance Contractor Pollution Liability, or personal injury or advertising injury under SECTION I – COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY directly caused by:

a. Your acts or omissions; or

b. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured described in Paragraph 1. or 2. Above.

A person's or organization's status as an additional insured under this endorsement ends when your operations for the person or organization described in Paragraph 1. above are completed.

34.     Plaintiff is informed and believes and thereon alleges that the insuring agreement in the NAUTILUS POLICIES provides, in relevant part, as follows:

**1.     Insuring Agreement**

a.   We will pay the sums the insured becomes legally obligated to pay as damages for bodily injury or property damage in excess of the deductible or self-insured retention, to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for bodily injury or property damage to which this insurance does not apply. We may at

15

COMPLAINT

our discretion, investigate any occurrence and settle any claim or suit that may result. But:

(1)    The amount we will pay for damages is limited as described in SECTION V – LIMITS OF INSURANCE; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgements or settlements under COVERAGES A, B, D, or E. or medical expenses under COVERAGE C, and/or defense costs under COVERAGES D or E.

35.    Plaintiff is informed and believes and thereon alleges that Defendant AIIC issued the following CGL insurance policies to Endura Construction Corp. ("Endura"): EX 1164254-02, effective 10/6/2021 through 10/6/2022, EX 1164254-03, effective 10/6/2022 through 10/6/2023, which afford primary insurance coverage to Endura and additional insureds for various construction projects, including but not limited to the Project and the Underlying Action (hereinafter referred to as the "AIIC POLICIES").  Plaintiff does not currently have complete copy of the AIIC POLICIES in its possession; it is common practice in the construction industry for subcontractors to furnish general contractors like Plaintiff with certificates of insurance indicating Plaintiff's additional insured status on subcontractor policies rather than furnishing complete copies of subcontractors' commercial general liability policies.  Plaintiff is further informed and believes and thereon alleges that the limits of the AIIC POLICIES are $1 million per occurrence, and $2 million in the aggregate, and the AIIC POLICIES contain a "blanket" or "automatic" additional insured endorsement which provides, in relevant part, as follows:

Name of Person or Organization: Any person or organization that the named insured is obligated by virtue of a written contract or Agreement to provide insurance such as is afforded by this policy.

[ . . . ]

A. Section II – Who Is An Insured is amended to include as an insured the person or organization shown in the Schedule, but only to the extent that the person or organization shown in the Schedule is held liable for your acts or omissions arising out of your ongoing operations performed for that insured.

B. With respect to the insurance afforded to these additional insureds, the following exclusion is added:

16

COMPLAINT

52228044.4

2.    Exclusions

This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1)    All work, including materials, parts or equipment furnished in connection with such work, on the project (other than services, maintenance or repair) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed: or

(2)    That portion of "your work" out of which the injury or damage arises has been put to its intended by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

36.    Plaintiff is informed and believes and thereon alleges that the insuring agreement in the AIIC POLICIES provides, in relevant part, as follows:

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1)    The amount we will pay for damages is limited as described in Section **III** – Limits of Insurance; and

(2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the in the payment of judgments or settlements under Coverage's **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

17

COMPLAINT

37.    Plaintiff is informed and believes and thereon alleges that Defendant USIC issued the following CGL liability insurance policy to MBW:: USIC CGL Policy Nos. AUN22115149, effective 9/30/2022 through 9/30/2023 and ATN23126977, effective 9/30/2023 through 9/30/2024, which afford primary insurance coverage to MBW and additional insureds such as Plaintiff for various construction projects, including but not limited to the Project and the Underlying Action (hereinafter referred to as the "USIC POLICIES").  Plaintiff does not currently have complete copy of the USIC POLICIES in Plaintiff's possession; it is common practice in the construction industry for subcontractors to furnish general contractors like Plaintiff with certificates of insurance indicating Plaintiff's additional insured status on subcontractor policies rather than furnishing complete copies of subcontractors' commercial general liability policies.  Plaintiff is further informed and believes and thereon alleges that the limits of each of the USIC POLICIES are $1 million per occurrence, and $2 million in the aggregate, and the USIC POLICIES contain a "blanket" or "automatic" additional insured endorsement which provides, in relevant part, as follows:

**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

**Name of Person or Organization:**
    As Required by Written Contract, Fully Executed Prior to the Named Insured's Work

**Location And Description of Completed Operations:**
    As Required By Written Contract, Fully Executed Prior to the Named Insured's Work

Section II – Who Is An Insured is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location for that insured and included in the "products-completed operations hazard".

52228044.4

38.    Plaintiff is informed and believes and thereon alleges that USIC's POLICIES also contain a "blanket" or "automatic" additional insured endorsement which is substantially similar to the additional insured endorsement in the AIIC POLICIES described above with respect to coverage for "ongoing operations."

39.    Plaintiff is informed and believes and thereon alleges that the insuring agreement in the USIC POLICIES provides, in relevant part, as follows:

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1)    The amount we will pay for damages is limited as described in Section **III** – Limits of Insurance; and

(2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the in the payment of judgments or settlements under Coverage's **A** or **B** or medical expenses under Coverage **C**. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

40.    Plaintiff is informed and believes and thereon alleges that Defendant OBSIDIAN issued the following commercial general liability ("CGL") insurance policy to Lion's: OBSIDIAN Policy No. SCB-GL-000000743, effective 1/24/2022 through 1/24/2023, and which affords primary insurance coverage to Lion's and additional insureds including Plaintiff for various construction projects, including but not limited to the Project and the Underlying Action (hereinafter referred to as the "OBSIDIAN POLICY").  Plaintiff does not currently have complete copy of the OBSIDIAN POLICY in its possession; it is common practice in the construction industry for subcontractors to furnish general contractors like Plaintiff with certificates of insurance

COMPLAINT

indicating Plaintiff's additional insured status on subcontractor policies rather than furnishing complete copies of subcontractors' commercial general liability policies. Plaintiff is further informed and believes and thereon alleges that the limits of the OBSIDIAN are $1 million per occurrence, and $2 million in the aggregate, and the OBSIDIAN contains a "blanket" or "automatic" additional insured endorsement which provides, in relevant part, as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**OBSIDIAN SPECIALTY INSURANCE COMPANY COMMERCIAL GENERAL LIABILITY POLICY**
**ADDITIONAL INSURED-OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART.**

**SCHEDULE**

**Name of Additional Insured:**
**As required by a legally enforceable written agreement entered into prior to commencement of the Named Insured's work.**

**Designated Project/Location to which this endorsement applies:**
**All Projects and Locations**

If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section III - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf in the performance of "your work" for the additional insured(s) at the location(s) designated above.

Coverage for any additional insured is governed by the terms, conditions, and exclusions of this policy and all endorsements, including the Insuring Agreement.

The coverage provided for any additional insured is only to the extent of and in the proportion the additional Insured is held liable for the negligence or strict liability/conduct/acts of the Named Insured. No coverage is provided for liability based upon the acts, errors or omissions of the Additional Insured.

COMPLAINT

52228044.4

41.     Plaintiff is informed and believes and thereon alleges that the OBSIDIAN POLICY also contains a "blanket" or "automatic" additional insured endorsement which is substantially similar to the additional insured endorsement in the AIIC POLICIES described above with respect to coverage for "ongoing operations."

42.     Plaintiff is informed and believes and thereon alleges that the insurance policies issued by Defendants DOES 1 through 50, inclusive, and each of them, are professional liability, director's & officers liability, commercial general liability and/or commercial excess/umbrella policies that afford coverage for the Project and the Underlying Action, and Plaintiff qualifies as a Named Insured or an additional insured under each of the policies issued by Defendants DOES 1 through 50, inclusive, and each of them.  The insurance policies referenced above which were issued to Plaintiff by Defendants AIIC, BERKLEY, GSICA, IRONSHORE, OBSIDIAN, TRAVELERS, NAUTILUS, USIC, and DOES 1 through 50, inclusive, and each of them, are collectively referred to herein as the "POLICIES."

## THE INSURANCE CARRIERS' FAILURE TO DEFEND PLAINTIFF

43.     Plaintiff is informed and believes and thereon alleges that Plaintiff promptly tendered its defense of the claims that constitute the subject matter of the Underlying Action to Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and Defendants DOES 1 through 50, inclusive, and each of them.

44.     Plaintiff is informed and believes and thereon alleges that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, acknowledged Plaintiff's tenders of defense, but failed to perform any significant or diligent investigation of the claims arising out of the subject matter of the Underlying Action against Plaintiff.  Instead, Plaintiff is informed and believes and thereon alleges that Defendants left Plaintiff to defend itself at its own expense.

45.     Plaintiff is informed and believes and thereon alleges that Plaintiff promptly responded to IRONSHORE's requests for information/documentation pertinent to the claims in the April 2023 time frame.

46.    Plaintiff is informed and believes and thereon alleges that once Excelsior and the individual homeowners filed the Cross-Complaints in the Underlying Action, Plaintiff promptly re-tendered the claim to Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, and NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them. Nevertheless, AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN USIC, and DOES 1 through 50, inclusive, and each of them, failed to defend Plaintiff in a manner consistent with their respective "immediate" and "entire" obligations under Buss v. Superior Court, 16 Cal. 4th 35, 49 (1997).

**A.  IRONSHORE's Unreasonable Failure to Defend Plaintiff**

47.    Plaintiff is informed and believes and thereon alleges that on February 2, 2024, IRONSHORE acknowledged receipt of Plaintiff's follow-up tender via electronic mail including the HOA Cross-Complaint, but did not offer or agree to participate in Plaintiff's defense.

48.    Plaintiff is informed and believes and thereon alleges that on March 8, 2024, IRONSHORE finally reached out again to Plaintiff despite the fact that the amount of time that had elapsed since Plaintiff re-tendered the Cross-Complaints was more than 40 days since the date of re-tender in violation of the California Insurance Regulations.  Rather than agreeing to defend Plaintiff in the Underlying Action and reimburse post-tender defense expenses, IRONSHORE simply requested copies of other insurance policies issued by GSICA, TRAVELERS, and Vantage Risk Specialty Ins. Co.

49.    Plaintiff is informed and believes and thereon alleges that on March 18, 2024, IRONSHORE sent a letter to Plaintiff advising, among other things, of the following: (1) "no obligations under the Policy are presently triggered. IRONSHORE is not obligated to pay Claim Expenses until RE has satisfied the Policy's $100,000 Each Claim Retention. IRONSHORE has not yet been provided with documentation demonstrating that RE has satisfied the Each Claim;" (2) "IRONSHORE reserves all rights with respect to other insurance available to RE Retention;" (3) "IRONSHORE reiterates that the Insureds must direct selected independent counsel to segregate billing relating to the Cross-Complaints when submitting defense expenses to Ironshore for payment or relative to the Retention. IRONSHORE expressly reserves the right to allocate defense

22
COMPLAINT

52228044.4

fees and costs with respect to those claims that fall within the scope of coverage and those that do not," and (4) "to the extent they qualify as covered Claims, the Cross-Complaints arise out of a series of logically or causally related possible Wrongful Acts and are a single Claim subject to a single $100,000 Each Claim Retention."

50.    On April 17, 2024, through insurance coverage counsel, Plaintiff sent a letter to Defendant IRONSHORE providing a link with post-tender invoices from Plaintiff's defense counsel Finch, Thornton & Baird, LLP totaling $896,076.06.  Said letter also pointed out that "it is inappropriate for IRONSHORE to insist that REI provide information about other insurance (requested in both of your letters). As you are likely aware, 'other insurance' clauses may not be used as a basis to deny or limit an insurer's obligation to defend its insureds Dart Industries, Inc. v. Commercial Union Ins. Co., 28 Cal.4th 1059, 1080 (2002)."    Said letter also informed IRONSHORE as follows:

> Your March 18, 2024 letter also states, in pertinent part, as follows concerning Ironshore's expectations as to billing: "Ironshore reiterates that the Insureds must direct selected independent counsel to segregate billing relating to the Cross-Complaints when submitting defense expenses to Ironshore for payment or relative to the Retention. Ironshore expressly reserves the right to allocate defense fees and costs with respect to those claims that fall within the scope of coverage and those that do not." This directive is inconsistent with the covenant of good faith and fair dealing inherent to Ironshore's policy. As a threshold matter, one of REI's defenses to the Cross-Complaints is "offset" based upon monies owed to REI. Furthermore, the facts of the Complaint and the Cross-Complaints are "inextricably intertwined" to the point which it would make it impossible for defense counsel to "segregate billing" as between litigation activities in support of the Complaint and in response to the Cross-Complaint.

51.    On April 18, 2024, Plaintiff, through insurance coverage counsel, sent a follow up email to IRONSHORE concerning Plaintiff's April 17, 2024 letter.   Said email demanded reimbursement of the sum of $796,076.06 in legal fees and costs paid directly by Plaintiff without the benefit of any insurance payments, which credited IRONSHORE with its $100,000 per claim retention.

52.    Plaintiff is informed and believes and thereon alleges that on April 19, 2024, IRONSHORE acknowledged Plaintiff's April 17, 2024 letter and April 18, 2024 email, and advised that IRONSHORE "is retaining insurance coverage counsel to respond to the coverage issues.  We

1    will need more time from your May 2 deadline for an appropriate and thorough review although

2    we strive to provide REI with a response as soon as practicable."

3        53.    Plaintiff is informed and believes and thereon alleges that IRONSHORE retained

4    Laura Smith of Nicolaides, Fink, Thorpe, Michaelides & Sullivan, LLP ("Nicolaides") in a dual

5    role as a "super claims adjuster" and as insurance coverage counsel for IRONSHORE in the

6    Underlying Action.  The dominant purpose of Ms. Smith/Nicolaides' retention by IRONSHORE

7    in the Underlying Action was to handle the further claims adjusting for IRONSHORE in the

8    Underlying Action.  Ms. Smith and Nicolaides were not retained for litigation purposes, did not

9    engage in any litigation-related conduct on behalf of IRONSHORE arising out of the Underlying

10   Action, and Plaintiff is not making any claims against IRONSHORE or any Defendant arising out

11   of litigation activity of said Defendants.

12       54.    Plaintiff is informed and believes and thereon alleges that on May 20, 2024, more

13   than 30 days after receiving Plaintiff's defense invoices and demand for reimbursement,

14   IRONSHORE sent a letter to Plaintiff through Ms. Smith at Nicolaides.  Nicolaides' May 20, 2024

15   letter on behalf of Ironshore (1) "doubled down" on IRONSHORE's demand for information about

16   other insurance, (2) demanded that Plaintiff unilaterally waive mediation protections under Cal.

17   Evid. Code Section 1119 and turn over documentation from a mediation to which IRONSHORE

18   was not a party, and (3) refused to acknowledge satisfaction of the $100,000 per claim retention in

19   Ironshore's policy, a defense obligation, or a duty to reimburse any of Plaintiff's defense expense.

20       55.    On May 28, 2024, Plaintiff, through coverage counsel, sent a letter to

21   IRONSHORE's coverage counsel Nicolaides: (1) demanding that IRONSHORE reimburse the sum

22   of $796,076.06 in post-tender legal expenses paid by Plaintiff in the Underlying Action; (2) refusing

23   to waive mediation protections; (3) once again demanding a defense from Ironshore in the

24   Underlying Action; and (4) providing IRONSHORE with the requested contact information for the

25   GSICA claims representative and coverage counsel, as well as the Travelers claims representative.

26       56.    Plaintiff is informed and believes and thereon alleges that on June 12, 2024,

27   Nicolaides sent a letter on behalf of IRONSHORE to Plaintiff advising that "IRONSHORE is

28   evaluating the defense options presented in your May 28 letter and considering the legal arguments

in the letter, and IRONSHORE expects to be in a position to provide substantive responses to the points raised shortly."

57.    Plaintiff is informed and believes and thereon alleges that on July 10, 2024, after not reimbursing a dime of Plaintiff's defense expenses in the Underlying Action, Nicolaides sent a letter on behalf of IRONSHORE to Plaintiff wherein Nicolaides asserted the following positions, among others: (a) "IRONSHORE is considering defense fees and expenses incurred by RE after tender of the Cross-Complaints relative to satisfaction of the Retention," but refusing to reimburse post-tender defense expenses incurred between April 5, 2023 and January 12, 2024; (2) refusing to acknowledge a current defense obligation, and (3) asserting that <u>Buss v. Superior Court</u>, 16 Cal. 4th 35 (1997) does not apply to IRONSHORE's defense obligations to Plaintiff in the Underlying Action.

58.    On July 10, 2024, Plaintiff, through insurance coverage counsel, responded to IRONSHORE's July 10, 2024 letter and advised, that, among other things, "Per Ironshore Specialty Ins. Co.'s ("Ironshore") definition of 'claim,' IRONSHORE's defense obligation was triggered on the date of tender in 2023, not on the date of the Cross-Complaints.  IRONSHORE's insistence on limiting its defense obligation to the date of receiving the Cross-Complaints is a blatant example of bad faith failure to investigate and defend."

59.    Plaintiff is informed and believes and thereon alleges that on July 12, 2024, IRONSHORE, through coverage counsel Nicolaides, sent an email responding to Plaintiff's July 10, 2024 email, and advising that IRONSHORE (1) disagrees with Plaintiff's positions on the facts and law (including the applicability of <u>Buss v. Superior Court</u>, 16 Cal. 4th 35 (1997) to IRONSHORE's defense obligations in the Underlying Action), and (2) is communicating with the two insurers that acknowledged a defense obligation to Plaintiff, but have not paid a dime of Plaintiff's defense expenses, about coordinating the going forward defense of Plaintiff in the case.

60.    On July 24, 2024, Plaintiff, through insurance coverage counsel, responded to IRONSHORE's July 10, 2024 email and once again demanded (1) an immediate defense on behalf of all Insureds, and (2) reimbursement of all post-tender defense expenses in excess of the $100,000 Retained limit in IRONSHORE's policy.    Furthermore, said communication provided

COMPLAINT

IRONSHORE with copies of the amended Cross-Complaints.  In addition, said communication included a copy of Finch Thornton & Baird, LLP's July 2024 defense invoice on behalf of Plaintiff in the Underlying Action.

61.    Plaintiff is informed and believes and thereon alleges that on August 15, 2024, IRONSHORE, through coverage counsel Nicolaides, sent an email to Plaintiff yet again advising that IRONSHORE would get back to Plaintiff.  IRONSHORE has not reimbursed a dime of Plaintiff's defense fees and/or costs in the Underlying Action to date.

62.    Plaintiff is informed and believes and thereon alleges that IRONSHORE reached out to GSICA in July or early August of 2024 about potentially sharing in the defense of Plaintiff through insurance defense counsel retained by GSICA to defend Plaintiff in the Underlying Action. Plaintiff is further informed and believes and thereon alleges GSICA declined to allow IRONSHORE to share the insurance defense counsel retained by GSICA to defend Plaintiff, thereby leaving IRONSHORE having retained no defense counsel to defend Plaintiff in the Underlying Action.

63.    Plaintiff is informed and believes and thereon alleges that in or about April of 2025, Defendant IRONSHORE sent Plaintiff a letter agreeing to participate in the defense of Plaintiff in the Underlying Action through defense counsel FTB at hourly rates approximately half of the hourly rates FTB had been charging Plaintiff for the defense of the Underlying Action since the inception of the Underlying Action.  Despite sending this letter IRONSHORE has not reimbursed a dime of Plaintiff's defense expenses through FTB to date.

64.    Plaintiff is informed and believes and thereon alleges that on February 19, 2025, April 22, 2025, May 20, 2025, June 5, 2025 and/or June 23, 2025, Plaintiff provided Defendants BERKLEY, GSICA, IRONSHORE, NAUTILUS, TRAVELERS and DOES 1 through 50, inclusive, and each of them, with post-tender defense invoices from the Underlying Action, and the total defense fees, costs  and expert invoices in the Underlying Action furnished to two of said Defendants exceed $1,800,000.  More than $1,700,000 of said invoices have not been reimbursed by any insurance carrier to date.

65.

COMPLAINT

1.  **The IRONSHORE and TRAVELERS Company Policy of Violating *Buss v. Superior Court*, 16 Cal. 4th 35 (1997).**

66.     Plaintiff is informed and believes and thereon alleges that IRONSHORE and TRAVELERS maintain a pattern and practice, which now constitutes a company-wide policy or practice, of unreasonably refusing to provide a prophylactic defense to policyholders in "mixed claims" where some of the claims at issue are covered, and others are potentially not covered.  The California Supreme Court in Buss v. Superior Court, 16 Cal. 4th 35 (1997), held that liability carriers such as IRONSHORE must defend mixed claims (claims and lawsuits where some claims are covered, and others are not) (1) on an "immediate" and "entire" basis; and (2) prophylactically. Plaintiff is further informed and believes and thereon alleges that IRONSHORE, its parent corporation Liberty Mutual Ins. Co., and TRAVELERS employ strategic claims handling tactics against policyholders throughout California designed to unreasonably deny policy benefits to policyholders required under Buss v. Superior Court, 16 Cal. 4th 35 (1997), by among other things:

    a.  Unreasonably delaying in accepting tenders of defense by policyholders while purporting to investigate claims;

    b.  Unreasonably delaying and/or outright refusing to reimburse post-tender defense expenses in claims and/or lawsuits incurred and/or paid by policyholders to defense counsel retained directly by policyholders; and/or

    c.  Unreasonably insisting that defense counsel for policyholders separate their defense billing entries as between covered and uncovered defense activities so that IRONSHORE and TRAVELERS can avoid having to pay for what IRONSHORE and TRAVELERS contend are uncovered defense expenses.  The claims handling tactics described in this paragraph and subparagraphs are collectively referred to herein as the "Anti-*Buss* Company Policy."

67.     Plaintiff is informed and believes and thereon alleges that IRONSHORE and TRAVELERS employed the "Anti-*Buss* Company Policy" in unreasonably denying policy benefits due and owing to Plaintiff in the Underlying Action, and in unreasonably denying policy benefits to similarly situated policyholders in other claims and lawsuits in California.

52228044.4

## 2. IRONSHORE Other Insurance Company Policy.

68.    Plaintiff is informed and believes and thereon alleges that IRONSHORE maintains a pattern and practice, which now constitutes a company-wide policy or practice, of unreasonably denying policy benefits to policyholders by asserting that (1) IRONSHORE is "excess to" other policies of insurance under "other insurance" clauses within IRONSHORE policies in underlying actions where other insurers share a common defense obligation to policyholders, and/or (2) refusing to pay or reimburse 100% of the defense of policyholders on the grounds that "other insurance" clauses within policies issued by IRONSHORE allow IRONSHORE to pro-rate its defense obligation with other insurers who have, or in IRONSHORE'S view, should have, acknowledged a common defense obligation to said policyholders, therefore only paying half or less of the defense of policyholders in given cases leaving its policyholders without a complete defense.  The California Supreme Court has held that liability carriers such as Ironshore cannot utilize "other insurance" clauses to limit coverage to an insured.  Dart Industries, Inc. v. Commercial Union Ins. Co., 28 Cal. 4th 1059, 1080 (2002).  Plaintiff is further informed and believes and thereon alleges that IRONSHORE, and its parent corporation Liberty Mutual Ins. Co., maintain a pattern and practice of employing strategic claims handling tactics against policyholders throughout California designed to unreasonably deny policy benefits to policyholders required under Buss v. Superior Court, 16 Cal. 4th 35 (1997), by among other things:

a.    Demanding that policyholders provide IRONSHORE with evidence of other insurance policies and/or insurance carriers that may owe a defense obligation in a given claim or lawsuit in response to tenders of defense by policyholders as a condition precedent to accepting a tender of defense;

b.    Asserting that IRONSHORE lacks a defense obligation to policyholders on the grounds that its "other insurance" clause makes it "excess to" other insurance carriers that Ironshore contends owes a common defense obligation to a policyholder in a given claim or lawsuit; and/or

c.    Approaching other insurance carriers that IRONSHORE contends owes a common defense obligation to a policyholder in a given claim or lawsuit,

28

claiming that Ironshore is "excess to" said insurance carriers and/or that said insurance carriers must pay a percentage of a policyholder's defense in a given claim in an effort to avoid paying the entirety of the policyholder's defense, and then informing the policyholder that IRONSHORE will "contribute to" the defense of the policyholder only subject to it rights under its "other insurance" clauses. The claims handling tactics described in this paragraph and subparagraphs are collectively referred to herein as the "Ironshore Other Insurance Clause Company Policy."

69. Plaintiff is informed and believes and thereon alleges that IRONSHORE has been applying the Ironshore Other Insurance Clause Company Policy to unreasonably deny policy benefits to Plaintiff in the Underlying Action. Among other things, Ironshore has repeatedly demanded information from Plaintiff about potentially available insurance in the Underlying Action other than IRONSHORE, asserted that its coverage obligations are subject to other insurance, and refused to reimburse defense fees and expenses incurred and/or paid by Plaintiff in the Underlying Action while secretly demanding that GSICA contribute to/reimburse post-tender defense expenses of Plaintiff in the Underlying Action.

70. Plaintiff is informed and believes and thereon alleges that in furtherance of its Ironshore Other Insurance Clause Company Policy, IRONSHORE attempted to belatedly discharge its defense obligations in the Underlying Action to Plaintiff, more than a year after Plaintiff's tender of defense to Ironshore, by attempting to join in the defense of Plaintiff through panel insurance defense counsel assigned by GSICA despite the fact that IRONSHORE breached its "immediate" and "entire" defense obligations to Plaintiff, and therefore waived its right to select defense counsel. Plaintiff is further informed and believes that GSICA refused to allow IRONSHORE to participate in Plaintiff's defense through GSICA's panel defense counsel, such that IRONSHORE has not defended Plaintiff for more than a year or at all.

71. As to Defendant IRONSHORE, this complaint does not arise from nor relate to a disagreement over the interpretation of the terms and/or conditions of IRONSHORE Policy; rather

52228044.4

this complaint arises out of IRONSHORE's failure to discharge its defense obligation to Plaintiff, a duty/obligation which IRONSHORE concedes.

### 3. IRONSHORE, GSICA and TRAVELERS' Self-Insured Retention and Defense Deductible Stacking Company Policy.

72. Plaintiff is informed and believes and thereon alleges that Defendants IRONSHORE, GSICA and TRAVELERS maintain a pattern and practice, which now constitutes a company-wide policy or practice, of unreasonably denying policy benefits to policyholders by "stacking" retained limits and/or self-insured retentions ("SIRs") and/or defense deductibles which apply on a "per claim" or "per occurrence" basis by (1) unreasonably and falsely claiming that there are "multiple claims" or "multiple occurrences" within a single claim or lawsuit such that IRONSHORE and GSICA can "stack" per claim or per occurrence SIRS against policyholders depriving them of policy benefits, and/or (2) insisting that policyholders fully satisfy the SIRs and/or defense deductibles of each carriers' policy rather than crediting the full payment of a single SIR or defense deductible by policyholders in satisfaction of SIRs and/or defense deductibles contained in multiple carriers' policies applicable to a single claim or lawsuit. California law prohibits the "stacking" of SIRS, as pointed out by one California Court of Appeal: "stacking of retained limits would have the effect of affording an insured far less coverage for occurrence-based claims than the insured has purchased." <u>California Pacific Homes v. Scottsdale Insurance Company</u>, 70 Cal. App. 4th 1187, 1194 (1999). Plaintiff is further informed and believes and thereon alleges that IRONSHORE, and its parent corporation Liberty Mutual Ins. Co., as well as GSICA and TRAVELERS, employ strategic claims handling tactics against policyholders under policy SIRS and defense deductibles throughout California designed to unreasonably deny policy benefits to policyholders by among other things:

   a. Unreasonably claiming that general contractors and developers who provided design advice or supervised and coordinated construction of entire construction projects resulted in claims with multiple claims or occurrences, and therefore multiple SIRs applied before their respective policies attached; and/or

COMPLAINT

b. Unreasonably claiming on one hand that multiple insurers share an obligation to defend and/or indemnify their policyholders, but then simultaneously claiming that defense expenditures should not jointly apply to satisfy SIR and/or defense deductible obligations such that each insurance carrier's respective SIR or defense deductible should be satisfied/exhausted in full before their respective obligation triggers. The claims handling tactics described in this paragraph and subparagraphs are collectively referred to herein as the "Self-Insured Retention Stacking Company Policy."

73. Plaintiff is informed and believes and thereon alleges that Defendant IRONSHORE wrongfully and unreasonably applied the Self-Insured Retention Stacking Policy against Plaintiff in the Underlying Action by, among other things: (1) refusing to acknowledge a defense obligation to Plaintiff in the Underlying Action on the grounds that the Underlying Action triggered multiple claims despite conceding to Plaintiff in writing on March 18, 2024 that the Underlying Action constituted "a single Claim"; and (2) insisting that Plaintiff prove that it fully satisfied the per claim SIR in the policy of $100,000 per claim without applying any defense expenses potentially arising out of claims not covered under its policy in an effort to "stack" its SIR with the $100,000 SIR within GSICA's CGL Policies and a $100,000 defense deductible within the TRAVELERS D&O Policy despite simultaneously claiming that IRONSHORE, GSICA and TRAVELERS owe a shared defense obligation in the Underlying Action to Plaintiff.

74. Plaintiff is informed and believes and thereon alleges that IRONSHORE routinely employs law firms specializing in insurance coverage on behalf of insurance carriers, such as Nicolaides, to essentially act as "super claims adjusters" to adjust claims on behalf of IRONSHORE, promote and carry out Ironshore's unreasonable claims handling tactics such as the Anti-*Buss* Company Policy, the Ironshore Other Insurance Clause Company Policy, and the Self-Insured Retention Stacking Company Policy. Nicolaides and other law firms retained by Ironshore carry out the following non-litigation functions as super claims adjusters on behalf on behalf of Ironshore, among others:

c. Drafting denial and reservations of rights letters in pending underlying claims and lawsuits;

COMPLAINT

      d.   Promoting coverage positions on behalf of IRONSHORE designed to unreasonably deprive policyholders of policy benefits; and

      e.   Mischaracterizing applicable legal authority pertinent to insurance carriers' coverage positions.

75.    Plaintiff is informed and believes and thereon alleges that IRONSHORE retained Nicolaides in the Underlying Action in 2024 to act as super claims adjusters in the Underlying Action to, among other things, implement and promote the IRONSHORE Anti-*Buss* Company Policy, the IRONSHORE Other Insurance Clause Company Policy, and the Self-Insured Retention Stacking Company Policy against Plaintiff in an effort to deny defense benefits to Plaintiff in the Underlying Action.  Plaintiff is further informed and believes and thereon alleges that the "dominant purpose" or "dominant role" of Nicolaides in the Underlying Action was to adjust the claim on behalf of IRONSHORE as opposed to serve as insurance coverage counsel.

76.    Plaintiff is informed and believes and thereon alleges that IRONSHORE is not relying upon the legal advice of Nicolaides in implementing the IRONSHORE Anti-*Buss* Company Policy, the IRONSHORE Other Insurance Clause Company Policy, and the Self-Insured Retention Stacking Company Policy against Plaintiff in the Underlying Action because Nicolaides has confidentially informed IRONSHORE that one or more of said claims handling tactics are unlawful and unreasonable, or at a minimum, has informed IRONSHORE that IRONSHORE currently owes defense expenses to Plaintiff even though IRONSHORE has failed and refused to reimburse a dime to Plaintiff.

**B.  GSICA's Unreasonable Failure to Defend Plaintiff.**

77.    Plaintiff is informed and believes and thereon alleges that Plaintiff placed Defendant GSICA on notice of Excelsior's claims in early April of 2023.  GSICA acknowledged the tender, but conducted no meaningful investigation of Plaintiff's tender until Excelsior filed its Cross-Complaint in January of 2024.

78.    Plaintiff is informed and believes and thereon alleges that Plaintiff informed GSICA of its intent to participate in mediation with Excelsior concerned the tendered claims in 2023, and that GSICA did not object or request any information about the claims prior to said mediation.

32

COMPLAINT

52228044.4

79.     Plaintiff is informed and believes that upon receipt of a follow up tender from Plaintiff of Excelsior's Cross-Complaint. GSICA continued to refuse to defend Plaintiff despite knowing that Plaintiff had spent more than $100,000 in its defense since originally tendering the claim to GSICA in April of 2023.

80.     Plaintiff is informed and believes and thereon alleges that Defendant GSICA wrongfully and unreasonably applied the Self-Insured Retention Stacking Policy against Plaintiff in the Underlying Action by, among other things, insisting that Plaintiff prove that it fully satisfied the per claim SIR in the policy of $100,000 per occurrence without applying any defense expenses potentially arising out of claims not covered under its policy in an effort to "stack" its SIR with the $100,000 SIR within IRONSHORE's Policy and a $100,000 defense deductible within the TRAVELERS' D&O Policy, despite simultaneously acknowledging that IRONSHORE, GSICA and TRAVELERS owe a shared defense obligation in the Underlying Action to Plaintiff.  GSICA has even refused to reimburse any portion of the approximate sum of $400,000 in defense fees and costs paid by Plaintiff to FTB for Plaintiff's defense of the Cross-Complaints by Excelsior between January 12, 2024 and May 2, 2024, when GSICA associated in Lorber, Greenfield & Olson, LLP as defense counsel for Plaintiff on May 2, 2024 after having waived GSICA's right to assign defense counsel by failing to timely accept Plaintiff's tender of defense.

81.     On July 24, 2024, Plaintiff, through insurance coverage counsel, sent an email to GSICA's coverage counsel providing GSICA with a July 2024 defense invoice from FTB on behalf of Plaintiff in the Underlying Action, and demanding that GSICA reimburse what was over $800,000 in post-tender defense invoices of Plaintiff as of that date.  Since that date, Plaintiff, through insurance coverage counsel, has provided copies of multiple defense invoices to GSICA, but GSICA has not reimbursed a dime of Plaintiff's defense expenses to date.

82.     Plaintiff is informed and believes and thereon alleges that GSICA acted in bad faith by, among other things, insisting upon assigning insurance defense counsel to defend Plaintiff in April of 2024 after having unreasonably refused to comply with its "immediate" and "entire" defense obligations under Buss v. Superior Court, 16 Cal. 4th 35, 49 (1997), and thereby waiving GSICA's right to control the assignment of defense counsel to Plaintiff or the hourly rates charged

1   by defense counsel in the defense of Plaintiff.  *See*, Travelers Indemnity Company of Connecticut

2   v. Centex Homes, 2015 WL 5836947 (N.D. Calif., 2015); Hartford Cas. Ins. v. J.R. Mktg., 61 Cal.

3   4th 988 (2015); and Southern California Edison Company v. Greenwich Insurance Company, 2023

4   WL 55055901 *5 (C.D. Calif., 2023).

5       83.    Plaintiff is informed and believes and thereon alleges that when GSICA associated

6   in Lorber, Greenfield & Polito, LLP ("Lorber") as co-defense counsel for Plaintiff in the

7   Underlying Action, it took several months to get Lorber up to speed on the claims in the Underlying

8   Action, but GSICA refused to pay FTB's defense invoices associated with getting Lorber up to

9   speed.  Plaintiff is further informed and believes and thereon alleges that GSICA directed Lorber

10  to focus on the defense of the construction defect claims within Excelsior's Cross-Complaint, and

11  not to defend the professional liability or director's and officer's liability-related claims in the

12  Underlying Action, leaving FTB to have to continue to defend said claims at Plaintiff's expense.

13      C.  **TRAVELERS' Unreasonable Denial of a Defense to Plaintiff**.

14      84.    Plaintiff is informed and believes and thereon alleges that Plaintiff placed Defendant

15  TRAVELERS on notice of Excelsior's Cross-Complaint against Plaintiff on February 9, 2024

16  when, for the first time, Excelsior made claims against Plaintiff potentially triggering the

17  TRAVELERS D&O Policy in the Cross-Complaints.

18      85.    Plaintiff is informed and believes and thereon alleges that TRAVELERS waited

19  more than 30 days prior to accepting Plaintiff's tender of defense on March 12, 2024, and demanded

20  that FTB, defense counsel for Plaintiff, accept hourly rates for their services that were substantially

21  lower than the hourly rates being charged by FTB to defend the case.  FTB promptly informed

22  TRAVELERS that FTB was unwilling to defend the case at the low hourly rates proposed by

23  TRAVELERS, but TRAVELERS did not attempt to assign alternative defense counsel to Plaintiff.

24      86.    On June 28, 2024, coverage counsel for Plaintiff sent an email to Cindy Bruder at

25  Travelers stating, in relevant part, as follows:  "Please let us know what Travelers ultimately decides

26  to do relative to the defense of Reconstruction Experts, Inc. ("REI") in the case going forward

27  (which Travelers is currently defending through Finch, Thornton & Baird)….  Of course, REI will

28

COMPLAINT

52228044.4

need reimbursement of post-tender defense expenses incurred through Finch, Thornton & Baird from Travelers."

87.    Plaintiff is informed and believes and thereon alleges that on July 1, 2024, Defendant TRAVELERS wrote to coverage counsel, in furtherance of TRAVELERS' Anti-*Buss* Company Policy, advising, in relevant part, as follows:

> I had anticipated that there was going to be issues with *FTB intermingling their fees/and expenses between the affirmative claims against RE – and the defense of the counter-claims.* Travelers had requested that FTB bill the defense of counter-claims separately from their fees incurred on behalf of RE against Excelsior – so not sure if that ever happened. I have not received any update, status or report from FTB as to their work/defense of the counter-claims since our initial discussion. As such, *I would request that FTB provide me their invoices (post tender through the transfer of the defense to Lorber Greenfield) which should reflect ONLY counter-claim defense fees/expenses (and which will be recalculated at the approved rates outlined in our reservation of rights) so that I can review and audit accordingly.* [Emphasis Added]

88.    On July 1, 2024, in response to TRAVELERS' July 1, 2024 email about Plaintiff's defense expenses, Plaintiff, through coverage counsel, responded via email in relevant part as follows:

> TRAVELERS' demand violates binding California Supreme Court authority which holds that an insurer like TRAVELERS must defend a case on an "immediate" and "entire" basis subject to a right of reimbursement at the conclusion of the case for defense expenses that solely relate to uncovered claims. *See*, <u>Buss v. Superior Court</u>, 16 Cal. 4th 35 (1997). The claims that are the subject of the Cross-Complaints are inextricably intertwined with claims that are the subject of REI's affirmative claims (for example, the REI's defense of offset for monies owed to REI), so TRAVELERS must defend the entire claim subject to a right of reimbursement at the conclusion of the case for activities which solely relate to uncovered claims (assuming there are any – there probably will not be any of any significant value). It would be inconsistent with the covenant of good faith and fair dealing to demand that REI's defense counsel attempt to separate out such claims in its billing. REI trusts that TRAVELERS is withdrawing this demand at this time.

89.    Plaintiff is informed and believes and thereon alleges that Defendant TRAVELERS wrongfully and unreasonably applied the Anti-*Buss* Policy and the Self-Insured Retention Stacking Policy against Plaintiff in the Underlying Action by, among other things, demanding that Plaintiff pay the first $25,000 of defense expenses incurred through counsel assigned to defend the individual cross-defendants in the Underlying Action through Petit Cohn despite the fact that:  (1)

35

COMPLAINT

Plaintiff had already exhausted the $25,000 defense deductible in the TRAVELERS D&O Policy through defense expenses paid by Plaintiff to defense counsel Finch Thornton Baird, LLP ("FTB") to defend Plaintiff; and (2) the individuals were dismissed from the Homeowners' Cross-Complaint without an indemnity payment which does not trigger a defense deductible under its express language.

90.    Plaintiff is informed and believes and thereon alleges that despite admitting a duty to defend Plaintiff on March 12, 2024, agreeing to defend Plaintiff through FTB, and receiving copies of defense invoices from Plaintiff on multiple occasions, TRAVELERS has failed and/or refused to reimburse a dime of Plaintiff's defense invoices to date.

D. **BERKLEY's Unreasonable Denial of a Defense to Plaintiff**.

91.    Plaintiff is informed and believes and thereon alleges that Defendant BERKLEY unreasonably denied a defense to Plaintiff between March 13, 2024 and September 17, 2024, and once it acknowledged a defense obligation, BERKELY unreasonably refused to properly discharge its defense obligations.  Among other things, BERKELY wrongfully and unreasonably denied coverage to Plaintiff in the Underlying Action on May 8, 2024.  BERKLEY's alleged basis for its denial was that it did not have a fully executed copy of a Master Subcontract Agreement ("MSA") between Plaintiff and BERKLEY Named Insured Sierra.

92.    On June 14, 2024, Plaintiff, through insurance coverage counsel, send a lengthy letter contesting BERKLEY's denial of coverage, and provided BERKLEY with a fully executed MSA and work order for the Project between Sierra and Plaintiff.  Said letter pointed out that, among other things:

> Berkley is already aware from RE's prior correspondence, and provided documents, that Sierra entered into agreements with RE to provide labor and materials for plumbing and party wall firestopping work and repairs at the property. Sierra provided the necessary labor and materials pursuant to the Master Subcontract Agreement ("MSA") and the fully executed Work Order ("Work Order"). See MSA and Work Order, enclosed herewith. Berkley suggests in its May 8, 2024 denial letter that the MSA was not executed by RE and the subcontractor work order for the Excelsior project wasn't executed by either RE or Sierra such that RE is not an additional insured. Berkley is mistaken, and had Berkley properly discharged its duty to investigate this claim rather than simply denying coverage to RE, Berkley would have realized that its position was erroneous.

93.     Plaintiff is informed and believes and thereon alleges that despite receiving the communication in the preceding paragraph on June 14, 2024, BERKLEY waited until September 17, 2024 to acknowledge a defense obligation to Plaintiff in the Underlying Action.  However, BERKLEY "doubled down" on its unreasonable claims handling conduct by attempting to assign Murchison & Cumming as co-counsel to FTB on behalf of Plaintiff.  However, Murchison & Cumming did not associate in as co-counsel for Plaintiff until November of 2024, and literally conducted no useful defense activities on behalf of Plaintiff.  After performing no substantive defense work on behalf of Plaintiff, Murchsion & Cumming dissociated as Plaintiff's defense counsel in June of 2025.

94.     Plaintiff is informed and believes and thereon alleges that that Plaintiff, through insurance coverage counsel, objected in writing to the assignment of Murchison & Cumming by BERKLEY, and advised BERKLEY that BERKLEY had waived the right to control the assignment of defense counsel and/or the ability of BERKLEY to control the hourly rates charged by Plaintiff's defense counsel.

95.     Plaintiff is informed and believes and thereon alleges that that Plaintiff, through insurance coverage counsel, demanded that BERKLEY reimburse all post-tender defense fees and costs of Plaintiff incurred through FTB in the Underlying Action which, as to BERKLEY, currently total more than $900,000  BERKLEY has only reimbursed $60,875 of Plaintiff's defense fees and costs to date.  In contrast, Plaintiff is further informed and believes and thereon alleges that BERKLEY is affording a defense to its Named Insured Sierra in the Underlying Action while simultaneously failing and/or refusing to pay the defense invoices of its Additional Insured Plaintiff.

E.   **NAUTILUS' Unreasonable Denial of a Defense to Plaintiff**.

96.     Plaintiff is informed and believes and thereon alleges that Defendant NAUTILUS unreasonably denied a defense to Plaintiff between March of 2024 and April 1, 2025.  Among other things, after Plaintiff placed NAUTILUS on notice of Excelsior's Cross-Complaint on March 13, 2024, NAUTILUS wrongfully and unreasonably denied coverage to Plaintiff in the Underlying Action on April 23, 2024.  NAUTILUS' alleged basis for its denial was that it did not have a copy

37

52228044.4

of a contract between Plaintiff and named insured ADEP relating to the Project and that Plaintiff could not substantiate that ADEP caused property damage to the Project.

97.     On or about October 29, 2024, Plaintiff, through insurance coverage counsel, sent a lengthy letter contesting NAUTILUS' denial of coverage and urging NAUTILUS to re-evaluate its denial.  In the letter, Plaintiff requested that all communications regarding NAUTILUS' coverage obligations to Plaintiff be directed to coverage counsel. The letter also explained that ADEP performed work on the Project pursuant to a "work order" that is subject to the terms of the Master Subcontract Agreement between REI and ADEP which, in turn, obligates ADEP, among other things, to name REI as an additional insured on its CGL insurance policies.  The letter also pointed out that:

> Nautilus is also mistaken in its suggestion that ADEP is not involved in the property damage allegations in the HOA's First Amended Cross-Complaint ("FACC"). ADEP's attached T&M tickets confirm that ADEP was "responsible for floor protection" as stated in your April 23, 2024 email on behalf of Nautilus. See, for example, the 6/24/22 ticket states: "Cover all floor wood with ram board and plastic for any damage." The FACC alleges "over $200,000.00" in flooring damage due to "the failure of Reconstruction Experts to adequately and/or properly protect the residences." (Excelsior FACC ¶¶ 353a, 898.) The attached Observation Report depicts one of the instances of flooring damage, which RE attributed to ADEP on 7/12/22 during a job walk. The HOA's attached flooring repair invoices also reflect more than $27,000 in alleged flooring damage in units where ADEP admittedly performed work (Unit Nos. 223, 323, and 623). The above-described flooring damage is in addition to the tile, cabinet, and countertop damage allegations of the FACC. These allegations are within ADEP's demolition/protection scope of work as indicated on the T&M tickets.

98.     Plaintiff is informed and believes and thereon alleges that despite receiving the communication in the preceding paragraph from coverage counsel on October 29, 2024 and agreeing to re-evaluate its coverage position, NAUTILUS purposefully excluded Plaintiff's insurance coverage counsel from communications regarding its coverage obligations when it attempted to "cut off" and avoid discharging its additional insured defense obligations by settling ADEP's liability directly with Plaintiff through defense counsel as follows:

COMPLAINT

52228044.4

Gentlemen:     Nautilus is re-evaluating the coverage position regarding Reconstruction Experts ("RE") tender for defense and indemnity to Danny Ryan Precision Contracting ("ADEP").     To fully evaluate the cross-complaint and retender by Lorber Law, we ask for your assistance in clarifying information.

We understand ADEP entered an MSA on 4/25/22 for demolition work at the Excelsior at Americana at Brand HOA project.  ADEP completed demolition work on the project's work order, Job No:  22LR220005, for demolition work on five (5) units in  Stack 17.  We further understand that ADEP performed its work on stack 17 from 6/22/22  to 7/9/22 and continued it from 7/11 to 7/25/22.  RE and Excelsior have alleged damage to the flooring in stack 17 due to ADEPs alleged failure to protect the flooring adequately.  The damages allegedly related to ADEPs work were in the $20,000 range.

No proof has been submitted to support the contention that ADEP was responsible for the damage to the floors.  ADEP laid coverings on the flooring, and many trades entered and exited and performed work in these units.  Any trade could have cut the floor covering and the floor beneath.  If you have proof that ADEP is liable for the damage, we would appreciate it if you could forward this information to us for review and evaluation.

Nautilus has responded to your tender and will do so again under separate cover.  However, damages were assessed at $20k against ADEP.  We offered $7500 based on the questionable if any, liability.  Our offer was rejected without explanation.  It does not make financial sense for ADEP to enter into litigation and be dragged along with the RE vs. Excelsior,  Excelsior vs. RE, and RE vs. subcontractors actions.  As ADEP has questionable, if any, exposure and to avoid this litigation, we will agree to pay the $20,000 in damage without an admission of coverage by Nautilus and no admission of negligence by ADEP.

While you consider this offer, we will work on our formal response to the Lorber retender and the Finch cross-complaint.

99.     Plaintiff is informed and believes and thereon alleges that on or about February 18, 2025, Plaintiff, through its insurance coverage counsel, sent a letter rejecting NAUTILUS' settlement offer and once again demanding that NAUTILUS assume Plaintiff's defense. The letter also highlighted that defending NAUTILUS' named insured, ADEP, but not its additional insured, Plaintiff, is inconsistent with its obligations and the law.

100.     Plaintiff is informed and believes and thereon alleges that NAUTILUS waited until April 1, 2025 to agree to participate in Plaintiff's defense.

101.     Plaintiff is informed and believes and thereon alleges that following NAUTILUS acceptance of Plaintiff's defense, Plaintiff, through insurance coverage counsel, provided

52228044.4

NAUTILUS with post-tender defense invoices from FTB for legal services provided, along with certain expert invoices, on multiple occasions, including defense invoices for defense services performed by FTB through May 31, 2025, and demanded that NAUTILUS reimburse all post-tender defense fees and costs of Plaintiff incurred in the Underlying Action. NAUTILUS has failed to reimburse any of Plaintiff's defense fees and costs to date. In contrast, Plaintiff is further informed and believes and thereon alleges that NAUTILUS is currently affording a defense to its Named Insured ADEP in the Underlying Action while simultaneously failing and/or refusing to pay the defense invoices of its Additional Insured Plaintiff.

F. **AIIC's Unreasonable Denial of a Defense to Plaintiff**.

102.    Plaintiff is informed and believes and thereon alleges that Defendant AIIC has been unreasonably denying a defense to Plaintiff since being tendered to by Plaintiff on March 13, 2024. Among other things, AIIC wrongfully and unreasonably denied coverage to Plaintiff in the Underlying Action on May 7, 2024. AIIC's alleged basis for its denial was that its obligations are limited to "ongoing operations" and AIIC's factually unsubstantiated assertion that there is no property damage arising out of and/or resulting from Endura's work.

103.    Plaintiff is informed and believes and thereon alleges that on May 31, 2024, Plaintiff, through insurance coverage counsel, sent a lengthy letter contesting AIIC's denial of coverage, and provided AIIC with specific allegations in the Cross-Complaint that allege property damage arising out of Endura's work. Said letter pointed out that, among other things, Excelsior's Cross-Complaint in the Underlying Action alleges property damage arising out of the scope of work performed by AIIC's Named Insured Endura which includes:

1. RE[I] destroyed the fire rating of the ceilings by improperly drilling holes through fire-rated drywall to install blown-in insulation. (Excelsior HOA Cross-Complaint, ¶ 445, 480.)

2. RE[I] "created more holes in the fire-resistant construction." (Excelsior HOA Cross-Complaint, ¶ 652.)

3. "Reconstruction Experts and Oscar Solis attempted to cover holes in ceilings— fire resistant construction—without following the building code." (Excelsior HOA Cross-Complaint ¶ 622, 638.)

40

COMPLAINT

104.    Plaintiff is informed and believes and thereon alleges that on June 28, 2024, AIIC reaffirmed its denial and alleged that "improperly installed or damaged drywall" does not meet the definition of "property damage" under AIIC's Policy and, therefore, is not covered.  AIIC's June 28, 2024 letter ignored the factual information provided by Plaintiff to AIIC that Endura had physically damaged another trade contractor's work.

105.    Plaintiff is informed and believes and thereon alleges that on October 31, 2024, Plaintiff, through insurance coverage counsel, sent a responding lengthy letter contesting AIIC's reaffirmed denial and asserted that the AIIC POLICY exclusions quoted as a basis to deny coverage were inapplicable. Nevertheless, after allegedly reviewing the letter, on November 22, 2025, AIIC maintained that its coverage position "remains the same" without providing a substantive response to the legal authority raised in Plaintiff's letter.

106.    Plaintiff is informed and believes and thereon alleges that on or about January 30, 2025, Plaintiff became aware that AIIC is affording a defense to its Named Insured Endura in the Underlying Action while simultaneously denying its Additional Insured Plaintiff a defense.  On January 31, 2025, AIIC responded and advised that its positions on the Named Insured and Additional Insured claims are different because coverage is reviewed for Named Insured(s) and Additional Insured(s) "independently." Plaintiff is further informed and believes and thereon alleges that Plaintiff, through its coverage counsel, informed AIIC that same day that defending its Named Insured and not its Additional Insured is inconsistent with its obligations and the law and, thereby has continued to demand AIIC accept Plaintiff's tender of defense and indemnity as an additional insured under the AIIC POLICY.

107.    Plaintiff follow up with AIIC via electronic mail on February 7, 2025, March 3, 2025, and March 10, 2025 demanding that AIIC reverse its denial of tender to Plaintiff in the Underlying Action.  Plaintiff is informed and believes and thereon alleges that on March 11, 2024 that she would re-evaluate AIIC's denial of coverage.

108.    Plaintiff is informed and believes and thereon alleges that to date, AIIC continues to deny coverage to Plaintiff while simultaneously continuing to defend AIIC Named Insured Endura in the Underlying Action.

COMPLAINT

**1.  AIIC and USIC's Bad Faith Company Practice of Defending Named Insured But Simultaneously Refusing to Defend an Additional Insured in the Same Litigation.**

109.    Plaintiff is informed and believes and thereon alleges that Defendants AIIC and USIC maintain a pattern and practice, which now constitutes a company-wide policy or practice, of unreasonably refusing to defend additional insured general contractors and developers in construction defect and property damage cases where AIIC and USIC have obligations to defend their Named Insured subcontractors.  In furtherance of said company policy, AIIC and USIC employ strategic claims handling tactics against general contractors and developers like Plaintiff who qualify as additional insureds throughout California designed to unreasonably deny policy benefits to policyholders required under <u>Buss v. Superior Court</u>, 16 Cal. 4th 35 (1997), by among other things:

    a.  Acknowledging but not accepting additional insured tenders while simultaneously accepting tenders by Named Insured subcontractors in the same case;

    b.  Claiming that said insurers are unable to complete their coverage investigation for Additional Insureds while simultaneously defending Named Insureds in the same case;

    c.  Denying coverage to Additional Insureds under policy exclusions such as the "your work" or "your product" exclusions why simultaneously defending their Named Insureds when the policy exclusions cited, if they applied, would also defeat coverage to their Named Insureds; and/or

    d.  Insisting on only paying a pro-rata share of the defense of Additional Insureds while defending Named Insureds on an "immediate" and "entire" basis.  The company policy described in this paragraph, wherein AIIC and USIC afford less policy benefits to Additional Insureds as compared to their Named Insureds, is referred to as the "Second-Class Corporate Citizen Policy," which AIIC is employing against Plaintiff in the Underlying Action.

G. **USIC's Unreasonable Failure to Defend Plaintiff**.

110.     Plaintiff is informed and believes and thereon alleges that Defendant USIC is unreasonably failing to defend Plaintiff as an additional insured since mid-March of 2024.  Plaintiff is informed and believes and thereon alleges that Plaintiff placed Defendant USIC on notice of Excelsior's Cross-Complaint against Plaintiff on March 13, 2024.  USIC acknowledged the tender on or about April 18, 2024 wherein USIC requested additional information; however, to date, USIC has not taken a coverage position on Plaintiff's claim.

111.     Plaintiff is informed and believes and thereon alleges that Plaintiff complied with USIC's request for additional information on June 21, 2024; yet, USIC did not acknowledge the supplemental information, despite having been responsive and proactively seeking information prior to Plaintiff's response.

112.     Plaintiff is informed and believes and thereon alleges that Plaintiff, through coverage counsel, later followed up on October 29, 2024, requesting USIC accept Plaintiff's tender of defense and indemnity.  USIC responded to Plaintiff's request on November 5, 2024, acknowledging the tender and informing Plaintiff that a new claims handler would continue investigating the claim.

113.     Plaintiff is informed and believes and thereon alleges that on May 31, 2024, Plaintiff, through insurance coverage counsel, sent a lengthy letter explaining USIC's obligations to Plaintiff as an additional insured under USIC's POLICY and demanding that USIC assume its obligations for Plaintiff's claim arising out of the property damage resulting from MBW's work at the Project. Plaintiff is also informed and believes that USIC failed to respond to Plaintiff's letter.

114.     Plaintiff is informed and believes and thereon alleges that Plaintiff has sent four follow-up email correspondence to USIC requesting a response to its tender on March 10, 2025, April 22, 2025, May 10, 2025, and May 19, 2025.  To date, USIC appears to be ignoring Plaintiff's requests by not taking a coverage position on Plaintiff's claim and failing to respond to Plaintiff at all.

115.     Plaintiff is informed and believes and thereon alleges that USIC is currently defending Named Insured MBW in the Underlying Action while simultaneously refusing to defend

COMPLAINT

Plaintiff, its Additional Insured in the same litigation, and that Defendant USIC is employing the Second-Class Corporate Citizen Policy against Plaintiff in the Underlying Action and thereby unreasonably denying Plaintiff a defense.

**H. OBSIDIAN's Unreasonable Refusal to Defend Plaintiff.**

116.    Plaintiff is informed and believes and thereon alleges that Defendant OBSIDIAN has been unreasonably denying a defense to Plaintiff since being tendered to by Plaintiff on March 13, 2024.  Among other things, OBSIDIAN wrongfully and unreasonably denied coverage to Plaintiff in the Underlying Action on April 30, 2024 OBSIDIAN's alleged basis for its denial was that (1) the Multi-Units Structures Exclusion excludes claims arising from the Project; (2) the Damage to Property, Damage to Your Product, and Damage to Your Work Exclusions exclude the alleged property damages; and (3) coverage to REI, as an additional insured, is limited to covered losses.

117.    On June 5, 2025, Plaintiff, through insurance coverage counsel, sent a lengthy letter contesting OBSIDIAN's denial of coverage, and provided OBSIDIAN with specific allegations in the Cross-Complaint that allege property damage arising out of  Lion's work which potentially occurred during OBSIDIAN's policy period.  Said letter pointed out that, among other things, Excelsior's Second-Amended Cross-Complaint in the Underlying Action alleges property damage arising out of the scope of work performed by OBSIDIAN's Named Insured Lion which includes, among other things:

824. Reconstruction Experts, failing its obligation to supervise construction, allowed its demolition crew/subcontractor to over-demo the lids of the balcony decks where a return air duct was to be repaired.

[ . . . ]

830. In addition to the over-demolition of the lids of the balconies, Reconstruction Experts over-demolished the podium deck around the pool and hot tub.

831. As a proximate result of the over-demolition of the podium deck by Reconstruction Experts, the pool equipment was flooded, and the pool equipment was damages and needed to be replaced by the Excelsior.

44

COMPLAINT

118.    Plaintiff's June 5, 2025 letter further explained to OBSIDIAN that OBSIDIAN's Multi-Units Structures Exclusion did not apply because said exclusion contains an exception "where the construction or related work is limited to . . . non-structural work performed on behalf of a Home Owners Association (HOA) for work performed to the HOA's common areas only, but the going exception does not apply to any work or services involving roofing, siding, stucco or plumbing." The demolition work performed by OBSIDIAN's Named Insured Lion's at the Project was non-structural work to the HOA's common areas, and did not involve roofing, siding, stucco or plumbing." Plaintiff's June 5, 2025 letter to OBSIDIAN further explained that the Master Services Agreement between Lion's and Plaintiff required Lion's to perform in-unit demolition to drywall in eighteen (18) units that allegedly resulted in property damage to vanities, countertops, and flooring within the units. (See, Second Amended Cross-Complaint ¶¶ 353(a)-(b), 362, 400, 499.)

119.    Plaintiff's June 5, 2025 letter also explained to OBSIDIAN as follows: "All of Lion's work—and the resulting property damage—occurred during OSIC's [OBSIDIAN] January24, 2022 to January 24, 2023 policy period. Lion's first day on site at the Project was June 14, 2022, and its last day was October 26, 2022. On or about January 5, 2023, the Excelsior HOA, through its counsel, notified REI of the leaks and resulting property damage at the Din Tai Fung restaurant."

120.    On June 23, 2025, Plaintiff, through insurance coverage counsel, followed up with OBSIDIAN via electronic mail advising OBSIDIAN's failure to respond to Plaintiff's June 5, 2025 letter within 15 days as required by the California Insurance Regulations was evidence of bad faith claims handling, and demanding that OBSIDIAN "*immediately* reverse its denial of coverage, and accept REI's additional insured tender of defense under the policy Obsidian issued to Richard Delgado dba Lions Demolition."

121.    Plaintiff is informed and believes and thereon alleges that OBSIDIAN unreasonably refused to respond to Plaintiff's rebuttal letter or June 23, 2025 follow up email, and has unreasonably refused to defend Plaintiff in the Underlying Action.

I.    **BERKLEY, GSICA, IRONSHORE, TRAVELERS, and NAUTILUS' Unreasonable Failure to Reimburse Post-Tender Defense Fees**.

122.    On or about February 27, 2025, Plaintiff, through insurance coverage counsel, furnished updated post-tender defense fee and cost invoices of FTB through January 31, 2025 to Defendants BERKLEY, GSICA, IRONSHORE, TRAVELERS and Defendants DOES 1 through 50, inclusive, and each of them, and Plaintiff demanded reimbursement.

123.    On or about February 27, 2025, Plaintiff, through insurance coverage counsel, furnished updated post-tender expert/consultant invoices through November of 2024 to Defendants BERKLEY, GSICA, IRONSHORE, TRAVELERS and Defendants DOES 1 through 50, inclusive, and each of them, and Plaintiff demanded reimbursement.

124.    On or about April 22, 2025, Plaintiff, through insurance coverage counsel, furnished post-tender defense fee and cost invoices of FTB for fees and costs between March 12, 2024 through March 31, 2025 to Defendant NAUTILUS; and on May 20, 2025, Plaintiff, through insurance coverage counsel, furnished updated post-tender expert/consultant invoices through November of 2024 to Defendant NAUTILUS.

125.    On or about June 5, 2025, Plaintiff, through insurance coverage counsel, furnished updated post-tender defense fee and cost invoices of FTB for fees and costs through April 30, 2025 to Defendants BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS and Defendants DOES 1 through 50, inclusive, and each of them, and Plaintiff demanded reimbursement.

126.    On or about June 23, 2025, Plaintiff, through insurance coverage counsel, furnished updated post-tender defense fee and cost invoices of FTB for fees and costs through May 31, 2025 to Defendants BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS and Defendants DOES 1 through 50, inclusive, and each of them, and Plaintiff demanded reimbursement

127.    Plaintiff is informed and believes and thereon alleges that to date, Defendants GSICA, IRONSHORE, TRAVELERS, NAUTILUS and DOES 1 through 50, inclusive, and each of them, have not reimbursed any monies incurred and/or paid by Plaintiff in defense of the Underlying Action, despite GSICA and IRONSHORE being presented with post-tender defense fee, cost and expert/consultant invoices collectively totaling in excess of $1,800,000 in the

46

52228044.4

Underlying Action, and BERKELEY, TRAVELERS and NAUTILUS being presented with post-tender defense fee, cost, and expert invoices exceeding $900,000. Defendant BERKLEY has only reimbursed a total of $60,875 in defense fees and costs to date.

128.    Plaintiff is informed and believes and thereon alleges that Plaintiff has retained the law firm of Fennemore, LLP to pursue policy benefits on behalf of Plaintiff in the Underlying Action which Plaintiff contends have been unreasonably withheld.

## **FIRST CAUSE OF ACTION**

### **(Breach of Written Contract – Duty to Defend, Pay and Reimburse Defense Expenses Against All Defendants)**

129.    Plaintiff hereby incorporates by reference Paragraphs 1 through 127, inclusive, of this Complaint as though fully set forth at length herein.

130.    Plaintiff is informed and believes and thereon alleges that the Policies described above issued by each Defendant constitutes a written contract of insurance between Plaintiff on one hand, and Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, on the other hand.

131.    Plaintiff is informed and believes and thereon alleges that the Insuring Agreement in each of the Policies requires Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, to pay for 100% of the post-tender defense expenses of Plaintiff in the Underlying Action.

132.    Plaintiff is informed and believes and thereon alleges that Plaintiff has complied with, or is excused from complying with, all conditions in any and all of the Policies identified herein.

133.    Plaintiff is informed and believes and thereon alleges that Defendants AAIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, have breached their respective Policies issued to Plaintiff by failing and/or refusing to timely defend Plaintiff in the Underlying Action.

134.    Plaintiff is informed and believes and thereon alleges that Defendants USIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES

52228044.4

1 through 50, inclusive, and each of them, have further breached their respective Policies issued to Plaintiff by failing and/or refusing to timely pay/reimburse Plaintiff's defense expenses in the Underlying Action in a collective amount exceeding $1,700,000 according to proof at the time of trial.

135.    Plaintiff is informed and believes and thereon alleges that as a proximate and legal result of each of the breaches by Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, Plaintiff has sustained substantial damages, including, but not limited to, attorneys' fees, investigation costs, consultant's fees, and other defense costs, together with loss of interest, and will sustain further damages, in an amount according to proof at the time of trial.  Furthermore, Plaintiff has incurred in excess of $150,000 in attorneys' fees and costs associated with the retention of Fennemore, LLP to pursue and obtain policy benefits on Plaintiff's behalf.

## SECOND CAUSE OF ACTION

### (Declaratory Relief - Duty to Pay Defense Expenses Against all Defendants)

136.    Plaintiff incorporates by reference Paragraphs 1 through 134, inclusive, of this Complaint as though fully set forth at length herein.

137.    An actual controversy has arisen and now exists between Plaintiff and Defendants AIIC, BERKLEY, GSICA, IRONSHORE, NAUTILUS, TRAVELERS, USIC, and DOES 1 through 50, inclusive, and each of them, concerning the parties' respective rights and duties under the Policies.  Plaintiff contends that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, and DOES 1 through 50, inclusive, and each of them, have an immediate duty to defend Plaintiff in the Underlying Action, and to reimburse all post-tender defense expenses of Plaintiff in the Underlying Action.  Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, dispute the contentions of Plaintiff, and contend that they do not have a duty to defend Plaintiff or pay for Plaintiff's defense in the Underlying Action.  Among other things, Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, contend that Defendants AIIC, BERKLEY,

48

GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, can "stack" SIRS on a "per claim" or "per occurrence" basis to deprive Plaintiff of a defense against any claims within each Underlying Action despite the fact that Plaintiff has satisfied/exhausted at least one $100,000 SIR in the Underlying Action, and/or (2) that they did not have a duty to defend the Underlying Action until the Excelsior filed its Cross-Complaint against Plaintiff in the Underlying Action.

138.    Plaintiff desires a judicial determination of its rights, and a declaration as to the Defendants' respective duties to defend/pay defense expenses in the Underlying Action. Specifically, Plaintiff desires a declaration that Defendants each have an immediate and entire duty to defend Plaintiff in the Underlying Action until such claims are resolved or until Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, demonstrate that there is no possibility of a duty to defend Plaintiff presented by the Underlying Action.

139.    A judicial determination is necessary and appropriate at this time because Plaintiff has expended money and/or incurred attorneys' fees, costs, and expenses in defending the Underlying Actions and in seeking to mitigate its losses.

140.    A judicial determination of the respective rights, duties, and liabilities of the parties under the Policies is necessary so that all of the parties can assess their respective positions, rights, and responsibilities and to avoid prejudicing the rights of Plaintiff.

## **THIRD CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against all Defendants)**

141.    Plaintiff hereby incorporates by reference Paragraphs 1 through 134, inclusive, of this Complaint as though fully set forth at length herein.

142.    The Polices issued by Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, contain an implied covenant that no party to the contract would do anything to injure, frustrate, or interfere with the right of the other party to receive the benefits of the contract. This implied covenant imposes a duty of good faith and fair dealing on the parties and the duty to act in

49

a fair, reasonable, and honest manner.  The duty of good faith and fair dealing obligates Defendants AIIC BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, to refrain from putting their own interests above those of Plaintiff.

143.    Plaintiff is informed and believes and thereon alleges that Plaintiff provided and/or offered to provide Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN. USIC, and DOES 1 through 50, inclusive, and each of them, with detailed information regarding the factual and legal basis of the claims against Plaintiff and arising out of the Underlying Action.  Plaintiff also provided and/or offered to provide Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, detailed information regarding the factual and legal basis of Plaintiff's entitlement to a defense and coverage under the Policies.  This information included, but was not limited to, the demand letters of Excelsior, Cross-Complaint of Excelsior, pleadings, contracts, and information regarding and/or copies of defense invoices relating to the defense expenses incurred by Plaintiff in response to the Underlying Action.  Notwithstanding the effort of Plaintiff, Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, have failed and refused, and continue to fail and refuse, to defend and/or reimburse the defense expenses incurred in the Underlying Action.

144.    Plaintiff is informed and believes and thereon alleges that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, breached their respective duties of good faith and fair dealing owed to Plaintiff in the Underlying Action in various respects, including but not limited to one or more of the following:

a.    Unreasonably and in bad faith failing to provide insurance benefits to Plaintiff at a time when said Defendants knew, or reasonably should have known, that Plaintiff was entitled to them;

b.    Unreasonably and in bad faith misrepresenting their policy provisions;

50

COMPLAINT

c. Unreasonably and in bad faith interpreting the Policies in a strained, narrow fashion, favoring its own interests over the interest of Plaintiff;

d. Unreasonably and in bad faith interpreting the Policies and the factual circumstances so as to resolve perceived ambiguities and uncertainties against Plaintiff, favoring their own interests over the interest of Plaintiff;

e. Unreasonably and in bad faith failing to act properly and reasonably upon communications from Plaintiff and its counsel;

f. Unreasonably and in bad faith failing to conduct a timely or reasonable investigation of the facts supporting the potential coverage under the Policies;

g. Unreasonably and in bad faith failing to provide Plaintiff with a defense when each of said Defendants knew, or should have known, that there was a clear potential or possibility for coverage under the Policies and that Plaintiff was in need of a defense to which it was entitled and unreasonably refusing to defend Plaintiff "immediately" or "entirely" and required by <u>Buss v. Superior Court</u>, 16 Cal. 4th 35 (1997);

h. Unreasonably and in bad faith failing and/or refusing to timely reimburse Plaintiff's defense fees, costs and expenses after conceding to Plaintiff that Defendants BERKLEY, GSICA, IRONSHORE, NAUTILUS and TRAVELERS owed Plaintiff a defense obligation.

i. Unreasonably and in bad faith failing to give a reasonable and complete explanation of reasons for refusing to defend, or giving spurious and inaccurate reasons, unsupported by fact or by law;

j. Unreasonably and in bad faith demanding information not reasonably required for or material to the resolution of the duty to defend as a prerequisite to fulfilling the defense obligation then owed;

k. Unreasonably and in bad faith asserting the right to stack self-insured retentions, as contrary to controlling California law;

l. Unreasonably citing the potential availability of other insurance as a ground to avoid payment/reimbursement of defense expenses when Defendants knew that no other

51

52228044.4

1    insurers were defending Plaintiff and that the availability of other insurance does

2    not constitute grounds for avoidance of the defense obligation under <u>Dart Industries,</u>

3    <u>Inc. v. Commercial Union Ins. Co.</u>, 28 Cal. 4th 1059, 1080 (2002); and

4    m.    Unreasonably and in bad faith applying the Ironshore Anti-*Buss* Company Policy,

5    the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking

6    Company Policy and/or the Second-Class Corporate Citizen Policy against Plaintiff

7    to deprive Plaintiff of policy benefits.

8    n.    Unreasonably and in bad faith demanding that Plaintiff accept (1) panel defense

9    counsel selected by Defendants, and (2) reduced hourly or "panel" rates for defense

10    counsel after breaching their defense obligations to Plaintiff, thereby waiving the

11    right to control the selection of defense counsel and the hourly rates charged by

12    defense counsel.

13    o.    Unreasonably and in bad faith defending their Named Insured while simultaneously

14    refusing to defend their Additional Insured against the same allegations in the

15    Underlying Action.

16    p.    Unreasonably and in bad faith attempting to avoid their additional insured

17    obligations by attempting to settle out their Named Insured's liability without

18    addressing their additional insured obligations.

19    145.    Plaintiff is informed and believes and thereon alleges that Defendants' wrongful

20    conduct has caused, and will continue to cause, Plaintiff's damages exceeding $1,700,000,

21    including attorneys' fees and costs incurred in defending and responding to the Underlying Action;

22    attorneys' fees and costs to pursue and obtain coverage; and other damages, together with interest,

23    according to proof at trial.

24    146.    Plaintiff is informed and believes and thereon alleges that, as a result of the

25    Defendants' wrongful conduct as alleged above, it has also suffered actionable damage to its

26    reputation and goodwill within the meaning of <u>Bodenhamer v. Sup. Ct.</u>, 192 Cal. App. 3d 1472

27    (1987).

28

147.    Plaintiff is informed and believes and thereon alleges that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50 inclusive, and each of them, by the foregoing conduct have engaged in despicable conduct with a conscious disregard for Plaintiff's rights, and with an intent to vex, injure, and annoy Plaintiff such as to constitute oppression, fraud, or malice under California Civil Code section 3294, justifying punitive and exemplary damages in an amount to be determined by proof at the time of trial sufficient to punish and set an example of said Defendants.

### FOURTH CAUSE OF ACTION

**(Unlawful Business Practices under California Business & Professions Code Section 17200 against Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive)**

148.    Plaintiff hereby incorporates by reference Paragraphs 1 through 134, inclusive, and Paragraphs 140 through 146, inclusive, of this Complaint as though fully set forth at length herein.

149.    Plaintiff is informed and believes and thereon alleges that the treatment of Plaintiff by Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, is pursuant to deliberate, pre-meditated, and intentional company policies that are designed to save Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES, and each of them, money by unlawfully denying insurance policy benefits to Plaintiff. In particular, Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, are unlawfully applying the Ironshore Anti-*Buss* Company Policy, the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy against Plaintiff to deprive Plaintiff of policy benefits in the Underlying Action.

150.    Plaintiff is informed and believes and thereon alleges that the Ironshore Anti-*Buss* Company Policy, Ironshore Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy and the Second-Class Corporate Citizen Policy are unlawful, and unreasonably and unfairly deprive Plaintiff of a full defense and potential indemnity coverage to which Plaintiff is entitled under the Policies issued by Defendants AIIC, GSICA, IRONSHORE,

1    TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, to which Plaintiff had

2    a reasonable expectation.

3        151.    Plaintiff is informed and believes and thereon alleges that in furtherance or as a

4    result of the Anti-*Buss* Company Policy described herein:

5            f.    IRONSHORE and TRAVELERS unreasonably deprived Plaintiff of policy benefits

6                in the Underlying Action by refusing to defend and/or reimburse post-tender defense

7                expenses of Plaintiff; and

8            g.    IRONSHORE and TRAVELERS profited by withholding policy benefits from

9                Plaintiff.

10        152.    Plaintiff is informed and believes and thereon alleges that in furtherance of the Other

11    Insurance Clause Company Policy described herein:

12            h.    Defendants GSICA, IRONSHORE, TRAVELERS and DOES 1 through 50,

13                inclusive, and each of them, unreasonably deprived Plaintiff of policy benefits in

14                the Underlying Action by refusing to defend and/or reimburse post-tender defense

15                expenses of Plaintiff; and

16            i.    Defendants GSICA, IRONSHORE, TRAVELERS and DOES 1 through 50,

17                inclusive, and each of them, profited by withholding policy benefits from Plaintiff.

18        153.    Plaintiff is informed and believes and thereon alleges that in furtherance of the Self-

19    Insured Retention Stacking Company Policy described herein:

20            j.    Defendants GSICA, IRONSHORE, TRAVELERS and DOES 1 through 50,

21                inclusive, and each of them, unreasonably deprived Plaintiff of policy benefits in

22                the Underlying Action by refusing to defend and/or reimburse post-tender defense

23                expenses of Plaintiff; and

24            k.    Defendants GSICA, IRONSHORE, TRAVELERS, and DOES 1 through 50,

25                inclusive, and each of them, profited by withholding policy benefits from Plaintiff.

26        154.    Plaintiff is informed and believes and thereon alleges that in furtherance of the

27    Second-Clas Corporate Citizen Policy described herein:

28

       a.  Defendants AIIC, USIC and DOES 1 through 50, inclusive, and each of them, unreasonably deprived Plaintiff of policy benefits in the Underlying Action by refusing to defend Plaintiff in the Underlying Action while simultaneously defending their respective Named Insureds; and

       b.  Defendants AIIC, USIC and DOES 1 through 50, inclusive, and each of them, profited by withholding policy benefits from Plaintiff.

155.    Plaintiff is informed and believes and thereon alleges that as a direct and proximate result of the unlawful conduct of Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, described above, Plaintiff has had, and will continue to have, insurance claims wrongfully denied by Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, resulting in great expense to Plaintiff, as well as resulting in an inappropriate windfall and undeserved profits to Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them. This includes another underlying lawsuit against Plaintiff which is currently pending, and which has been tendered to Defendants IRONSHORE, GSICA and DOES 1 through 50, inclusive, and each of them.

156.    Plaintiff is informed and believe and thereon alleges that Plaintiff is entitled to injunctive relief, pursuant to California Business and Professions Code Section 17203, because Plaintiff will suffer irreparable harm unless Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, are restrained from performing the unlawful acts, misrepresentations, omissions, and practices comprising the Ironshore Anti-*Buss* Company Policy, the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy described herein because unless restrained, Defendants AIIC, GSICA, IRONSHORE, TRAVELERS and DOES 1 through 50, inclusive, and each of them, will continue to engage in the unlawful business practices described herein because, among other things, such business practices: (1) create an irresistible incentive to Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, to deny claims and policy benefits due

COMPLAINT

and owing to Plaintiff where Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, are legally obligated to afford coverage to Plaintiff; (2) have resulted in tremendous profits to Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them; and (3) is currently being applied in pending claims against Plaintiff and other policyholders.  Therefore, Plaintiff is entitled to injunctive relief because it has no other adequate remedy at law to prevent Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, from continuing to assert the Ironshore Anti-*Buss* Company Policy, the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy in the Underlying Action and other pending claims or lawsuits, as well as in future design and/or construction defect cases or other lawsuits initiated by third parties.

157.    Plaintiff is entitled to an injunction which restrains Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, from applying the Ironshore Anti-*Buss* Company Policy, the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy as well as other equitable remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment on its Complaint against Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, as follows:

## AS AND FOR THE FIRST CAUSE OF ACTION FOR BREACH OF WRITTEN CONTRACT – DUTY TO DEFEND

1.    General and special damages in an amount according to proof at trial for defense fees, costs, and expenses arising out of the Underlying Action;

2.    Pre-judgment interest on said damages at the rate of at least ten percent per annum as permitted by law; and

3.    Costs of suit.

56

## AS AND FOR THE SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF – DUTY TO DEFEND

1.    A declaration of the right of Plaintiff concerning the duties of Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, to defend Plaintiff against the claims in the Underlying Action;

2.    A declaration that Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, have an independent, immediate duty to completely defend Plaintiff in the Underlying Action;

3.    Injunctive relief consistent with such declaratory relief requiring Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, to reimburse the defense costs of Plaintiff in full as and when they are incurred in the Underlying Actions from the time of exhaustion of a single self-insured retention through resolution; and

4.    Costs of suit.

## AS AND FOR THE THIRD CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

1.    General, special, and consequential damages proximately caused by Defendants AIIC, BERKLEY, GSICA, IRONSHORE, NAUTILUS, TRAVELERS, OBSIDIAN, USIC and DOES 1 through 50, inclusive, and each of them, according to proof at trial;

2.    Reasonable attorneys' fees and other expenses incurred to pursue and establish coverage and/or a denial of policy benefits;

3.    Punitive damages against Defendants AIIC, BERKLEY, GSICA, IRONSHORE, TRAVELERS, NAUTILUS, OBSIDIAN, USIC, and DOES 1 through 50, inclusive, and each of them, in an amount sufficient to punish, deter and make an example of said Defendants according to proof at trial; and

4.    Costs of suit.

COMPLAINT

52228044.4

**AS AND FOR THE FOURTH CAUSE OF ACTION FOR UNLAWFUL BUSINESS PRACTICES UNDER CALIF. BUS. & PROF. CODE § 17200**

1.      For restitution in the form of disgorgement of all ill-gotten gains of Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, based upon the application of the Ironshore Anti-*Buss* Company Policy, the Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Corporate Citizen Policy against Plaintiff in a sum to be proven at trial according proof;

2.      For injunctive relief restraining Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, from engaging in the Anti-*Buss* Company Policy, the Ironshore Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy against Plaintiff described herein against Plaintiff;

3.      For an injunction directing Defendants AAIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them, to review and re-evaluate its Ironshore Anti-*Buss* Company Policy, the Ironshore Other Insurance Clause Company Policy, the Self-Insured Retention Stacking Company Policy, and/or the Second-Class Corporate Citizen Policy against Plaintiff and adopt new, written company policies that are lawful and do not unreasonably deprive Plaintiff of the coverage to which Plaintiff is entitled to receive under the Policies and other insurance policies issued by Defendants AIIC, GSICA, IRONSHORE, TRAVELERS, USIC and DOES 1 through 50, inclusive, and each of them; and

4.      For other appropriate equitable remedies as determined by the Court.

**AS AND FOR ALL CAUSES OF ACTION**

1.      Prejudgment interest at the rate of at least ten percent per annum as permitted by law; and

///

///

///

///

58

COMPLAINT

1          2.      For such other and further relief as is just and proper.

2    Dated: July 7, 2025                      FENNEMORE LLP

3

4
                                             By: _____
5                                                Timothy C. Earl
                                                 Alexa Smith
6                                                Attorneys for Plaintiff
                                                 RECONSTRUCTION EXPERTS, INC.
7

8
                              **REQUEST FOR TRIAL BY JURY**
9
          Plaintiff hereby requests a trial of the above-captioned matter by a jury of its peers.
10

11   Dated: July 7, 2025                      FENNEMORE LLP

12

13
                                             By: _____
14                                               Timothy C. Earl
                                                 Alexa Smith
15                                               Attorneys for Plaintiff
                                                 RECONSTRUCTION EXPERTS, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

52228044.4

# EXHIBIT 1



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

This contract is delivered as a surplus line coverage under the 'Nonadmitted Insurance Act'. The insurer issuing this contract is not licensed in Colorado but is an approved eligible insurer. There is no protection under the provisions of the 'Colorado Insurance Guaranty Association Act'.

# DESIGNERS AND CONTRACTORS PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATIONS

(Please read your Policy carefully. Certain provisions restrict coverage.)

This is a **Claims Made** and Reported Policy that applies only to **Claims** first made during the **Policy Period** or any **Extended Reporting Period** and which are reported in writing to the **Company** during the Policy Period or any extended reporting period, and as specified in the Policy at Section VI. Conditions, A.  Coverage is subject to all terms and conditions of the Policy.  The Policy does not cover **Claims** arising out of a **Wrongful Act** that occurred prior to the **Retroactive Date** of the Policy or after the Expiration Date of the Policy.  The **Limit of Insurance** available to pay **Damages** will be reduced and may be exhausted by the payment of **Claim Expenses**.

| | | | | |
|---|---|---|---|---|
| **Policy Number:** | DCP7BABWAMI004 | | **Renewal of Policy Number:** | DCP7BABWAMI003 |

**Item 1.**  **Named Insured**  Reconstruction Experts, Inc.
        **Address:**  5310 Vivian St.
                Arvada, CO 80002

**Item 2.**  **Policy Period:**  **Effective:**  November 01, 2022  **Expiration:**  November 01, 2023
        12:01 a.m. standard time at the address of the **Named Insured** as shown above

**Item 3.**  **Retroactive Date:**  April 01, 2011

**Item 4.**  **Extended Reporting Period:**  100% for 12 months: 150% for 24 months: 200% for 36 months

**Item 5.**  **Limit of Insurance:**  **a.**  $5,000,000 **Each Claim**

                **b.**  $5,000,000 **Aggregate**

**Item 6.**  **Retention:**  $100,000 **Each Claim**

All Broker Fees are 100% earned at inception.
This policy is subject to Surplus Lines taxes and fees.

SURPLUS LINES LICENSEE: CRC Corporate License 183767
This contract is delivered as a surplus line coverage under the 'Nonadmitted Insurance Act'. The insurer issuing this contract is not licensed in Colorado but is an ELIGIBLE nonadmitted insurer. There is no protection under the provisions of the 'Colorado Insurance Guaranty Association Act'.

| Policy Number: | DCP7BABWAMI004 | Renewal of Policy Number: | DCP7BABWAMI003 |
|---|---|---|---|

**Named Insured:**   Reconstruction Experts, Inc.

**Item 7.**

| **Premium:** | *Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.* |
|---|---|
| Premium: ---------------------- Total Amount Due: | *See Invoice for the date Premium is due and payable.  Failure to pay the premium in full may result in voidance of coverage.* |

**Item 8.        Forms & Endorsements:**

1. ADM-OFAC-0419 - Sanction Limitation and Exclusion Clause
2. Service of Suit Clause - Colorado - SC-9 (11_18)
3. DCPL-END-10010 (0422) Crisis ThreeSixty Amendatory Endorsement
4. DCPL-END-10003 (0415) DCPL Practice Policy-Additional Named Insured Endorsement
5. DCPL-END-10009 (0718) DCPL Practice Policy - Risk Management Services Endorsement
6. DCPL-END-10007 (0819) Technology Services Coverage Extension and Product Exclusion Exception Endorsement
7. DCPL-END-10002 (0819) Rectification Cost Coverage Extension
8. DCPL-END-10004 (0819) Protective Loss Endorsement
9. DCPL-END-10008 (0819) Requirement to Maintain General Liability Insurance Endorsement
10. DCPL-END-10017 (0819) Minimum Earned Premium
11. DCPL-END-10021 (0120) Retroactive Periods With Specific Limits Of Insurance Endorsement
12. DCPL-END-10013 (0815) DCPL Practice Policy- Additional Insured(s) Endorsement - Limited
13. DCPL-MANU-0001 (1122) Amendatory Definition of Professional Services Endorsement
14. DCPL-MANU-0002 (1122) Amend Policy Exclusions Endorsement

**Item 9.        Broker:**

CRC Insurance Services, Inc.
6200 S. Syracuse Way, Suite 100
Greenwood Village, CO 80111

**Item 10.    Notice of Claims to Insurer:**

By mail:          Ironshore Casualty Claims CSO
                      28 Liberty Street, 5th Floor
                      New York, NY 10005

By e-mail:       USClaims@Ironshore.com

These Declarations, the completed and signed **Application** and the Policy with Endorsements will constitute the contract between the **Insured** and the **Company**.

| **Policy Number:** | DCP7BABWAMI004 | **Renewal of Policy Number:** | DCP7BABWAMI003 |
| --- | --- | --- | --- |

**Named Insured:**    Reconstruction Experts, Inc.

Ironshore Specialty Insurance Company by:

Secretary                                                    President

November 4, 2022
Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Insured Name:** Reconstruction Experts, Inc.
**Policy Number**: DCP7BABWAMI004

# DESIGNERS AND CONTRACTORS PROFESSIONAL LIABILITY INSURANCE POLICY

IMPORTANT NOTICE
(**Claim Expenses** are within the Limit of Insurance**)**

THIS IS A **CLAIMS** MADE AND REPORTED POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** OR ANY **EXTENDED REPORTING PERIOD** AND WHICH ARE REPORTED IN WRITING TO THE **COMPANY** DURING THE **POLICY PERIOD** OR ANY **EXTENDED REPORTING PERIOD** IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN.

THE LIMIT OF INSURANCE AVAILABLE TO PAY **DAMAGES** WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF **CLAIM EXPENSES**. PLEASE READ THE POLICY CAREFULLY.

TERMS THAT APPEAR IN **BOLDFACE** TYPE, EXCLUDING CAPTION HEADINGS HAVE SPECIAL MEANING, PLEASE REFER TO SECTION V**.** OF THIS POLICY.

     I.       INSURING AGREEMENTS
     II.     COVERAGE EXTENSIONS
     III.    LIMITS OF INSURANCE AND RETENTION
     IV.    EXCLUSIONS
     V.     DEFINITIONS
     VI.    CONDITIONS

In consideration of payment of the premium by the **Named Insured** and in reliance on all statements made and information provided to the **Company**, including but not limited to the statements contained in or provided with the **Application**, and subject to all terms and conditions of this policy, the **Company** agrees with the **Insured** as follows:

I.    INSURING AGREEMENTS

A.   COVERAGE

     The **Company** will pay on behalf of the **Insured** those sums in excess of the **Retention** and up to the applicable Limit of Insurance specified in Item 5. of the Declarations that the **Insured** becomes legally obligated to pay as **Damages,** including **Claim Expenses,** because of a **Claim** for a **Wrongful Act** in the performance or non-performance of **Professional Services** rendered to others by the **Insured** or by any person or entity for whom the **Insured** is legally liable and to which this insurance applies.

     For this coverage to apply, all the following conditions must be satisfied:

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

a. the **Wrongful Act** forming the basis of any **Claim** must first take place on or after the **Retroactive Date** and prior to the expiration date of the Policy;

b. prior to the effective date of this policy, no officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any Insured had knowledge of any actual or alleged **Wrongful Act** or circumstance that reasonably could give rise to a **Claim** under this policy;

c. **Claims** must first be made against the **Insured** during the **Policy Period** or any applicable **Extended Reporting Period**; and

d. the Insured must report the **Claim** to the **Company**, in writing, during the **Policy Period** or within sixty (60) days after the expiration of the **Policy Period** or during any applicable **Extended Reporting Period**.

B. TERRITORY

1. The coverage in this policy applies worldwide except where coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control.

2. If **Damages** or **Claim Expenses** are paid in a currency other than United States of America dollars, then the payment under this policy will be considered to have been made in United States of America dollars at the conversion rate that was used for the payment.

C. DEFENSE PROVISIONS

1. **Claims** brought within the United States of America, its territories or possessions or Puerto Rico:

a. For all **Claims** brought within the United States of America, its territories or possessions or Puerto Rico, for which coverage is provided under this policy, the **Company** has the right to investigate such **Claim** and the duty to defend such **Claim** with defense counsel selected by the **Company**, even if the allegations of the **Claim** are groundless, false or fraudulent. **Claim Expenses** reduce the Limit of Insurance and shall be applied against the **Retention**. The **Company** shall not defend any **Claim** or pay any **Claim Expenses** or **Damages**:

i. after the applicable Limit of Insurance has been exhausted by payment of **Claim Expenses** or **Damages** or both;

ii. after the applicable Limit of Insurance has been exhausted by the payment of **Claim Expenses** or a tender of **Damages** into a court of applicable jurisdiction or both; or

iii. upon the **Insured's** refusal to consent to a settlement offer as provided in paragraph D., subparagraph 2. below.

b. Should any of the preceding listed in items I., ii., or iii. occur, the **Company** shall have the right to withdraw from the further defense of such **Claim** and control of the defense shall be ceded to the **Insured.**

2. **Claims** brought outside the United States of America, its territories, possessions or Puerto Rico:

When any **Claim** against an **Insured** for which coverage is provided under this policy is brought outside the jurisdiction set forth in paragraph C., subparagraph 1. above, the **Company** shall have the right and duty to defend if permissible under the law of the jurisdiction where the **Claim** is made. If, however, the law of the

jurisdiction where the **Claim** is made does not permit the **Company** to defend the **Claim**, the **Company** shall have the right to associate with the **Insured** in the investigation, defense and control of such **Claim** from the date the **Claim** is first made against the **Insured** and has been received by the **Company**. The **Insured** has a right to select defense counsel for such matters with the **Company's** prior consent, which consent shall not be unreasonably withheld. The **Insured** has a duty to cooperate with the **Company** and promptly provide any information or materials that the **Company** requests. The **Company** shall reimburse the **Insured** for **Damages** and/or **Claim Expenses** as authorized by the **Company**. The **Company** shall not pay **Damages** and/or **Claim Expenses** after the applicable Limit of Insurance has been exhausted.

D.   SETTLEMENT PROVISIONS

1.   An **Insured** may not, except at its own non-reimbursable cost, settle any **Claim** or incur any costs or expenses in connection with any **Claim** without the prior written consent of the **Company**.

2.   The **Company** has the right to settle all **Claims** subject to the consent of the **Insured**. However, if the **Insured** refuses to consent to any settlement recommended by the **Company**, then the liability of the **Company** for the **Claim** will be limited to the amount equal to the amount for which the **Claim** could have been settled plus **Claim Expenses** incurred up to the date of the refusal of the **Insured** to consent to the settlement minus any remaining **Retention** payable by the **Insured**.

3.   The failure of the **Insured** to express consent to a settlement recommended by the **Company** will be deemed refusal to consent to the settlement.

II.   COVERAGE EXTENSIONS

A.   DISCIPLINARY PROCEEDINGS

1.   Upon written request from the **Insured,** the **Company** will reimburse the **Insured** for:

a.   reasonable attorney fees and court or administrative costs incurred by the **Insured,** with the **Company's** consent**,** to investigate, defend or appeal any formal **Disciplinary Proceeding**, provided such proceeding is first commenced during the **Policy Period** and is brought against the **Insured** by a disciplinary or regulatory official, board or agency through the filing of a notice of charges, formal investigative order, service of summons or similar document; or

b.   reasonable attorney fees and expenses incurred, with the **Company's** consent, for responding to regulatory or administrative actions brought directly against an **Insured**, by a government agency, for alleged violations of the Americans with Disabilities Act of 1990 (ADA) or the Fair Housing Act (FHA),

2.   Reimbursement under paragraph 1.a. or 1.b. above is subject to the following:

a.   payments made by the **Company** shall not include fines, penalties or sanctions assessed against any **Insured**; or salaries, wages, fees, or other compensation payable to any **Insured**;

b.   the most the **Company** will pay for such reimbursement shall not exceed twenty-five thousand dollars ($25,000) in the aggregate, or as specifically endorsed to this policy, for all such proceedings regardless of the number of **Insureds**, Disciplinary **Proceedings** or regulatory or administrative actions;

c.   the reimbursement amount is included within and reduces the Limit of Insurance. The **Retention** amount applicable to each **Claim** including **Claim Expenses** shall not apply to the payments made by the **Company** pursuant to this provision of this policy; and

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

    d.   the **Company** has no obligation to defend or provide defense counsel with respect to such **Disciplinary Proceeding**, or regulatory or administrative actions.

B.   MEDIATION INCENTIVE

If the **Insured** and the **Company** jointly agree to utilize mediation as a means to try to resolve a **Claim** made against the **Insured**, and if such **Claim** is fully and finally resolved through the use of mediation, then the **Retention** for such **Claim** shall be fifty percent (50%) of the amount of the **Retention**, subject to a maximum reduction of twenty thousand dollars ($20,000). The **Company** shall reimburse the **Insured** for any applicable **Retention** payment made in excess of such reduced **Retention**, as soon as practicable, after the final resolution of the **Claim**.

C.   ATTENDANCE AT MEDIATIONS, ARBITRATIONS, DEPOSITIONS, OR TRIAL

Upon written request by the **Insured**, the **Company** will reimburse reasonable expenses incurred by the **Insured** for loss of earnings incurred as a result of being required to attend, at the **Company's** request, a mediation, arbitration, deposition or trial related to a covered **Claim**, subject to the following:

1.   no reimbursement will apply for the first two (2) days of attendance by the **Insured**;

2.   loss of earnings reimbursement for attending mediations, arbitrations, depositions or trials shall not exceed five hundred dollars ($500) per **Insured** per day for each **Claim** subject to a maximum policy aggregate of seven thousand five hundred dollars ($7,500) for all **Claims** during the **Policy Period**, regardless of the number of **Insureds** who attend such proceedings at the request of the **Company**;

3.   loss of earnings reimbursement will not be considered **Damages** and/or **Claim Expenses** and will be reimbursed in addition to the Limit of Insurance; and

4.   loss of earnings reimbursement is not subject to the **Retention**.

D.   ESTATES, HEIRS AND LEGAL REPRESENTATIVES

In the event of the death or incapacity of an **Individual Insured**, or the bankruptcy of an **Insured**, any **Claim** made against any of the heirs, executors, administrators, trustees in bankruptcy, assignees and legal representatives of any **Insured**, based upon actual or alleged **Wrongful Acts** of such **Insured**, shall be deemed to be a **Claim** against such **Insured** for the purposes of this policy.

E.   SPOUSAL AND DOMESTIC PARTNER LIABILITY

If a **Claim** is asserted against the lawful spouse or domestic partner of any **Insured** solely as a result of:

1.   the status of the spouse or domestic partner as spouse or domestic partner of any **Insured**; or

2.   the ownership interest of the spouse or domestic partner in property, which the claimant seeks as recovery for actual or alleged **Wrongful Acts** of any **Insured**, then such **Claim** shall be deemed a **Claim** against the **Insured** for the purpose of this policy. Coverage for such **Claim** shall only apply for actual or alleged **Wrongful Acts** of the **Insured** and no coverage will be provided for any **Claim** for any actual or alleged **Wrongful Acts** of the spouse or domestic partner.

III.   LIMIT OF INSURANCE AND RETENTION

A.   LIMIT OF INSURANCE - EACH CLAIM AND LIMIT OF INSURANCE - AGGREGATE

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

1. The Limit of Insurance-Each **Claim** specified in Item 5.a. of the Declarations is the most the **Company** will pay for **Damages** and **Claim Expenses** combined for each **Claim** or related Claim, as described in Section B.1. Related Claims, made during the **Policy Period** and any **Extended Reporting Period**, no matter how many:

   a. **Insureds** this policy covers;

   b. **Claims** that are made; or

   c. persons or organizations that make **Claims.**

2. The Limit of Insurance–Each **Claim** shall apply in excess of the **Retention.**

3. The Limit of Insurance-Aggregate specified in Item 5.b. of the Declarations is the most the **Company** will pay for **Damages** and **Claim Expenses** combined for the total of all **Claims** made during the **Policy Period** and any **Extended Reporting Period**, no matter how many:

   a. **Insureds** this policy covers;

   b. **Claims** that are made; or

   c. persons or organizations that make **Claims.**

4. Each payment the **Company** makes for **Damages** or **Claim Expenses** is included within and reduces the Limit of Insurance-Each **Claim** amount and the Limit of Insurance-Aggregate amount.

5. The **Company** will not be obligated to pay or reimburse any **Claim Expenses** or **Damages**, defend any **Claim** or reimburse amounts covered under Section II., A. DISCIPLINARY PROCEEDINGS after the Limit of Insurance-Each **Claim** is exhausted, subject to the Limit of Insurance-Aggregate.

6. The **Company** will not be obligated to pay or reimburse any **Claim Expenses** or **Damages**, defend any **Claim**, or reimburse amounts covered under Section II., A. DISCIPLINARY PROCEEDINGS after the Limit of Insurance-Aggregate is exhausted.

B. RELATED CLAIMS

1. Two or more covered **Claims** arising out of a single **Wrongful Act** or any series of logically or causally related **Wrongful Acts** will be considered a single **Claim** and shall be deemed to be made at the time the first of such **Claims** is made.

2. This policy shall only apply if the first or earliest **Claim** arising from such logically or causally related **Wrongful Act** is made during the **Policy Period,** or any applicable **Extended Reporting Period.**

3. These provisions apply regardless of the number of **Insureds** involved in such a **Claim**, the number of **Claims** made, or the number of persons or organizations that make the **Claims**. The number of **Claims** made or the number of persons or organizations that make **Claims** shall not operate to increase the Limit of Insurance as described above, and as specified in Item 5. of the Declarations.

C. RETENTION

1. The **Retention** applies separately to each **Claim**.

2.  The **Retention** shall be satisfied by monetary payments by the **Named Insured** for **Damages** and **Claim Expenses** resulting from **Claims** first made during the **Policy Period,** or any applicable **Extended Reporting Period**, and reported to the **Company** pursuant to the terms of this policy. Satisfaction of the **Retention** is a condition precedent to the payment by the **Company** of any amounts hereunder, and the **Company** shall be liable only for the amounts in excess of the **Retention,** and subject to the Limit of Insurance specified in Item 5. of the Declarations.

IV.  EXCLUSIONS

This policy does not provide coverage and the **Company** is not obligated to pay amounts covered under the policy or defend any **Claim** based upon or arising out of:

A.  DISHONEST ACTS – Any dishonest, fraudulent, criminal or malicious act or omission, or any intentional or knowing violation of any law, statute, ordinance, rule or regulation by an **Insured** or at the direction of an **Insured**, provided, however, this exclusion shall not apply:

1.  to **Claim Expenses** incurred by the **Company** to fulfill its duty to defend any such **Claim** until there is a judgment against, binding arbitration against, adverse admission by, finding of fact against, or pleas of *nolo contendere* or no contest by the **Insured**, at which time the **Insured** shall reimburse the **Company** for any **Claim Expenses** paid by the **Company**; or

2.  to any individual **Insured** who did not commit, participate or have knowledge of such conduct or violation.

Under no circumstances shall the **Company** be responsible for the payment of **Claim Expenses** related to the defense of a criminal prosecution against the **Insured**.

B.  DISCRIMINATION, HARASSMENT, WRONGFUL TERMINATION - Any unlawful discrimination, harassment or wrongful termination including that based upon race, creed, color, religion, national origin, age, sex, marital status, sexual orientation or disability. However, this exclusion shall not apply where such **Claim** arises out of the failure to make reasonable accommodations under the Americans With Disabilities Act ("ADA") or any state or local versions of that act, as amended, in the course of the performance of **Professional Services.**

C.  INSURED VS. INSURED - Any **Claim** made by any **Insured** against any other **Insured.**

D.  SAFETY - Any failure to implement or monitor safety precautions or programs**.**

E.  WORKERS COMPENSATION - Any obligation of any **Insured** under any workers' compensation, disability benefits or unemployment compensation law or any similar laws.

F.  CONTRACTUAL LIABILITY - Liability of others assumed by any **Insured** under any contract or agreement; except this exclusion does not apply to liability an **Insured** would have in the absence of such contract or agreement.

G.  WARRANTY OR GUARANTEE - Any express warranty or guarantee unless the **Insured's** liability arises as a result of a **Wrongful Act** and would have existed absent such warranty or guarantee.

H.  FAULTY WORKMANSHIP - The cost to repair or replace any faulty workmanship in any construction, erection, fabrication, installation, assembly or manufacturing, including materials, parts or equipment furnished in connection therewith, and including any workmanship which is not in accordance with the drawings and specifications with respect to any construction, erection, fabrication, installation, assembly or manufacturing process.

This exclusion does not apply to a **Claim** which results from a **Wrongful Act** in the performance of **Professional Services** by the **Insured** or others for whom the **Insured** is legally responsible.

I.  CONSTRUCTION MEANS AND METHODS - Any actual or alleged obligation on the part of any **Insured** for construction means, methods, techniques, sequences or procedures, unless the **Insured's** obligation arises from the **Insured's** design documents which require specific construction means, methods, techniques, sequences or procedures to execute the design.

J.  BUSINESS ENTERPRISE - Any **Insured's** involvement as a partner, officer, director, stockholder, employer or employee of any business enterprise not named in the Declarations.

K.  RELATED ENTITIES - Any **Claim** made by any organization or subsidiary or affiliate thereof, not named in the Declarations, which any **Insured** controls, manages, operates or holds more than a twenty-five percent (25%) ownership interest in, or which controls, manages, operates or holds more than a twenty-five percent (25%) ownership interest in any **Insured.**

L.  PRODUCTS - The design, manufacture, sale, supply or distribution of any goods or products by any **Insured**, any subsidiary of any **Insured**, or any entity which wholly or partly owns, operates, or manages the **Insured**, or by any person or entity under license from the **Insured.**

This exclusion does not apply to computer programs or software created or modified specifically for a client in connection with **Professional Services** performed by the **Insured** for that client.

M.  INSURANCE, BONDS AND SURETIES - The **Insured's** requiring, obtaining, maintaining or the **Insured's** failure to require, obtain or maintain any bond, suretyship or any form of insurance, or any **Claim** based upon or arising out the **Insured's** advising or failing to advise with respect to the requiring, obtaining or maintaining of any bond, suretyship or any form of insurance.

N.  INTELLECTUAL PROPERTY - Infringement of patent, trademark or trade dress or misappropriation of trade secrets.

O.  FINANCIAL ADVICE AND PROCUREMENT - The **Insured's** advising or requiring of, or failure to maintain or procure, any financing or monies for payment of any portion of a project.

P.  BODILY INJURY - **Bodily Injury** sustained by any employee of any **Insured** while engaged in employment by any **Insured**, or by any person whose right to assert a **Claim** against the **Insured** arises by reason of any blood, marital or other relationship with the employee. This exclusion applies:

1.  whether the **Insured** may be liable as an employer or in any other capacity; and

2.  to any obligation to share **Damages** with or repay someone else whom must pay **Damages** because of such **Bodily Injury**.

Q.  WAR - War, including undeclared or civil war; or

1.  warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

2.  insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

This exclusion does not apply to a certified act of terrorism defined by Section 102. Definitions, of the Terrorism Risk Act of 2002 and any revisions or amendments thereto.

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

R.  NUCLEAR – Based on or arising out of radioactive, toxic or explosive properties of source materials, special nuclear materials or by-product materials as defined in the Atomic Energy Act of 1954 or any amendment thereof, and for which the United States Department of Energy or any other government authority or agency has indemnified the **Insured** or for which financial protection or the Price Anderson Act provides protection for the **Insured**.

S.  PRIOR NOTICE - Any **Claim**, fact or circumstance for which notice was given by an **Insured** to any other insurer prior to the effective date of this policy.

T.  ASBESTOS – The manufacture, mining, use, sale, installation, removal, distribution of, or exposure to asbestos or silica, materials or products containing asbestos or silica, or asbestos fibers or dust, or silica fibers or dust, or any obligation of any **Insured** to indemnify any party because of **Damages** arising out of such liability.

V.  DEFINITIONS

Some **Boldfaced** words may be defined in other parts of the policy.

A.  **Application** means the signed application for the policy including any attachments and other materials submitted in conjunction with the signed **Application. The Application** shall be maintained by the **Company** and shall be deemed a part of this policy as if physically attached. If this policy is a renewal or replacement of a previous policy or policies issued by the **Company**, all signed applications and other materials that were attached to and became a part of these previous policies shall be considered as part of the **Application** for this policy.

B.  **Bodily Injury** means physical injury, sickness, disease, death, mental anguish or emotional distress sustained by any person.

C.  **Claim** means any demand received by an **Insured** alleging a **Wrongful Act** in the performance or non-performance of **Professional Services** on the part of the **Insured** or persons for whose conduct the **Insured** is legally liable.

D.  **Claim Expenses** means expenses incurred by the **Company**, or incurred by the **Insured** and reimbursed by the **Company** pursuant to the terms of the policy, in the investigation, adjustment, negotiation, arbitration, mediation, settlement and defense of **Claims**.

  1.  **Claim Expenses** include:

    a.  expenses the **Company** incurs, other than salary, wages or expenses of the regular employees of the **Company,** to investigate, adjust, negotiate, arbitrate, mediate, settle, defend or appeal a **Claim**;

    b.  reasonable and necessary fees charged by attorneys selected or pre-approved by the **Company** to defend an **Insured**;

    c.  the cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. The **Company** will not apply for or furnish these bonds; and

    d.  reasonable and necessary expenses incurred by an **Insured** at the request of the **Company**.

  2.  **Claim Expenses** do not include:

    a.  loss of earnings or profit by any **Insured**; and

    b.  salaries, wages, fees, or other compensation payable to any **Insured** or employee of any Insured**.**

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

E.  **Company** refers to the company named in the Declarations.

F.  **Construction Manager** means a person or organization that provides professional consulting services to a project owner to assist the project owner in the oversight of the project and to monitor the progress of the design and construction process.

G.  **Damages** means:

1.  amounts which an **Insured** is legally obligated to pay for any **Claim** to which this insurance applies, as a result of a covered judgment, award or settlement;

2.  costs charged against an **Insured** in any suit defended by the **Company** unless such costs are assessed as a sanction for the delay or misconduct in the litigation process by an **Insured**;

3.  pre-judgment interest and post-judgment interest assessed before the **Company** has paid, offered to pay or deposited in court the part of the judgment that is covered by this policy and that is within the applicable Limit of Insurance; and

4.  punitive, exemplary or multiple damages, where insurable by law.

5.  **Damages** do not include:

    a.  taxes, criminal or civil fines or penalties imposed by law;

    b.  the return or withdrawal of professional fees;

    c.  amounts deemed uninsurable by the law pursuant to which this policy is construed; or

    d.  **Liquidated Damages** except for liability the **Insured** would have in the absence of such **Liquidated Damages.**

H.  **Disciplinary Proceedings** means any matter alleging a violation of a rule of professional conduct, including an initial inquiry before a state or federal licensing board or a peer review committee to investigate such charges.

I.  **Extended Reporting Period** means that period described in Section VI**.,** paragraph D1., a. and b. and specified in Item 4. of the Declarations.

J.  **Insured** means:

1.  the **Named Insured**;

2.  any past, present or future partner, director, officer, member, board member or employee of a **Named Insured**, but only for acts within the scope of their duties for the **Named Insured**;

3.  the heirs, executors, administrators, and legal representatives of each **Insured** as defined in 1. and 2. above, in the event of death, incapacity or bankruptcy of such **Insured,** but only as respects liability arising out of **Professional Services** rendered by or on behalf of the **Named Insured** prior to such **Insured's** death, incapacity or bankruptcy;

4.  contract or leased personnel or any independent contractor of the **Named Insured**, but only for **Professional Services** performed on behalf of and at the direction of the **Named Insured**;

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

5.  a joint venture in which a **Named Insured** is named as a co-venturer, but only for the **Named Insured's** legal liability arising out of the **Named Insured's** participation in such joint venture;

6.  a limited liability company in which the **Named Insured** is a member, but only for the **Named Insured's** legal liability arising out of the **Named Insured's** participation in such limited liability company; or

7.  any **Predecessor in Interest**.

K.  **Liquidated Damages** means an amount stipulated in advance in a contract to be the amount or measure of damages to be recovered by a party to that contract if the other party breaches the agreement or fails to perform or fails to adequately perform its obligations under the contract.

L.  **Named Insured** means the entity shown in Item 1. of the Declarations.

M.  **Policy Period** means the period of time specified in Item 2. of the Declarations or a shorter period resulting from cancellation of the policy.

N.  **Predecessor in Interest** means any prior entity that:

1.  was acquired or whose assets were acquired by the **Named Insured** prior to the effective date of this policy or for which a name change has occurred prior to the effective date of this policy,

2.  has been disclosed in the application for insurance under this policy, or

3.  for which the **Named Insured** in a written contract or written agreement is required to provide insurance coverage as is provided by this policy.

O.  **Professional Services** means those services the **Insured,** or any person or entity for whom the **Insured** is legally liable, is qualified to perform for others as an architect, engineer, **Construction Manager**, land surveyor, landscape architect, scientist, or technical consultant, including when such services are performed on projects seeking LEED Certification and/or utilizing Building Information Modeling "(BIM)" or as specifically defined by endorsement to this policy. **Professional Services** also includes those design services provided under a written contract to facilitate the construction process whether performed by the **Insured** or anyone for whom the **Insured** is legally liable.

**Professional Services** shall not include maintenance operation services or property and/or facility operation services.

P.  **Retention** shall mean the amount specified in Item 6. of the Declarations.

Q.  **Retroactive Date** means the date specified in Item 3. of the Declarations.

R.  **Wrongful Act** means negligence, which is the failure to meet the professional standard of care legally required or reasonably expected, under the same or similar circumstances, in the performance or non-performance of **Professional Services** rendered to others by the **Insured** which results in **Damages** for which the **Insured** is legally liable

VI.  CONDITIONS

A.  REPORTING A CLAIM

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

1. As a condition precedent to the right of coverage under this policy, the **Insured** has the duty to give written notice to the **Company**, of any **Claim** made against the **Insured**, as soon as practicable, which must be done during the **Policy Period**, within sixty (60) days after the expiration of the **Policy Period**, during any applicable **Extended Reporting Period** or upon an earlier termination date of the policy.  Written notice shall be given to the **Company** at the address specified in Item 10. of the Declarations.

2. Written notice shall include all of the following:

   a. the actual or alleged **Wrongful Act** or circumstance which is the subject of the **Claim**;

   b. a description of the project and the **Professional Services** performed or failed to be performed by the **Insured(s)**;

   c. the date(s) that such **Professional Services** were performed or failed to be performed by the **Insured(s)**;

   d. a description of the injury or damage;

   e. the identities and addresses of any potential claimant(s);

   f. the project(s) involved in the **Claim;** and

   g. every demand, notice, summons or other process received by the **Insured** or the **Insured's** representatives.

3. In addition, the **Insured** must comply with all of the following:

   a. cooperate with the **Company** in the investigation, defense and settlement of the **Claim**, including providing the **Company** with information and/or documents requested by the **Company** in connection with its investigation or defense of the **Claim**, within thirty (30) days after such request by the **Company**;

   b. immediately notify the **Company** of any settlement offers or demands;

   c. immediately notify the **Company** upon the receipt of any request to engage in settlement negotiations;

   d. submit to an examination under oath by a representative of the **Company**, if required by the **Company**; and

   e. assist the **Company**, upon the **Company's** request, to secure and affect any rights of indemnity, contribution or apportionment.

4. Unless explicitly provided under Section II., paragraph C. ATTENDANCE AT MEDIATIONS, ARBITRATIONS, DEPOSITIONS OR TRIAL, any expenses incurred by the **Insured** with respect to the above subparagraphs 3.a. through 3.e., inclusive, shall be without charge to the **Company**.

5. If the **Insured** has the right to either accept or reject arbitration of any **Claim**, the **Insured** shall exercise such right only with the written consent of the **Company**.

6. Other than what is required by law, the **Insured** shall refrain from discussing the facts and circumstances of any **Claim** with anyone other than defense counsel representing the **Insured** or representatives of the **Company**.

B.  REPORTING A POTENTIAL CLAIM

1.  If the **Insured** first becomes aware during the **Policy Period** of an actual or alleged **Wrongful Act** or circumstance that reasonably could give rise to a **Claim** under this policy, the **Insured** may give written notice to the **Company** containing all of the information below.  If such written notice is received by the **Company** prior to the end of the **Policy Period**, then any **Claim** subsequently made against the **Insured** arising out of the same **Wrongful Act** or circumstance shall be deemed to have been first made during the **Policy Period**.

2.  Written notice shall contain all of the following information:

a.  the actual or alleged **Wrongful Act** or circumstance which is the subject of a potential **Claim**;

b.  a description of the **Professional Services** performed or failed to be performed by the **Insured(s)**;

c.  the date(s) that such **Professional Services** were performed or failed to be performed by the **Insured(s)**;

d.  a description of the injury or damage that may result in a **Claim**;

e.  the identities and addresses of any potential claimant(s);

f.  the project(s) involved in any such potential **Claim**; and

g.  the circumstances by which the **Insured** first became aware of the potential **Claim**.

3.  The **Insured** shall cooperate fully with the **Company** in any investigation of a potential **Claim**.

C.  ACQUISITIONS OR FORMATION OF NEW ENTITIES

1.  The **Company** will cover any organization, other than joint ventures or limited liability companies, that the **Named Insured** newly acquires or forms and over which the **Named Insured** maintains ownership or a majority interest, from the date that the **Named Insured** acquires or forms the organization for sixty (60) days or for the remainder of the **Policy Period**, whichever is less, (hereinafter the "initial period") provided that no **Insured** is covered for any **Wrongful Act** that occurred before the **Named Insured** acquired or formed the organization.

2.  The **Named Insured** shall notify the **Company** in writing within sixty (60) days after the **Named Insured** newly acquires or forms such organization.  The **Company** reserves the right to charge an additional premium for this initial period.

3.  For coverage to apply after the expiration of this initial period, the **Named Insured** must provide any information the **Company** requires within the first sixty (60) days after the **Named Insured** newly acquires or forms such organization.  The **Company** will review such information and reserves the right to amend the policy and charge an additional premium from the date of the acquisition or formation of such organization.  The additional premium must be paid when due in order for coverage to be extended for the newly acquired or formed organization.

4.  The **Company** will not provide coverage after the initial period unless the **Named Insured** has notified the **Company** as set forth in paragraph C., subparagraph 2., above.

D.  EXTENDED REPORTING PERIOD

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

1. In the event of cancellation or non-renewal of this policy by the **Company** or the **Named Insured**, for reasons other than non-payment of premium and/or non-payment of the **Retention** and/or non-compliance with the terms and conditions of this policy, the **Named Insured** will have the right to purchase an **Extended Reporting Period**.

   a. The right to purchase the **Extended Reporting Period** will terminate unless written notice of the intention of the **Named Insured** to purchase it, together with payment of the additional premium due, is received by the **Company** within thirty (30) days after the effective date of the nonrenewal or cancellation.

   b. The additional premium for the **Extended Reporting Period** will be calculated using the percentage specified in Item 4. and the premium specified in Item 7. of the Declarations. The additional premium for the **Extended Reporting Period** will be fully earned at inception. Once purchased, the **Extended Reporting Period** may not be cancelled.

2. A **Claim** made during the **Extended Reporting Period** will be deemed to have been made on the last day of the **Policy Period**.  All terms and conditions in effect on that day will apply to the **Claim**.

3. The **Extended Reporting Period** does not extend the **Policy Period** or change the scope of coverage provided nor does it provide an additional or renewed Aggregate Limit of Insurance.  It applies only to **Claims** made against an **Insured** during the **Extended Reporting Period** for a **Wrongful Act** in the performance or non-performance of **Professional Services** that occurs after the **Retroactive Date** and before the end of the **Policy Period**.

4. In the event the **Named Insured** elects to cancel or non-renew this policy, the **Company** will offer an **Extended Reporting Period** at its discretion.

5. As a condition precedent to the **Named Insured's** right to purchase the **Extended Reporting Period**, the **Named Insured** must have satisfied all conditions of this policy and must have paid all premiums and retention amounts due.

E.  SUBROGATION

1. The **Insured** and the **Company** may have rights to recover all or part of any payment an **Insured** or the **Company** makes under this policy.  If so, those rights are transferred to the **Company**.

2. The **Insured** must do nothing to impair such rights. The **Insured** will do everything necessary to secure such rights and help the **Company** enforce them, including the execution of documents necessary to enable the **Company** to effectively bring suit.  Any recoveries will be applied as follows:

   a. first, to the **Company** up to the amount of its payment for **Damages** and **Claim Expenses**;

   b. then, to the **Insured** as recovery of **Retention** amounts paid as **Damages** and **Claim Expenses**.

3. The **Company** agrees to waive its right of subrogation against any client of the **Insured** for a **Claim** which is covered by this policy to the extent that the **Insured** had, prior to such **Claim** having been made, a written agreement to waive such rights.

F.  TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY

Any rights and duties of the **Insured** under this policy may not be transferred without the prior written approval of the **Company**.

©2021 Ironshore Specialty Casualty, Inc.  All rights reserved.

G.  NO WAIVER OR CHANGE OF TERMS

Notice or knowledge possessed by any person will not result in a waiver or a change in any part of this policy or estop the **Company** from asserting any rights under the terms of the policy; nor will the terms of this policy be waived or changed except by written endorsement issued by the **Company** and made part of the policy.

H.  CANCELLATION; NO OBLIGATION TO RENEW

1.  The **Named Insured** may cancel this policy by mailing or delivering to the **Company** advance written notice of cancellation.  If the **Named Insured** cancels this policy, the earned premium will be calculated using the customary short rate table and procedure.

2.  The **Company** may cancel this policy by mailing or delivering to the **Named Insured** written notice of cancellation at least:

    a.  ten (10) days before the effective date of cancellation for nonpayment of premium; or

    b.  thirty (30) days before the effective date of cancellation for any other reason or as otherwise specified by state law.

3.  The **Company** will mail or deliver its notice to the last known mailing address of the **Named Insured**.  Notice of cancellation will state the effective date of the cancellation.  This policy will expire on that date.  If this policy is cancelled, the **Company** will send the **Named Insured** any premium refund due.  The payment or tender by the **Company** of unearned premium is not a condition of cancellation.  If notice is mailed, proof of mailing will be sufficient proof of notice.

4.  The **Company** will not be obligated or required to renew this policy.  Any offer of renewal terms involving a change of **Retention**, premium, Limit of Insurance, or other terms and conditions will not constitute, nor be construed as, a refusal by the **Company** to renew this policy.  The **Company** may elect to non-renew this policy by mailing to the **Named Insured** at least thirty (30) days advance written notice, or notice as otherwise specified by state law.

I.  OTHER INSURANCE

1.  The insurance afforded by this policy is in excess over any other valid and collectible insurance available to the **Insured**, except insurance specifically arranged by the **Named Insured** to apply in excess of this insurance.

2.  The **Insured** shall promptly, upon request of the **Company**, provide the **Company** with copies of all policies potentially applicable, whether collectible or not, against the liability covered by this policy.

J.  BANKRUPTCY

The bankruptcy or insolvency of an **Insured**, or of the estate of an **Insured**, will not relieve the **Company** of its obligations under this policy, nor deprive the **Company** of its rights or defenses under this policy. However, such bankruptcy, receivership or insolvency shall in no way increase the **Company's** liability under this policy, nor will this insurance apply to liability directly or indirectly due to bankruptcy, insolvency, receivership, or subsequent liquidation.

K.  APPLICATION STATEMENTS AND WARRANTIES

1. The **Insured** warrants and agrees that the warranties herein are a condition for any obligations of the **Company** hereunder and the **Insured** further warrants and agrees as follows:

   a. that statements made in the **Application** and in its attachments and any materials submitted therewith are true and are the basis of the policy and are to be considered as incorporated into and constituting a part of this policy; and

   b. that the statements made in the **Application** and in its attachments and any materials submitted therewith are representations the **Named Insured** made on behalf of the **Insured**; that they shall be deemed material to the acceptance of the risk assumed by the **Company** under the policy and that this policy is issued in reliance upon the truth of such representations; and

   c. that in the event the **Application**, including its attachments and any materials submitted therewith, contains misrepresentations which materially affect the acceptance of the risk assumed by the **Company** under this policy, this policy shall be void and of no effect whatsoever.

L.  JOINING THE COMPANY IN A LEGAL ACTION

1. No person or organization has a right under this policy to join the **Company** as a party or otherwise bring the **Company** into a suit against an **Insured** unless;

   a. the **Insured** has fully complied with all terms and conditions of this policy, and

   b. the amount of such loss has been fixed or rendered certain either by:

      i.   final judgment against the **Insured** after trial of the issues and after the time to appeal such judgment has expired without an appeal being taken;

      ii.  if appeal is taken, after the appeal has been determined; or

      iii. an agreed settlement in accordance with the terms and conditions of this policy. An agreed settlement means a settlement and release of liability executed by the claimant or the claimant's legal representative, and the **Insured,** with the written consent of the **Company.**

M.  FALSE OR FRAUDULENT CLAIMS

If any **Insured** refers any **Claim** to the **Company** knowing such **Claim** to be false or fraudulent, this policy shall become void as to that **Insured** only and all insurance coverage hereunder as regards the false or fraudulent **Claim** shall be forfeited as to that **Insured** only.

N.  SEVERABILITY

If any material provision or clause of this policy is declared illegal, ambiguous or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, that provision will immediately become null and void, leaving the remainder of this policy in full force and effect.

O.  ARBITRATION

1. In the event of a disagreement as to the interpretation of this policy, it is mutually agreed that such dispute shall be submitted to binding arbitration before a panel of three (3) arbitrators, consisting of two (2) party-nominated (non-impartial) arbitrators and a third (impartial) arbitrator (hereinafter "umpire") as the sole and exclusive remedy.

2. The party desiring arbitration of a dispute shall notify in writing the other party, said notice including the name, address and occupation of the arbitrator nominated by the demanding party. The other party shall, within thirty (30) days following receipt of the demand, notify in writing the demanding party of the name, address and occupation of the arbitrator nominated by it. The two (2) arbitrators so selected shall, within thirty (30) days of the appointment of the second arbitrator, select an umpire. If the arbitrators are unable to agree upon an umpire, each arbitrator shall submit to the other arbitrator a list of three (3) proposed individuals, from which list such arbitrator shall choose one (1) individual. The names of the two (2) individuals so chosen shall be subject to a draw, whereby the individual drawn shall serve as umpire.

3. The parties shall submit their cases to the panel by written and oral evidence at a hearing. Said hearings shall be held within thirty (30) days of the selection of the umpire unless otherwise agreed by a majority of the panel. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud or gross misconduct by the arbitrators. The award will be issued within thirty (30) days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly share with the other the expense of the umpire and of the arbitration proceeding.

4. The arbitration proceeding shall take place in or in the vicinity of New York, New York. The procedural rules applicable to this arbitration, shall, except as provided otherwise herein, be in accordance with the Commercial Rules of the American Arbitration Association.

**IN WITNESS WHEREOF**, the **Company** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

Ironshore Specialty Insurance Company by:

Secretary                                                    President

# IRONSHORE™
**A Liberty Mutual Company**

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 1

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No Insurer shall be deemed to provide cover and no Insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that Insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

**IRONSHORE**
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 2

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SERVICE OF SUIT CLAUSE – COLORADO

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS IN THIS POLICY

Ironshore Specialty Insurance Co. hereby appoints the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as the agent upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance.

The Company furthermore designates Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120 as the agent to whom a copy of the Service of Process should be forwarded by the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the State of Colorado. A copy of any process, "suit", complaint or summons may be made upon the Office of the General Counsel, North America Specialty, Liberty Mutual Insurance, C/O Ironshore Specialty Insurance Co., 175 Berkeley Street, Boston, MA 02116.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

## IRONSHORE™
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 3

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS THREESIXTY℠ AMENDATORY ENDORSEMENT

The policy is amended as follows:

Section II. COVERAGE EXTENSIONS, is amended to include the following additional provision:

**Crisis ThreeSixty**

1.    **Crisis ThreeSixty.** The **Company** will advance **Crisis ThreeSixty Costs** directly to third parties on behalf of the **Named Insured** shown in Item 1 of the Declarations, regardless of fault, arising from a **Crisis Management Event** first commencing during the **Policy Period** shown in Item 2 of the Declarations, up to the amount of the **Crisis ThreeSixty Limit of Insurance**.

2.    **Specialty Casualty Fund.** The **Company** will pay **Crisis Management Loss** on behalf of the **Named Insured** arising from a **Crisis Management Event** first commencing during the **Policy Period**, up to the amount of the **Specialty Casualty Fund Limit of Insurance**.

3.    A **Crisis Management Event** will first commence at the time during the **Policy Period** when a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event** and will end when the **Company** determines in good faith that a crisis no longer exists or when the **Crisis ThreeSixty Limit of Insurance** has been exhausted, whichever occurs first.

4.    There will be no retention applicable to **Crisis ThreeSixty Costs** or **Crisis Management Loss**.

5.    Any advancement of **Crisis ThreeSixty Costs** or payment of **Crisis Management Loss** that the **Company** makes under the coverage provided by this Section II**.** will not be a determination of the **Company's** obligations under this policy, nor create any duty to defend any Suit under any other part of this policy.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved

Section III. LIMIT OF INSURANCE AND RETENTION is amended to include the following additional provisions:

**Crisis ThreeSixty**

1. The **Crisis ThreeSixty Limit of Insurance** is the most the **Company** will pay for all **Crisis ThreeSixty Costs** under this policy, regardless of the number of **Crisis Management Events** first commencing during the **Policy Period**. The **Crisis ThreeSixty Limit of Insurance** will be in addition to and separate from the **Limits of Insurance** shown in Item 5a and 5b of the Declarations.

2. The **Specialty Casualty Fund Limit of Insurance** is the most the **Company** will pay for all **Crisis Management Loss** under this policy, regardless of the number of **Crisis Management Events** first commencing during the **Policy Period.**  The **Specialty Casualty Fund Limit of Insurance** will be in addition to and separate from the **Limits Of Insurance** shown in Item 5a and 5b of the Declarations.

3. The **Company** will have no obligation to advance **Crisis ThreeSixty Costs** when the **Company** determines in good faith that a **Crisis Management Event** has ended or when the **Crisis ThreeSixty Limit of Insurance** has been exhausted, whichever occurs first.

It is further understood and agreed, that **Item 5** of the **Declarations** is amended to include the following additional limits:

**c.**    $50,000   **Crisis ThreeSixty Limit of Insurance**
**d.**    $50,000   **Specialty Casualty Fund Limit of Insurance**

Section VI. CONDITIONS, is amended to include the following additional provision:

**Crisis ThreeSixty** Notice

1. The **Insured** must report any **Crisis Management Event** to the **Company** within twenty-four (24) hours of the time that a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event,** or as soon as practicable thereafter, to be eligible for the advancement of **Crisis ThreeSixty Costs** and the payment of **Crisis Management Loss**.

2. Notice of a **Crisis Management Event** may be given 24 hours / 7 days by calling Ironshore @ 1.866.795.1414.

3. **Crisis ThreeSixty Firms** . The following firms are approved **Crisis ThreeSixty Firms**:

   **The Abernathy MacGregor Group**

   | | |
   |---|---|
   | **277 Park Avenue** | **707 Wilshire Boulevard, Suite 3950** |
   | **New York, NY 10172** | **Los Angeles, CA 90017** |
   | **(212) 371-5999** | **(213) 630-6550** |
   | | |
   | **Rhonda Barnat** | **Ian Campbell** |
   | **(cell) (917) 912-6378** | **(cell) (213) 422-7958** |
   | **rb@abmac.com** | **idc@abmac.com** |
   | | |
   | **Mike Pascale** | **Charlie Sipkins** |
   | **(cell) (917) 860-2048** | **(cell) (310) 600-0293** |
   | **mmp@abmac.com** | **cfs@abmac.com** |

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved

Section V. DEFINITIONS is amended to include the following additional definitions:

The following additional Definitions are applicable to **Crisis ThreeSixty** only**.**

**Crisis Management Event** means an **Occurrence** that in the good faith opinion of a **Key Executive** of the **Named Insured**, in the absence of **Crisis Management Services**, has or may reasonably result in:

1.    damages covered by this policy that are in excess of the total applicable limits of the **Underlying Policies** or any **Self-Insured Retentions**; and

2.    significant adverse regional or national media coverage.

**Crisis Management Event** will include, without limitation, man-made disasters such as explosions, major crashes, multiple deaths, burns, dismemberment, traumatic brain injury or permanent paralysis, provided that any damages arising out of any of the aforementioned are covered under this policy.

**Crisis Management Firm** means any firm shown in Section VI. CONDITIONS, **Crisis ThreeSixty** Notice, 3. **Crisis ThreeSixty Firms**, or in Schedule A, Approved Crisis Management Firms, attached to and forming a part of this policy or any other firm that the **Insured** retains with the **Company's** consent to perform **Crisis Management Services** in connection with a **Crisis Management Event**.

**Crisis Management Loss** means the following amounts incurred during a **Crisis Management Event**:

1.    amounts for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Named Insured** solely arising from a covered **Crisis Management Event**; and

2.    amounts for reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Named Insured** or a **Crisis Management Firm** incurred at the direction of a **Crisis Management Firm**, solely arising from a covered **Crisis Management Event**.

**Crisis Management Services** means those services performed by a **Crisis Management Firm** in advising the **Named Insured** on minimizing potential harm to the **Named Insured** from a covered **Crisis Management Event**.

**Crisis ThreeSixty Costs** means the following reasonable and necessary expenses incurred during a **Crisis Management Event** directly caused by a **Crisis Management Event**, provided that such expenses have been pre-approved by the **Company** and may be associated with damages that would be covered by this policy:

1.    medical expenses;

2.    funeral expenses;

3.    psychological counseling;

4.    travel expenses;

5.    temporary living expenses;

6.    expenses to secure the scene of a **Crisis Management Event**; and

7.    any other expenses pre-approved by the **Company**.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved

**Crisis ThreeSixty Costs** do not include defense costs or **Crisis Management Loss**.

**Crisis ThreeSixty Limit of Insurance** means the **Crisis ThreeSixty Limit of Insurance** shown in item 3c. of the Declarations.

**Specialty Casualty Fund Limit of Insurance** means the **Specialty Casualty Fund Limit of Insurance** shown in Item 3d. of the Declarations.

**Key Executive** means the Chairman, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel or general partner (if the **Named Insured** is a partnership) of the **Named Insured** or sole proprietor (if the **Named Insured** is a sole proprietorship).  A **Key Executive** also means any other person holding a title designated by **Insured** and approved by the **Company**, which is shown in Schedule B, Additional Key Executives, attached to and forming part of this policy.

**Occurrence** means an accident, offense or event that is neither expected nor intended from the standpoint of the **Insured.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved

IRONSHORE™
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 4

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL NAMED INSURED ENDORSEMENT

This endorsement modifies the insurance provided by the policy:

1.  Item 1. of the Declarations, **Named Insured** is amended to include the persons or organizations shown in the Schedule of Additional Named **Insureds** below.

2.  The **Named Insured** first shown in Item 1. of the Declarations is the appointed and irrevocable agent for all **Insureds**, including for the purpose of receipt of any notice or cancellation, notice of nonrenewal (if applicable), and the payment of any premium or deductible or the return of any premium under this policy.

### SCHEDULE OF ADDITIONAL NAMED INSURED[S]

Reconstruction Experts, Inc.

Reconstruction, Inc.

Advanced Inc., dba Advanced Roofing and Sheet Metal

Advanced Roofing and Sheet Metal, LLC d/b/a Advanced Roofing and Sheet Metal

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

IRONSHORE™
A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 5

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PRE-CLAIM SERVICES, LOSS PREVENTION SERVICES AND RISK MANAGEMENT SERVICES

IT IS AGREED that, for purposes of this endorsement, the following definitions have been added to the end of Section **V. DEFINITIONS**.  All other definitions of this policy remain unchanged:

The following Definitions are applicable to the Pre-Claims Services, Loss Prevention Services and Risk Management Services Endorsement.

AA.     **Loss Prevention Expenses** means reasonable and necessary fees, costs and expenses incurred by or on behalf of the **Named Insured** with the prior written consent of the **Company**, in the investigation of a specific **Loss Prevention Matter**

BB.     **Loss Prevention Matter** means a circumstance that is neither a **Claim** nor a Notice of **Potential Claim** in accordance with the policy, but that involves a professional liability issue.

CC.     **Potential Claim** means any circumstance that might reasonably be expected to give rise to a **Claim** arising from a **Wrongful Act** and is reported as such in accordance with the policy in Section VI. Conditions, paragraph **B.** REPORTING A POTENTIAL CLAIM.

DD.     **Pre-Claim Expenses** means reasonable and necessary fees, costs and expenses incurred by or on behalf of the **Named Insured** with the prior written consent of the **Company**, in the investigation of a specific **Potential Claim**.

© 2018 Ironshore Specialty Casualty, Inc.  All rights reserved.

IT IS FURTHER AGREED that for purposes of this endorsement, the following subsections have been added to the end of Section II. COVERAGE EXTENSIONS:

F.     LOSS PREVENTION SERVICES AND PRE-CLAIM SERVICES

At the discretion of the **Company,** Loss Prevention Services and Pre-Claims Services may be provided through the **Company**'s legal vendors subject to all of the following:

1.     Timely notice must be made to the **Company** within the policy period.

2.     Matter must be classified as a **Loss Prevention Matter** or a Notice of **Potential Claim** by the **Company**:

3.     Loss Prevention Services and Pre-Claims Services are complimentary services delivered at the **Company's** discretion without cost to the **Named Insured**.   Therefore, the **Company** shall determine in its sole discretion whether an issue constitutes a matter for Loss Prevention Services or Pre-Claims Services.

4.     Services are provided by a Law Firm selected by the **Company**. For the purposes of this endorsement, the **Named Insured** agrees that any Policy endorsement concerning "Choice of Counsel" shall not apply to **Loss Prevention Matters** or Risk Management Services however, if the matter is a Notice of **Potential Claim**, the **Company** shall take into consideration the **Named Insured's** "Choice of Counsel".

5.     The **Company** may approve and pay **Loss Prevention Expenses** or **Pre-Claim Expenses** up to a maximum of $5,000 ("**Loss Prevention Expenses** or **Pre-Claim Expenses**") for each **Loss Prevention Matter** or **Potential Claim**. This **Loss Prevention Expenses** or **Pre-Claim Expenses** option shall also be subject to an annual aggregate **Loss Prevention Expenses** or **Pre-Claim Expenses** amount of $20,000. The **Loss Prevention Expenses** or **Pre-Claim Expenses** option shall apply to matters that are reported in accordance with the provisions listed in this section.

6.     The **Named Insured** shall agree to retain in writing the law firm of W&D Law LLP to incur costs and/or to select and appoint counsel to investigate any **Loss Prevention Matter** or **Potential Claim**. The **Named Insured** may not incur any costs or expenses in connection with any **Potential Claim** without the prior written consent of the **Company**.

7.     **Pre-Claim Expenses** must be incurred prior to the date that any **Claim** that arises from a **Wrongful Act** is made based upon or arising out of such **Potential Claim**. Payment by the **Company** of **Pre-Claim Expenses** shall not be applied to the Retention and shall not reduce the applicable Limit of Insurance; provided, however, such payment will reduce the aggregate **Pre-Claim Expenses** available to the **Named Insured**. Any expenses that exceed **Pre-Claim Expenses** shall remain the sole obligation of, and payable by, the **Named Insured**.  If a **Potential Claim** becomes a **Claim** that arises from a **Wrongful Act**, any resultant **Damages** and/or **Claim Expenses** are subject to the Retention, and any amount that exceeds the Retention, will reduce the Limit of Insurance.

8.     A notice of **Potential Claim** constitutes a "reported" matter for the purposes of relation back to the policy period should a claim be brought in the future and will be deemed to have been first made on the date written notice of the **Potential Claim** was received by the **Company.**

9.     A matter classified as a **Loss Prevention Matter** is neither a **Claim** nor a Notice of **Potential Claim** in accordance with the policy, and as such, does not constitute a "reported" matter for the purposes of relation back to the policy period should a claim be brought in the future.

© 2018 Ironshore Specialty Casualty, Inc.  All rights reserved.

10.     Without exception, services for **Loss Prevention Matters** are only available while the **Named Insured**'s policy with the **Company** is in force. Such services end if the insured ceases to be an **Insured.**

11.     The above referenced services are provided at no cost to the **Named Insured** and no premium has been allocated for these services.  As such, the **Company** reserves the right to change or discontinue these services at the **Company's** sole discretion and without notice to the **Named Insured.**

G.     RISK MANAGEMENT SERVICES

In addition to Loss Prevention Services and Pre-Claim Services, the **Company** provides the **Named Insured** with access during the **Policy Period** to *Ironshore Specialty Insurance Company's Designers and Contractors Professional Liability Risk Management Services*, as listed below.  The **Named Insured** may access these services, as needed, without paying or incurring legal fees.

1.     <u>Contract Review</u> –Donovan Hatem LLP shall provide certain no cost contract review services focusing on limitation of liability/indemnity provisions, insurance requirements, suspension/termination rights and scope of services.  The review is generally conducted within two business days.

2.     <u>Risk Management Seminars</u> – an annual Risk Management Seminar may be presented to groups of **Insured's** or specific individual **Insured's** at the sole discretion of the **Company**.  Seminar presentation location is based on need and volume of attendees.  Seminar presentations shall be customized to the needs of the design professional Insured.

3.     The election to utilize any of the offered Risk Management Services shall not constitute notice to the **Company** of a **Claim** or **Potential Claim**.

All of the above referenced services are provided at no cost to the **Insured** and no premium has been allocated for these services.  As such, the **Company** reserves the right to change or discontinue these services at the **Company's** sole discretion and without notice to the **Named Insured.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2018 Ironshore Specialty Casualty, Inc.  All rights reserved.

IRONSHORE™
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 6

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORESEMENT CHANGES THE DESIGNERS AND CONTRACTORS PROFESSIONAL LIABILITY POLICY.
PLEASE READ IT CAREFULLY.

# TECHNOLOGY SERVICES COVERAGE EXTENSION AND PRODUCT EXCLUSION EXCEPTION ENDORSEMENT

This endorsement modifies the insurance provided by the policy:

1. Paragraph O: **Professional Services** of Section **V. DEFINITIONS** is deleted in its entirety and replaced by the following:

    **O.  Professional Services** means:

    1. Those services, other than **Technology Services**, that the **Insured,** or any person or entity for whom the **Insured** is legally liable, is qualified to perform for others as an architect, engineer, **Construction Manager**, land surveyor, landscape architect, scientist, or technical consultant, including when such services are performed on projects seeking LEED Certification and/or utilizing Building Information Modeling "(BIM)" or as specifically defined by endorsement to this policy. **Professional Services** also includes those design services provided under a written contract to facilitate the construction process whether performed by the **Insured** or anyone for whom the **Insured** is legally liable; and

    2.  **Technology Services**.

    3. **Professional Services** shall not include maintenance operation services or property and/or facility operation services.

2. The following definition is added to Section **V. DEFINITIONS**:

    **Technology Services** means computer or electronic information technology service that the **Insured** performs for others in conjunction with **Professional Services** defined in Paragraph **O. 1.** of Section **V. DEFINITIONS** including but not limited to: consulting, development, training, outsourcing, systems analysis, design, integration, management, web hosting, application hosting, programming, data processing including such services when performed on projects seeking LEED certification and/or Utilizing Building Information Modeling (BIM).

3. Paragraph **L.** of Section **IV. Exclusions** is deleted in its entirety and replaced with the following:

    L.   PRODUCTS - The design, manufacture, sale, supply or distribution of any goods or products by any **Insured**, any subsidiary or any entity which wholly or partly owns, operates, or manages the **Insured** or any subsidiary of such entity, or by any person or entity under license from the **Insured;**

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.

1.   However, this exclusion does not apply to:

    a.   computer programs, software, databases, applications, websites, or computer systems created or modified specifically for a client in connection with **Professional Services** performed by the **Insured**; or

    b.   To the design of goods or products which are specifically designed by the **Insured** and produced for one particular project.

Notwithstanding the foregoing, this exclusion shall apply to computer system security software of any type or description.

4.   The exclusions of the policy apply to this endorsement.  However, the following exclusions are added to the policy and supersede any similar exclusions of the policy to the contrary, and only apply to a **Wrongful Act** by the insured in performance of **Technology Services**.

This policy does not provide coverage and the **Company** will not pay **Claim Expenses** or **Damages** for any **Claim** based upon or directly or indirectly arising out of or resulting from:

1.   Any infringement of any copyright, trademark, trade dress, trade name, patent, service mark or other intellectual property or any misappropriation of a trade secret or propriety information.

2.   Any actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost representations, contract price or estimates of probable costs or cost estimates being exceeded;

3.   Any of the Insured's costs of providing, correcting, or re-performing or completing any **Technology Services**;

4.   Any breach or express warranty, guarantee or service level agreement or any delay in delivery, installation or performance or non-acceptance of products or services unless liability would have attached to the Insured in the absence of such express warranty, guarantee or service level agreement or any delay in delivery, installation or performance or non-acceptance or products or services and such liability arises out of a **Wrongful Act** by the **Insured** in the performance of **Technology Services;**

5.   Any unauthorized use of or unauthorized access to the Insured's computer network, Building Information Model (BIM), Web Hosting or failure of the **Insured's** computer network to prevent transmission of malicious code or a denial of service attack.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.



**IRONSHORE**
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 7

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE DESIGNERS AND CONTRACTORS PROFESSIONAL LIABILITY POLICY.
PLEASE READ IT CAREFULLY.

# RECTIFICATION COST COVERAGE EXTENSION

This endorsement modifies the insurance provided by the policy:

### SCHEDULE

| | |
|---|---|
| Rectification Sublimit of Insurance-Aggregate: | **$2,000,000** |
| Rectification Sublimit of Insurance-Each Design Defect: | **$2,000,000**  Each **Design Defect** |
| Rectification Retained Amount: | **$100,000**  Each **Design Defect** |

This Rectification Sublimit of Insurance-Aggregate is included within and reduces the Policy Aggregate shown in Item 5. of the Declarations.

---

The following paragraphs are added to and modify the policy.  At Section II. COVERAGE EXTENSIONS, insert:

RECTIFICATION

1.  The **Company** shall reimburse the **Insured** for **Rectification Costs** in excess of the **Rectification Retained Amount** reasonably and necessarily incurred by the **Insured** to redesign and/or remediate a **Design Defect** that would otherwise lead to a **Claim** covered under this policy.  All of the following conditions must be met in order for **Rectification Cost** reimbursement to apply:

    a.  the **Design Defect** must be caused by or result from **Professional Services** rendered by or on behalf of the **Insured** or by any person or entity for whom the **Insured** is legally liable on or after the **Retroactive Date** specified in Item 3. of the Declarations and prior to the end of the **Policy Period** specified in Item 2. of the Declarations; and

    b.  the **Design Defect** must first be discovered during the **Policy Period** and prior to the earliest of either:

        I.    the issuance of a certificate of substantial completion, or

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.

II.  the date that the constructed project has been put to its intended use by any person other than a contractor or subcontractor; and

c.  prior to incurring or committing to incur any **Rectification Costs** the **Insured** must provide written notice to the **Company** during the **Policy Period,** but in no event later than fifteen (15) calendar days after the end of the **Policy Period; and**

d.  the written notice provided to the **Company** must include the proposed corrective action and supporting documentation that the **Design Defect** could result in a **Claim** being made against the **Insured; and**

e.  all **Rectification Costs** to correct a **Design Defect** must be approved by the **Company** in writing prior to being incurred by the **Insured**; and

f.  to the extent of reimbursement under this **Rectification Cost** Coverage Extension, and in accordance with Section VI. CONDITIONS, paragraph E. SUBROGATION of the policy, the **Named Insured** agrees to transfer any rights of recovery it may have against any person or organization not insured under this policy who may be responsible for the **Design Defect** to the **Company**, and the **Named Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Named Insured** shall not waive these rights of subrogation either before or after such rights accrue.

2.  The **Company's** agreement to reimburse the **Insured** for **Rectification Costs** necessary to correct a **Design Defect** shall also serve as the **Company's** acceptance of the **Insured's** written notice of a reported potential **Claim** under this policy.

3.  If following the payment of **Rectification Costs,** a **Claim** is also made against the **Insured**, the **Company's** total payment, including any payments previously paid by the **Company,** will not exceed the **Limits of Insurance** specified in Item 5. of the Declarations.

4.  The **Company's** agreement to **Rectification Costs** shall not alleviate any **Insured** from complying with any ordinance or law, or transfer any liability to the **Company**.

5.  The preceding paragraphs do not supersede, replace or modify the **Insured's** reporting obligations specified in Section VI. CONDITIONS. Paragraphs A. and B of the policy.


The following paragraphs are added to and modify the policy.  At Section III. LIMITS OF INSURANCE AND RETENTION insert:

SUBLIMIT OF INSURANCE-RECTIFICATION COST COVERAGE EXTENSION

1.  The following Sublimits of Insurance apply to the **Rectification Cost** Coverage Extension regardless of the number of **Design Defects:**

a.  the Rectification Sublimit of Insurance-Aggregate shown in the Schedule of this Rectification Cost Coverage Extension Endorsement (hereinafter, this Endorsement) is the maximum amount the **Company** will reimburse for all **Rectification Costs** under this coverage extension, subject to the Limit of Insurance-Aggregate shown in Item 5.b. of the Declarations; and

b.  subject to the preceding subparagraph a., the Rectification Sublimit of Insurance-Each Design Defect shown in the Schedule of this **Endorsement** is the maximum amount the **Company** will reimburse for all **Rectification Costs** arising out of one single **Design Defect**. All **Design Defects** that are causally related will be treated as a single **Design Defect**. Each single **Design Defect** will be subject to the Rectification Sublimit of Insurance-Each Design Defect and the **Rectification Retained Amount,** subject to subparagraph a. above.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.

The following paragraphs are added to and modify the policy.  At the end of Section IV. EXCLUSIONS, insert:

All of the preceding EXCLUSIONS of the Policy apply to the **Rectification Cost** Coverage Extension.  The following exclusions apply only to the **Rectification Cost** Coverage Extension and supersede any similar exclusions of the policy to the contrary.  The **Rectification Cost** Coverage Extension does not apply to**:**

AA.    FAILURE OF TEMPORARY WORKS - The failure of any **Temporary Works** to perform their intended function.

BB.    COSMETIC DEFECT - Any **Cosmetic Defect.**

CC.    INTENTIONAL ACT - Any intentional act which results, directly or indirectly, in a **Design Defect.**

DD.    OTHER COVERAGE - Coverage provided under any property policy or endorsement, including builder's risk insurance, an installation floater, or other property coverage that would provide coverage for loss that is covered under this Coverage Extension except for the exhaustion of the limits of insurance of such property policy or endorsement.

The following paragraphs are added to and modify the policy.  At the end of Section V. DEFINITIONS, insert:

All other terms and all of the preceding DEFINITIONS of the Policy apply to the **Rectification Cost** Coverage Extension.  The following additional definitions apply only to the **Rectification Cost** Coverage Extension and supersede any similar definitions of the policy to the contrary:

AA.    **Completed Design** means the signed and sealed documents for construction and/or a successfully tested mock-up design approved to be part of the completed and permanent project as required by the contract documents.

BB.    **Cosmetic Defect** means a superficial or surface defect that does not:

      1.    affect the structural soundness of the construction project; or

      2.    interfere with the functionality of the construction project.

CC.    **Design Defect** means a defect in the **Completed Design** approved to be part of the completed and permanent project, caused by a **Wrongful Act** in the performance or non-performance of **Professional Services** rendered to others by the **Insured** or any entity for whom the **Insured** is legally liable.

DD.    **Rectification Costs** means direct costs and expenses the **Company** deems necessary to rectify a **Design Defect**, or to prevent further damages resulting from a **Design Defect**.  **Rectification Costs** shall not include:

      1.    any of the **Insured's** profit, mark-up, overhead or betterment to the project to which this **Rectification Cost** Coverage Extension applies;

      2.    **Claim Expenses**;

      3.    any indirect costs for consequential damages including but not limited to; delay costs, cost overruns, increase in funding costs or loss of use; and

      4.    any costs or expenses incurred by any **Insured** prior to the **Company's** written agreement.

EE.    **Rectification Retained Amount** means the retained amount which applies on an each single **Design Defect** basis shown in the Schedule of this **Endorsement** and shall only be reduced by **Rectification Costs**.  If the same **Design Defect** results in a **Claim** thereafter, then the amount paid by the **Insured** in satisfaction of the **Rectification Retained Amount** shall be applied to the **Retention** specified in the Declarations.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.

FF.   **Temporary Works** means temporary formwork or structures designed and constructed for use as construction aids during the construction of a project.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.

# IRONSHORE™
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 8

**Policy Number:** DCP7BABWAMI004                **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROTECTIVE LOSS ENDORSEMENT

This endorsement modifies the insurance provided by the policy:

**SCHEDULE**

| | |
|---|---|
| **Protective Loss** Sublimit of Insurance-Aggregate: | **$2,000,000** |
| **Protective Loss** Sublimit of Insurance-Each **Protective Claim:** | **$2,000,000**  Each **Protective Claim** |
| **Protective Loss** Retained Amount: | **$100,000**  Each **Protective Claim** |

This **Protective Loss** Sublimit of Insurance-Aggregate is included within and reduces the Policy Aggregate shown in Item 5. of the Declarations.

---

The following paragraphs are added to and modify the policy.  At Section I. INSURING AGREEMENTS, Paragraph A, insert:

The **Company** shall indemnify the **Insured** for **Protective Loss** in excess of all of the **Design Professionals Insurance** provided that:

a.    the **Protective Claim** results from **Design Professional Services** performed on or after the **Retroactive Date** specified in Item 3. of the Declarations and prior to the end of the **Policy Period** specified in Item 2. of the Declarations; and

b.    the **Protective Claim** arises out of a **Wrongful Act** by the **Design Professional** in the performance of **Professional Services** on behalf of the **Insured** on or after the Retroactive Date and before the end of the **Policy Period**; and

c.    the **Protective Claim** is first made by the **Insured** against the **Design Professional** and reported by the **Insured** to **Company** in writing, during the **Policy Period** or within 60 days after the end of the **Policy Period** or before the end of any applicable Extended Reporting Period; and

d.    prior to the effective date of the first policy issued to the **Insured** by the **Company** and continuously renewed, no **Insured**, or principal, partner, director, officer, or risk manager of the

© 2015 Ironshore Specialty Casualty, Inc.  All rights reserved.

**Insured**, had any basis to believe that the Wrongful Act asserted in the **Protective Claim** could reasonably be expected to be the basis of a **Protective Claim**; and

e.     the **Insured** has taken all steps necessary to pursue the **Protective Claim** and obtain recovery of all **Protective Loss** from all responsible **Design Professionals** and each **Design Professional's Insurance** provider.

The following paragraphs are added to and modify the policy.  At Section III. LIMITS OF INSURANCE AND DEDUCTIBLE insert:

SUBLIMIT OF INSURANCE-PROTECTIVE LOSS COVERAGE

1.     The following Sublimits of Insurance apply to **Protective Loss** Coverage regardless of the number of **Protective Claims**:

a.     the Protective Loss Sublimit of Insurance-Aggregate shown in the Schedule of the **Protective Loss** Coverage Endorsement is the maximum amount the **Company** will reimburse for all **Protective Loss** under this coverage extension, subject to the Limit of Insurance-Aggregate shown in Item 5.b. of the Declarations; and

b.     subject to the preceding subparagraph a., the **Protective Loss** Sublimit of Insurance-Each **Protective Claim** shown in the Schedule of the **Protective Loss** Coverage Endorsement is the maximum amount the **Company** will reimburse for all **Protective Loss** arising out of one single **Protective Claim**. All **Protective Claims** that are causally related will be treated as a single **Protective Claim**. Each and every individual **Protective Claim** will be subject to the **Protective Loss** Sublimit of Insurance-Each Protective Claim and the **Protective Loss Retained Amount,** subject to subparagraph a. above.

c.     the Company's liability and obligation to indemnify the **Insured** for **Protective Loss** under this endorsement attaches only upon full payment of the **Design Professional's Insurance**. In the event the **Design Professional's Insurance** is unavailable through either exhaustion of its limits or through the applicability of a valid exclusion under the "Design Professional's Insurance" then the **Company's** liability and obligation to indemnify the **Insured** shall attach excess of the **Protective Loss** Retained Amount of Insurance-Each **Protective Claim** shown in the Schedule of the **Protective Loss** Coverage Endorsement.

The following paragraphs are added to and modify the policy.  At the end of Section IV. EXCLUSIONS, insert:

All of the preceding EXCLUSIONS of the Policy apply to **Protective Loss** Coverage.  The following exclusions apply to the **Protective Loss** Coverage Endorsement only and supersede any similar exclusions of the policy to the contrary.  **Protective Loss** Coverage does not apply to**:**

AA.     DEFAULT JUDGEMENT - Any amount awarded by default judgment, or any other proceeding where the **Design Professional** failed to answer, plead or otherwise defend itself or indemnify the **Insured** in connection with a **Protective Claim**.  This exclusion shall not apply if the **Insured** cooperates with the **Company** to establish what would have been recovered from the **Design Professional** in the absence of such default judgment or monetary award where the **Design Professional** failed to appear, plead or otherwise defend itself or indemnify the Insured.

BB.     LEGAL FEES - Any attorney's fees, costs and expenses incurred by the **Insured** in connection with the **Insured's** making of a **Protective Claim** however, this exclusion shall not apply to those sums which the **Insured** is awarded and legally entitled to recover as a result of a **Protective Loss**.

The following paragraphs are added to and modify the policy.  At the end of Section V. DEFINITIONS, insert:

© 2015 Ironshore Specialty Casualty, Inc.  All rights reserved.

All of the DEFINITIONS of the policy apply to **Protective Loss** Coverage.  However, the following additional definitions apply to the **Protective Loss** Coverage Endorsement only and supersede any similar definitions of the policy to the contrary.

AA.     **Design Professional** means those persons or entities retained by or on behalf of an **Insured** to perform **Professional Services** which include those services the **Insured** is qualified to perform for others as an architect, engineer, **Construction Manager**, land surveyor, landscape architect, scientist, or technical consultant, including when such services are performed on projects seeking LEED Certification and/or utilizing Building Information Modeling "(BIM)" or as specifically defined by endorsement to this policy. **Professional Services** also includes those design services provided under a written contract to facilitate the construction process whether performed by the **Insured** or anyone for whom the **Insured** is legally liable.  **Professional Services** shall not include maintenance operation services or property and/or facility operation services.

BB.     **Design Professionals Insurance** means all available professional liability insurance policies insuring any **Design Professional**, or any person or entity for whom the **Design Professional** is legally responsible.

CC.     **Protective Claim** means a written demand made or a lawsuit commenced by the **Insured** against a **Design Professional** alleging liability or responsibility on the part of the **Design Professional** for **Protective Loss** arising out of the **Design Professionals Wrongful Act** in the performance or non-performance of **Professional Services.**

DD.     **Protective Loss** means the amount the **Insured** is legally entitled to recover from the **Design Professional** as determined by:

1.       a final monetary judgment by a court of competent jurisdiction;

2.       a final monetary award resulting from an arbitration or other dispute resolution proceeding, in which the **Insured** participates with the **Company's** prior written consent; or

3.       a final settlement to which the **Company** agrees to in advance in writing**.**

EE.     **Protective Claim Retained Amount** means the retained amount which applies on an each and every **Protective Claim** basis shown in the Schedule of the **Protective Loss** Coverage Endorsement and shall only be reduced by **Protective Loss.**


The following paragraphs are added to and modify the policy.  At the end of Section VI. CONDITIONS, insert:

All of the preceding CONDITIONS of the Policy apply to **Protective Loss** Coverage.  The following conditions apply to the **Protective Loss** Coverage Endorsement only and supersede any similar conditions of the policy to the contrary.

AA.     **Design Professionals Insurance**

The **Insured** shall require all directly contracted **Design Professionals** to evidence professional liability insurance.


BB.     Limitation of Liability

The **Insured** shall not, without the **Company's** express written consent, agree to any limitation of liability clause with any **Design Professional** other than to limit the **Design Professional's** liability to insurance proceeds.

CC.     Protective Claims Notification and Reporting Provisions:

1.       The **Insured** shall provide the **Company** with written notice of a **Protective Claim** at the same time that the **Insured** makes such **Protective Claim** against a **Design Professional**.

© 2015 Ironshore Specialty Casualty, Inc.  All rights reserved.

2.    The **Company** has the right but not the duty to participate in the investigation or settlement of a **Protective Claim** covered under this policy. Whether or not the **Company** chooses to participate in the settlement of a **Protective Claim**, the **Insured** shall make every effort, within reason, to obtain from the "**Design Professional(s)**" party to such settlement, an assignment of any rights said "**Design Professional(s)**" has against any other "**Design Professional**(s)" to pursue claims that are related to or arising from the **Wrongful Act** by the **Design Professional** in the performance of **Professional Services** included in the **Protective Claim** and settlement.

3.    The **Insured** shall not enter negotiations or settlement of a **Protective Claim** with the **Design Professional** or its representative involving any part of the Limit of Insurance of this policy without the **Company's** knowledge and consent to such negotiation and settlement. However, the **Company** may, in writing, and at its election, waive its participation and consent to such negotiation and settlement.  If the **Company** elects to participate in the negotiation and settlement of a **Protective Claim**, the Insured shall fully cooperate with the **Company's** requests for information.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2015 Ironshore Specialty Casualty, Inc.  All rights reserved.

# IRONSHORE™
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 9

**Policy Number:** DCP7BABWAMI004                          **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## REQUIREMENT TO MAINTAIN GENERAL LIABILITY INSURANCE ENDORSEMENT

This endorsement modifies the insurance provided by the policy:

DESIGNERS & CONTRACTORS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium paid, it is hereby agreed that Section VI. Conditions is amended by the addition of the following at the end of Section VI. Conditions:

GENERAL LIABILITY COVERAGE REQUIREMENT

1. It is a condition precedent to coverage under this policy that the **Named Insured** maintain in-force General Liability Insurance, including the Products and Completed Operations hazard, with an insurance company, risk retention group or captive (or any other self-insurance plan or trust by whatever name) which has an A.M. Best rating of A- or better and having an Each Occurrence Limit of Insurance equal to or greater than the Each Claim Limit of Insurance stated in the Declarations during the **Policy Period** and the **Extended Reporting Period**, if exercised.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2019 Ironshore Specialty Casualty, Inc.  All rights reserved.



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 10

**Policy Number:** DCP7BABWAMI004                                          **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE DESIGNERS AND CONTRACTORS PROFESSIONAL LIABILITY POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM EARNED PREMIUM

It is understood and agreed that in the event of cancellation of this policy by or at the direction of the **Insured**, the **Company** shall retain a Minimum Earned Premium of 25 %.

It is further agreed that if the **Insured** cancels this policy, earned premium will be computed in accordance with the customary short-rate table and procedure, or will be the Minimum Earned Premium stated herein, whichever is greater.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

© 2016 Ironshore Specialty Casualty, Inc.  All rights reserved.

**IRONSHORE.**
A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 11

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:** Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE DESIGNERS AND CONTRACTORS
PROFESSIONAL LIABILITY POLICY. PLEASE READ IT CAREFULLY

# RETROACTIVE PERIODS WITH SPECIFIC LIMITS OF INSURANCE ENDORSEMENT

At Section **I. INSURING AGREEMENTS**, delete paragraph A. COVERAGE in its entirety and insert the following;

A.      COVERAGE

The **Company** will pay on behalf of the **Insured** those sums in excess of the **Retention** and up to the applicable Limit of Insurance specified in Item 5. of the Declarations that the **Insured** becomes legally obligated to pay as **Damages,** including **Claim Expenses,** because of a **Claim** for a **Wrongful Act** in the performance or non-performance of **Professional Services** rendered to others by the **Insured** or by any person or entity for whom the **Insured** is legally liable and to which this insurance applies.

1.      For this coverage to apply, all of the following conditions must be satisfied:

a.      the **Wrongful Act** forming the basis of any **Claim** must first take place on or after the **Retroactive Date** specified in the Retroactive Period Table shown in Item 3. of the Declarations and prior to the expiration date of the **Policy Period** specified in Item 2. of the Declarations**;**

b.      subject to the Policy Aggregate Limit shown in Item 5b. of the Declarations, which is the maximum amount payable under this policy, the Each Claim limit and Aggregate limit corresponding to each Retroactive Period shown in the Retroactive Period Table in Item 3. of the Declarations applies to **Wrongful Acts** that first take place during such Retroactive Period;

c.      prior to the effective date of this policy, no officer, director, principal, partner, insurance manager, risk manager or in-house counsel of any **Insured** had knowledge of any actual or alleged **Wrongful Act** or circumstance that reasonably could give rise to a **Claim** under this policy;

d.      **Claims** must first be made against the **Insured** during the **Policy Period** or any applicable **Extended Reporting Period;** and

e.      the **Insured** must report the **Claim** to the **Company**, in writing, during the **Policy Period** or within sixty (60) days after the expiration of the **Policy Period** or during any applicable **Extended Reporting Period**

DCPL-END-10021 (0120)                                                                      Page 1 of 2

**Item 3.** of the Declarations are deleted in their entirety and replaced with the following:

| Item 3. | Retroactive Date Table: | | |
|---|---|---|---|
| | **Retroactive Date-Period to Which Limits Apply:** | **Each Claim Limit** | **Aggregate Limit** |
| | Advanced Inc. DBA: Advanced Roofing & Sheet Metal Advanced Roofing and Sheet Metal, LLC d/b/a Advanced Roofing and Sheet Metal | | |
| | 12/12/2018 to 11/1/2023 | $1,000,000 | $1,000,000 |
| | 11/1/2019 to 11/1/2023 | $4,000,000 xs $1,000,000 | $4,000,000 xs $1,000,000 |
| | All Other Named Insureds 4/1/2011 to 11/1/2023 | $5,000,000 | $5,000,000 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

IRONSHORE™
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 12

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED(S) ENDORSEMENT - LIMITED

This endorsement modifies the insurance provided by the policy:

1.  Item 1. of the Declarations, **Named Insured** is amended to include the persons or organizations shown in the Schedule of Additional Named **Insureds** below, but only for **Damages** or **Claim Expenses** arising out of actual or alleged **Wrongful Acts** committed by the **Insured** first shown in Item 1. of the Declarations.  Under no circumstance shall coverage apply to any services or activities performed by the Scheduled Additional Named **Insured(s).**

2.  The **Named Insured** first shown in Item 1. of the Declarations is the appointed and irrevocable agent for all **Insureds**, including for the purpose of receipt of any notice or cancellation, notice of nonrenewal (if applicable), and the payment of any premium or deductible or the return of any premium under this policy.

**SCHEDULE OF ADDITIONAL NAMED INSURED[S]**

Reconstruction, Inc.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

**IRONSHORE**
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 13

**Policy Number:** DCP7BABWAMI004                          **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDARTORY DEFINITION OF PROFESSIONAL SERVICES ENDORSEMENT

It is agreed that Section V. DEFINITIONS, Paragraph R. **Professional Services** is amended to EXCLUDE roofing construction, roofing inspections, or roofing system design, including inspection or design of solar or green roofs; except this EXCLUSION does not apply to roofing construction, roofing inspections, or roofing system design, including inspection or design of solar or green roofs performed from 4/1/2011 to 12/12/2019 by the entities list below:

> Reconstruction Experts, Inc.
> Reconstruction, Inc.
> Reconstruction Holdings, Inc.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

# IRONSHORE™
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 14

**Policy Number:** DCP7BABWAMI004                    **Effective Date of Endorsement:** November 01, 2022
**Insured Name:**  Reconstruction Experts, Inc.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND POLICY EXCLUSIONS ENDORSEMNT

Section IV. EXCLUSIONS - the following EXCLUSIONS are deleted in their entirety without replacement:

M.      INSURANCE, BONDS AND SURETIES - The **Insured's** requiring, obtaining, maintaining or the **Insured's** failure to require, obtain or maintain any bond, suretyship or any form of insurance, or any **Claim** based upon or arising out the **Insured's** advising or failing to advise with respect to the requiring, obtaining or maintaining of any bond, suretyship or any form of insurance.

O.       FINANCIAL ADVICE AND PROCUREMENT - The **Insured's** advising or requiring of, or failure to maintain or procure any financing or monies for payment of any portion of a project.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

## Liberty Mutual Group California Privacy Notice

Commercial Lines (excluding Workers' Compensation)
(Effective January 1, 2020)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant residing in California.** It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to libertymutual.com/privacy to review the applicable Liberty Mutual privacy notice.

## What Data Does Liberty Mutual Gather?

We may collect the following categories of data:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal information described in California Civil Code § 1798.80(e)**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;
- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history or performance evaluations;
- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records and loss history information, health data, or criminal convictions; and
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data.

For information about the types of personal data we have collected about California consumers in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**How We Get the Personal Data**:

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| ▪ ask about, buy insurance or file a claim | ▪ your insurance agent or broker |

1

| ▪ pay your policy | ▪ your employer, association or business (if you are insured through them) |
|---|---|
| ▪ visit our websites, call us, or visit our office | ▪ our affiliates or other insurance companies about your transactions with them |
| | ▪ consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | ▪ other public directories and sources |
| | ▪ third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government agencies, open electoral register or in the event of a claim, third parties including other parties to the claim witnesses, experts loss adjustors and claim handlers |
| | ▪ other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

For information about how we have collected personal data in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**How Does Liberty Mutual Use My Data?**

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice. Your data may be used to:

| **Business Purpose** | **Data Categories** |
|---|---|
| **Market, sell and provide insurance.** This includes for example:<br>• calculating your premium;<br>• determining your eligibility for a quote;<br>• confirming your identity and service your policy; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Manage your claim.** This includes, for example:<br>• managing your claim, if any;<br>• conducting claims investigations;<br>• conducting medical examinations;<br>• conducting inspections, appraisals;<br>• providing roadside assistance;<br>• providing rental car replacement, or repairs; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |

2

Version 1.0 (last updated October 13, 2019)

| | |
|---|---|
| **Day to Day Business and Insurance Operations.** This includes, for example:<ul><li>creating, maintaining, customizing and securing accounts;</li><li>supporting day-to-day business and insurance related functions;</li><li>doing internal research for technology development;</li><li>marketing and creating products and services;</li><li>conducting audits related to a current contact with a consumer and other transactions;</li><li>as described at or before the point of gathering personal data or with your authorization;</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> |
| **Security and Fraud Detection.** This includes for example:<ul><li>detecting security issues;</li><li>protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities;</li><li>managing risk and securing our systems, assets, infrastructure and premises; roadside assistance, rental car replacement, or repairs</li><li>help to ensure the safety and security of Liberty staff, assets and resources, which may include physical and virtual access controls and access rights management;</li><li>supervisory controls and other monitoring and reviews, as permitted by law; and emergency and business continuity management;</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> |
| **Regulatory and Legal Requirements.** This includes for example:<ul><li>controls and access rights management;</li><li>to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred;</li><li>exercising and defending our legal rights and positions;</li><li>to meet Liberty contract obligations;</li><li>to respond to law enforcement requests and as required by applicable law, court order, or governmental regulations;</li><li>as otherwise permitted by law.</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> |
| **Improve Your Customer Experience and Our Products.** This includes for example: | <ul><li>Identifiers</li><li>Personal Information</li><li>Commercial Information</li></ul> |

3

| | • Internet or other similar network activity |
|---|---|
| • improve your customer experience, our products and service; | • Professional or employment related information |
| • to provide, support, personalize and develop our website, products and services; | • Inferences drawn from other personal information |
| • create and offer new products and services; | • Risk data |
| | • Claims data |
| **Analytics to identify, understand and manage our risks and products.** This includes for example: | • Identifiers |
| | • Personal Information |
| • conducting analytics to better identify, understand and manage risk and our products; | • Protected Classification Characteristics |
| | • Commercial Information |
| | • Internet or other similar network activity |
| | • Professional or employment related information |
| | • Inferences drawn from other personal information |
| | • Risk data |
| | • Claims data |
| **Customer service and technical support.** This includes for example: | • Identifiers |
| | • Personal Information |
| • answer questions and provide notifications; | • Commercial Information |
| • provide customer and technical support; | • Internet or other similar network activity |
| | • Professional or employment related information |
| | • Inferences drawn from other personal information |
| | • Risk data |
| | • Claims data |

## How Does Liberty Mutual Share My Data?

Liberty Mutual does not sell your personal data as defined by the California Consumer Privacy Act.

Liberty Mutual shares personal data of California consumers with the following categories of third parties:

- Liberty Mutual affiliates;
- Service Providers;
- Public entities and institutions (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Insurers, re-insurers, policy holders, and claimants; and
- As permitted by law.

Liberty Mutual shares the following categories of personal data regarding California consumers to service providers for business purposes:

| | |
|---|---|
| Identifiers | Personal Data; |
| Protected Classification Characteristics; | Commercial Information; |
| Internet or other similar network activity; | Claims Data; |
| Inferences drawn from other personal information; | Risk Data; |
| Professional, employment, and education information; | |

For information about how we have shared personal information in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

## What Privacy Rights Do I Have?

The California Consumer Privacy Act provides California residents with specific rights regarding personal information. These rights are subject to certain exceptions. Our response may be limited as permitted under law.

4

Version 1.0 (last updated October 13, 2019)

**Access or Deletion**

You may have the right to request that Liberty Mutual disclose certain information to you about our collection and use of your personal data in the twelve (12) months preceding such request, including a copy of the personal data we have collected. You also may have the right to request that Liberty Mutual delete personal data that Liberty Mutual collected from you, subject to certain exceptions.

Specifically, you have the right to request that we disclose the following to you, in each case for the twelve (12) month period preceding your request:

- the categories of personal data we have collected about you;

- the categories of sources from which the personal data was/is collected;

- our business or commercial purpose for collecting personal data;

- the categories of third parties with whom we share personal data;

- the specific pieces of data we have collected about you;

- the categories of personal data about you, if any, that we have disclosed for monetary or other valuable consideration, including the categories of third parties to which we have disclosed the data, by category or categories of personal data for each third party to which we disclosed the personal data; and

- the categories of personal data about you that we disclosed for a business purpose.

**You can make a request by either:**

Calling: 800-344-0197

Online: libertymutualgroup.com/privacy-policy/data-request

Mail:    Liberty Mutual Insurance Company
175 Berkeley St., 6th Floor
Boston, MA 02116
Attn:  Privacy Office

You may also make a verifiable consumer request on behalf of your minor child.

You or your authorized agent may only make a verifiable consumer request for access or data deletion twice within a twelve (12) month period. The verifiable consumer request must provide sufficient information that allows Liberty Mutual to reasonably verify that you are the person about whom Liberty Mutual collected personal data or an authorized representative of such person; and describe your request with sufficient detail that allows Liberty Mutual to properly understand, evaluate, and respond to it.  For more information about how Liberty Mutual will verify your identity and how an authorized agent may make a request on your behalf, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**Response Timing**

Liberty Mutual will respond to a verifiable consumer request within forty-five (45) days of its receipt.  If more time is needed, Liberty Mutual will inform you of the reason and extension period in writing.

Any disclosures that will be provided will only cover the twelve (12) month period preceding our receipt of the verifiable consumer request. If Liberty Mutual is unable to fulfill your request, you will be provided with the reason that the request cannot be completed.   For more information about how we will respond to requests, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**Rights to opt in and out of data selling**

California consumers have the right to direct businesses not to sell your personal data (opt-out rights), and personal data of minors under 16 years of age will not be sold, as is their right, without theirs or their parents' opt-in consent. Liberty Mutual does not sell the personal data of consumers.  For more information, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

5

Version 1.0 (last updated October 13, 2019)

**No account needed**

You do not need to create an account with Liberty Mutual to exercise your rights. Liberty Mutual will only use personal data provided in a request to review and comply with the request.

**No discrimination**

You have the right not to be discriminated against for exercising any of your CCPA rights. Unless permitted by the CCPA, exercising your rights will not cause Liberty Mutual to:

- Deny you goods or services;
- Charge you different prices or rates for goods or services, including through granting discounts or other benefits, or imposing penalties;
- Provide you a different level or quality of goods or services; or
- Suggest that you may receive a different price or rate for goods or services, or a different level or quality of goods or services.

## Will Liberty Mutual Update This Privacy Notice?

We reserve the right to makes changes to this notice at any time and for any reason. The updated version of this policy will be effective once it is accessible. You are responsible for reviewing this policy to stay informed of any changes or updates.

## Who Do I Contact Regarding Privacy?

If you have any questions or comments about this Notice or the Supplemental CCPA Notice, your rights, or are requesting the Notice in an alternative format, please do not hesitate to contact Liberty Mutual at:

**Phone**:              800-344-0197

**Email**:              privacy@libertymutual.com

**Postal Address**:     Liberty Mutual Insurance Company
                        175 Berkeley St., 6th Floor
                        Boston, MA 02116
                        Attn:  Privacy Office

6

Version 1.0 (last updated October 13, 2019)

# EXHIBIT 2



through our underwriting agency, Venture Underwriters, LLC.  Please review it carefully.

In the event of a claim that may be covered under this policy, please forward all information to:

**National Claims Services, LLC**    <u>**CLAIMS NOTICE**</u>
Northridge Center 1
Attention: Venture Claims Manager
365 Northridge Road, Suite 250
Atlanta, GA  30350

Phone: (800) 424-0132
Fax: (770) 670-4070
Dear Policyholder:
Email: creport@natlclaim.com

We are pleased to enclose your policy as quoted and bound with General Security Indemnity Company of Arizona
Please contact your broker with any questions, comments or concerns.

GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA
Home Office: 2338 W. Royal Palm Road, Suite 1, Phoenix, AZ 85021
Administrative Office:  28 Liberty Street | Suite 5300 | New York, NY 10005 | 212-480-1900

Managed by:
Venture Underwriters, LLC
Northridge Center 1 | 365 Northridge Road, Suite 400 | Atlanta, GA 30350 | 678-832-2144

## COMMON POLICY DECLARATIONS

**POLICY NO:** GSA4639119825-01                  Renewal of:   GSA4639119825-00

| NAMED INSURED: | MAILING ADDRESS: |
|---|---|
| Reconstruction Experts, Inc. | 5310 Vivian Street<br>Arvada, CO 80002 |

**BUSINESS DESCRIPTION:**
Restoration and Reconstruction Contractor

**POLICY PERIOD:**         **FROM:** 12/1/2022         **TO:** 11/1/2023
**AT 12:01 A.M. Standard Time at your mailing address shown above.**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. WHERE NO PREMIUM IS SHOWN, THERE IS NO COVERAGE. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| Coverage Part(s) | | Premium |
|---|---|---|
| Commercial General Liability Coverage Part | CG 00 01 12 07 | █████ |
| Terrorism Coverage (TRIA) | | |
| Employee Benefits Liability | | |
| Policy Fee | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total** | | █████ |

**M&D Premium**
**Minimum Earned Premium:** 25 % of the original premium

Forms and endorsements applicable to all Coverage Parts: See Schedule VEN D3 04/07

In consideration of the payment of premium and in reliance upon statements made in the application, this policy including all endorsements issued herewith shall constitute the contract between Company and the Named Insured.  This policy is valid only if signed below by a duly authorized representative of the company.

**General Security Indemnity Company of Arizona**

Rodolphe Herve
President & CEO

**THIS CONTRACT IS DELIVERED AS A SURPLUS LINE INSURANCE UNDER THE 'NONADMITTED INSURANCE ACT'. THE INSURER ISSUING THIS CONTRACT IS NOT ADMITTED IN COLORADO BUT IS AN APPROVED NONADMITTED INSURER. THERE IS NO PROTECTION UNDER THE PROVISIONS OF THE 'COLORADO INSURANCE GUARANTY ASSOCIATION ACT.**

Maxine Verne
SVP, General Counsel & Corporate Secretary

# General Security Indemnity Company of Arizona
## COMMERCIAL GENERAL LIABILITY COVERAGE FORM DECLARATIONS

**POLICY NO.:** GSA4639119825-01

**NAMED INSURED:** Reconstruction Experts, Inc.

---

**LIMITS OF INSURANCE**

| | |
|---|---|
| **General Aggregate Limit (other than Products/Completed Operations)** | $2,000,000 |
| **Products/Completed Operations Aggregate Limit** | $2,000,000 |
| **Personal and Advertising Injury Limit** | $1,000,000 |
| **Each Occurrence Limit** | $1,000,000 |
| **Damage to Premises Rented to You** | $50,000 |
| **Medical Expense Limit** | $10,000 |

---

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

**As on file with the company**

---

**FORM OF BUSINESS**

[ ] Individual        [ ] Partnership        [X] Corporation

[ ] Joint Venture      [ ] LLC          [ ] Non-Profit      [ ] Other

---

**THIS IS AN OCCURRENCE [X] / CLAIMS MADE [ ] POLICY.**

If this is a claims made policy, Coverage A of this insurance does not apply to "Bodily Injury" or 'Property Damage" which occurs before the retroactive date shown here:

**PREMIUM**

| CLASSIFICATION | * Premium Basis | Rate | Description | Premium |
|---|---|---|---|---|
| 91580 - Contractors - Executive Supervisors or Executive Superintendents | (r) ▆▆▆▆ | ▆▆▆ | ▆▆▆ | ▆▆▆▆ |
| Flat Charge | (o) | Flat | EBL Premium Charge | ▆▆ |

*(a) Area,   (c) Total cost,   (m) Admission,   (s) Gross sales,   (u) Units, (r) Receipts, (p) Payroll, (o) Other

**FORMS AND ENDORSEMENTS** (other than applicable forms and endorsements shown elsewhere in the policy)

Forms and endorsements applying to this Coverage Part and made part of this policy at time of issue:

SEE SCHEDULE OF FORMS AND ENDORSEMENTS

# General Security Indemnity Company of Arizona

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and endorsements applying to the Coverage Parts listed below and made a part of this policy at the time of issue:

**POLICY NO.:**GSA4639119825-01   **EFFECTIVE DATE** 12/1/2022 - 11/1/2023      At 12.01 A. M. Standard Time

**NAMED INSURED:** Reconstruction Experts, Inc.

**Forms Applicable:**

CLAIMS NOTICE
GSINDA DS 10 (04/21) - COMMON POLICY DECLARATIONS
VEN D2 (04/07) - Commercial General Liability Coverage Form DECLARATIONS
VEN D3 (04/07) - SCHEDULE OF FORMS AND ENDORSEMENTS
CG 00 01 (12/07) - COMMERCIAL GENERAL LIABILITY COVERAGE FORM
CG 00 67 (03/05) - EXCLUSION - VIOLATION OF STATUTES THAT GOVERN EMAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION
CG 20 10 (07/04) - ADDITIONAL INSURED - OWNERS, LESSEES, OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 20 10 (07/04) - ADDITIONAL INSURED - OWNERS, LESSEES, OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 20 11 (04/13) - ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES
CG 20 12 (04/13)- ADDITIONAL INSURED - STATE OR GOVERNMENTAL AGENCY OR SUBDIVISION OR POLITICAL SUBDIVISION - PERMITS OR AUTHORIZATIONS
CG 20 18 (04/13) - ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, or RECEIVER
CG 20 34 (04/13) - ADDITIONAL INSURED - LEASOR OF LEASED EQUIPMENT - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU
CG 20 37 (07/04) - ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - COMPLETED OPERATIONS
CG 20 37 (07/04) - ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - COMPLETED OPERATIONS
CG 21 07 (05/14) - EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFO--RMATION AND DATA-RELATED LIABILITY - LIMITED LIABILITY EXCEPTION NOT INCLUDED
CG 21 36 (03/05) - EXCLUSION - NEW ENTITIES
CG 21 65 (12/04) - TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING  EQUIPMENT EXCEPTION AND A HOSTILE FIRE
CG 21 86 (12/04) - EXCLUSION - EXTERIOR INSULATION and FINISH SYSTEMS
CG 24 04 (05/09) - WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
CG 24 04 (05/09) - WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
CG 24 27 (03/05) - LIMITED CONTRACTUAL LIABILITY - RAILROADS
IL 00 17 (11/98) - COMMON POLICY CONDITIONS
IL 00 21 (09/08) - NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (Broad Form)
IL P 001 (01/04) - U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS
SOS 00 01 (04/21) - SERVICE OF SUIT
TRIA 00 02 (04/21) - Terrorism Risk Insurance Program Reauthorization Act of 2019

# General Security Indemnity Company of Arizona

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and endorsements applying to the Coverage Parts listed below and made a part of this policy at the time of issue:

**POLICY NO.:** GSA4639119825-01    **EFFECTIVE DATE** 12/1/2022 - 11/1/2023        At 12.01 A. M. Standard Time

**NAMED INSURED:** Reconstruction Experts, Inc.

**Forms Applicable:**

TRIA 00 06 (04/21) - Exclusion of Certified and Other Acts of Terrorism
VEN 001 00 (05/18) - ABSOLUTE ASBESTOS AND LEAD EXCLUSION
VEN 008 01 12 19 - CGL CHANGES ENDORSEMENT - AMENDED - REMOVE A. 1.
POLLUTION EXCLUSION
VEN 013 00 (05/18) - COMPOSITE RATE ENDORSEMENT
VEN 015 01 (05/18) - CONDOMINIUM, TOWNHOME AND TRACT EXCLUSION - AMENDED
VEN 027 00 (01/15) - EMPLOYEE BENEFITS LIABILITY COVERAGE
VEN 044 00 (01/15) - MINIMUM AND DEPOSIT PREMIUM ENDORSEMENT
VEN 046 00 (01/15) - NAMED INSURED ENDORSEMENT
VEN 047 00 (01/15) - NEW YORK OPERATIONS EXCLUSION
VEN 049 01 (02/20) - OTHER INSURANCE AMENDATORY ENDORSEMENT
VEN 051 00 (01/15) - PRIMARY & NON CONTRIBUTING INSURANCE ENDORSEMENT
VEN 051 00 (01/15) - PRIMARY & NON CONTRIBUTING INSURANCE ENDORSEMENT
VEN 053 00 (02/20) - PROFESSIONAL LIABILITY EXCLUSION
VEN 057 01 05 19 - ROOFING OPERATIONS EXLCUSION
VEN 058 00 (02/20) - SELF INSURED RETENTION ENDORSEMENT (CONDITION
PRECEDENT - with administrator requirement)
VEN 062 07 (02/20) - CONTRACTORS WARRANTY and SELF-INSURED RETENTION
ENDORSEMENT
VEN 064 00 (01/15) - THIRD PARTY CANCELLATION NOTICE ENDORSEMENT
VEN 064 00 (01/15) - THIRD PARTY CANCELLATION NOTICE ENDORSEMENT
VEN 064 00 (01/15) - THIRD PARTY CANCELLATION NOTICE ENDORSEMENT
VEN 064 00 (01/15) - THIRD PARTY CANCELLATION NOTICE ENDORSEMENT
VEN 065 01 (02/20) - HEATING DEVICES OR PROCESSES EXCLUSION ENDORSEMENT
VEN 069 02 (04/18) - WRAP-UP EXCLUSION (Limited off-site exception)
VEN 079 01 (03/18) - POLICY LIMITATION - TOTAL AGGREGATE LIMIT FOR ALL
CONSTRUCTION PROJECTS
VEN 089 01 (02/20) - FUNGI OR BACTERIA EXCLUSION
VEN 100 00 (10/19) - EXCLUSION FOR WORK PERFORMED FOR AND PRODUCTS OR
EQUIPMENT PROVIDED TO ELECTRICAL-RELATED PUBLIC UTILITIES IN CALIFORNIA
VEN 105 00 (02/20) - PREMIUM BASIS
VEN 107 00 (02/20) - PREMIUM AUDIT ENDORSEMENT
VEN 108 00 (07/20) - EXCLUSION FOR RADIOACTIVE CONTAMINATION, CHEMICAL,
BIOLOGICAL, BIO-CHEMICAL, and/or ELECTROMAGNETIC LIABILITY
VEN 109 00 (08/20) - TRADE OR ECONOMIC SANCTIONS

COMMERCIAL GENERAL LIABILITY
CG 00 01 12 07

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** –Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

© ISO Properties, Inc., 2006

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2006
CG 00 01 12 07    ☐

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2006

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006
□

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

© ISO Properties, Inc., 2006

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

     **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

     **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

   **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

   This insurance does not apply to:

   **a. Knowing Violation Of Rights Of Another**

     "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   **b. Material Published With Knowledge Of Falsity**

     "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

   **c. Material Published Prior To Policy Period**

     "Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

   **d. Criminal Acts**

     "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   **e. Contractual Liability**

     "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   **f. Breach Of Contract**

     "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   **g. Quality Or Performance Of Goods – Failure To Conform To Statements**

     "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   **h. Wrong Description Of Prices**

     "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

   **i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

     "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

     However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

   **j. Insureds In Media And Internet Type Businesses**

     "Personal and advertising injury" committed by an insured whose business is:

     **(1)** Advertising, broadcasting, publishing or telecasting;

     **(2)** Designing or determining content of web-sites for others; or

© ISO Properties, Inc., 2006

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

© ISO Properties, Inc., 2006

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   **(1)** "Bodily injury" or "personal and advertising injury":

   **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

   **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

   **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

   **(d)** Arising out of his or her providing or failing to provide professional health care services.

   **(2)** "Property damage" to property:

   **(a)** Owned, occupied or used by,

   **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

   you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C**;

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

© ISO Properties, Inc., 2006

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

 © ISO Properties, Inc., 2006 □

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   **c.** All other parts of the world if the injury or damage arises out of:

      **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

      **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.** A sidetrack agreement;

   **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph **f.** does not include that part of any contract or agreement:

   **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2006

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   **b.** While it is in or on an aircraft, watercraft or "auto"; or

   **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** Vehicles maintained for use solely on or next to premises you own or rent;

   **c.** Vehicles that travel on crawler treads;

   **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      **(1)** Power cranes, shovels, loaders, diggers or drills; or

      **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

   **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      **(2)** Cherry pickers and similar devices used to raise or lower workers;

   **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **(1)** Equipment designed primarily for:

      **(a)** Snow removal;

      **(b)** Road maintenance, but not construction or resurfacing; or

      **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **f.** The use of another's advertising idea in your "advertisement"; or

   **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

© ISO Properties, Inc., 2006

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

         Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2006

□

COMMERCIAL GENERAL LIABILITY
CG 00 67 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

  **2. Exclusions**

  This insurance does not apply to:

  **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

  "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

  **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

  **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

  **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

  This insurance does not apply to:

  **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

  "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

  **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

  **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

  **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

© ISO Properties, Inc., 2004

POLICY NUMBER:GSA4639119825-01

**COMMERCIAL GENERAL LIABILITY**
**CG 20 10 07 04**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| As Required By Written Contract, Fully Executed Prior To The Named Insured's Work | As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

  **1.** Your acts or omissions; or

  **2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

  **1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

  **2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**CG 20 10 07 04**                    © ISO Properties, Inc., 2004                    **Page 1 of 1**                □

POLICY NUMBER:GSA4639119825-01

COMMERCIAL GENERAL LIABILITY
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| City of Pasadena, its Council Members, Commissioners, Officers, Employees and Agents 100 N. Garfield Ave. Pasadena, CA 91101 | As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

   **1.** Your acts or omissions; or

   **2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

   **1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   **2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

© ISO Properties, Inc., 2004

POLICY NUMBER: GSA4639119825-01

COMMERCIAL GENERAL LIABILITY
CG 20 11 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| |
|---|
| **Designation Of Premises (Part Leased To You):**<br>As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| **Name Of Person(s) Or Organization(s) (Additional Insured):**<br>As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| **Additional Premium:**     $ Included |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

POLICY NUMBER: GSA4639119825-01

**COMMERCIAL GENERAL LIABILITY**
**CG 20 12 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ADDITIONAL INSURED – STATE OR GOVERNMENTAL**
**AGENCY OR SUBDIVISION OR POLITICAL**
**SUBDIVISION – PERMITS OR AUTHORIZATIONS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| State Or Governmental Agency Or Subdivision Or Political Subdivision: |
|---|
| As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured any state or governmental agency or subdivision or political subdivision shown in the Schedule, subject to the following provisions:

1. This insurance applies only with respect to operations performed by you or on your behalf for which the state or governmental agency or subdivision or political subdivision has issued a permit or authorization.

   However:

   **a.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

   **b.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

2. This insurance does not apply to:

   **a.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

   **b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 12 04 13**

© Insurance Services Office, Inc., 2012

**Page 1 of 1**

POLICY NUMBER: GSA4639119825-01

COMMERCIAL GENERAL LIABILITY
CG 20 18 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| As Required By Written Contract, Fully Executed Prior To The Named Insured's Work | As required by written contract; Any and All Locations |

| |
|---|
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 20 34 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT – AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy. Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However, the insurance afforded to such additional insured:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement you have entered into with the additional insured; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

POLICY NUMBER: GSA4639119825-01

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| As Required By Written Contract, Fully Executed Prior To The Named Insured's Work | As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

© ISO Properties, Inc., 2004

POLICY NUMBER: GSA4639119825-01

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| City of Pasadena, its Council Members, Commissioners, Officers, Employees and Agents<br>100 N. Garfield Ave.<br>Pasadena, CA 91101 | As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

© ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 21 07 05 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 21 36 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II – Who Is An Insured** does not apply.

© ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

COMMERCIAL GENERAL LIABILITY
CG 21 86 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

  **1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

  **2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

  **1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

  **2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

  **3.** A reinforced or unreinforced base coat;

  **4.** A finish coat providing surface texture to which color may be added; and

  **5.** Any flashing, caulking or sealant used with the system for any purpose.

         © ISO Properties, Inc., 2003

POLICY NUMBER: GSA4639119825-01

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| **Name Of Person Or Organization:** |
| --- |
| As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
| --- |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

POLICY NUMBER: GSA4639119825-01

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| City of Pasadena, its Council Members, Commissioners, Officers, Employees and Agents |
| 100 N. Garfield Ave. |
| Pasadena, CA 91101 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008

POLICY NUMBER:

COMMERCIAL GENERAL LIABILITY
CG 24 27 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED CONTRACTUAL LIABILITY – RAILROADS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Scheduled Railroad:** As Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| **Designated Job Site: A**s Required By Written Contract, Fully Executed Prior To The Named Insured's Work |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

With respect to operations performed for, or affecting, a Scheduled Railroad at a Designated Job Site, the definition of "insured contract" in the **Definitions** Section is replaced by the following:

9. "Insured Contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   (a) Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

(2) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(1)** above and supervisory, inspection, architectural or engineering activities.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

□

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

 © ISO Properties, Inc., 2007  ☐

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

**General Security Indemnity Company of Arizona**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SERVICE OF SUIT**

In the event an action or proceeding arises under the contract, it is agreed that the Company, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver or limitation of the right to arbitration as set forth herein or to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of process in such suit may be made upon:

> General Security Indemnity Company of Arizona
> General Counsel
> 28 Liberty Street
> Suite 5400
> New York, NY 10005, United States

In any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, other officer specified for that purpose in the statute, or his successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suite, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named General Security Indemnity Company of Arizona as the entity to whom the said officer is authorized to mail such process or a true copy thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**General Security Indemnity Company of Arizona**

## Policyholder Notice

### Terrorism Risk Insurance Program Reauthorization Act of 2019

This Notice addresses requirements of the Terrorism Risk Insurance Act of 2002, and any amendments or extensions thereto, including the Terrorism Risk Insurance Program Reauthorization Act of 2019 (hereinafter "Act").

**Definitions**

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States: to be an act of terrorism; to be an act that is violent or dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism loss" means any loss resulting from an "act of terrorism" (including an act of war, in the case of workers compensation) that is covered by primary or excess or umbrella property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means the amount established in the Act that must be paid by the insurer issuing your policy before the federal government can pay its share of the compensation for insured terrorism losses.

**Notice of Federal Share of Losses, Premium Charge, and potential reduction in coverage under your Policy**

YOU SHOULD KNOW THAT COVERAGE WHICH MAY BE PROVIDED BY THIS POLICY FOR INSURED TERRORISM LOSSES IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR, BIOLOGICAL OR CHEMICAL EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 80% OF INSURED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, **YOUR COVERAGE MAY BE REDUCED**.

If you elected to purchase coverage for insured terrorism losses, the premium charge for this coverage is shown in the Declarations or an extension to the Declarations.

If you rejected this offer of coverage, coverage for statutorily mandated fire coverage resulting from such acts, if applicable to your coverage, is provided at no additional premium charge

© 2020 General Security Indemnity Company of Arizona
All Rights Reserved.
May not be copied without permission.

**General Security Indemnity Company of Arizona**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Exclusion of Certified and Other Acts of Terrorism

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:**

1. "We, "us," "our" and "insurer" means General Security Indemnity Company of Arizona.

2. "You" means the insured listed in the declarations to this policy.

3. "Certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism according to the U.S. federal Terrorism Risk Insurance Act and any subsequent federal law modifying it, including the Terrorism Risk Insurance Program Reauthorization Act of 2019 ("TRIA"). The criteria contained in TRIA for a "certified act of terrorism" include the following:

    a.    The act resulted in insured losses in excess of $5 million in the aggregate, that are attributable to all types of insurance that is subject to the TRIA; and

    b.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

4. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure (including the use or operation, as a means of inflicting harm, of any computer, computer system, computer software program, malicious or improperly written code, computer virus or trojan, or any other electronic, photonic or optoelectronic system) that is committed by or for any individual, individuals, corporation, partnership or any entity and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to TRIA.

**B. The following exclusions are added:**

**1. Exclusion of Certified Act of Terrorism and Other Act of Terrorism**

The provisions of this endorsement shall have control over any other conflicting provisions in the policy. Except as required by Section V, this policy does not apply to any bodily injury, property damage, personal injury, advertising injury, loss, damage, cost, claim or suit, expense, punitive damages, exemplary damages, or any other demand for money under the policy to which this endorsement is attached, or any underlying insurance, that is caused by, exacerbated by or which arises, directly or indirectly, out of a "certified act of terrorism" or an "other act of terrorism."

**2. Exclusion of Actions in Relation to a Certified Act of Terrorism and Other Act of Terrorism**

This policy does not apply to loss, damage, cost or expense of any nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, retaliating against, suppressing or in any way relating to a "certified act of terrorism" or an "other act of terrorism."

In the event any portion of these exclusions or clause thereof is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**General Security Indemnity Company of Arizona**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**C. No Coverage Implied**

The terms and conditions of this policy shall always apply, and the limitations of any exclusion or exceptions to such exclusion, or the inapplicability or omission of an exclusion, shall not serve to create coverage for any loss which would otherwise be excluded under this policy, such as losses excluded by the Nuclear Hazard Exclusion or the War and Military Action Exclusion.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 001 00 (05/18)**

**ABSOLUTE ASBESTOS AND LEAD EXCLUSION**

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to **SECTION 1 - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE,** Paragraph **2. Exclusions** and **SECTION 1 – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY,** Paragraph **2. Exclusions** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM;**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of the mining, manufacture, handling, use, ingestion, inhalation, absorption, distribution, sale, existence, abatement, "enclosure", "encapsulation" or removal of "asbestos" or "lead" in any form.

We have no duty to defend you or to investigate any "occurrence", "offense" or "suit" against you, which arises out of "asbestos", or "lead" in any form.  If you investigate or defend any such "occurrence", "offense" or "suit", we have no duty to pay the expenses of the investigation or defense, nor do we have any duty to reimburse you.

Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of asbestos or lead; or

Any loss, cost or expense arising out of any claim or suit on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of asbestos or lead.

A. SECTION V. – DEFINITIONS is amended to add the following additional definitions:

1. "Asbestos" means naturally occurring hydrated fibrous mineral silicates that possess a unique crystalline structure and are incombustible in air, including chrysotile, amosite, crocidolite, tremolite, anthophyllite, anctinolite, and any material which contains "asbestos".

2. "Encapsulant" means a substance applied directly to the surface of a material or substance to prevent the discharge, dispersal, release or escape of any part of that material or substance, either by creating a membrane over the surface or by penetrating the material or substance and binding its components together.

3. "Encapsulation" means the coating of the surface of a material or substance with an "encapsulant" to prevent the discharge, dispersal, release or escape of any part of that material or substance.

4. "Enclosure" means those procedures and operations (excluding "encapsulation") required to construct an airtight, impermeable wall, ceiling or other permanent barrier around the surface of a material or substance to prevent the discharge, dispersal, release or escape of any part of that material or substance.

5. "Lead" means the heavy, soft, solid and naturally occurring metallic element used in paints, pipes, solder, pottery, and batteries, as well as in any other substance containing "lead".

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 008 01 (12/19)**

**COMMERCIAL GENERAL LIABILITY
AMENDMENT TO INSURING AGREEMENT and
ADDITIONAL EXCLUSIONS AND DEFINITIONS
ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.    Exclusion 2.f of **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted and replaced by the following:

**Pollution**

1.    "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

a.    "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

b.    "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(1)    At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(2)    At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

2.    Any loss, cost or expense arising out of any:

a.    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

b.    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

3.    "Bodily Injury", "property damage" or "personal and advertising injury" arising out of, related to, or attributable to, in whole or in part, runoff or escape of water, silt, soil, or other debris or materials from any job site or property of any insured caused by any precipitation or other weather event, including but not limited to any actual or alleged failure to adequately maintain containment or to otherwise protect against or prevent the runoff or escape of water, silt, soil,

or other debris/materials from any worksite of any insured.

**C.** **SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** is amended to add the following exclusion to paragraph 2.

"Personal and advertising injury" to an "employee" of the insured which arises out of or is in the course of their employment by the insured.

**D.** **SECTION III - LIMITS OF INSURANCE** is amended to add the following to paragraph 5.:

The Each Occurrence Limit is the most we will pay regardless of the number of primary liability policies issued to any insured by us which may apply to the same "occurrence", claim, or suit.

**E.** The following exclusions are added as **Additional Exclusions** applicable to **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** AND **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to, and we shall have no duty to investigate or defend any insured in connection with any liability, claim, or "suit" for:

**1.** **Punitive or Exemplary Damage, Fines, and Penalties:**

Exemplary or punitive damages, fines or penalties, based upon, arising out of, or imposed by or under any law, statute, or ordinance of any federal, state or municipal government agency, or any other types of fines, penalties, punitive damages, exemplary damages, treble damages, or the multiplication of compensatory damages, of any nature. We will not have an obligation to pay for any costs, interests or damages attributable to punitive or exemplary damages, or any fines or penalties of any nature under any statute, rule, or order of a court.

This exclusion does not apply to the extent that the foregoing is expressly prohibited by state law or insurance department regulation.

**2.** **Abuse or Molestation**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of:

    a.   The actual, alleged or threatened abuse, harassment or molestation, whether physical, sexual or emotional, by anyone of any person while in the care, custody or control of any insured, or

    b.   The negligent:
       (1) Employment;
       (2) Investigation;
       (3) Supervision;
       (4) Reporting to the proper authorities, or
       failure to so report; or
       (5) Retention;
      of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 3.a. above.

**3.** **Pre-Existing Injury or Damage**

    a.   "Bodily injury, "property damage" or "personal and advertising injury", whether known or unknown to the Named Insured:

       (1) which first occurred prior to the inception date of this policy or the retroactive date of this policy, if any; or

       (2) which is, or is alleged to be, in the process of occurring as of the inception of this policy or the retroactive date of this policy, if any; even if the "occurrence continues during this policy period.

    b.   This exclusion shall apply whether or not the insured's legal obligation to pay damages in respect of such damage, defect, deficiency, inadequacy or dangerous condition was established before the inception date of this policy.

    c.   Any incidents or occurrences arising out of actual or alleged "bodily injury", "property damage" or "personal and advertising injury" which are in the process of settlement, adjustment or "suit" as of the inception of this policy or the retroactive date of this policy, if any.

    d.   "Bodily injury", "property damage", or "personal and advertising injury" arising out of any damage, defect, deficiency, inadequacy or dangerous condition shall be deemed to have taken place in its entirety as of the earliest date by which any damage first occurred, irrespective of whether any insured was aware of the existence of any such damage, and irrespective of whether such damage may have been continuous or progressive or may have been due to repeated exposure to substantially the same harmful

conditions or may have become progressively worse during the period of this policy. Work performed by Named Insured prior to the inception of this policy will be deemed to have taken place prior to the inception of this policy.

**4.    Operations Covered by a Project Policy**

"Bodily Injury", "property damage", or "personal and advertising injury" arising out of "your work" when other liability insurance covers you for "your work" arising out of a specific project or operations at a location designated in the other liability insurance policy. This exclusion applies whether or not the other insurance has limits adequate to cover all claims or remains in effect, and whether or not all of "your work" in connection with the project or development is covered under the project-specific policy.

**5.    Athletic Activities**

"Bodily injury", "property damage", or "personal and advertising injury" to any person or organization while practicing for or participating in any contest or exhibition of an athletic or sports

nature. This exclusion includes but is not limited to injury or damage to any person or organization while rehearsing, practicing, instructing, or in any way participating in physical exercises or games, sports, or athletic contests or exhibitions.

**6.    Cross Suits**

"Bodily injury", "property damage", or "personal and advertising injury" arising from claims or "suits" brought by:

a.    One Named Insured against another Named Insured;

b.    Any parent company, parent corporation, or holding company that owns any interest in any Named Insured, or any subsidiary company or subsidiary corporation which owns any interest in any Named Insured;

c.    Any other company or corporation of which any interest is owned by any of the entities described in a. or b. above;

d.    Any division or department of any of the entities described in a., b., or c. above;

e.    Any officer, director, or employee of any of the entities described in a., b., c., or d. above.

**7.    Silica, Silica Dust Or Mixed Dust**

a. (1) "bodily injury", "property damage" or "personal and advertising injury" arising out of the inhalation, ingestion, physical exposure to, absorption of dust, silica, silica dust, concrete dust, plaster dust, or "mixed dust" in any form, or from any goods, products or structures containing silica, silica dust, concrete, plaster, or "mixed dust" in any form; or

    (2) "property damage", loss or use, or devaluation of property arising from any form of silica, silica dust, concrete dust, plaster dust, or "mixed dust", in any form, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to any such "bodily injury", "property damage" or "personal and advertising injury".

b.    any loss, cost or expenses arising out of

    (1) the existence of silica, silica dust, concrete dust, plaster dust or "mixed dust", in any form, in any occupancy, structure or construction; or

    (2) goods, products or structures containing silica, silica dust, concrete dust, plaster dust or "mixed dust", in any form;

c.    any loss, cost or expenses arising out of:

    (1) the manufacture, sale, transportation, distribution, use, installation handling or storage of silica, silica dust, concrete dust, plaster dust or "mixed dust", in any form; or

    (2) the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of silica, silica dust, concrete dust, plaster dust or "mixed dust", in any form; or

    (3). any supervision, instructions, recommendations, requests, warnings or advice given or which should have be

given in relation to silica, silica dust, concrete dust, plaster dust or "mixed dust", in any form, by any insured or by any other person or entity.

"Mixed dust" includes any dust particles from quartz, granite or other rock, metallic or fibrous minerals, metals, wood, concrete and/or plaster.

8.  **Drywall Manufactured in China**

    "Bodily Injury", "property damage" or "personal and advertising injury" arising out of, caused by, related or attributable to, in whole or in part, drywall, plasterboard, sheetrock, gypsum board, or any materials used in the manufacture of drywall, plasterboard, sheetrock, gypsum board or any other materials used in the construction of interior walls, that were manufactured in, originated or exported from China or incorporated any component parts or materials made in, originated or exported from China.

9.  **Misrepresentation in Application.**

    This policy does not apply to any "claim," "occurrence" or "suit" that would otherwise be covered but for a misrepresentation in the application for insurance by the insured. This exclusion shall apply if the concealed, undisclosed, or misrepresented information would have had an effect on the terms, conditions, exclusions, endorsements, premium, overall risk eligibility, or issuance of the policy, had it been known to the Company at the time the insured initially applied for or renewed this policy.

F.  **SECTION V - DEFINITIONS** is amended as follows:

    1.  Paragraph 5. Is deleted in its entirety and replaced by the following:

        "Employee" includes a "leased worker" and a "temporary worker".

    2.  Paragraph 19. Is deleted in its entirety and replaced by the following:

        "Temporary worker" means a person who is furnished to or employed by you to substitute for a permanent "employee" on leave or to meet seasonal or short-term work load conditions. "Temporary worker" includes casual labor.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 013 00 (05/18)**

**COMPOSITE RATE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This policy is adjustable at a rate of of exposure based on:      **$6.19**      **per $1,000**

[ ] Acreage        [ ] Area        [ ] Construction costs        [X] Gross receipts

[ ] Payroll        [ ] Subcosts        [ ] Units        [ ] Other: _____

Estimated exposure for the policy period at policy inception: **$137,500,000.00**

All other terms, conditions and exclusions under the policy are applicable to this Endorsement and remain unchanged.

**GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 015 01 (05/18) - AMENDED**

**CONDOMINIUM, TOWNHOME AND TRACT EXCLUSION**

This endorsement modifies the insurance provided under the following:

COMMERCIAL     GENERAL     LIABILITY
COVERAGE PART

The following exclusion is added to **SECTION 1 - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE**, Paragraph **2. Exclusions** and **SECTION 1 – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**, Paragraph **2. Exclusions** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**;

This insurance does not apply to and the Company shall have no obligation to provide indemnity or defense for any "bodily injury", "property damage", or "personal and advertising injury" arising from work or product performed or supplied by you or contractors or subcontractors:

1. "Condominiums or townhomes", or "tract houses";
2. Any location which has been or becomes converted into condominiums or townhomes, regardless of whether:
   a. Any insured had involvement in the conversion;
   b. Any insured had knowledge of the conversion;
   c. The conversion is prior to or subsequent to any insured's work at the location

This exclusion does not apply to:

1. Remodeling or repair of existing individual condominium or townhome units if the work is performed for the individual unit owner.
2. Remodeling, repair, or additions to an existing single house in a "tract house" development if the work is performed for the individual unit owner.
3. Maintenance, service, remodeling, or repair of a completed and occupied "residential condominium or townhome" or "tract house" development.
4. repair/remodel     work     done     for HOA's/COA's

The following are added to Section V – DEFINITIONS:

"Condominiums or townhomes" means real estate, portions of which are designated, designed or intended for occupancy in whole or in part by any person, persons, or organization with separate ownership and the remainder of which is designated for common ownership by the owners of those portions and where the undivided interests in the common elements are vested in the unit owners.

A "tract house" is a house that was originally built as part of a tract house development project.  A tract house development project is comprised of a piece or parcel of land subdivided into five or more lots for the development, construction and sale of freestanding one or two family dwellings.

All other terms, conditions and exclusions under the policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 027 00 (01/15)**

## EMPLOYEE BENEFITS LIABILITY COVERAGE

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE OF COVERAGE**

| Coverage | Limit Of Insurance | Deductible | Premium |
|---|---|---|---|
| **Each Wrongful Act or Series of Related Wrongful Acts** | $1,000,000 | **$1,000 Each Wrongful Act or Series of Related Wrongful Acts** | Included |
| **Employee Benefits Liability Aggregate** | $1,000,000 | | |
| **Retroactive Date:** | 04/02/2009 | | |

**THE COVERAGE AFFORDED UNDER THIS ENDORSEMENT IS WRITTEN ON A CLAIMS-MADE BASIS PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

**A.  EMPLOYEE BENEFITS LIABILITY**

**1.  Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any wrongful act, error or omission, of the insured, or of any other person for whose wrongful acts the insured is legally liable, to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  We may, at our discretion, investigate any report of a wrongful act, error or omission and settle any "claim" or "suit" that may result.  But:

    **(1)** The amount we will pay for damages is limited as described in Paragraph **E.** (Section **III** – Limits Of Insurance); and

    **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform wrongful acts or services is covered unless explicitly provided for under Supplementary Payments.

    **b.** This insurance applies to damages only if:

    **(1)** The wrongful act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

    **(2)** The wrongful act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

    **(3)** A "claim" for damages, because of a wrongful act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **G.** of this endorsement.

c. A "claim" seeking damages will be deemed to have been made at the earlier of the following times.
   (1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

   (2) When we make settlement in accordance with Paragraph **1.a.** above.

   A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

d. All "claims" for damages made by an "employee" because of any wrongful act, error or omission, or a series of related wrongful acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2. Exclusions**
This Insurance does not apply to:

a. **Dishonest, Fraudulent, Criminal or Malicious Wrongful act**
   Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious wrongful act, error or omission committed by any insured, including the willful or reckless violation of any statute.

b. **Bodily Injury, Property Damage, or Personal And Advertising Injury**
   "Bodily injury", "property damage" or "personal and advertising injury".

c. **Failure to Perform A Contract**
   Damages arising out of failure of performance of contract by any insurer.

d. **Insufficiency of Funds**
   Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

e. **Inadequacy Of Performance Of Investment/Advise Given With Respect To Participation**

   Any "claim" based upon:
   (1) Failure of any investment to perform;

   (2) Errors in providing information on past performance of investment vehicles; or
   (3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

f. **Worker's Compensation and Similar Laws**
   Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

g. **ERISA**
   Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Wrongful act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

h. **Available Benefits**
   Any "claims" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

i. **Taxes, Fines or Penalties**
   Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

j. **Employment-Related Practices**
   Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:
1. All references to Supplementary Payments – Coverages **A** and **B** are replaced by Supplementary Payments – Coverages **A, B** and **Employee Benefits Liability.**

2. Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **4.** of **Section II – Who Is An Insured** are replaced by the following:

    **2.** Each of the following is also an insured:

        **a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".

        **b.** Any persons, organizations, or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

        **c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

    **4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

        **a.** Coverage under this provision is afforded only until the 60th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

        **b.** Coverage under this provision does not apply to any wrongful act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, Paragraph **3.** of **Section II – Who Is An Insured** does not apply.

**E.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

    **1. Limits Of Insurance**

        **a.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

        **(1)** Insureds;

        **(2)** "Claims" made or "suits" brought;

        **(3)** Persons or organizations making "claims" or bringing "suits";

        **(4)** Wrongful acts, errors or omissions; or

        **(5)** Benefits included in your "employee benefit program".

        **b.** The Aggregate Limit is the most we will pay for all damages because of wrongful acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

        **c.** Subject to the Aggregate Limit, the Each Wrongful act Limit is the most we will pay for all damages sustained, as a result of:

        **(1)** A wrongful act, error or omission; or

        **(2)** A series of related wrongful acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

        However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

    The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

    **2. Deductible**

        **a.** The deductible amount indicated in the Schedule of Coverage shall be subtracted from the total amount of all sums which we are obligated to pay or incur on behalf of the insured on account of each "wrongful act" or series of related "wrongful acts" as stated in the Schedule of Coverage.

        **b.** The terms of this insurance, including those with respect to:

        **(1)** Our right and duty to defend any "suits" seeking those damages; and

(2) Your duties and the duties of any other involved insured, in the event of a wrongful act, error or omission, or "claim" apply irrespective of the application of the deductible amount.

**F.** For the purposes of the coverage provided by this endorsement, Conditions **2.** and **4.** of **Section IV – Conditions** are replaced by the following.

**2. Duties In The Event Of An Wrongful act, Error Or Omission, Or "Claim" Or "Suit"**

**a.** You must see to it that we are notified as soon as practicable of a wrongful act, error or omission, which may result in a "claim". To the extent possible, notice should include:

(1) What the wrongful act, error or omission was and when it occurred; and

(2) The names and addresses of anyone who may suffer damages as a result of the wrongful act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the "claim" or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the 'claim' or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization, which may be liable to the insured because of a wrongful act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**
If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**
This insurance is primary except when **b.** below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**
(1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an wrongful act, error or omission on other than a claims-made basis, if:

(a) No Retroactive Date is shown in the Schedule  of this insurance; or

(b) The other insurance has a policy period  that continues after the Retroactive Date shown in the Schedule of this insurance.

(2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and that total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance of all insurers.

**G.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage part:

**EXTENDED REPORTING PERIOD**

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if:

**a.** This endorsement is cancelled or not renewed; or

**b.** We renew or replace this endorsement with insurance that:

(1) Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

(2) Does not apply to a wrongful act, error or omission on a claims-made basis.

**2.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for wrongful acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be cancelled.

**3.** An Extended Reporting Period of three years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 30 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**a.** The "employee benefit programs" insured;

**b.** Previous types and amounts of insurance;

**c.** Limits of insurance available under this endorsement for future payment of damages; and

**d.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **E.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **E.1.c.**

**H.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.** "Administration" means:

    **a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.** Handling records in connection with the "employee benefit program"; or

    **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    **a.** Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    **b.** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

    **c.** Unemployment insurance, social security benefits, workers' compensation and disability benefits.

    **d.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

    **e.** Any other similar benefits designated in the Schedule or added thereto by endorsement.

**4.** "Wrongful act" means any wrongful actual or alleged negligent wrongful act, error or omission in the "administration" of the "employee benefits program."

**I.** For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

**4.** "Employee" means a person wrongful actively employed, formerly employed, on leave of absence or disable, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**18.** "Suit" means a civil proceeding in which damages because of a wrongful act, error or omission to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 044 00 (01/15)**

**MINIMUM AND DEPOSIT PREMIUM ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Item b. of the Premium Audit Condition under SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS is replaced as follows:

The minimum and deposit premium shown on the declarations page of this policy is the advance premium for the full policy term applicable to this policy.

At the close of each audit period, we will compute the earned premium for that period.  Audit premiums are due and payable to us on notice to the first Named Insured.  If the audit premium is less than the minimum and deposit premium, the minimum and deposit premium will apply, with no return to you.

For purposes of this policy, the terms advance premium, audit premium, earned premium, and minimum premium are defined as follows:

**Advance Premium** – The premium that is stated in the policy declarations and payable in full by the first Named Insured at the inception of the policy.
**Audit Premium –** The premium that is developed by calculating the difference between the advance premium and the earned premium.
**Earned Premium –** The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the policy period.
**Minimum Premium** – The lowest premium for which this insurance will be written for the policy period.

**MINIMUM EARNED PREMIUM**

Paragraph 5. Of the CANCELLATION Condition contained in the COMMON POLICY CONDITIONS is deleted in its entirety and replaced with the following:

If this policy is cancelled, we will send the first named insured any premium refund due.  If we cancel the refund will be pro rata.  If the first Named Insured cancels, the refund will reflect either a 25% Minimum Earned Premium or a Short Rate charge, whichever is greater.  The cancellation will be effective even if we have not made or offered a refund.

Minimum and Advance Premium:   $851,125

Minimum Earned Premium: **25%** of the Minimum and Advanced Premium or   $212,782

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 046 00 (01/15)**

**NAMED INSURED ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The person(s) or organization(s) named in the schedule below shall be added as a Named Insured under this policy.  The person(s) or organization(s) who appears on the Declarations page as the Named Insured shall remain the first Named Insured for the purposes of this policy.

**SCHEDULE OF NAMED INSUREDS**

Reconstruction Experts, Inc. / Reconstruction, Inc. / Reconstruction Holdings, Inc. / Advanced, Inc. / Advanced Roofing and Sheetmetal, LLC

Coverage as a Named Insured is limited to performance of duties for other Named Insureds that are either a corporation, Ltd., LLC, or L.C. entity (applies to any individuals appearing on the list).

It is understood and agreed that irrespective of the number of persons or organizations schedules as Named Insureds under this policy in no event shall the Company's limits of liability exceed the limits designated in the Declarations.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 047 00 (01/15)**

**NEW YORK OPERATIONS EXCLUSION**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions:

**Schedule**

ANY CONSTRUCTION WORK PERFORMED IN THE STATE OF NEW YORK

This insurance does not apply to "bodily injury" or "property damage" arising out of the operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or others.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 049 01 (02/20)**

**OTHER INSURANCE AMENDATORY ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, Paragraph 4. Other Insurance,** is amended as follows:

Paragraph **a. Primary Insurance,** Paragraph **b. Excess Insurance,** and Paragraph c. **Method of Sharing,** are **deleted** in their entirety and **replaced** by the following:

**a.** This insurance is primary, except when **b.** below applies.

**b.** This insurance is excess over any other insurance that is valid and collectible insurance available to any Named Insured or any Additional Insured whether such insurance is primary, excess, contingent or on any other basis and regardless of the nature, type, date of issuance or limits of such other insurance available to any Named Insured or any Additional Insured. Our obligation to defend and indemnify any Named Insured or any Additional Insured under this policy shall not arise until the limits of such other insurance are exhausted.

**c.** As a condition precedent to our obligations to provide or to continue to provide indemnity, coverage, or defense hereunder, each insured, upon receipt of notice of any "suit", incident, or "occurrence" that may give rise to a "suit," must first request indemnity, coverage, or defense, in writing, from all other potentially implicated carriers. The insured waives any right it may have to demand that we provide indemnity, coverage, or defense to the insured without providing proof of such written tender or tenders. The insured waives any rights it may have to a targeted tender or any other right to select us as the insurer to provide indemnity, coverage or defense.

Does not apply when the insured has signed a fully executed contract prior to their work that requires Primary/Non-Contributory wording.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 051 00 (01/15)**

**PRIMARY AND NON-CONTRIBUTING INSURANCE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Any coverage provided to an Additional Insured shall be excess over any other valid and collectible insurance available to such Additional Insured whether primary, excess, contingent or on any other basis unless:

1) a written contract or written agreement specifically requires that this insurance apply on a primary and non-contributory basis; or

2) prior to a loss, you request in writing and we agree that this insurance shall apply on a primary and non-contributory basis.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 051 00 (01/15)**

**PRIMARY AND NON-CONTRIBUTING INSURANCE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Any coverage provided to an Additional Insured shall be excess over any other valid and collectible insurance available to such Additional Insured whether primary, excess, contingent or on any other basis unless:

1) a written contract or written agreement specifically requires that this insurance apply on a primary and non-contributory basis; or

2) prior to a loss, you request in writing and we agree that this insurance shall apply on a primary and non-contributory basis.

| Name Of Person(s) Or Organization(s) |
|---|
| City of Pasadena, its Council Members, Commissioners, Officers, Employees and Agents |
| 100 N. Garfield Ave. |
| Pasadena, CA  91101 |
| |

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 053 00 (02/20)**

**PROFESSIONAL LIABILITY EXCLUSION**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions**, and **COVERAGE B PERSONAL AND ADVERTISING INJURY**, **2. Exclusions**, are amended to include the following exclusion:

A.  This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any "professional services" by, for or on behalf of any insured.

B.  **SECTION V - DEFINITIONS**, is amended to add the following:

1. "Professional services" means:

a.  The preparing, approving, recommending or failing to prepare, approve or recommend maps, drawings, opinions, reports, surveys, change orders, designs, specifications, hazard assessment plans, response actions, abatement methods or products, air monitoring plans, or insurance requirements.

b.  Supervisory, inspection, training or engineering services; or,

c.  Commercial or industrial hygiene, air monitoring, testing, laboratory analysis, public health, legal, accounting, architectural, medical, nursing, data processing, consulting or investment advisory services.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 057 01 (05/19)**

**OPEN ROOF/ROOFING OPERATIONS EXCLUSION ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to, and the Company shall have no obligation to defend any claim or "suit" seeking any damages for any "property damage" to any part of any structure, or any real or personal property in or around any structure, arising out of, resulting from, caused by, contributed to, alleged to be, or in any way related to, in whole or in part, from an "open roof," unless the insured has taken  "adequately effective" action to determine adverse weather conditions and maintained "adequately effective" temporary waterproof covering that protects the building or structure from damage by rain, hail, snow, or any other form of precipitation.

The term "open roof" as used in this endorsement shall include any roof or section thereof, or any other opening in a building or other structure that is in, at, or near the roof (including but not limited to skylights, windows, parapet walls, and eaves) where any protective covering (such as shingles, tar, paper, caulking, sealant, and molding) has been removed leaving exposed to the elements any materials, underlayment, sheathing, structure shell, any part of the structure interior, or contents of any building..

The term "adequately effective" as used in this endorsement shall means your satisfaction of the following conditions precedent to coverage under this policy:

(1)     You provide a designated "weather watcher" whenever roofing-related operations are performed by you or by others on your behalf ,including but not limited to any tear-off operations, roof removal, debris removal, roof installation, and/or supply, removal, repair, or replacement of any equipment or materials on any roof areas; and

(2)    The insured and the "weather watcher" complies with each of the following requirements:

(a)     The insured has a written plan respecting how it, or others working on its behalf, will track weather conditions and how the insured, or others

working on its behalf, will respond to moisture producing weather conditions, to which the "weather watcher" complies. The plan must specify how weather will be monitored and how an "open roof" will be returned to a water tight condition;

(b)     The "weather watcher" has access to real time weather monitoring radar and local weather prediction, or like services, and the "weather watcher" accesses those services no less frequently than hourly to check for impending moisture producing weather conditions including but not limited to rain, snow, hail or fog;

(c)     The insured has at the ready, on the job site, proper materials to return an open roof to a water tight condition within:

        i. One hour for a single family residence; or
        ii. Two hours for any other building or structure;

(d)     Any "open roof" is returned to a water-tight condition before the roof is to be left unattended for more than four hours regardless of weather conditions or forecast; and

(e)     In the event of any precipitation weather event, the temporary covering placed on any building or structure is checked to ensure that it is secure prior to the insured leaving the site, and checked to ensure that it is secure no less frequently than every six hours.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 058 00 (02/20)**

**SELF INSURED RETENTION ENDORSEMENT**

**(CONDITION PRECEDENT - with administrator requirement)**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS,** is amended to include the following:

**SCHEDULE**

| Amount and Basis of Self-Insured Retention | |
|---|---|
| $100,000 Per Occurrence | |
| | |
| | |
| | |
| | |

| Aggregate | N/A |
|---|---|

The insurance provided by this policy is subject to the following additional provisions, which in the event of conflict with any other provisions elsewhere in the policy, shall control the application of the insurance to which this endorsement applies:

**1.     Condition Precedent Self-Insured Retention**

**a.**   The total limit of liability of the Company as stated in the policy Declarations shall apply in excess of the applicable Self-Insured Retention stated in the above Schedule and as set forth below. The limits of insurance applicable to such coverages will not be reduced by the amount of such Self-Insured Retention.

**b.**   The Company's obligations under this policy to any insured, including defense and indemnity, apply only to the amount in excess of the Self-Insured Retention, and satisfaction of the Self-Insured Retention is a **condition precedent** to any of our obligations under this policy to any insured.  In the event the insured does not comply with any requirement set forth in this Endorsement, no claim expenses or defense costs, damages, loss, cost or expense will be

payable by us.  A separate condition precedent Self-Insured Retention applies to each individual or organization that qualifies as an insured under this policy.

**c.**  The Self-Insured Retention shall remain applicable even if the Named Insured files for bankruptcy, discontinues business or otherwise becomes unable to or unwilling to pay the Self-Insured Retention. The Named Insured's bankruptcy, insolvency, or inability to pay the Self-Insured Retention shall not increase our obligations or liability under this policy. The risk of insolvency is retained by the Named Insured and is not transferable to us.

**d.**  The Self-Insured Retention may be satisfied only by payments actually made by the insured seeking coverage under this policy, and only by payments made following written notice to us by such insured of the underlying "occurrence," claim or "suit".  Such insured must satisfy or pay the full amount of the applicable Self-Insured Retention directly, without reimbursement or contribution from any other source, including but not limited to, subcontractors, other insureds, other insurers, additional insureds or their carriers, reinsurers, or any other persons or entities. Sums paid by any others on the Named Insured's behalf, or on behalf of any other insured seeking coverage under this policy, do not apply to reduce or satisfy the applicable Self-Insured Retention under this policy. Compliance with this provision and the other requirements of this Endorsement are **conditions precedent** for any coverage (defense and/or indemnity) under the policy.

**e.**  As a condition precedent to the Company's obligations to provide indemnity, coverage or defense hereunder to any insured, that insured shall first, have the obligation and duty, upon receipt of notice of any incident, claim, offense or "occurrence" that may give rise to a "suit", to provide at its own expense a proper investigation and defense of any claim. Additionally, the insured will exercise utmost good faith, diligence, and prudence to accept any reasonable offer of settlement within the Self-Insured Retention. No insured may settle any claim or "suit" which exceeds the applicable Self-Insured Retention amount without our prior written consent.

**f.**  The insured shall notify us promptly and in writing of any "occurrence," claim, or "suit" which either **(1)** presents potential liability exposure in excess of the Self-Insured Retention, or **(2)** without regard to the extent of potential liability, arises from or results in any of the following actual or alleged injuries:

death; brain damage; paraplegic or quadriplegic impairment; amputations or serious functional or sensory impairment or injury to the face, any major limb, or any nerve(s) or organ (including sight, hearing, smell, feel, taste); severe burns; multiple fractures; permanent total or partial disability; psychological or neurological impairment; or any other serious bodily injury.

**g.**  The insured's obligation to provide for its own defense and investigation is terminated upon the exhaustion of the Self-Insured Retention as described above. The insured is required and shall provide written evidence of its own payments of amounts within the Self-Insured Retention, and will keep the Company notified of the amounts incurred by the insured and the status of the satisfaction of the Self-Insured Retention.  The insured must notify us promptly and in writing when the Self-Insured Retention is **50%** satisfied, and when it is **75%** satisfied.  Only fees and costs paid by the subject insured following tender of the claim or suit to us, and for which the evidence and notice of payments has been timely provided to us, shall apply to satisfy the Self-Insured Retention.

**h.** Alternatively, at our sole election, upon our request the insured shall pay over and deposit with us the Self-Insured Retention amount as specified, to be applied by us as payment toward any damages, claim expenses, or other costs incurred by us in the handling or settlement of any claim, "occurrence" or "suit". If we make such an election, we shall have the right to negotiate a reasonable settlement which is more than, equal to, or less than the Self-Insured Retention amount (and will return the balance to you, if any, of any unused Self-Insured Retention). Payment of the Self-Insured Retention is due immediately upon receipt of our request.  As noted above, in the event that any insured fails or refuses, for any reason, to promptly pay to us the applicable Self-Insured Retention amounts following our request, no claim expenses or defense costs, damages, loss, cost, or expense will be payable by us.

**i.** In the event of a "suit" we shall have the right to select defense counsel, even if the amount claimed in the suit is unspecified or less than the applicable Self-Insured Retention amount. If the insured selects its own counsel, then such fees will not apply towards the Self-Insured Retention amount unless the counsel and rates are approved by us in advance and in writing.

**j.** We shall have, at our option, the right to negotiate the settlement of any claim we deem expedient both within and in excess of the applicable Self-Insured Retention amount, but we shall obtain your consent prior to entering into any settlement of any claim which is equal to or less than the Self-Insured Retention amount.  If you refuse to consent to any settlement recommended by us within the Self-Insured Retention and legal proceedings in connection with such claim(s) continue, our total liability for such claim(s) shall not exceed the amount determined by subtracting the applicable total Self-Insured Retention amount from the amount for which the claim(s) could have been settled, and including "defense costs" incurred with our consent to the date of such refusal, and we shall have no liability with respect to such claim if that difference is zero or negative.

**k.** With respect to any claim under this insurance which has been tendered to us and which may exceed the Self-Insured Retention amount, we may pay any or all of the Self-Insured Retention and/or related defense expenses to effect settlement of such claim.   You shall remain responsible for any amounts paid within the applicable Self-Insured Retention amounts, and such amount paid by us shall be reimbursed promptly by you.

**l.** The applicable Self-Insured Retention amount reflected in the Schedule of this endorsement above apply as follows:

(1) If a "Per Occurrence" Self-Insured Retention amount is shown in the Schedule of this endorsement, you shall be responsible for payment of all damages and "defense costs" for each "occurrence" or offense, until you have paid the applicable Self-Insured Retention amounts and "defense costs" equal to the Per Occurrence amount shown in the Schedule. The Per Occurrence "amount" is the most you will pay for Self-Insured Retention amounts and "defense costs" arising out of any one "occurrence" or offense, regardless of the number of persons or organizations making claims or bringing suits because of the "occurrence."

(2) If a "Per Claim" Self-Insured Retention amount is shown in the schedule of this endorsement, you shall be responsible for payment of all damages and "defense costs" for each claim until you have paid the applicable Self-Insured Retention amounts and "defense costs" equal to the Per Claim amount shown in the Schedule. The per claim amount is the most you will pay for Self-Insured Retention amounts

and "defense costs" sustained by any one person or one organization as a result of any one occurrence or offense, however it applies separately to each claimant (person or organization), regardless of how many claimants are asserting claims in any claim or "suit."

(3) If an "Aggregate" Self-Insured Retention amount is shown in the Schedule of this endorsement, the Aggregate amount is the most you will pay for all Self-Insured Retention amounts and "defense costs" incurred under this policy.  If no entry appears in the Schedule of this endorsement as Aggregate, then your obligation for payment of Self-Insured Retention amounts and "defense costs" applies in accordance with the Per Occurrence or Per Claim provisions, as applicable.

(4) Except for any defense costs that we may elect to pay, you shall pay all such "defense costs" and damages for "bodily injury", "property damage," "personal or advertising injury," medical payments, or any other such coverage's which may be included in the policy, equal to the applicable Self-Insured Retention amounts.  If any final judgment or settlement and "defense costs" is less than the applicable Self-Insured Retention amounts stated above, we shall have no obligation to reimburse you or pay "defense costs" under this policy.

**2.      Settlement of Claim**

You may not settle any claim or suit which exceeds any "self insured retention" amount indicated in the Schedule of this endorsement without our written permission to do so.  If you fail to obtain such written permission, we shall have no obligation to provide coverage (defense or indemnity) arising from that "occurrence, claim, or "suit" under this policy.

**3.      Authorized Claim Service Provider**

**a.** You shall employ a third-party claim service provider acceptable to us for the purpose of providing claim services for the administration of claims and settlement of losses within the applicable Self-Insured Retention amount. You shall pay all fees, charges, and costs of the claim service provider in addition to the Self-Insured Retention amounts, without any reimbursement from us.

**b.** In the event of cancellation, expiration or revision of the claims service contract between you and the claim service provider, you shall notify us in writing within (10) calendar days of such change and shall replace the claim service provider with another claims service provider that is acceptable to us.

**c.** You or the authorized claim service provider must notify us promptly in writing of any:

(1)    Potential exposure which equals or exceeds the level of penetration of the applicable Self-Insured Retention amount;

(2)    Loss reserve established which equals or exceeds the level of notification of potential penetration of the applicable Self-Insured Retention amount as provided above in Paragraph I(G);

(3)    Potential judgment, if the claim prevails, without regard to liability, which equals or exceeds the level of notification of potential penetration of the applicable Self-Insured Retention amount; and

(4)    Suit, in the event a suit is filed, and we shall have the right to appoint defense counsel, even if the amount claimed in the suit is unspecified or less than the applicable Self-Insured Retention amount.

**4. Reporting of Claims Within Self-Insured Retention**

    **a.** Within forty-five (45) days after the end of the policy term, you must give us a listing of all existing claims or suits within the Self Insured Retention Amounts. At a minimum, such listing will include the following for each claim or suit:\

        (1)    A description of each claim or "suit";
        (2)    The date of the occurrence or offense;
        (3)    The amount paid and/or reserved for future payments for loss and defense costs; and
        (4)    The current status of the claim or suit

    **b.** Quarterly thereafter, you are required to give us an updated listing of the status of all claims or suits, both paid and reserved, until all claims or "suits" for the policy period are closed or settled.

    **c.** Compliance with the reporting requirements set forth in this endorsement is a condition precedent to coverage. You acknowledge that in the event of non-compliance, we shall not be required to establish prejudice resulting from the non-compliance, but shall be automatically relieved of liability with respect to the claim, "occurrence," or "suit."

**5.**    **Representations**

By acceptance of this policy you agree that you will not procure insurance for all or any part of the Self-Insured Retention amounts shown in the Schedule of this endorsement. If such insurance is procured, there will be no coverage under this policy.

**6.**    **Definitions**

    **a.** "Self Insured Retention" means:

    The amount or amounts which you or any insured must pay for all "defense costs" and compensatory damages which you or any insured shall become legally obligated to pay because of "bodily injury," "property damage," "personal or advertising injury," medical payments, or any other such coverage included in the policy, sustained by one or more persons or organizations, subject to the terms and conditions set forth above.

    **b.** "Defense costs" means the reasonable expenses directly incurred by an insured in the defense of a tendered "suit" and shall include only reasonable and necessary court costs and expenses, reasonable attorney and paralegal fees commensurate with panel counsel rates in the area, and reasonable expenses for experts, depositions, alternative dispute resolution, or costs reasonably chargeable to discovery, defense or settlement of a "suit," to which coverage under this policy applies.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 062 07 (02/20)**

**CONTRACTORS WARRANTY**
**and SELF-INSURED RETENTION ENDORSEMENT**
**$100,000 SIR - Subject to a $200,000 Total Claim Payout**

This endorsement modifies the coverage provided under this policy under the following coverage part:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**, of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**, is amended to include the following:

Unless you satisfy all of the conditions set forth herein below, any coverage obligation under this policy is subject to the Self-Insured Retention(s) as set forth below:

a.    In connection with any claim or "suit" for any liability arising in whole or in part from any work performed by, or products provided by, any of your independent contractors or suppliers that are otherwise covered under this policy, all of the following conditions must be satisfied by you and any other subcontractor or supplier that may utilize or contract with other subcontractors or suppliers (referred to herein as "contractor" or "contractors"):

(1)   All "contractors" shall maintain "occurrence" form Commercial General Liability coverage covering all work performed by them or any contractors, with an insurance carrier rated "A-" or better by A.M. Best, and with limits of liability of at least $ 1,000,000 per occurrence and $1,000,000 in the aggregate;

(2)   The insurance set forth in paragraph (1) above must include the following:

(a)   Additional Insured Endorsement under which you qualify as an Additional Insured, that includes "products-completed operations hazard" coverage.
(b)   Primary and Non-Contributory wording; and
(c)   Waiver of Subrogation.

(3)   You must maintain copies of all of the above documents, and you must provide these documents to us in connection with any "occurrence," "claim," or "suit" that arises in whole or in part from the work of any "contractors."

b.    Self-Insured Retentions:

(1)   If all of the foregoing requirements are not satisfied by you or any "contractors," then the Company's obligation to defend or indemnify any insured in connection with any claim or "suit" for "property damage," "bodily injury," or "personal and advertising injury," arising from the work of any "contractors" shall apply only in excess of the Self-Insured Retention(s) in the amount set forth above.  Satisfaction of the Self-Insured Retention, in the manner provided below, is a condition precedent to any coverage under this policy

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

for any insured in connection with any claims arising in whole or in part from the work of any "contactors." The limits of insurance otherwise applicable will not be reduced by the amount of such Self-Insured Retention(s).  An additional, separate, Self-Insured Retention will apply with regard to each "contractor" respecting which all of the conditions and requirements set forth herein are not satisfied.

(2)   Satisfaction of the applicable Self-Insured Retention(s), and compliance with the **SELF INSURED RETENTION ENDORSEMENT (form VEN 058)** made part of this policy and hereby incorporated in full by this reference, is a condition precedent to any of our obligations under this policy to any insured.  A separate condition precedent Self-Insured Retention applies to each individual or organization that qualifies as an insured under this policy.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 064 00 (01/15)**

**THIRD PARTY CANCELLATION NOTICE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

If we cancel this policy for any reason other than nonpayment of premium, we will mail notification to the persons or organizations shown in the schedule below (according to the number of days listed below) once the Named Insured has been notified.

If we cancel this coverage for nonpayment of premium, we will mail a copy of such written notice of cancellation to the name and address below at least 10 days prior to the effective date of such cancellation.

Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

**SCHEDULE**

| **Name and Address of Other Person/Organization** | **Number of Days Notice** |
|---|---|
| Per schedule on file with the company | 30 |

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 064 00 (01/15)**

**THIRD PARTY CANCELLATION NOTICE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

If we cancel this policy for any reason other than nonpayment of premium, we will mail notification to the persons or organizations shown in the schedule below (according to the number of days listed below) once the Named Insured has been notified.

If we cancel this coverage for nonpayment of premium, we will mail a copy of such written notice of cancellation to the name and address below at least 10 days prior to the effective date of such cancellation.

Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

**SCHEDULE**

| Name and Address of Other Person/Organization | Number of Days Notice |
|---|---|
| City of Pasadena, its Council Members, Commissioners, Officers, Employees and Agents, 100 N. Garfield Ave., Pasadena, CA 91101 | 30 |

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 064 00 (01/15)**

**THIRD PARTY CANCELLATION NOTICE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

If we cancel this policy for any reason other than nonpayment of premium, we will mail notification to the persons or organizations shown in the schedule below (according to the number of days listed below) once the Named Insured has been notified.

If we cancel this coverage for nonpayment of premium, we will mail a copy of such written notice of cancellation to the name and address below at least 10 days prior to the effective date of such cancellation.

Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

**SCHEDULE**

| Name and Address of Other Person/Organization | Number of Days Notice |
|---|---|
| Kaufman Lynn Construction, Inc.<br>3185 S Congress Ave, Delray Beach, FL 33445 | 30 |

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

VEN 064 00 (01/15)                                                          Page 1 of 1

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 064 00 (01/15)**

**THIRD PARTY CANCELLATION NOTICE ENDORSEMENT**

This endorsement modifies the Conditions provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

If we cancel this policy for any reason other than nonpayment of premium, we will mail notification to the persons or organizations shown in the schedule below (according to the number of days listed below) once the Named Insured has been notified.

If we cancel this coverage for nonpayment of premium, we will mail a copy of such written notice of cancellation to the name and address below at least 10 days prior to the effective date of such cancellation.

Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

**SCHEDULE**

| Name and Address of Other Person/Organization | Number of Days Notice |
|---|---|
| Oden Hardy Construction, Inc.<br>1400 59th Street West,, Bradenton, FL 34209 | 30 |

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 065 01 (02/20)**

**HEATING DEVICES OR PROCESSES EXCLUSION ENDORSEMENT**

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to **SECTION 1 - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE**, Paragraph **2. Exclusions,** and **SECTION 1 – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**, Paragraph **2. Exclusions,** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**:

**Heating Devices or Processes**

This insurance does not apply, and the Company shall have no duty to defend any claim or "suit" seeking any damages for "bodily injury," "property damage," or "personal or advertising injury" arising out of, resulting from, caused by, contributed to, alleged to be, or in any way related to, in whole or in part, to the use of any "heating devices or processes" by or on behalf of any insured.

The term "heating devices or processes" includes but is not limited to a heat wand, welding equipment, open flame devices, torches, heaters, or any type of heat application, or any other equipment that generates heat or sparks in the normal course of its operation.

Provided that all of the following conditions precedent to coverage under this policy are satisfied, the above exclusion will not apply to any torch-down roofing operations or operations using an open flame to remove paint or other coating performed by or on behalf of any insured:

    **a.**    A diligent inspection of any hot tar or heat application work performed by or on behalf of the Insured immediately preceding the insured's departure from the premises each day.

    **b.**    A specifically designated employee complete a signed and dated written report of each inspection showing the time of the completion of work and the time of the inspection. Copies of all reports shall be maintained by the Insured at the insured's office for no less than one (1) year following completion of the work.

**c.** Any operations involving the application of a heat source on or about a roof must be certified by the National Roofing Contractors Association as Certified Roofing Tech Applicators (CERTA) and the application of a heat source must comply strictly with the CERTA guidelines.

**d.** The insured will ensure that a person remains at the job-site of any hot tar or heat application for a period of time not less than two (2) hours after the hot tar or heat application process has been completed, and that such person will inspect the areas at, beneath, behind, and around where the application process took place prior to leaving the site. The insured's designated employee (as provided in **b.** above), must complete a written report stating the time the hot tar or heat application was finished, the areas of the operations and inspections, the time the insured and designated employee left the jobsite, and the time the other person remaining at the job site left the job site. The report must be signed and dated the day of the work and a copy maintained at the Insured's office for no less than one (1) year following completion of the work.

**e.** The insured and all persons designated in **b.** and **d.** above have at hand a functional fully charged 15 lb or larger dry chemical fire extinguisher during any hot tar or heat application process work and for at least two (2) hours after the completion of such work each day.

If the insured or anyone working on its behalf fails to satisfy all of the conditions precedent stated above, there is no coverage (defense or indemnity) under this policy for any liability arising any from torch-down roofing operations or operations using an open flame to remove paint or other coating performed by or on behalf of the insured.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 069 02 (04/18)**

**WRAP- UP EXCLUSION**
**(Limited off-site exception)**

This Exclusion modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to **SECTION 1 - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE**, Paragraph **2. Exclusions** and **SECTION 1 – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**, Paragraph **2. Exclusions** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**;

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of any project which is insured, in whole or in part, under a Consolidated Insurance Program  commonly known as an Owner Controlled Insurance Program, a Contractor Controlled Insurance Program, a Wrap-Up Insurance Program or any other type of insurance program designed to provide liability coverage for parties involved in the development, design, construction, erection, supervision or management of a specific project or projects.

This exclusion applies whether or not the Consolidated Insurance Program:

1. Provides coverage identical to that provided by this policy:
2. Has limits adequate to cover all claims;
3. Remains in effect.

However, this exclusion does not apply to work performed by you or on your behalf for a project that is insured under a Consolidated Insurance Program if the work is performed away from the premises insured under the Consolidated Insurance Program and that no coverage for this work is found in the Consolidated Insurance Program.  This exception to the exclusion does not apply to "bodily injury" or "property damage" which is included in the "products-completed operations hazard".  Nothing in this endorsement shall be construed as to grant any products-completed operations coverage.

All other terms, conditions and exclusions under the policy are applicable to this Endorsement and remain unchanged.

## General Security Indemnity Company of Arizona

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VEN 079 01 (03/18)

# POLICY LIMITATION - TOTAL AGGREGATE LIMIT FOR ALL CONSTRUCTION PROJECTS

---

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE**

**SECTION III – LIMITS OF INSURANCE – 2**, is amended by the addition of the following:

d. The General Aggregate Limit, shown in the Policy Declarations, applies separately to each "construction project".

e. Notwithstanding the application of the General Aggregate Limit to each "Project" of the Named Insured, under no circumstances shall we pay more than **$5,000,000** for all claims under this policy that are subject to the General Aggregate Limit.

The following are added to the DEFINITIONS section of this policy:

"Construction project" means any construction project, development, property, or group of properties, including all premises, phases, lots, and areas of such project, development, or property, and any building or group of buildings or other structures contained in any business or housing project, development, subdivision, or business park.

If a construction project, or construction activity related thereto, has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same location or construction project under this endorsement.

Multiple jobs, work orders, purchase orders, change orders or work done at multiple locations under one contract or master contract are not considered separate "construction projects" within the meaning of this policy.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 089 01 (02/20)**

**FUNGI OR BACTERIA EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**a.** The following exclusion is added to Paragraph **2.,** Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

**Fungi or Bacteria**

"Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material, or product contributed concurrently or in any sequence to such injury or damage.

Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion shall apply even if coverage is excluded for such "bodily injury" or "property damage" by any other provision, exclusion, or endorsement in this policy.

**b.** The following exclusion is added to Paragraph **2.,** Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

**Fungi or Bacteria**

"Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material, or product contributed concurrently or in any sequence to such injury.

Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**c.** The following definition is added to **SECTION V - Definitions,** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM:**

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi.

All other terms, conditions and exclusions under this policy remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 100 00 (10/19)**

# EXCLUSION FOR WORK PERFORMED FOR AND PRODUCTS OR EQUIPMENT PROVIDED TO ELECTRICAL-RELATED PUBLIC UTILITIES IN CALIFORNIA

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. This policy does not cover, and the company will not have any duty to defend or indemnify any insured with respect to any claim, suit, loss, or other expense, arising from work performed for, or products or equipment provided to, any **electrical-related public utility, in conjunction with any electrical-related public utility, or any related services, products, or equipment,** in the State of California.

This exclusion applies to any work performed or products provided by any insured, and any person or entity working for or on behalf of any insured or contracted by any insured.  This exclusion applies to any damage or injury that arises from any work performed, products or equipment provided in connection with, projects located in California, even if such damage or injury takes place in or extends to another state.

B. As used herein, **"electrical-related public utility"** means any governmental agency or private business organization subject to governmental regulation, that provides or produces electricity and/or related products, services, or equipment, including but not limited to solar, wind, or other power generation or transmission.

VEN 105 00 (02/20)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PREMIUM BASIS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

The following definitions apply to the Premium Basis shown in the Declarations.

**A. ADMISSIONS**

    **1. Definition:**

        The total number of persons, other than employees of the Named Insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

    **2. Application:**

        The rates apply per 1,000 Admissions.

**B. SQUARE FEET**

    **1. Definition:**

        The total number of Square Feet of floor space at the insured premises, computed as follows:

        **a.** For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

            **(1)** Courts and mezzanine types of floor openings.

            **(2)** Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.

        **b.** For tenants, determine the area they occupy in the same manner as for entire buildings.

    **2. Application:**

        The rates apply per 1,000 Square Feet of area.

**C. EACH**

    This basis or premium involves units of exposure, and the quantity comprising each unit of exposure is indicated in the classification footnotes, such as "per person".

Includes copyrighted material of Insurance Services Office, Inc. with its permission

## D. GALLONS

### 1. Definition

The basis of premium is the total number of gallons sold or distributed.

Specifically for Gas Dealers and Distributors – where a record of the number of gallons sold is not available, the number of gallons to be used for premium computation purposes shall be determined by dividing the number of pounds sold by 4.6.

### 2. Exclusions

Specifically for Gas Dealers and Distributors - distribution of gas transferred to gas dealers by pipeline, gas mains or piping.

### 3. Application:

The rates apply per 1,000 Gallons.

## E. GROSS RECEIPTS

### 1. Definition:

The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

**a.** All goods or products, sold or distributed;

**b.** Operations performed during the policy period;

**c.** Rentals; and

**d.** Dues or fees.

### 2. Inclusions:

The following items shall not be deducted from "gross sales" as determined above:

**a.** Foreign exchange discounts;

**b.** Freight allowance to customers;

**c.** Total sales of consigned goods and warehouse receipts;

**d.** Trade or cash discounts;

**e.** Bad debts; and

**f.** Repossession of items sold on installments (amount actually collected).

### 3. Application:

The rates apply per $1,000 of Gross Receipts.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

**F.  PAYROLL**

    **1.  Definition:**

        **a.**  Payroll means remuneration.

        **b.**  Remuneration means money or substitutes for money.

    **2.  Inclusions**

    Payroll includes the following items:

        **a.**  Commissions;

        **b.**  Bonuses;

        **c.**  Extra pay for overtime work, except as provided in paragraph **4.** below;

        **d.**  Pay for holidays, vacations or periods of sickness;

        **e.**  Payment by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;

        **f.**  Payment to employees on any basis other than time worked, such as piece work, profit sharing or incentive plans;

        **g.**  Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;

        **h.**  The rental value of an apartment or a house provided for an employee based on comparable accommodations;

        **i.**  The value of lodging, other than an apartment or house, received by employees as part of their pay, to the extent shown in the insured's records;

        **j.**  The value of meals received by employees as part of their pay to the extent shown in the insured's records;

        **k.**  The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;

        **l.**  The Payroll of "mobile equipment" operators and their helpers, whether or not the operators are designated or licensed to operate "autos" or "mobile equipment". If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual Payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

        **m.**  The Payroll of executive officers of a corporation and individual insureds and co-partners. For the purposes of Payroll determination, managers of limited liability companies shall be considered executive officers and members of limited liability companies shall be considered co-partners.

        The executive officers of a corporation are those persons holding any of the officer positions created by the Named Insured's charter, constitution or by-laws or any other similar governing document.

        The Payroll of all executive officers of an corporation and individual insureds or co-partners engaged principally in clerical operations or as salespersons, and officers and co-partners who are inactive for the entire policy period shall not be included for premium purposes.

        For part-time or seasonal businesses the Payroll amounts may be reduced by 2 percent for each full calendar week in excess of twelve during which the risk performs not operations.

**n.** The Payroll of leased workers furnished to the Named Insured by a labor leasing firm. Premium on such Payroll shall be based on the classifications and rates which would have applied if the leased workers had been the direct employees of the Named Insured. If Payroll is unavailable, use 100% of the total cost of the contract for leased workers as the Payroll of leased workers. The premium shall be charged on that amount as Payroll.

If investigation of a specific employee leasing contract discloses that a definite amount of the contract price represents Payroll, such amount shall be considered Payroll for the premium computation purposes.

**o.** Fees paid to employment agencies for temporary personnel provided to the insured.

**3. Exclusions**

Payroll does not include:

**a.** Payments by an employer to group insurance or group pension plans for employees, other than payments covered by paragraph **2.e.** above;

**b.** The Payroll of clerical office employees;

Clerical office employees are those employees who work in an area which is physically separated by walls, floors or partitions from all other work areas of the insured and whose duties are strictly limited to keeping the insured's books or records or conducting correspondence, including any other employees engaged in clerical work in the same area.

**c.** The Payroll of salespersons, collectors or messengers who work principally away from the insured's premises. Salespersons, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer;

**4. Application**

The rates apply per $1,000 of Payroll.

**G. TOTAL COST**

**1. Definition**

All Construction Costs related to the physical construction of the project are considered

Hard Construction costs; including:

**a.** Infrastructure including on and offsite utilities, streets & driveways, demolition, and rough & fine grading and landscaping

**b.** Direct construction costs including labor and materials

**c.** General requirements including temporary power, security, fencing, sanitation, site maintenance and onsite offices.

**d.** Hard cost contingency

**e.** Construction related professional fees – architects, engineers, surveyors, etc.

2. **Soft Costs to be Exclided Costs Are:**

    a. Permit & Zoning Fees, and Inspection Costs and Fees

    b. Insurance Costs

    c. Land Acquisition Cost

    d. Loan Fees & Interest

    e. Closing Costs & Real Estate Commissions paid

    f. Legal & Accounting Fees

    g. Warranty Expenses

    h. Marketing & Advisertising Costs

    i. HOA Reserve Study Costs

    j. Sales Ta

3. **Application**

The rates apply per $1,000 of Total Cost.

## H. TOTAL OPERATING EXPENDITURES

1. **Definition**

Total expenditures (including grants, entitlements and shared revenue) without regard to source of revenue during the policy period, including accounts payable.

2. **Inclusions**

The following items are included in Total Operating Expenditures:

**a.** Capital improvements **-** Work performed by the named insured in connection with any purchase or improvement of any individual item of personal or real property which is bonded or financed, including interest thereon, or exceeds 5% of Total Operating Expenditures;

**b.** Expenditures for independent contractors operations when the contractor does not carry adequate insurance;

**c.** Any federal or state funds for the sole purpose of training employees unless a separate policy with adequate coverage and limits has been issued in the name of the governing body of such funds with the governmental entity named as an additional insured or a hold harmless agreement in favor of the governmental subdivision exists.

3. **Accounting Terminology**

The following are explanations of accounting terminology used in the definition of Total Operating Expenditures or addressed in the inclusions or exclusions.

a. Grant - A contribution or gift by one governmental unit to another unit. It can be cash or other assets. The contribution is usually made to aid in the support of a specific function, for example, education, but it is sometimes for general purposes.

   Capital grants are restricted for the acquisition and/or construction of fixed (capital) assets. All other grants are operating grants.

b. Entitlement - The amount of payment to which a political subdivision is entitled as determined by the Federal Government, for example, revenue sharing.

c. Shared Revenue - A revenue levied by one government but shared on a predetermined basis with another government or class of government, often in proportion to the amount collected at the local level.

d. Budget - The budget for a government subdivision consists of a series of Funds (basically, a minibudget) where a Fund is defined as an independent fiscal and accounting entity with a self-balancing set of accounts recording cash and/or other resources together with all related liabilities, reserves and equities. Transfer of funds should be excluded from the expenditures of the transferor (for example, included in the expenditures of the recipient).

   Most of the expenditures for items to be excluded from or included in Total Operating Expenditures can be found as entries in the following Funds:

   (1) General Fund - Used to account for all financial resources except those required to be accounted for in another fund. It would be used for all general governmental operations such as administration, public works, parks, recreation and education. If there are education expenditures, a separate education fund is established which falls under the general fund heading.

   The General Fund is used to account for the ordinary operations of a governmental unit which is financed from taxes and other general revenues.

   (2) Special Revenue Funds - To account for the proceeds of specific revenue sources (other than special assessment, expendable trusts, or for major capital projects) that are legally restricted to expenditure for specified purposes. An example is a motor fuel tax fund used to finance highway and road construction.

   (3) Capital Projects Funds (Bond Funds) - To account for financial resources to be used for the acquisition or construction of major capital facilities (other than those financed by Propriety Funds, Special Assessment Funds and Trust Funds).

   (4) Debit Service Fund (formerly called a Sinking Fund) - To account for the accumulation of resources for, and the payment of, general long-term debt principal and interest.

   (5) Special Assessment Fund - To finance and account for the construction of improvements or provision of services which are to be paid for, wholly or in part, from special assessments levied against the benefited property. An example is the construction of sewer lines.

**(6)** Enterprise Fund - To finance and account for the acquisition, operation and maintenance of governmental facilities and services which are entirely or predominantly self-supporting by user charges. Examples of facilities and services are water, gas and electric utilities, swimming pools, airports, parking garages and transit systems.

**(7)** Intra-governmental Services Fund (formerly called a Working Capital Fund) - To finance and account for services and commodities furnished by a designated department or agency to other departments and agencies within a single governmental unit. Amounts expended by the fund are restored either from operating earnings or by transfers from other funds, so that the original fund capital is kept intact.

**5. Application**

The rates apply per $1,000 of Total Operating Expenditures.

**I. UNITS**

A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

**J. CONSTRUCTION COSTS**

**1. Definition**:

"Construction Costs" means the total cost for all work performed during the policy period by you or for you by independent contractors and/or subcontractors at all levels.

**2. Inclusions**:

The following items are included in Construction Costs

**a.** The cost of all labor, materials, equipment and supplies furnished, used or delivered for use in the execution of such work, whether furnished by the owner, by the contractors, or by subcontractors at any level.
**b.** General conditions, contingency fees, overhead and profit.

**3. Exclusions**:

Soft costs, including but not limited to, the cost of land acquisition, financing (including lender's fees), insurance premiums, attorneys, environmental audits, architectural fees, engineering fees, design costs, permitting costs, consulting costs and other associated fees shall be deducted from Construction Costs.

**4. Application**:

The rates apply per $1,000 of Construction Costs.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 107 00 (02/20)**

**PREMIUM AUDIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **5. Premium Audit** of **SECTION IV- CONDITIONS** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**, is hereby deleted and replaced by the following:

**5.    Premium Audit**

a.   All premiums for this policy shall be computed in accordance with our rules, rates, rating plans, premiums and minimum premiums applicable.

b.   Premium shown in this policy as advance premium is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. Advance premium shall be determined based on an estimate of your exposures for the policy period.

c.   At the close of each period (or part thereof terminating with the end of the policy period) designated in the Declarations as the audit period, we may conduct an audit of your books and records to determine the actual premium bases developed during the policy period and to compute the earned premium.  If the total computed earned premium is greater than the premium previously paid, the additional premium is due upon notice to the first Named Insured. If the total computed earned premium is less than the premium previously paid, then we shall receive and retain no less than the minimum premium(s) listed in the coverage part(s) attached hereto.

d.   Failure to pay the additional earned premium due will be deemed a breach of contract and, at our sole discretion, may subject this policy, as well as any other policy of yours in force, to cancellation for non-payment of premium.

e.   Should it become necessary to institute collection activities, including litigation, in order to collect any earned premium, then you shall be responsible for 100% of the expenses, fees and costs incurred by us in that regard plus any collectible interest.

f.    You must maintain records of such information as is necessary for premium computation, and shall send copies of such records to us at the end of the policy period and at such times as we may direct. Failure to supply such records upon request will be deemed a breach of policy conditions and may subject this policy, as well as any other policy of yours in force, to cancellation for breach of policy conditions.

g.   If, after three documented attempts, we are unable to examine your books and records to obtain the information required to complete the audit, the audit will be deemed unproductive and an Estimated Audit Endorsement will be issued as follows:

    (1)  A 50% increase in your reported premium basis will be shown. This increase is an estimate.

    (2)  Documentation on the attempts to collect the required audit information will be included with the endorsement.

    (3)  You must remit payment for the full amount of the additional premium upon receipt of notice to the first Named Insured.

    (4)  If you dispute the Estimated Audit Endorsement, within ten (10) days of receipt of the Estimated Audit Endorsement or other notice regarding the additional premium amount, you must provide the requested audit information to us. Failure to do so shall be deemed as your agreement with the Estimated Audit Endorsement.

h.  In the event that you fail to timely pay any premium (including but not limited to any additional premium), we shall be entitled to recover from you all third-party fees and costs, including attorneys' fees, that we reasonably incur in connection with any related collection efforts or proceedings.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**VEN 108 00 (07/20)**

**EXCLUSION FOR RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, and/or ELECTROMAGNETIC LIABILITY**

**Notwithstanding any other provision of this policy, this insurance shall not apply, and we shall have no duty to defend or indemnify any insured in connection with any "occurrence," claim, or suit for any liability, arising in whole or in part directly or indirectly from any of the following, regardless of cause, and whether actual, alleged or threatened:**

1. Loss, damage, injury, liability, cost or expense, directly or indirectly caused by, contributed to by, or arising in whole or in part from ionizing radiations from, or contamination by, radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;
2. The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;
3. Any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;
4. The radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter; or
5. Any chemical, biological, bio-chemical, or electromagnetic contamination, radiation, dissemination, ingestion, or release, or exposure to any of the foregoing in any form, at any time, or at or from any location.

All other terms, conditions and exclusions under this policy are applicable to this Endorsement and remain unchanged.

**General Security Indemnity Company of Arizona**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VEN 109 00 (08/20)**

# TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited, to those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), such coverage or payment requirement shall be null and void.  Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other terms and conditions remain unchanged.

# EXHIBIT 3



**PO Box 2950**
**Hartford, CT 06104-2950**

October 31, 2023

Johns Lyng USA, LLC
14142 DENVER WEST PKWY.
SUITE 190
LAKEWOOD, CO 80401

Re: Important Information about **Claims Information Line**

Dear Johns Lyng USA, LLC

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

- The information that needs to be included with the claim notice
- The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information
- Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.

© 2009 The Travelers Indemnity Company. All rights reserved.



P.O. Box 2950
Hartford, CT 06104-2950

10/31/2023

Johns Lyng USA, LLC

14142 DENVER WEST PKWY.
SUITE 190
LAKEWOOD, CO 80401

**RE: Risk Management PLUS+ Online® from Travelers Bond & Specialty Insurance** (www.rmplusonline.com)

As a Travelers Bond & Specialty Insured you receive risk management services, at no additional cost, to help protect you and your business.

Risk Management PLUS+ Online, is a robust website to assist you in the mitigation of risk relative to employment practices, directors and officers, fiduciary liability, cyber, crime, kidnap & ransom, and identity fraud exposures.

Highlights of Risk Management PLUS+ Online include:
- ☒ Thousands of articles on a variety of risk management topics
- ☒ Topical webinars and podcasts on current issues
- ☒ Checklists to assist in managing risk
- ☒ Web based training
- ☒ Model Employee Handbook, including policies and forms for downloading or printing that reduce risks in the workplace.

The following Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS+ Online representative. It's that simple.

Thank you for choosing Travelers Bond & Specialty Insurance for your insurance needs. Travelers is a market leader in providing management liability and crime coverages that are specifically customized for your organization.

<u>Instructions for Registration & Orientation to Risk Management PLUS+ Online®</u>

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to  www.rmplusonline.com.
2. In the Sign-In box, click   **Register**.
3. Enter the password/passcode: █████████
4. Fill in the Registration Information and click   **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to  www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on   **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.

© 2017 The Travelers Indemnity Company. All rights reserved.



**PO Box 2950**
**Hartford, CT 06104-2950**

## Employment Practices Liability Hotline

As part of the services provided through Risk Management PLUS+ Online®, Travelers Bond & Specialty Insurance is pleased to provide its Employment Practices Liability policyholders with up to one hour of access to a toll-free hotline designed to provide quick, practical risk management guidance on day-to-day workplace issues.

From reviewing the proper steps for a sexual harassment investigation to discussing general factors to consider before making employment decisions, the firm's attorneys are available to assist policyholders in managing their workplace risk and minimizing employment-related claims. This hotline is staffed by a nationally recognized employment law firm exclusively dedicated to representing management on workplace issues and is available at no additional cost to Employment Practices Liability policyholders.

To utilize the hotline, call **1-866-EPL-TRAV (1-866-375-8728)**.

We encourage policyholders to take advantage of this risk management tool. For more information about the hotline, go to www.rmplusonline.com/EPLhotline.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

Travelers Casualty and Surety Company of America, PO Box 2950, Hartford, CT 06104-2950

© 2020 The Travelers Indemnity Company. All rights reserved.



PO Box 2950
Hartford, CT 06104-2950

## Toll-Free ERISA HelpLine

As part of the services provided through Risk Management PLUS+ Online®, Travelers Bond & Specialty Insurance is pleased to provide its Fiduciary Liability policyholders with access to the ERISA HelpLine, a toll-free hotline designed for quick, practical guidance on day-to-day workplace issues.

To utilize the HelpLine, call **1-888-401KLAW (1-888-401-5529)**.

Through the ERISA HelpLine, policyholders are eligible for a consultation with an ERISA attorney from the law firm of Jackson Lewis P.C. at no charge. Jackson Lewis P.C., one of the largest law firms in the country, is exclusively dedicated to representing management on workplace issues. With more than 950 attorneys throughout the U.S. and Puerto Rico, the firm has both a recognized expertise in workplace-related issues and a dedicated ERISA practice.

The ERISA HelpLine is designed to provide general guidance on issues relating to employee benefits and ERISA law. From reviewing potential compliance pitfalls to defending employers and plan sponsors in adversary proceedings and appeals under internal agency procedures, attorneys from Jackson Lewis P.C. are there to help you. The ERISA HelpLine is available toll-free from anywhere in the United States.

We encourage policyholders to take advantage of this no-cost hotline. For more information about the hotline, go to www.rmplusonline.com/ERISAHelpLine.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

Travelers Casualty and Surety Company of America, and its property casualty affiliates, PO Box 2950, Hartford, CT 06104-2950.





# CyberRisk Policyholder Benefits

Thank you for choosing Travelers for your cyber insurance needs. As our insured, Travelers provides you with innovative value-added pre and post breach risk management services at *no additional cost* to help you protect your business. These current benefits include:

## Travelers *eRisk Hub*®:

Access to a private web-based portal containing information and technical resources that can assist you in the prevention of network, cyber and privacy events and support you in a timely response if an incident occurs. Travelers *eRisk Hub* portal powered by *NetDiligence*® features news, content and services from leading practitioners in risk management, computer forensics, forensic accounting, crisis communications, legal counsel, and other highly-specialized segments of cyber risk.

To register for Travelers *eRisk Hub*:

1. Go to www.eriskhub.com/travelerscyber
2. Complete the registration form. Your Access Code is 13881-197
3. Once registered, you can access the portal immediately.

## Please note the following:

Travelers *eRisk Hub* is a private site provided to certain cyber insureds of Travelers. Please do not share portal access instructions with anyone outside your organization. You are responsible for maintaining the confidentiality of the Access Code provided.

- Travelers *eRisk Hub* contains a directory of experienced providers of cyber risk management and breach recovery services. Travelers does not endorse these companies or their respective services. Before you engage any of these companies, we urge you to conduct your own due diligence to ensure the companies and their services meet your needs Unless otherwise indicated or approved, payment for services providedby these companies is your responsibility.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.

© 2022 The Travelers Indemnity Company. All rights reserved. LTR-19027 Rev. 09-22

# CyberRisk Policyholder Benefits

## Travelers Cyber Coaches

Three cybersecurity coach services are available to help your organization extend your team with expert guidance at no additional cost, as follows:

- **Breach Coach ® –**

  Should you experience a data breach event, you may choose to call the Breach Coach listed in the Travelers *eRisk Hub* portal for immediate triage assistance. Your initial consultation of up to one half-hour is at no additional charge. Please be aware that the Breach Coach service is provided by a third-party law firm. Therefore, contacting the Breach Coach does NOT satisfy the claim or first-party notification requirements of your policy.

- **HIPAA Coach –**

  To help your organization identify the cyber related issues HIPAA raises and help minimize potential exposures, you are entitled to consult with a HIPAA Coach listed in the Travelers *eRisk Hub* portal for up to one hour.

- **Security Coach –**

  Talk with a HCL Technologies security professional about general cybersecurity questions for up to one hour to help strengthen your organizations security posture with actionable advice and insights listed in the Travelers *eRisk Hub* portal.

## Pre-Breach Services provided by HCL Technologies:

Preparation is key in helping to mitigate a potential cyber related event. To assist policyholders achieve a higher level of cybersecurity for their organizations Travelers offers the following pre-breach services from HCL Technologies, a global leader in cybersecurity solutions accessible through the Travelers *eRisk Hub*:

- **HCL Technologies Cyber Resilience Readiness Assessment and Cyber Security Professional Consultation** - An online assessment designed for an organization to quickly understand their current cybersecurity posture while receiving an official report and up to 1 hour consultation with a HCL Technologies security professional to help in improving areas of weakness or vulnerability.

- **HCL Technologies Cyber Security Awareness Training Videos** -

  Gain access to security awareness training videos as a method of defense against cybersecurity threats by promoting proactive employee behavior. These courses can be used to complement your employee training requirements.

- **HCL Technologies Consulting Services** -

  Boost your cybersecurity readiness with HCL Technologies solutions including HCL Technologies Cyber Security Incident Response Review, HCL Technologies Cyber Security Vulnerability Assessment and HCL Technologies Cyber Security Architecture Review.

Certain services are being provided to you by HCL Technologies and in using them you must agree to HCL Technologies' terms of use & privacy policy. Travelers Casualty and Surety Company of America and its property casualty affiliates ("Travelers") makes no warranty, guarantee, or representation as to the accuracy or sufficiency of any such services. The use of the services and the implementation of any product or practices suggested by HCL Technologies or NetDiligence is at your sole discretion. Travelers disclaims all warranties, express or implied. In no event will Travelers be liable in contract or in tort for any loss arising out of the use of the services or HCL Technologies' or any other vendor's products. *eRisk Hub* and Breach Coach are registered trademarks of NetDiligence.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.

© 2022 The Travelers Indemnity Company. All rights reserved. LTR-19027 Rev. 9-22

This notice provides no coverage, nor does it change any policy terms. To determine the scope of coverage and the insured's rights and duties under the policy, read the entire policy carefully. For more information about the content of this notice, the insured should contact their agent or broker. If there is any conflict between the policy and this notice, the terms of the policy prevail.

**Independent Agent And Broker
Compensation Notice**

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html.

Or write or call:

**Travelers, Agency Compensation
P.O. Box 2950
Hartford, Connecticut 06104-2950**

**(866) 904.8348**

© 2019 The Travelers Indemnity Company. All rights reserved.

This notice provides no coverage, nor does it change any policy terms. To determine the scope of coverage and the insured's rights and duties under the policy, read the entire policy carefully. For more information about the content of this notice, the insured should contact their agent or broker. If there is any conflict between the policy and this notice, the terms of the policy prevail.

**Colorado Claims-Made Disclosure Notice**

## THIS POLICY

This policy is a claims-made policy. It provides coverage only for claims made during the policy period for covered acts occurring after the policy retroactive date (if any) shown in the policy and before the end of the policy period. Upon termination of the claims-made policy, an extended reporting period option is available.

There is no difference in the type of acts covered by occurrence or claims-made policies. Claims for covered acts may be assigned to different policy periods, depending on the type of policy.

If claims are reported under a claims-made policy, the claim must fall within the definition of Claim set forth in the policy and must be made (or deemed made) during the policy period in order to be covered. Under most circumstances, a claim is considered made when it is received and recorded by the insured or insurer. Sometimes, a claim may be deemed made at an earlier time. This can happen when another claim for the same covered act has already been made, or when the claim is received and recorded during an extended reporting period.

## PRINCIPAL BENEFITS

This policy provides for liability coverage up to the maximum dollar limit specified in the policy.

The principal benefits and coverages are explained in detail in this claims-made policy. Please read it carefully and consult an insurance producer about any questions.

## EXCEPTIONS, REDUCTIONS AND LIMITATIONS

This claims-made policy contains certain exceptions, reductions and limitations. Please read them carefully and consult an insurance producer about any questions.

## RENEWALS AND EXTENDED REPORTING PERIODS

This claims-made policy has some unique features relating to renewal, extended reporting periods and coverage for events with long periods of potential liability exposure.

If there is a retroactive date in this policy, no act prior to that date will be covered under the policy even if reported during the policy period. It is therefore important to be certain that there are no gaps in insurance coverage. These gaps can occur in several ways. Among the most common are:

1. Switching from an occurrence policy to a claims-made policy, the retroactive date in the claims-made policy should be no later than the expiration date of the occurrence policy.

2. When replacing a claims-made policy with a claims-made policy, consider the following:
   a. The retroactive date in the replacement policy should extend far enough back in time to cover any acts with long periods of liability exposure, or
   b. If the retroactive date in the replacement policy does not extend far enough back in time to cover events with long periods of liability exposure, consider purchasing extended reporting period coverage under the old claims-made policy.

3. If this claims-made policy is replaced with an occurrence policy, insurance coverage may not exist for a claim arising during the period of claims-made coverage unless an extended reporting period is purchased under the claims-made policy. Extended reporting period coverage must be offered to the insured by law for at least one year after the expiration of the claims-made policy at a premium not to exceed 200% of your last policy premium.

**CAREFULLY REVIEW THIS POLICY REGARDING THE AVAILABLE EXTENDED REPORTING PERIOD COVERAGE, INCLUDING THE LENGTH OF COVERAGE, THE PRICE AND THE TIME PERIOD DURING WHICH ANY OFFER FOR EXTENDED REPORTING PERIOD COVERAGE MUST BE PURCHASED OR ACCEPTED.**





**Declarations**

| POLICY NO. | 107756394 |
|---|---|

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

**LIABILITY COVERAGES, SEPARATE LIABILITY COVERAGES, AND THIRD PARTY LIABILITY INSURING AGREEMENTS ARE WRITTEN ON A CLAIMS-MADE BASIS AND COVER ONLY CLAIMS MADE AGAINST INSUREDS DURING THE POLICY PERIOD.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

**ITEM 1**  **NAMED INSURED/INSURANCE REPRESENTATIVE:**

Johns Lyng USA, LLC

D/B/A:

Principal Address:
14142 DENVER WEST PKWY.
SUITE 190
LAKEWOOD, CO 80401

**ITEM 2**  **POLICY PERIOD:**

Inception Date: November 01, 2023         Expiration Date: November 01, 2024
12:01 A.M. local time both dates at the Principal Address stated in ITEM 1.

**ITEM 3**  **ADDRESS INFORMATION FOR NOTICES TO COMPANY:**

Email: BSIclaims@travelers.com
Fax: 1-888-460-6622

Mail: Travelers Bond & Specialty Insurance Claim
      P.O. Box 2989
      Hartford, CT 06104-2989

Overnight Mail: Travelers Bond & Specialty Insurance Claim
                One Tower Square, MN06
                Hartford, CT 06183

For questions related to claim reporting or handling, please call 1-800-842-8496.

**ITEM 4**  **COVERAGES INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**

**Liability Coverages** (subject to LIA-3001 Terms & Conditions)

      Private Company Directors and Officers Liability

      Employment Practices Liability

      Fiduciary Liability

**Crime Coverages**

      Crime

**Cyber Coverage**

      CyberRisk

---

**ITEM 5**

---

### LIABILITY COVERAGES (subject to LIA-3001)

| PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY |
|---|

| | | |
|---|---|---|
| **Limit of Liability:** | $3,000,000 | for all **Claims** |
| **Supplemental Personal Indemnification Coverage:** | ☒ Applicable | ☐ Not Applicable |
| **Supplemental Personal Indemnification Limit of Liability:** | $1,000,000 | for all **Claims** |
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |
| **Additional Defense Limit of Liability:** | Not Covered | for all **Claims** |
| **Investigation Expense Limit of Liability:** | $150,000 | for all **Claims** |
| **Retention:** | | |
| | $0 | for each **Claim** under Insuring Agreement A. |
| | $25,000 | for each **Claim** under Insuring Agreement B. |
| | $25,000 | for each **Claim** under Insuring Agreement C. |
| **Prior and Pending Proceeding Date:** | December 31, 2021 | |
| **Continuity Date:** | December 31, 2021 | |

| EMPLOYMENT PRACTICES LIABILITY |
|---|

| | | |
|---|---|---|
| **Limit of Liability:** | $3,000,000 | for all **Claims** |
| **Third Party Claim Coverage:** | ☒ Applicable | ☐ Not Applicable |
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |

© 2022 The Travelers Indemnity Company. All rights reserved.

| | | |
|---|---|---|
| **Additional Defense Limit of Liability:** | Not Covered | for all **Claims** |

| | | |
|---|---|---|
| **Retention:** | $25,000 | for each **Claim** under Insuring Agreement A. |
| | $25,000 | for each **Claim** under Insuring Agreement B., if applicable |

| | | |
|---|---|---|
| **Prior and Pending Proceeding Date:** | **Claims** for **Wrongful Employment Practices**: | December 31, 2021 |
| | **Claims** for **Third Party Wrongful Acts**: | December 31, 2021 |

| | | |
|---|---|---|
| **Continuity Date:** | **Claims** for **Wrongful Employment Practices**: | December 31, 2021 |
| | **Claims** for **Third Party Wrongful Acts**: | December 31, 2021 |

---

### FIDUCIARY LIABILITY

| | | |
|---|---|---|
| **Limit of Liability:** | $1,000,000 | for all **Claims** |

| | | |
|---|---|---|
| **Settlement Program Limit of Liability:** | $250,000 | for each **Settlement Program Notice**, which amount is included within, and not in addition to, any applicable limit of liability |

| | | |
|---|---|---|
| **HIPAA Limit of Liability:** | $1,000,000 | which amount is included within, and not in addition to, any applicable limit of liability |

| | | |
|---|---|---|
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |

| | | |
|---|---|---|
| **Additional Defense Limit of Liability:** | Not Covered | for all **Claims** |

| | | |
|---|---|---|
| **Retention:** | $0 | for each **Claim** under Insuring Agreement A. |
| | $0 | for each **Settlement Program Notice** under Insuring Agreement B. |

| | | |
|---|---|---|
| **Prior and Pending Proceeding Date:** | December 31, 2021 | |

| | | |
|---|---|---|
| **Continuity Date:** | December 31, 2021 | |

### CRIME COVERAGES

### CRIME

| INSURING AGREEMENT | SINGLE LOSS LIMIT OF INSURANCE | SINGLE LOSS RETENTION |
|---|---|---|
| **A. Fidelity** | | |
| 1. Employee Theft | $1,000,000 | $10,000 |
| 2. ERISA Fidelity | $1,000,000 | $0 |
| 3. Employee Theft of Client Property | $500,000 | $10,000 |
| **B. Forgery or Alteration** | $1,000,000 | $10,000 |

© 2022 The Travelers Indemnity Company. All rights reserved.

| | | |
|---|---|---|
| **C. On Premises** | $1,000,000 | $10,000 |
| **D. In Transit** | $1,000,000 | $10,000 |
| **E. Money Orders and Counterfeit Money** | $1,000,000 | $10,000 |
| **F. Computer Crime**<br>  1. Computer Fraud<br>  2. Computer Program and Electronic Data Restoration Expense | $1,000,000<br>$100,000 | $10,000<br>$10,000 |
| **G. Funds Transfer Fraud** | $1,000,000 | $10,000 |
| **H. Personal Accounts Protection**<br>  1. Personal Accounts Forgery or Alteration<br>  2. Identity Fraud Expense Reimbursement | Not Covered<br>Not Covered | |
| **I. Claim Expense** | $25,000 | $0 |

**Policy Aggregate Limit of Insurance:**    ☐ Applicable    ☒ Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** for Insuring Agreements A through H, inclusive, is:    Not Applicable

If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in section V. CONDITIONS, B.1.a.

**Cancellation of Prior Insurance:**

By acceptance of this **Crime Policy**, the **Insured** gives the Company notice canceling prior policies or bonds issued by the Company that are designated by policy or bond numbers  Not Applicable, such cancellation to be effective at the time this **Crime Policy** becomes effective.

**INSURED'S PREMISES COVERED:**

All Premises of the **Insured** in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:

Not Applicable

| CYBERRISK DECLARATIONS |
|---|

**CyberRisk Aggregate Limit:** $1,000,000

| Liability | Limit | Retention |
|---|---|---|
| Privacy and Security | $1,000,000 | $10,000 |
| Payment Card Costs | $1,000,000 | Subject to Privacy and Security Retention |
| Media | $1,000,000 | $10,000 |
| Regulatory Proceedings | $1,000,000 | $10,000 |

| Breach Response | Limit | Retention |
|---|---|---|
| Privacy Breach Notification | $1,000,000 | $10,000 |
| Computer and Legal Experts | $1,000,000 | $10,000 |

| | | |
|---|---|---|
| Betterment | $100,000 ID #:237 | NA |
| Cyber Extortion | $1,000,000 | $10,000 |
| Data Restoration | $1,000,000 | $10,000 |
| Public Relations | $1,000,000 | $10,000 |

| **Cyber Crime** | **Limit** | **Retention** |
|---|---|---|
| Computer Fraud | $100,000 | $5,000 |
| Funds Transfer Fraud | $100,000 | $5,000 |
| Social Engineering Fraud | $100,000 | $5,000 |
| Telecom Fraud | $100,000 | $5,000 |

| **Business Loss** | **Limit** | **Retention** |
|---|---|---|
| Business Interruption | $1,000,000 | |
| Dependent Business Interruption | $1,000,000 | |
| Dependent Business Interruption - System Failure | $1,000,000 | |
| Dependent Business Interruption - Outsource Provider | $1,000,000 | |
| Dependent Business Interruption - Outsource Provider - System Failure | $1,000,000 | |
| Reputation Harm | $250,000 | $5,000 |
| System Failure | $1,000,000 | |

**Additional First Party Provisions**

Accounting Costs Limit: $25,000

Betterment Coparticipation: 50%

Period Of Restoration: 180 days

Period Of Indemnity: 30 days

Wait Period: 12 hours

**Knowledge Date**: December 31, 2022

**P&P Date**: December 31, 2022

**Retro Date**: December 31, 2021

**Extended Reporting Period**

Months: 12

Percentage of Annualized Premium: 75%

© 2022 The Travelers Indemnity Company. All rights reserved.

**ITEM 6**

**PREMIUM FOR THE POLICY PERIOD FOR ALL COVERAGES:**

████████    Policy Premium for all purchased Coverages

**ITEM 7**    **TYPE OF CLAIM DEFENSE FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGE:**

☐ Reimbursement

☒ Duty-to-Defend

☐ Varies by Coverage - See Expanded Claim Defense Options Endorsement

Only the type of CLAIM DEFENSE marked "☒" is included in this policy.

**ITEM 8**    **EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

Additional Premium Percentage:    ████
Additional Months:    12

(If exercised in accordance with the applicable EXTENDED REPORTING PERIOD condition)

**ITEM 9**    **RUN-OFF EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

Additional Premium Percentage:  Not Applicable
Additional Months:    Not Applicable

(If exercised in accordance with the applicable CHANGE OF CONTROL condition**)**

**ITEM 10**    **ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY FOR LIABILITY COVERAGES SUBJECT TO LIA-3001:**

☐ Applicable        ☒ Not Applicable

Only those coverage features marked " ☒ Applicable" are included in this policy.

**ITEM 11**    **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE FOR ALL COVERAGES:**

ACF-7007-0811; ACF-7006-0511; AFE-19029-0719; AFE-19030-0920; LIA-3001-0109; AFE-16001-0119; LIA-7097-0109; LIA-10001-0610; LIA-10002-0610; LIA-19002-1111; EPL-19026-1112; LIA-19081-1113; LIA-19097-0315; LIA-19109-0415; LIA-19137-0517; LIA-4004-0912; PDO-3001-0109; PDO-7061-0109; PDO-19004-0512; PDO-19009-0612; PDO-19011-0612; PDO-19032-1112; PDO-7064-1013; PDO-19052-0314; PDO-19018-0517; PDO-19006-0517; PDO-19053-0119; PDO-19121-0122; EPL-3001-0109; EPL-7059-0109; EPL-7062-0109; EPL-7110-0109; EPL-10004-0111; EPL-10008-0111; EPL-19007-0712; EPL-19020-0712; EPL-19050-0316; EPL-19056-0517; EPL-19057-0517; EPL-19058-0517; EPL-19059-0517; EPL-19060-0517; EPL-19063-0319; FRI-3001-0109; FRI-7020-0109; FRI-19030-0712; FRI-19046-1012; FRI-19086-0414; FRI-19093-1015; FRI-19103-0517; LIA-7016-0109; LIA-7116-0109; LIA-7198-0110; LIA-7330-0109; LIA-7335-0109; LIA-7307-0911; CRI-3001-0109; CRI-7087-0109; CRI-19002-0412; CRI-19024-0412; CRI-19060-0713; CRI-19072-0315; CRI-19101-1117; CRI-19115-0519; CRI-19085-0919; CRI-19122-1120; CRI-19118-0719; CRI-7027-0109; CRI-5006-0613; CRI-5057-0613; CRI-7026-0713; CYB-16001-TOC-0620; CYB-16001-0620; CYB-19105-0119; CYB-19123-0519; CYB-19122-0519; CYB-19102-0620; CYB-19104-0620; AFE-19015-0119; LIA-5005-1107

**ITEM 12**      **LIABILITY COVERAGE SHARED LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001):

☐ Applicable            ☒ Not Applicable

N/A                          for all **Claims** under the following **Liability Coverages** that are subject to the Terms & Conditions in LIA-3001:

If the **Liability Coverages** selected in ITEM 12 are also **Scheduled Coverages** selected in ITEM 13, then the amount of the **Liability Coverage Shared Limit of Liability** set forth in ITEM 12 is part of, and not in addition to, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages** set forth in ITEM 13.

---

**ITEM 13**      **SHARED LIMIT OF LIABILITY/LIMIT OF INSURANCE FOR SCHEDULED COVERAGES:**

☐ Applicable            ☒ Not Applicable

N/A                          for all **Claims** and limits of insurance under the following **Scheduled Coverages**:

The Company's maximum liability for the **Policy Period** for all **Claims** and limits of insurance under the **Scheduled Coverages** listed in ITEM 13 will not exceed the amount of the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**. Any Additional Defense Limit of Liability, Supplemental Personal Indemnification Limit of Liability, or Identity Fraud Expense Reimbursement Limit of Insurance is in addition to, and not part of, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**.

---

**PRODUCER INFORMATION:**

MOODY INS AGCY INC
8055 E TUFTS AVE STE 1000
DENVER, CO 80237

---

IN WITNESS WHEREOF, the Company has caused this policy/bond to be signed by its authorized officers.

President                                          Corporate Secretary

---

© 2022 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CROSS-COVERAGE NOTICE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Crime, CyberRisk**

**It is agreed that:**

Notice provided to the Company of any:

1.   **Claim**, **Potential Claim**, **Settlement Program Notice**, or circumstances which may give rise to a **Claim** under any Management Coverage or **Liability Coverage**; or

2.   loss or situation that may result in loss, **Insured Event**, or **Identity Fraud** under any Crime Coverage or Other Coverage;

shall be deemed to have been provided under the Policy in its entirety.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

© 2011 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Crime, CyberRisk**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

© 2011 The Travelers Indemnity Company. All rights reserved.

This endorsement modifies any Coverage Part or Coverage Form included in this Policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

## Cap On Losses From Certified Acts Of Terrorism Endorsement

The following is added to this Policy. This provision can limit coverage for any loss arising out of a *Certified Act Of Terrorism* if such loss is otherwise covered by this Policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of *Certified Acts Of Terrorism* in another endorsement to this policy.

If aggregate insured losses attributable to *Certified Acts Of Terrorism* exceed $100 billion in a calendar year and the Insurer has met its insurer deductible under *TRIA*, the Insurer will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

*Certified Act Of Terrorism* means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of *TRIA*, to be an act of terrorism pursuant to *TRIA*. The criteria contained in *TRIA* for a *Certified Act Of Terrorism* include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

*TRIA* means the federal Terrorism Risk Insurance Act of 2002 as amended.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

This endorsement modifies any Coverage Part or Coverage Form included in this Policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

**Federal Terrorism Risk Insurance Act Disclosure Endorsement**

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA"), establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is 80% of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA).

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is no more than one percent of your premium, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA. Please note that no separate additional premium charge has been made for coverage for Insured Losses covered by TRIA. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium.

---

Issuing Company:  **Travelers Casualty and Surety Company of America**
Policy Number:  **107756394**

© 2020 The Travelers Indemnity Company. All rights reserved.



*LIABILITY COVERAGE TERMS AND CONDITIONS*

*THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE COVERAGE LIMITS. PLEASE READ THE POLICY CAREFULLY.*

*CONSIDERATION CLAUSE*

IN CONSIDERATION of the payment of the premium, in reliance on the statements in the **Application,** subject to the Declarations, and pursuant to all the terms, conditions, exclusions and limitations of this **Policy**, the Company and the Insureds agree as follows:

## I.    GENERAL

These **Liability Coverage** Terms and Conditions apply to all **Liability Coverages**.  Unless otherwise stated to the contrary, the terms and conditions of each **Liability Coverage** apply only to that particular **Liability Coverage**.  If any provision in these Liability Coverage Terms and Conditions is inconsistent or in conflict with the terms and conditions of any particular **Liability Coverage**, such **Liability Coverage's** terms, conditions, and limitations will control for purposes of that **Liability Coverage**.

## II.    DEFINITIONS

Wherever appearing in this **Liability Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this Section II. DEFINITIONS:

**A.    *Additional Defense Limit of Liability*** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**. If  "*Not Applicable*" is shown as the amount of any **Liability Coverage's Additional Defense Limit of Liability**, then any reference to the **Additional Defense Limit of Liability** will be deemed to be deleted from such **Liability Coverage**.

**B.    *Annual Reinstatement of the Liability Coverage Limit of Liability*** means, if included in ITEM 10 of the Declarations, the reinstatement of each applicable **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for each applicable **Liability Coverage** for each **Policy Year** during the **Policy Period**.

**C.    *Application*** means the application deemed to be attached to and forming a part of this **Liability Policy**, including any materials submitted and statements made in connection with that application. If the **Application** uses terms or phrases that differ from the terms defined in this **Liability Policy**, no inconsistency between any term or phrase used in the **Application** and any term defined in this **Liability Policy** will waive or change any of the terms, conditions and limitations of this **Liability Policy**.

**D.    *Change of Control*** means:

1.    the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

2.    the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than fifty percent (50%) of the board of directors, board of trustees, board of managers, or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Named Insured**.

**E.    *Claim*** has the meaning set forth in the applicable **Liability Coverage**.

**F.**     ***Defense Expenses*** means reasonable and necessary legal fees and expenses incurred by the Company or the **Insured**, with the Company's consent, in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such **Claim**; provided, that **Defense Expenses** will not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any employee of such **Insured**.

**G.**     ***Executive Officer*** has the meaning set forth in the applicable **Liability Coverage**.

**H.**     ***Financial Insolvency*** means, with respect to the **Insured Organization** or any **Outside Entity**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** or **Outside Entity** financially to indemnify the **Insured Persons**.

**I.**     ***Foreign Parent Corporation*** means any entity incorporated outside the United States, which owns more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint the **Named Insured's** board of directors, board of trustees or board of managers, or to exercise a majority control of the board of directors, board of trustees or board of managers of the **Named Insured**.

**J.**     ***Insured*** has the meaning set forth in the applicable **Liability Coverage**.

**K.**     ***Insured Organization*** has the meaning set forth in the applicable **Liability Coverage**.

**L.**     ***Insured Person*** has the meaning set forth in the applicable **Liability Coverage**.

**M.**     ***Liability Coverage*** means, individually or collectively, the **Liability Coverages** that have been purchased, as indicated in ITEM 4 of the Declarations.

**N.**     **Liability Coverage Limit of Liability** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**.

**O.**     ***Liability Coverage Shared Limit of Liability*** means the amount set forth in ITEM 12 of the Declarations. If "*Not Applicable*" is shown in ITEM 12 of the Declarations or ITEM 4 of the Declarations indicates that only one **Liability Coverage** is included in this **Liability Policy**, any reference to either the **Liability Coverage Shared Limit of Liability** or ITEM 12 of the Declarations will be deemed to be deleted from this **Liability Policy**.

**P.**     ***Liability Policy*** means, collectively, the Declarations, the **Application**, the Liability Coverage Terms and Conditions, each purchased **Liability Coverage**, and any endorsements attached thereto.

**Q.**     ***LLC Manager*** means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of an **Insured Organization** that is a limited liability company.

**R.**     ***Loss*** has the meaning set forth in the applicable **Liability Coverage**.

**S.**     ***Named Insured*** means any entity named in ITEM 1 of the Declarations.

**T.**     ***Policy Period*** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.  In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Liability Policy**.

**U.**     ***Policy Year*** means:

1.     the period of one year following the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof;

2.     the time between the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof and the effective date of cancellation or termination of this **Liability Policy** if such time period is less than one year;

3.      with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of such **Liability Coverage** and any anniversary of this **Liability Policy** if the time between the inception date of such **Liability Coverage** and any anniversary of this **Liability Policy** is less than one year; and

4.      with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of such **Liability Coverage** and the effective date or cancellation or termination of this **Liability Policy,** if such time is less than one year.

**V.**      *Pollutant* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**W.**      *Potential Claim* means any **Wrongful Act** that may subsequently give rise to a **Claim**.

**X.**      *Related Wrongful Act* means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event or decision.

**Y.**      *Subsidiary* has the meaning set forth in the applicable **Liability Coverage**.

**Z.**      *Wage and Hour Law* means any federal, state, or local law or regulation governing or related to the payment of wages including the payment of overtime, on-call time, minimum wages, meals, rest breaks or the classification of employees for the purpose of determining employees' eligibility for compensation under such law(s).

**AA.**      *Wrongful Act* has the meaning set forth in the applicable **Liability Coverage**.

---

## III.      *CONDITIONS*

**A.      TERRITORY**

This **Liability Policy** applies to **Claims** made or **Wrongful Acts** occurring anywhere in the world.

**B.      RETENTION**

The **Insured** shall bear uninsured at its own risk the amount of any applicable Retention, which amount must be paid in satisfaction of  **Loss.**

If any **Claim** gives rise to coverage under a single **Liability Coverage**, the Company has no obligation to pay **Loss**, including **Defense Expenses**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.

If any **Claim** is subject to different Retentions under a single **Liability Coverage**, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions will not exceed the largest applicable Retention under such **Liability Coverage**.

If any **Claim** gives rise to coverage under two or more **Liability Coverages**, the Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the largest Retention that is applicable to such **Claim** under such **Liability Coverages** has been paid by the **Insured**.

No Retention will apply to an **Insured Person** if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is unable to make such indemnification solely by reason of its **Financial Insolvency**. The **Insured Organization** will be conclusively deemed to have indemnified all  **Insured Persons**  to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.

The Company, at its sole discretion, may pay all or part of the Retention amount on behalf of any **Insured**, and in such event, the **Insureds** agree to repay the Company any amounts so paid.

C.    **LIMITS OF LIABILITY**

1.    Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, and further subject to any applicable **Liability Coverage Shared Limit of Liability** or **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under each applicable **Liability Coverage** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the **Declarations** for each applicable **Liability Coverage**; and

b.    in the event that a **Claim** triggers more than one **Liability Coverage**, the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for any such **Claim** will not exceed the sum of the remaining **Liability Coverage Limits of Liability** of the applicable **Liability Coverages**.

2.    Liability Coverage Shared Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established; and further subject to any applicable **Annual Reinstatement of the Liability Coverage Limit of Liability**, if ITEM 4 of the Declarations indicates that more than one **Liability Coverage** has been purchased and a **Liability Coverage Shared Limit of Liability** is shown in ITEM 12 of the Declarations:

a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will not exceed the remaining **Liability Coverage Shared Limit of Liability**; and

b.    if the **Liability Coverage Shared Limit of Liability** is exhausted by the payment of amounts covered under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, the premium for all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be fully earned, all obligations of the Company under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations.

3.    Annual Reinstatement of the Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 10 of the Declarations includes an **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** made during each **Policy Year** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the Declarations for each applicable **Liability Coverage** or, if applicable, the remaining **Liability Coverage Shared Limit of Liability**; and

b.    with regard to the Extended Reporting Period or the Run-Off Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Extended Reporting Period or the Run-Off Extended Reporting Period will not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the termination or cancellation of the **Liability Coverage** or the **Change of Control**.

4.    Other Provisions

Payment of **Defense Expenses** will reduce and may exhaust all applicable limits of liability. In the event the amount of **Loss** exceeds the portion of the applicable limit of liability remaining after prior payments of **Loss**, the Company's liability will not exceed the remaining amount of the applicable limit of liability. In no event will the Company be obligated to make any payment for **Loss** , including **Defense Expenses**, with regard to a **Claim** after the applicable limit of liability has been exhausted by payment or tender of payment of **Loss**.

If a **Liability Coverage Limit of Liability** is exhausted by the payment of amounts covered under such **Liability Coverage**, the premium for such **Liability Coverage** will be fully earned, all obligations of the Company under such **Liability Coverage** will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under such **Liability Coverage**.

D.    **ADDITIONAL DEFENSE COVERAGE**

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 5 of the Declarations indicates that any **Liability Coverage** includes Additional Defense Coverage, **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of any **Claim** made during the **Policy Period** under any such **Liability Coverage** will apply first to and reduce the **Additional Defense Limit of Liability**. The **Additional Defense Limit of Liability** will be in addition to, and not part of, such **Liability Coverage's** applicable **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. The **Additional Defense Limit of Liability** is applicable to **Defense Expenses** only. If the **Annual Reinstatement of the Liability Coverage Limit of Liability** is applicable, the **Additional Defense Limit of Liability** will be reinstated for each **Policy Year**.

Upon exhaustion of the Additional Defense Limit of Liability:

1.    **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of a **Claim** are part of and not in addition to any applicable limit of liability; and

2.    payment by the Company or the **Insured** , with the Company's consent, of **Defense Expenses** reduces any applicable limit of liability.

E.    **CLAIM DEFENSE**

1.    If Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any **Claim** covered by a **Liability Coverage**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided, that the Company will not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**.

2.    If Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations:

a.    the Company will have no duty to defend any **Claim** covered by a **Liability Coverage**. It will be the duty of the **Insured** to defend such **Claims**; and the Company will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Liability Coverage** and the selection of appropriate defense counsel; and

b.    upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**. Such advanced payments by the Company will be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses** under such **Liability Coverage**. As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Liability Coverage**.

3.    The **Insured** agrees to cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission insured under such **Liability Coverage**, will attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

## F.    INSURED'S DUTIES IN THE EVENT OF A CLAIM

The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by an **Executive Officer.** If an **Executive Officer** becomes aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under this **Liability Policy,** must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt. The **Insured** agrees not to voluntarily settle any **Claim**, make any settlement offer, assume or admit any liability or, except at the **Insured's** own cost, voluntarily make any payment, pay or incur any **Defense Expenses**, or assume any obligation or incur any other expense, without the Company's prior written consent, such consent not to be unreasonably withheld. The Company is not liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## G.    NOTICE OF POTENTIAL CLAIMS

If an **Insured** becomes aware of a **Potential Claim** and gives the Company written notice of the particulars of such **Potential Claim,** including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act** , the dates of the alleged events, and the reasons for anticipating a **Claim** , as soon as practicable during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, any **Claim** subsequently made against any **Insured** arising out of such **Wrongful Act** will be deemed to have been made during the **Policy Period**.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt.

## H.    RELATED  CLAIMS

All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Liability Policy**. All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Related Wrongful Acts** was made whether prior to or during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## I.    SUBROGATION

In the event of payment under this **Liability Policy**, the Company is subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** agrees to execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** will do nothing to prejudice such rights.

## J.    RECOVERIES

All recoveries from third parties for payments made under this **Liability Policy** will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1.    first, to the Company to reimburse the Company for any Retention amount it has paid on behalf of any **Insured**;

2.    second, to the **Insured** to reimburse the **Insured** for the amount it has paid which would have been paid hereunder but for the fact that it is in excess of the applicable limits of liability hereunder;

3.    third, to the Company to reimburse the Company for the amount paid hereunder; and

4.    fourth, to the **Insured** in satisfaction of any applicable Retention;

provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit.


## K.    CHANGE OF CONTROL

If, during the  **Policy Period**, a **Change of Control** occurs, coverage will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed after such event.  No coverage will be available hereunder for **Loss**, including **Defense Expenses**, for any **Claim** based upon, alleging, arising out of, or in any way relating to, directly or indirectly any **Wrongful Act** committed or allegedly committed after such event.  After any such event, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

Upon the occurrence of any **Change of Control**, the **Named Insured** will have the right to give the Company notice that it desires to purchase a Run-Off Extended Reporting Period for any **Liability Coverage** for the period set forth in ITEM 9 of the Declarations following the effective date of such **Change of Control**, regarding **Claims** made during such Run-Off Extended Reporting Period against persons or entities who at the effective date of the **Change of Control** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to such **Change of Control** and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Run-Off Extended Reporting Period will not provide new, additional or renewed limits of liability; and

2.    the Company's total liability for all **Claims** made during such Run-Off Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Change of Control**.

The premium due for the Run-Off Extended Reporting Period will equal the percentage set forth in ITEM 9 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period** prior to the **Change of Control**. The entire premium for the Run-Off Extended Reporting Period will be deemed fully earned at the commencement of such Run-Off Extended Reporting Period.

The right to elect the Run-Off Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the **Change of Control**. In the event the Run-Off Extended Reporting Period is purchased, the option to purchase the Extended Reporting Period in Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions will terminate. In the event the Run-Off Extended Reporting Period is not purchased, the **Named Insured** will have the right to purchase the Extended Reporting Period under the terms of Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions.

If, at any time during the **Policy Period**, the **Insured Organization** eliminates or reduces its ownership interest in, or control over a **Subsidiary**, such that it no longer meets the definition of a **Subsidiary**, coverage will continue for such entity but only with regard to **Claims**  for **Wrongful Acts** which occurred wholly during the time that the entity was a **Subsidiary**.


## L.    ACQUISITIONS

If, during the **Policy Period**, the **Insured Organization** acquires or forms a **Subsidiary**, this **Liability Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Policy**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for such  **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed 30% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period**.

**M.    SPOUSAL AND DOMESTIC PARTNER LIABILITY COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or a person qualifying as a domestic partner under the provisions of any applicable federal, state or local law (a "Domestic Partner") of an **Insured Person**, but only if and so long as:

1.    the **Claim** against such spouse or Domestic Partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the Domestic Partner; and

2.    such **Insured Person** and his or her spouse or Domestic Partner are represented by the same counsel in connection with such **Claim**.

No spouse or Domestic Partner of an **Insured Person** will, by reason of this subsection have any greater right to coverage under this **Liability Policy** than the Insured Person to whom such spouse is married, or to whom such Domestic Partner is joined.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a spouse or Domestic Partner of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or Domestic Partner.

**N.    FOREIGN PARENT CORPORATION COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply coverage for **Defense Expenses** resulting from any **Claim** made against a **Foreign Parent Corporation**, but only if and so long as:

1.    such **Claim** results from a **Wrongful Act** actually or allegedly committed solely by any **Insured**;

2.    such **Insured** and the **Foreign Parent Corporation** are represented by the same counsel in connection with such **Claim**; and

3.    such **Insured** is included as a co-defendant.

No **Foreign Parent Corporation** will, by reason of this subsection, have any greater right to coverage under this **Liability Policy** than any **Insured**.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a **Foreign Parent Corporation** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such **Foreign Parent Corporation** or any member of the board of directors, officer, employee, or functional equivalent thereof.

**O.    EXTENDED REPORTING PERIOD**

At any time prior to or within 60 days after the effective date of termination or cancellation of any Liability Coverage for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability; and

2.    the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation.  The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of the termination or cancellation.

**P.    ALLOCATION**

1.    If Duty-to-Defend coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then such covered **Loss**  and uncovered loss will be allocated as follows:

   a.    one hundred percent (100%) of **Defense Expenses** incurred by the **Insureds** who are afforded coverage for such **Claim** will be allocated to covered **Loss**; and

   b.    all loss other than **Defense Expense** will be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under such **Liability Coverage**.  In making such a determination, the **Insured Organization**, the **Insured Persons** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

2.    If Reimbursement coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then the **Insureds**  and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under the applicable **Liability Coverage**.  In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

**Q.    CANCELLATION**

The Company may cancel this **Liability Policy** for failure to pay a premium when due, in which case twenty (20) days written notice will be given to the **Named Insured**, unless, payment in full is received within twenty (20) days of the **Named Insured's** receipt of such notice of cancellation. The Company has the right to the premium amount for the portion of the **Policy Period** during which this **Liability Policy** was in effect.

Subject to the provisions set forth in Section III. CONDITIONS K. CHANGE OF CONTROL, the **Named Insured** may cancel any **Liability Coverage** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective.  In the event the **Named Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **Liability Policy** upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least thirty (30) days before the Expiration Date set forth in ITEM 2 of the Declarations.

**R.     ACTION AGAINST THE COMPANY**

No action will lie against the Company unless there has been full compliance with all of the terms of this **Liability Policy**.

No person or organization has any right under this **Liability Policy** to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor may the Company be impleaded by an **Insured** or said **Insured's** legal representative. Bankruptcy or insolvency of any **Insured** or an **Insured's** estate does not relieve the Company of any of its obligations hereunder.

**S.     CHANGES**

Only the **Named Insured** is authorized to make changes in the terms of this **Liability Policy** and solely with the Company's prior written consent. This **Liability Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Liability Policy**. Notice to any representative of the **Insured** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Liability Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Liability Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Liability Policy** issued by the Company.

**T.     ASSIGNMENT**

This **Liability Policy** may not be assigned or transferred, and any such attempted assignment or transfer is void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**U.     REPRESENTATIONS**

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Liability Policy** is issued in reliance upon the truth of such representations, and embodies all agreements existing between said **Insured** and the Company or any of its agents.

If any statement or representation in the **Application** is untrue with respect to any **Liability Coverage**, such **Liability Coverage** is void and of no effect whatsoever, but only with respect to:

1.     any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;

2.     any **Insured Organization**, with respect to its indemnification coverage, to the extent it indemnifies any **Insured Person** referenced in 1. above; and

3.     any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

**V.     LIBERALIZATION**

If, during the **Policy Period**, the Company is required, by law or by insurance supervisory authorities of the state in which this **Liability Policy** was issued, to make any changes in the form of this **Liability Policy**, by which the insurance afforded by this **Liability Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

W.    **AUTHORIZATION**

By acceptance of the terms herein, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due hereunder, and the receiving of notices of cancellation, nonrenewal, or change of coverage, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing herein will relieve the **Insureds** from giving any notice to the Company that is required under this **Liability Policy**.

X.    **ENTIRE AGREEMENT**

The Declarations, the **Application**, the Liability Coverage Terms and Conditions, each **Liability Coverage**, and any endorsements attached thereto, constitute the entire agreement between the Company and the **Insured**.

Y.    **HEADINGS**

The titles of the various paragraphs of this **Liability Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

This form contains terms that apply to the Policy.

**General Conditions**

---

**Authorization And Changes.**

The Named Insured will act on behalf of all *Insureds* regarding the payment of premium, receipt of return premium, change of coverage, and receipt of notices of cancelation or nonrenewal. Each *Insured* agrees that they have delegated such authority to the Named Insured.

The Named Insured may change this Policy with the Insurer's consent by endorsement to this Policy. No rights or duties under this policy may be transferred or assigned without the Insurer's written consent.

**Conformity To Law.**

Any part of this Policy that conflicts with applicable statutory or regulatory law is changed to conform to such law. This Policy provides coverage and benefits only to the extent that it does not expose the Insurer, or any of its subsidiaries, or affiliated companies, to a trade or economic sanction, prohibition, or restriction under a U.N. resolution, trade or economic sanction, or E.U., U.K., or U.S. law or regulation.

**Consent And Cooperation.**

Where the Insurer's consent is required, such consent will not be unreasonably withheld. The *Insured* agrees to give all information, assistance, and cooperation the Insurer reasonably requires.

**Representatives.**

In the event of an *Insured Person's* death, incapacity, or bankruptcy, this Policy will afford coverage to his or her:
1. estate;
2. legal representative;
3. legal spouse, domestic partner, or party to a civil union; or
4. assignee,

but only to the extent that it would have applied to such *Insured Person*.

**Suits Against The Insurer.**

No person or entity has the right under this Policy to join the Insurer as a party in an action against an *Insured* to determine such *Insured's* liability, nor may the Insurer be impleaded by any *Insured*. No action will lie against the Insurer unless there has been full compliance with all the terms of this Policy.

**Territory And Valuation.**

This Policy applies anywhere in the world, but it does not apply to *Loss* incurred by an *Insured* residing or domiciled in a country or jurisdiction in which the Insurer is not licensed to provide this insurance, to the extent that providing this insurance would violate any applicable foreign law or regulation ("Foreign Loss").

If an *Insured Entity* incurs Foreign Loss, the Insurer will reimburse the Named Insured for such Foreign Loss because of the Named Insured's financial interest in such *Insured Entity*. If an *Insured Person* incurs Foreign Loss not indemnified by an *Insured Entity*, such Foreign Loss will be paid in a country or jurisdiction mutually acceptable to such *Insured Person* and the Insurer, to the extent that doing so would not violate any applicable foreign law or regulation.

All amounts in this Policy are stated in U.S. Dollars. If amounts are due under a liability coverage and are stated in a different currency, payment will be made in U.S. Dollars at the exchange rate published in The Wall Street Journal at the time the final amount is determined.

**Titles, Headings, And Defined Terms.**

The titles and headings in this Policy do not affect coverage. Where appearing in this Policy, in singular or plural, words and phrases appearing in italicized type have the meaning shown in the Definitions of the applicable Coverage.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### AMEND NUMBER OF DAYS FOR ELECTING EXTENDED REPORTING PERIOD ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Employment Practices Liability**

**It is agreed that:**

Solely with respect to the **Liability Coverage(s)** shown above, section **III. CONDITIONS, O. EXTENDED REPORTING PERIOD** of the **Liability Coverage Terms and Conditions** is replaced by the following:

O.    **EXTENDED REPORTING PERIOD**

At any time prior to or within **90** days after the effective date of termination or cancellation of any Liability Coverage for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability; and

2.    the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation.  The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within **90** days of the effective date of the termination or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SETTLEMENT CONDITION ENDORSEMENT

This endorsement modifies the following when indicated below by ☒:

**It is agreed that:**

☒ **Private Company Directors and Officers Liability**

The following replaces **B. SETTLEMENT** of the *CONDITIONS* section of the **Liability Coverage**:

**B.    SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

☐ **Financial Institution Professional Liability**

The following replaces **B. SETTLEMENT** of the *CONDITIONS* section of the **Liability Coverage**:

**B.    SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

☒ **Employment Practices Liability**

The following replaces section *IV. CONDITIONS*, **A. SETTLEMENT** of the **Liability Coverage**:

**A.    SETTLEMENT**

1.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that:

a.    the **Insured** and the party bringing a **Claim** hereunder consent to the first settlement offer recommended by the Company (the "Settlement Offer") within thirty (30) days of being made aware of such offer by the Company; and

b.    the amount of such Settlement Offer:

i.    is less than the remaining applicable limit of liability available at the time; and

ii.    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention;

the Retention will be retroactively reduced by ten percent (10%) with respect to such **Claim**.

2.    If the **Insured** does not consent to the Settlement Offer within thirty (30) days of being made aware of such offer by the Company:

a.    the Retention will not be reduced as provided in paragraph 1. above even if consent is given to the same or subsequent Settlement Offer; and

b.    the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss** , other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

[x]    **Fiduciary Liability**

The following replaces section *V. CONDITIONS*, **A. SETTLEMENT** of the **Liability Coverage**:

**A.    SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

[ ]    **Miscellaneous Professional Liability**

The following replaces section *V. CONDITIONS*, **B. SETTLEMENT** of the **Liability Coverage**:

**B.    SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NON-RESCISSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

The following replaces section *III. CONDITIONS*, **U. REPRESENTATIONS** of the Liability Coverage Terms and Conditions:

**U.      REPRESENTATIONS**

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Liability Policy** is issued in reliance upon the truth of such representations, and embodies all agreements existing between said **Insured** and the Company or any of its agents.

With respect to all the statements contained in the **Application,** no knowledge possessed by any one **Insured Person** will be imputed to any other **Insured Person.**

The Company will not, under any circumstance, rescind this **Liability Coverage** with respect to any **Insured**. However, the Company and the **Insureds** agree that if any statement or representation in the **Application** is untrue or inaccurate with respect to such **Liability Coverage**, then no coverage shall be afforded under such **Liability Coverage** for any **Claim** based upon, arising out of, or attributable to the subject matter of any such untrue or inaccurate statement or representation with respect to:

1.      any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;

2.      any **Insured Organization**, with respect to its indemnification coverage, to the extent it indemnifies any **Insured Person** referenced in 1. above; and

3.      any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 107756394

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADVANCEMENT OF THE RETENTION ENDORSEMENT

This endorsement changes the following:
**Fiduciary Liability, Employment Practices Liability, Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following is added to section **III. *CONDITIONS*, B. RETENTION** of the Liability Coverage Terms and Conditions:

Notwithstanding anything in this section III. CONDITIONS, B. RETENTION to the contrary, if the **Insured Organization** is permitted by law to indemnify any **Insured Person** for any applicable Retention but refuses or fails to do so and such refusal or failure is not by reason of **Financial Insolvency**, then the Company will advance the amount of any applicable Retention that would otherwise be covered under this **Liability Coverage** on behalf of such **Insured Person** and will be subrogated to the rights of such **Insured Person** pursuant to section III. CONDITIONS, I. SUBROGATION for purposes of recovering such Retention amount from the **Insured Organization**.

The **Insured Organization's** failure or refusal to indemnify such **Insured Person** will be deemed to have occurred if the **Insured Organization** has neither paid such Retention on behalf of the **Insured Person**, nor acknowledged its obligation to do so, within 60 days of the **Insured Person's** written demand to the **Insured Organization** for indemnification or payment of such Retention.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2011 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEPARATE RETENTION FOR EMPLOYEES LOCATED IN SPECIFIED STATE ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

1.　The following is added to section ***III. CONDITIONS***, **B. RETENTION** of the Liability Coverage Terms and Conditions:

　　The Retention for each **Claim** set forth in ITEM 5 of the Declarations will not apply to any **Claim** under the Employment Practices Liability coverage brought by or on behalf of any **Employee** located in the state set forth in Item 5 of the Declarations in the Specified State Schedule, and instead, the Retention for each such **Claim** will be the Retention set forth in ITEM 5. of the Declarations for each **Claim** brought by or on behalf of **Employees** located in the state set forth in Specified State Schedule.

2.　The following is added to ITEM 5. of the Declarations:

　　**Retention**:　　　　　　　　　　**$50,000** for each **Claim** brought by or on behalf of **Employees** located in the state set forth in the Specified State Scheduled.

　　**Specified State Schedule**

　　**California**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND ACQUISITIONS CONDITION TO DELETE
## SPECIFIC APPLICATION REQUIREMENT ENDORSEMENT

This endorsement modifies the following:
**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

The following replaces the first paragraph of section **III. CONDITIONS**, **L. ACQUISITIONS** of the Liability Coverage Terms and Conditions:

**L.      ACQUISITIONS**

If, during the **Policy Period**, the **Insured Organization** acquires or forms a **Subsidiary**, this **Liability Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Policy**, provided written notice of such acquisition or formation has been given to the Company, together with such documentation and information as the Company may require, all within 90 days after the effective date of such formation or acquisition. Coverage for such **Subsidiary** will not be afforded following such 90 day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

©2013 The Travelers Indemnity Company. All rights reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

---

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS**:

    ***Financial Interest*** means the **Named Insured's** insurable interest in an **Insured Organization** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **Named Insured's**:

    1. ownership of the majority of the outstanding securities or voting rights of such **Insured Organization** representing the present right to elect, appoint, or exercise a majority control over such **Insured Organization's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

    2. indemnification of, or representation that it has an obligation to indemnify, such **Insured Organization** for **Loss** incurred by such **Insured Organization**; or

    3. election or obligation to obtain insurance for such **Insured Organization**.

2. The following is added to section **III. CONDITIONS**:

    **SANCTIONS**

    This **Liability Policy** will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition, or restriction.

3. The following replaces section **III. CONDITIONS, A. TERRITORY**:

    **A.  TERRITORY AND VALUATION**

    1. This **Liability Policy** applies anywhere in the world; provided, this **Liability Policy** does not apply to **Loss** incurred by an **Insured**, or a **Foreign Parent Corporation**, residing or domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

    2. In the event an **Insured Organization** incurs **Loss** referenced in 1. above to which this insurance would have applied, the Company will reimburse the **Named Insured** for its **Loss**, on account of its **Financial Interest** in such **Insured Organization**. As a condition precedent to such reimbursement, or any rights under this **Liability Policy**, the **Named Insured** will cause the **Insured Organization** or its **Insured Persons** to comply with the conditions of this **Liability Policy**.

    3. All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Liability Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Liability Policy** is stated in a currency other than United States dollars, payment under this **Liability Policy** will be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2015 The Travelers Indemnity Company. All rights reserved.

4.  The following is added to section **III. CONDITIONS**, **E. CLAIM DEFENSE**:

In the event of a **Claim** against an **Insured** or **Foreign Parent Corporation** that resides or is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance and if Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend such **Claim** as set forth in this section III. CONDITIONS, E. CLAIM DEFENSE, 1. to the extent that doing so would not violate the laws or regulations of such country or jurisdiction.

If the Company is prohibited from defending such **Claim** or if Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, then this section III. CONDITIONS, E. CLAIM DEFENSE, 2. applies to such **Claim**; provided, any such **Claim** is subject to section III. CONDITIONS, P. ALLOCATION, 2.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### AMEND CHANGE OF CONTROL AND EXTENDED REPORTING PERIOD CONDITIONS ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability, Fiduciary Liability, Private Company Directors and Officers Liability**

**It is agreed that:**

1.  The following replaces the first paragraph of section **III. CONDITIONS**, **K. CHANGE OF CONTROL**:

    If, during the **Policy Period**, a **Change of Control** occurs, coverage will continue in full force and effect with respect to **Loss** arising out of a **Claim** or that part of a **Claim** alleging **Wrongful Acts** committed before the **Change of Control**; coverage will cease with respect to **Loss** arising out of a **Claim** or that part of a **Claim** alleging **Wrongful Acts** committed after the **Change of Control**. After such **Change of Control**, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

2.  The second and fifth paragraphs of section **III. CONDITIONS**, **K. CHANGE OF CONTROL** are amended by deleting "wholly."

3.  The first paragraph of section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD** is amended by deleting "wholly."

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AUTOMATIC COVERAGE FOR ALL FORMED SUBSIDIARIES AND ACQUIRED SUBSIDIARIES WITH ASSETS NOT EXCEEDING 35% ENDORSEMENT

This endorsement changes the following:
**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

The following amends section **III. CONDITIONS**, **L. ACQUISITIONS** of the Liability Coverage Terms and Conditions:

1.  The **Insureds** need not complete an application for, and need not provide written notice of, the formation of any **Subsidiary** during the **Policy Period** by the **Insured Organization** in order for the Company to provide coverage for a formed **Subsidiary** and **Insured Persons** thereof.

2.  The words "forms" and "formation" are deleted from the first paragraph.

3.  The second paragraph is replaced by the following:

    The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired **Subsidiary** do not exceed 35% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition occurs less than 90 days prior to the end of the **Policy Period**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

LIA-19137 Ed. 05-17                                                                                     Page 1 of 1
© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## COLORADO CHANGES ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

The following replaces section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD**, of the Liability Terms and Conditions:

**O.     EXTENDED REPORTING PERIOD**

At any time prior to or within 60 days after the effective date of effective date of termination or cancellation of any **Liability Coverage**, for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period offered by the company. Such offering will include a period of 12 months, for all **Liability Coverages** that are part of this **Liability Policy,** following the effective date of termination or cancellation of any **Liability Coverage**, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of effective date of termination or cancellation of any **Liability Coverage** are **Insureds** , but only for **Wrongful Acts** occurring wholly prior to the effective date of the effective date of termination or cancellation of any **Liability Coverage** which otherwise would be covered by such **Liability Coverage** , subject to the following provisions:

1.      such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability;

2.      the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation; and

3.      such Extended Reporting Period will not be available if the **Named Insured** or any other **Insured** qualifies as an exempt commercial policyholder.

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to effective date of effective date of termination or cancellation of any **Liability Coverage**; provided, the additional premium for the Extended Reporting Period will not exceed 200% of the annualized premium of the applicable **Liability Coverage**. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of termination or cancellation of any **Liability Coverage**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**



PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY

**THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

## I.    INSURING  AGREEMENTS

The Company will pay on behalf of:

**A.**    the **Insured Persons, Loss** for **Wrongful Acts**, except for **Loss** which the **Insured Organization** pays to or on behalf of the  **Insured Persons**  as indemnification;

**B.**    the **Insured Organization, Loss** for **Wrongful Acts** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

**C.**     the **Insured Organization, Loss** for **Wrongful Acts**,

resulting from any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

The Company will also pay on behalf of the **Insured Organization, Investigation Expense** resulting from any **Security Holder Derivative Demand** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, against an **Insured Organization** for **Wrongful Acts**.  The Company's maximum limit of liability for all **Investigation Expense** will be the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

## II.    SUPPLEMENTAL PERSONAL INDEMNIFICATION

If ITEM 5 of the Declarations indicates that coverage for Supplemental Personal Indemnification Coverage has been purchased, and if the **Liability Coverage Limit of Liability** under this **Liability Coverage** or a **Liability Coverage Shared Limit of Liability**, if applicable, has been exhausted, the Company will provide the **Insured Persons** with an additional Supplemental Personal Indemnification Limit of Liability under Insuring Agreement A. Such Supplemental Personal Indemnification Limit of Liability will not exceed the amount set forth in ITEM 5 of the Declarations, which amount is in addition to and not part of the **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. This Supplemental Personal Indemnification Limit of Liability applies solely to **Loss** resulting from any **Claim,**  other than a **Claim** for an employment-related **Wrongful Act,** against an **Insured Person** to which Insuring Agreement A. is applicable.

## III.    DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in this Section III. DEFINITIONS:

**A.**    *Claim* means:

1.    a written demand, other than a **Security Holder Derivative Demand**, for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by filing of charges;

4.    a formal administrative or regulatory proceeding, commenced by a filing of charges, formal investigative order, service of summons, or similar document;

5.    an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

©2009 The Travelers Companies, Inc. All Rights Reserved

6.    a **Security Holder Derivative Demand** solely with respect to **Investigation Expenses** and subject to the **Investigation Expense Limit of Liability** set forth in ITEM 5 of the Declarations;

7.    the service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal administrative or regulatory proceeding, or

8.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an **Insured** for a **Wrongful Act**, provided that **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim.** However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim.**

**B.**    *Executive Officer* means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, or **LLC Manager** of the **Insured Organization** or a functional equivalent thereof.

**C.**    *Insured* means the **Insured Persons** and the **Insured Organization**.

**D.**    *Insured Organization* means the **Named Insured,** any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**E.**    *Insured Person* means any natural person who was, is or becomes a duly elected or appointed member of the board of directors, officer, or a functional equivalent to a member of the board of directors or officer of the **Insured Organization** in the event the **Insured Organization** is incorporated or domiciled outside the United States, member of the board of managers, **Executive Officer**, employee, or member of a management committee or an advisory committee of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**F.**    *Investigation Expense* means reasonable and necessary fees, costs and expenses incurred by the **Insured Organization**, including its board of directors, board of managers or any duly constituted committee thereof, in connection with any investigation or evaluation by the **Insured Organization** of any **Security Holder Derivative Demand**.

**G.**    *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements, judgments, back and front pay, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages, prejudgment and postjudgment interest, and legal fees and expenses awarded pursuant to a court order or judgment. **Loss** does not include:

1.    civil or criminal fines, sanctions, liquidated damages other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; or

2.    any amount allocated to non-covered loss pursuant to Section III. CONDITIONS. P. ALLOCATION of the Liability Coverage Terms and Conditions.

**H.**    *Outside Entity* means a corporation or organization:

1.    other than the **Insured Organization**, which is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

2.    specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

©2009 The Travelers Companies, Inc. All Rights Reserved

**I.**     *Outside Position* means service by an **Insured Person** as a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof with an **Outside Entity**, but only during such time that such service is with the knowledge, consent, and at the specific request of the **Insured Organization**.

**J.**     *Security Holder Derivative Claim* means any **Claim** brought on behalf of, or in the name or right of, the **Insured Organization** by one or more security holders of the **Insured Organization** in their capacity(ies) as such, but only if such **Claim** is brought and maintained without the assistance, participation or solicitation of any member of the board of directors, officer, member of the board of managers, or a functional equivalent thereof.

**K.**     *Security Holder Derivative Demand* means a written demand by one or more security holders of the **Insured Organization** in their capacity(ies) as such to bring a civil proceeding in a court of law on behalf of, or in the name or right of, the **Insured Organization** against any **Insured Person** for a **Wrongful Act** by an **Insured Person**, but only if such demand is asserted without the assistance, participation or solicitation of any member of the board of directors, officer, member of the board of managers, or a functional equivalent thereof.

**L.**     *Subsidiary* means:

1.   any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.   any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.   any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.   subject to the provisions set forth in Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**M.**     *Wrongful Act* means:

1.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her capacity as such;

2.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her **Outside Position**;

3.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the **Insured Organization**; or

4.   any matter asserted against an **Insured Person** solely by reason of his or her status as such.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

## IV.    EXCLUSIONS

**A.    EXCLUSIONS APPLICABLE TO ALL LOSS**

1.    The Company will not be liable for **Loss** for any **Claim** for any damage to, destruction of, loss of, or loss of use of any tangible property including damage to, destruction of, loss of, or loss of use of tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, loss of reputation, libel, slander, oral or written publication of defamatory or disparaging material, or invasion of privacy; provided that this exclusion will not apply to:

a.    any **Claim** for emotional distress, mental anguish, or humiliation with respect to any employment related **Wrongful Act**; or

b.    any **Security Holder Derivative Claim**.

3.    The **Company** will not be liable for **Loss** for any **Claim**:

a.    based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b.    based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

c.    brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

provided this exclusion does not apply to any **Security Holder Derivative Claim**.

4.    The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

5.    The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6.    The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

7.    The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation or for any violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA) (except the Equal Pay Act), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

8.    The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including

amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an employee or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA.

9.   The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Insured**; provided that this exclusion will not apply to:

   a.   any **Security Holder Derivative Claim** or any **Security Holder Derivative Demand**;

   b.   any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Liability Coverage**;

   c.   any **Claim** brought by a receiver, liquidator, bankruptcy trustee or similar official of the **Insured Organization**;

   d.   any **Claim** brought or maintained by a natural person who was a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof, but who has not served in such capacity for at least four (4) years preceding the date the **Claim** is first made; and who brings and maintains the Claim without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made;

   e.   any **Claim** for an employment related Wrongful Act brought by an employee; or

   f.   any **Claim** brought by an employee for a **Wrongful Act** in connection with an offer, purchase or sale of securities if:

      i.   the employee brings the **Claim** solely in his or her capacity as a security holder of the **Insured Organization** without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made; and

      ii.  the employee is not a member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof and has not served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made.

10.  The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such  **Outside Entity**; provided that this exclusion will not apply to any **Claim** brought derivatively by a security holder of such **Outside Entity** in his or her capacity as such.

11.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of:

   a.   the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization**; or

   b.   the violation of any federal, state, local or provincial statute relating to securities, including the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder.

   provided that this exclusion will not apply to any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction").

   In addition, if at least thirty (30) days prior to an offering of securities of the **Insured Organization**, other than pursuant to an Exempt Transaction, the Company receives notice of the proposed transaction and any additional information requested by the Company, the **Insured Organization** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

12.  The Company will not be liable for **Loss** for any **Claim** based  upon or arising out of any **Wrongful Act** by an entity that is, or was a **Subsidiary,** or any **Insured Person** of such entity, occurring at any time during which such entity was not a **Subsidiary**.

---

13. The Company will not be liable for **Loss** for any **Claim,** with respect to Insuring Agreement C. only:

 a. for any plagiarism;

 b. for any misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

 c. based upon or arising out of any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

 d. based upon or arising out of any employment related **Wrongful Act**; or

 e. for any liability of the **Insured Organization** under any express contract or agreement. For the purposes of this exclusion, an express contract or agreement is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making.

## B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES

1. The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

 a. committing any intentionally dishonest or fraudulent act or omission;

 b. committing any willful violation of any statute, rule or law; or

 c. gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

2. The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar federal, state or local law or regulation.

---

## V. *SEVERABILITY OF EXCLUSIONS*

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the exclusions set forth in Section IV. EXCLUSIONS above. Solely with respect to exclusion B.1. set forth above, no conduct of any **Insured** will be imputed to any other **Insured** to determine if coverage is available.

---

## VI. *CONDITIONS*

### A. RETENTION

This Section VI. CONDITIONS A. RETENTION will supplement, and not replace, Section III. CONDITIONS B. RETENTION of the Liability Coverage Terms and Conditions.

No retention will apply to **Defense Expenses** resulting from any **Claim**, other than a **Claim** for an employment related **Wrongful Act**, and the Company will reimburse the **Insured Organization** for any such retention paid by the **Insured Organization** in connection with any such **Claim**, if:

1. with respect to such **Claim**, there is a final adjudication of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals, or a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals; or

---

©2009 The Travelers Companies, Inc. All Rights Reserved

2.      such **Claim** is dismissed or there is a stipulation to dismiss such **Claim** with prejudice and without the payment of any monetary consideration by the **Insureds**.

In no event will a settlement of a **Claim** be considered a final adjudication of no liability for purposes of this subsection.

As a condition of any reimbursement of the retention as set forth above, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of such amounts in the event that such **Claim** is reinstituted after payment by the Company.

**B.      SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** will refuse to consent to such Settlement Offer, the **Insured** will be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the  **Insured**  refused to consent to the Settlement Offer, and the  **Insured**  will also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this  **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

**C.      PRESUMPTION OF INDEMNIFICATION**

Regardless of whether **Loss** resulting from any **Claim** against **Insured Persons** is actually indemnified, Insuring Agreement B. and the Retention set forth in the Declarations will apply to any  **Loss**  as to which indemnification by the **Insured Organization** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Organization** or such **Outside Entity** solely by reason of its **Financial Insolvency**.

The certificate of incorporation, charter, articles of association or other organizational documents of the **Insured Organization** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Person**s to the fullest extent permitted by law.

**D.      OTHER  INSURANCE AND INDEMNIFICATION**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with: (1) any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**; or (2) indemnification to which an  **Insured Person**  is entitled from any **Outside Entity** other than the **Insured Organization**.  This **Liability Coverage** will not be subject to the terms of any other insurance.

**E.      OUTSIDE POSITIONS – LIMIT OF LIABILITY**

If any **Claim** against the **Insureds** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, for such **Claim** will not exceed the largest single available limit of liability under any such coverage.

**F.      ORDER OF PAYMENTS**

If **Loss,**  other than **Defense Expenses,**  from any **Claim** exceeds the remaining applicable limit of liability as set forth in ITEM 5 of the Declarations:

1.      the Company will first pay **Loss** for such **Claim** to which Insuring Agreement A. applies; then
2.      to the extent that any amount of the applicable limit of liability will remain available, the Company will pay **Loss** for such **Claim** to which Insuring Agreements B. and C. apply.

Upon written request of the **Insured Organization** by and through any **Executive Officer**, the Company will either pay or withhold payment of **Loss** from such **Claim** under Insuring Agreements B. and C., as applicable. In the event of a written request to withhold payment, the Company will make any future payment only for **Loss** from any such **Claim** to which Insuring Agreement A. applies, unless otherwise so instructed upon written request by and through an **Executive Officer** of the **Insured Organization**.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF INSURED PERSONS TO INCLUDE ADVISORY BOARD MEMBERS ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following is added to section **III. DEFINTIONS, E. Insured Person** of the **Liability Coverage:**

**Insured Person** also means any natural person who was, is, or becomes a duly elected or appointed member of an advisory board of the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRUCIAL EVENT MANAGEMENT COVERAGE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

1.    The following is added to ITEM 5 of the Declarations:

**Crucial Event Management Limit of Liability:**    $ 25,000    for all **Crucial Event Management Loss**, which amount is part of, and not in addition to, the **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable

2.    The following is added to section *I. INSURING AGREEMENTS* of the **Liability Coverage**:

**CRUCIAL EVENT MANAGEMENT COVERAGE**

The Company will pay, on behalf of the **Insured Organization**, **Crucial Event Management Loss** for any **Crucial Event Management Matter** first occurring during the **Policy Period**.

3.    The following are added to section *III. DEFINITIONS* of the **Liability Coverage**:

**Crucial Event Management Firm** means any crucial event or crisis management firm or public relations firm hired by the **Insured Organization** with the Company's written consent, which will not be unreasonably withheld, to perform services for an **Insured** to minimize potential harm to the **Insured Organization** arising from a **Crucial Event Management Matter**.

**Crucial Event Management Loss** means the: reasonable costs, charges, fees, and expenses of the **Crucial Event Management Firm** in connection with the **Crucial Event Management Matter**, incurred subsequent to a **Crucial Event Management Matter**, regardless of whether a **Claim** is made against an **Insured** arising from the **Crucial Event Management Matter** and, in the event a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

**Crucial Event Management Matter** means:

1.    the death, incapacity or criminal indictment of any **Insured Person** on whom the **Insured Organization** maintains key person life insurance;

2.    a public announcement of the recall of a major product of the **Insured Organization**;

3.    a public announcement or accusation that the **Insured Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible real estate, including the loss of use thereof;

4.    a public announcement of employee layoffs in excess of **20%** of the **Insured Organization's** total number of employees;

5.    a public announcement that the **Insured Organization** has defaulted or intends to default on its debt;

6.    a public announcement that the **Insured Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Insured Organization**, or that bankruptcy proceedings are imminent, whether voluntary or involuntary; or

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2011 The Travelers Indemnity Company. All rights reserved.

7.      a public announcement that governmental or regulatory proceedings are beginning or may begin against the **Insured Organization**;

A **Crucial Event Management Matter** will first begin when an **Executive Officer** becomes aware of the matter, and will conclude when the **Crucial Event Management Firm** advises the **Insured Organization** that such matter no longer exists or when the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations is exhausted.

4.      The following is added to section *III. CONDITIONS*, **C. LIMITS OF LIABILITY** of the Liability Coverage Terms and Conditions:

The Company's maximum limit of liability for all **Crucial Event Management Loss** first made during the **Policy Period** is the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations. Such Crucial Event Management Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

5.      The following is added to section *III. CONDITIONS*, **B. RETENTION** of the **Liability Coverage**:

No Retention applies to **Crucial Event Management Loss**.

6.      The following is added to section *III. CONDITIONS* of the Liability Coverage Terms and Conditions:

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the Company written notice of any **Crucial Event Management Matter** or circumstances that could give rise to a **Crucial Event Management Matter** as soon as practicable after an **Executive Officer** first becomes aware of a **Crucial Event Management Matter**.

As a condition precedent to exercising rights under this **Policy**, the **Insured** must:

1.      include within any notice of a **Crucial Event Management Matter** or circumstance a description of the **Crucial Event Management Matter** or circumstance, the nature of the **Crucial Event Management Matter** or circumstance, the nature of the alleged or potential damage, the names of **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Crucial Event Management Matter** or circumstance; and

2.      give to the Company such other information and cooperation as the Company may reasonably request.

All notices under this section must be sent or delivered to the Company, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2011 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXPRESS CONTRACT EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following replaces section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 13., e.:

13.     The Company will not be liable for **Loss** for any **Claim,** with respect to Insuring Agreement C. only:

e.      for any liability of the **Insured Organization** under any express contract or agreement, except to the extent that the **Insured Organization** would have been liable in the absence of such express contract or agreement. For the purposes of this exclusion, an express contract or agreement is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLLUTANT EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability Coverage**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 3. of the Private Company Directors and Officers Liability Coverage:

3.      The **Company** will not be liable for **Loss** for any **Claim**:

    a.      based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

    b.      based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

    c.      brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**,

provided this exclusion does not apply to any: (i) **Security Holder Derivative Claim**; or (ii) **Claim** brought directly against any **Insured Person** by a security holder of the **Insured Organization** in his or her capacity as such, but only if such **Claim** is brought and maintained without the assistance, participation or solicitation of any other **Insured Person**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company.  All rights reserved.

---
**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
---

## AMEND SECTION IV. EXCLUSIONS, B. 1. - FINAL NON-APPEALABLE ADJUDICATION IN ANY PROCEEDING OTHER THAN A PROCEEDING INITIATED BY THE COMPANY ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, **B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**, 1., of the **Liability Coverage**:

1.      The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

     a.      committing any intentionally dishonest or fraudulent act or omission;

     b.      committing any willful violation of any statute, rule, law; or

     c.      gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled;

     provided that this exclusion will not apply unless a final non-appealable adjudication in any proceeding other than a proceeding initiated by the Company establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

---

PDO-19032 Ed. 11-12                                                                                                    Page 1 of 1
© 2012 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF OUTSIDE ENTITY TO INCLUDE ANY NON-PROFIT OR SPECIFIED OUTSIDE ENTITY ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section **III. DEFINITIONS**, **H. Outside Entity**:

H.     **Outside Entity** means any corporation or organization:

    1.     other than the **Insured Organization**, that is a non-profit entity; or

    2.     any Specified Outside Entity as set forth in the Specified Outside Entity schedule below.

    <u>Specified Outside Entity</u>

    **Any non-profit plus scheduled entities**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

Issuing Company:  **Travelers Casualty and Surety Company of America**

Policy Number:     **107756394**

---

PDO-7064 Rev. 10-13

© 2013 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND PRODUCT EXCLUSION ENDORSEMENT – SECURITY HOLDER CLAIM CARVEBACK

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following replaces section 13., c. of **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

13.    The Company will not be liable for **Loss** for any **Claim**, with respect to Insuring Agreement C only:

c.    based upon or arising out of any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy, or dangerous condition in such product or in its design or manufacture; provided that this exclusion will not apply to any **Claim** brought by one or more security holders of the **Insured Organization** in their capacity as such;

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND LOSS DEFINITION TO INCLUDE COVERAGE CARVEBACKS FOR LIQUIDATED DAMAGES UNDER THE AGE DISCRIMINATION IN EMPLOYMENT, EQUAL PAY, AND FAMILY MEDICAL LEAVE ACTS, AND CIVIL PENALTIES UNDER THE FOREIGN CORRUPT PRACTICES ACT ENDORSEMENT**

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section **III. DEFINITIONS**, **G. Loss**, 1.:

1.  civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; provided, **Loss** includes:

    a.  liquidated damages awarded under the Age Discrimination in Employment Act, the Equal Pay Act, or the Family Medical Leave Act;

    b.  civil penalties assessed against any **Insured Person** pursuant to the Foreign Corrupt Practices Act of 1977 §§ 15 U.S.C. 78dd-2(g)(2)(B) and 78ff(c)(2)(B) and the United Kingdom Bribery Act of 2010 (Eng.) § 11(1)(a), to the extent that the violations of such laws are neither intentional nor willful; or

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company:     **Travelers Casualty and Surety Company of America**

Policy Number:     **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXTRADITION COVERAGE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

1. The following is added to section **III. DEFINITIONS**, **A. Claim** of the **Liability Coverage**:

   **Claim** also means a request for **Extradition**.

2. The following is added to section **II. DEFINITIONS**, **F. Defense Expenses** of the Liability Coverage Terms and Conditions:

   **Defense Expenses** also means **Extradition Expenses**.

3. The following is added to section **III. DEFINITIONS** of the **Liability Coverage**:

   ***Extradition*** means a formal process by which an **Insured Person** located in any country is surrendered, or sought to be surrendered, to any other country to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

   ***Extradition Expenses*** means the reasonable legal fees and expenses incurred by an **Insured Person** in lawfully opposing, challenging, resisting, or defending against any request for, or any effort to obtain, the **Extradition** of such **Insured Person**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company:     **Travelers Casualty and Surety Company of America**

Policy Number:     **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND INSURED VERSUS INSURED AND OUTSIDE ENTITY EXCLUSIONS ENDORSEMENT – WHISTLEBLOWER ACTIVITY CLARIFICATION; CARVEBACKS FOR CREDITOR COMMITTEES, FORMER DIRECTORS AND EMPLOYEES, AND CLAIMS BROUGHT OUTSIDE THE UNITED STATES

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

1. The following is added to section **III. DEFINITIONS**:

   *Whistleblower Activity* means activity protected under any whistleblower protection provision of any applicable federal, state, local or foreign securities law or regulation that affords protection to a natural person, other than the filing of a proceeding, causing a proceeding to be filed, or any other activity that is engaged in on a voluntary basis.

2. The following replaces section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 9.:

   9. The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Insured**; provided that this exclusion will not apply to:

      a. any **Security Holder Derivative Claim** or any **Security Holder Derivative Demand**;

      b. any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Liability Coverage**;

      c. any **Claim** brought by a receiver, liquidator, bankruptcy trustee, member of a creditors' committee, or similar official of the **Insured Organization**;

      d. any **Claim** brought or maintained by a natural person who was a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof, but who has not served in such capacity for at least the number of years set forth in the Specified Number of Years of Director, Officer or Trustee Service schedule below, preceding the date the **Claim** is first made; and who brings and maintains the **Claim** without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such a capacity during the period of years set forth in the Specified Number of Years of Director, Officer or Trustee Service schedule below, immediately preceding the date the **Claim** is first made;

      e. any **Claim** for an employment related **Wrongful Act** brought by an employee;

      f. any **Claim** brought by an employee for a **Wrongful Act** in connection with an offer, purchase or sale of securities if:

         i. the employee brings the **Claim** solely in his or her capacity as a security holder of the **Insured Organization** without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the period of years set forth in the Specified Number of Years of Employed Service schedule below, immediately preceding the date the **Claim** is first made; and

         ii. the employee is not a member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof and has not served in such capacity during the period of years set forth in the Specified Number of Years of Employed Service schedule below, immediately preceding the date the **Claim** is first made; or

      g. any **Claim** brought or maintained by any **Insured Person**, if such **Insured Person** is required to bring such **Claim** under any applicable code, regulation or statute of any jurisdiction outside the United States.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: 107756394

For purposes of applying this exclusion, an **Insured Person's Whistleblower Activity** alone will not constitute solicitation, assistance, or participation.

3.  The following replaces section **IV. EXCLUSIONS** , **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 10.:

> 10. The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such **Outside Entity** ; provided that this exclusion will not apply to:
>
>     a.  any **Claim** brought derivatively by a security holder of such **Outside Entity** in his or her capacity as such; or
>
>     b.  any **Claim** brought by a receiver, liquidator, bankruptcy trustee or similar official of the **Outside Entity**.

**Specified Number of Years of Director**, **Officer or Trustee Service**: 2

**Specified Number of Years of Employed Service**: 2

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2019 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## DATA AND PRIVACY EXCLUSION WITH SIDE A AND SECURITY HOLDER CARVEBACK ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following is added to section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

The Company will not be liable for **Loss** for any **Claim** based upon or arising out of:

a.   any loss or theft of, disclosure of, or unauthorized access to or use of, personal private or personal confidential information;

b.   any unauthorized access to a computer system;

c.   any use of authorized access to cause intentional harm to a computer system;

d.   any denial-of-service attack against a computer system;

e.   any introduction of malicious code into a computer system;

f.   failure to provide an authorized user with access to a computer system;

g.   any violation of law regarding the protection, use, collection, destruction, disclosure of, loss of, access to, or storage of personal private or personal confidential information; or

h.   the failure to provide notification required by law in connection with a. through g.;

provided however, this exclusion will not apply to any **Claim**: (i) under Insuring Agreement A., or (ii) brought by one or more security holders of the **Insured Organization** in his or her capacity as such, including a **Security Holder Derivative Claim** or **Security Holder Derivative Demand**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---



*EMPLOYMENT PRACTICES LIABILITY COVERAGE*

***THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.***

## I.    INSURING  AGREEMENT

**A.**    The Company will pay on behalf of the **Insured**, **Loss** for any **Employment Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Employment Practice**.

**B.**    If ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, the Company will pay on behalf of the **Insured**, **Loss** for any **Third Party Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Third Party Wrongful Act**.

## II.    DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in section II. DEFINITIONS:

**A.**    ***Claim*** means an **Employment Claim** or, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, a **Third Party Claim**.  A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim**  will be deemed to have been made on the date such  **Insured Person**  first received written notice of the  **Claim**.

**B.**    ***Claimant*** means:

  1.    a past, present or future **Employee** of or applicant for employment with the **Insured Organization**;

  2.    a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of a past, present or future **Employee** or applicant for employment with the **Insured Organization**; or

  3.    any **Independent Contractor**.

**C.**    ***Discrimination*** means any actual or alleged:

  1.    violation of any employment discrimination law; or

  2.    disparate treatment of, or the failure or refusal to hire a **Claimant** or **Outside Claimant** because he or she is or claims to be a member of a class which is or is alleged to be legally protected.

**D.**    ***Employee*** means a natural person whose labor or service is engaged by and directed by the **Insured Organization** and:

  1.    who is on the payroll of the **Insured Organization**, including:

    a.    any in-house general counsel of the **Insured Organization**; and

b.  any other full-time, part-time, and seasonal worker;

2.  who is a volunteer or temporary worker; or

3.  whose services have been leased by the **Insured Organization**.

**Independent Contractors** are not **Employees**.  The status of an individual as an **Employee** will be determined as of the date of the alleged **Wrongful Act**.

E.  ***Employment Agreement*** means any express or implied employment agreement regardless of the basis in which such agreement is alleged to exist, other than a collective bargaining agreement.

F.  ***Employment Claim*** means:

1.  a written demand for monetary damages or non-monetary relief;

2.  a civil proceeding commenced by service of a complaint or similar pleading;

3.  a criminal proceeding commenced by filing of charges;

4.  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency; provided that in the context of an audit conducted by the Office of Federal Contract Compliance Programs, **Employment Claim** will be limited to a Notice of Violation or Order to Show Cause or written demand for monetary damages or non-monetary relief;

5.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of a **Claimant**, or against an **Insured Person** serving in an **Outside Position** by or on behalf of or for the benefit of an **Outside Claimant**, for a **Wrongful Employment Practice**; provided that **Employment Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

G.  ***Executive Officer*** means an officer, member of the board of directors, natural person partner, principal, risk manager, **LLC Manager**, in-house general counsel, member of the staff of the human resources department of the **Insured Organization** or a functional equivalent thereof.

H.  ***Independent Contractor*** means any natural person who is not an **Employee** but who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act**.

I.  ***Insured*** means the **Insured Persons** and the **Insured Organization**.

J.  ***Insured Organization*** means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

K.  ***Insured Person*** means any natural person who was, is or becomes an **Employee**, duly elected or appointed member of the board of directors, officer, member of the board of trustees, member of the board of regents, member of the board of governors, natural person partner, **LLC Manager** or a functional equivalent thereof of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such, or while serving in an **Outside Position**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**L.**    *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and postjudgment interest; and legal fees and expenses of a **Claimant** or **Outside Claimant** awarded pursuant to a court order or judgment. "**Loss**" does not include:

1. civil or criminal fines; sanctions; liquidated damages other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act; payroll or other taxes; or damages, penalties or types of relief deemed uninsurable under applicable law;

2. future compensation, including salary or benefits, for a **Claimant** or **Outside Claimant** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the **Claimant** or **Outside Claimant** to whom such sums are to be paid, but fails to do so;

3. medical, pension, disability, life insurance, **Stock Benefit** or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of:

    a. medical, pension, disability, life insurance, or other similar employee benefits; or

    b. **Stock Benefits** of an **Insured Organization** whose equity or debt securities are not publicly traded, including on a stock exchange or another organized securities market,

    as consequential damages for a **Wrongful Act**; or

4. any amount allocated to non-covered loss pursuant to Section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

**M.**    *Outside Claimant* means:

1. a past, present or future **Outside Employee** of or applicant for employment with an **Outside Entity**;

2. a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of present or former **Outside Employees** or applicants for employment; or

3. any natural person independent contractor who performs labor or service for the **Outside Entity** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Outside Entity**.

**N.**    *Outside Employee* means a natural person whose labor or service is engaged by and directed by an **Outside Entity** and:

1. who is on the payroll of an **Outside Entity**, including:

    a. any in-house general counsel of the **Outside Entity**; and

    b. any other full-time, part-time, and seasonal worker;

    2.        who is a volunteer or temporary worker; or

    3.        whose services have been leased by the **Outside Entity**.

The status of an individual as an **Outside Employee** will be determined as of the date of the alleged **Wrongful Employment Practice**.

**O**.    *Outside Entity* means a corporation or organization:

    1.        other than the **Insured Organization**, which is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

    2.        specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

**P**.    *Outside Position* means service by an **Insured Person** as a member of the board of directors, officer, member of the board of trustees, member of the board of managers, member of the board of regents, member of the board of governors or a functional equivalent thereof with an **Outside Entity**, but only during such time that such service is with the knowledge, consent, and at the specific request of the **Insured Organization**.

**Q**.    *Retaliation* means any actual or alleged **Wrongful Termination** or other adverse employment action against a **Claimant** or **Outside Claimant** on account of such **Claimant's** or **Outside Claimant's** exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat to disclose to a superior or to any governmental agency alleged violations of the law, or on account of the **Claimant** or **Outside Claimant** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

**R** .    *Sexual Harassment* means any actual or alleged unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature:

    1.        which is made a term or condition of a **Claimant's** or **Outside Claimant's** employment or advancement;

    2.        which the submission to or rejection of is used as a basis for decisions affecting the **Claimant** or **Outside Claimant**; or

    3.        which has the purpose or effect of creating an intimidating, hostile or offensive work environment.

**S**.    *Stock Benefit* means compensation provided to **Employees** in the form of equity or debt securities or rights to purchase equity or debt securities or the value thereof, including any grant of stock, restricted stock, stock options or warrants, phantom stock, stock appreciation rights, or performance shares.

**T**.    *Subsidiary* means:

    1.        any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

    2.        any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

    3.        any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly fifty percent (50%) of the issued and outstanding voting stock and whose management and operation the **Insured**

**Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.      subject to the provisions set forth in Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

U.    *Third Party Claim* means:

1.      a written demand for monetary damages or non-monetary relief;

2.      a civil proceeding commenced by service of a complaint or similar pleading;

3.      a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons, or similar document;

4.      an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

5.      a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of any natural person other than a **Claimant** for a **Third Party Wrongful Act**; provided that **Third Party Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement or any type of criminal proceeding.

V.    *Third Party Wrongful Act* means, with respect to any natural person other than a **Claimant**, any actual or alleged:

1.      violation of any federal, state or local law or statute or any common law prohibiting any kind of discrimination; or

2.      unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature which violates the civil rights of any such person.

W.    *Workplace Harassment* means any actual or alleged harassment, other than **Sexual Harassment**, which creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive work environment.

X.    *Wrongful Act* means:

1.      a **Wrongful Employment Practice** occurring in the course of or arising out of a **Claimant's** employment, application for employment or performance of services with the **Insured Organization**;

2.      a **Wrongful Employment Practice** by an **Insured Person** in his or her **Outside Position** occurring in the course of or arising out of an **Outside Claimant's** employment, application for employment or performance of services with an **Outside Entity**; or

3.      a **Third Party Wrongful Act**, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage has been purchased.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

**Y.**     *Wrongful Employment Practice*  means any actual or alleged:

    1.    **Discrimination**;

    2.    **Retaliation**;

    3.    **Sexual Harassment**;

    4.    **Workplace Harassment**;

    5.    **Wrongful Termination**;

    6.    breach  of  **Employment Agreement**;

    7.    violation of the Family Medical Leave Act;

    8.    employment-related  misrepresentation;

    9.    employment-related  defamation, including libel or slander, or invasion of privacy;

    10.    failure or refusal to create or enforce adequate workplace or employment policies and procedures, employ or promote, including wrongful failure to grant bonuses or perquisites, or grant tenure;

    11.    wrongful discipline, wrongful demotion, denial of training, deprivation of career opportunity, denial or deprivation of seniority, or evaluation;

    12.    employment-related wrongful infliction of emotional distress; or

    13.    negligent hiring, supervision of others, training, or retention committed or allegedly committed by any **Insured**, but only if such act is alleged in connection with a **Wrongful Employment Practice** set forth in 1. through 12. above; provided that the **Claim** alleging the negligent hiring, supervision of others, training, or retention is brought by or on behalf of any **Claimant** or **Outside Claimant**.

**Z.**     *Wrongful Termination* means the actual, alleged or constructive termination of an employment relationship between a **Claimant** and the **Insured Organization**, or the actual or constructive termination of an employment relationship between an **Outside Claimant** and an **Outside Entity**, in a manner or for a reason which is contrary to applicable law or public policy, or in violation of an **Employment Agreement**.

---

**III.**     *EXCLUSIONS*

**A.**     **EXCLUSIONS APPLICABLE TO ALL LOSS**

    1.    The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

    2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, or loss of consortium; provided that this exclusion will not apply to that portion of a **Claim** seeking **Loss** for emotional distress, mental anguish, humiliation, or loss of reputation.

    3.    The  **Company**  will not be liable for **Loss** for any **Claim**:

a.  based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b.  based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

c.  brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

provided that this exclusion will not apply to **Claims** for **Retaliation**.

4.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

5.  The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

7.  The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation; or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), National Labor Relations Act (NLRA) or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; provided that this exclusion will not apply to **Claims** for **Retaliation**.

8.  The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

9.  The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or **Outside Employee** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA; provided that this exclusion will not apply to **Claims** for **Retaliation**.

10.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

11.  The Company will not be liable for **Loss** for any **Third Party Claim**:

a.    alleging price discrimination, or other violation of any antitrust or unfair trade practices law; or

b.    against an **Insured Person** solely due to their service in an **Outside Position**.

12.    The Company will not be liable for **Loss** for any **Claim** for any liability under any agreement governing the terms of the labor or service of an **Independent Contractor**, temporary worker or leased employee with the **Insured Organization** or for liability under any agreement governing the terms of the labor or service of any natural person independent contractor who performs labor or service solely for the **Outside Entity** on a full-time basis pursuant to a written contract or agreement.

13.    The Company will not be liable for **Loss** for any **Claim** for violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that this exclusion will not apply to:

a.  **Claims** for **Retaliation**; or

b.  any actual or alleged violation of the Equal Pay Act.

**B**.    **EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.    The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

2.    The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking severance pay, damages or penalties under an express written **Employment Agreement**, or under any policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services.

## IV.    CONDITIONS

### A.    SETTLEMENT

1.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that:

a.    the **Insured** and the party bringing a **Claim** hereunder consent to the first settlement offer recommended by the Company (the "Settlement Offer") within thirty (30) days of being made aware of such offer by the Company; and

b.    the amount of such Settlement Offer:

i.    is less than the remaining applicable limit of liability available at the time; and

ii.    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention;

the Retention will be retroactively reduced by ten percent (10%) with respect to such **Claim**.

2.    If the **Insured** does not consent to the Settlement Offer within thirty (30) days of being made aware of such offer by the Company:

    a.    the Retention will not be reduced as provided in paragraph 1. above even if consent is given to the same or subsequent Settlement Offer; and

    b.    the **Insured** will be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

**B.    OTHER INSURANCE**

1.    This **Liability Coverage** is primary, except as expressly stated otherwise in this **Liability Coverage**.

2.    Except as stated in paragraph 3. of section IV. CONDITIONS B., this **Liability Coverage** will apply only as excess insurance over, and will not contribute with any insurance that applies to any **Claim**:

    a.    against any leased or temporary worker; or

    b.    for a **Third Party Wrongful Act**.

3.    With respect to **Claims** against **Insured Persons** for **Wrongful Employment Practices** in their **Outside Positions**, this **Liability Coverage** will apply only as excess insurance over, and will not contribute with:

    a.    any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**; or

    b.    indemnification to which an **Insured Person** is entitled from any **Outside Entity** other than the **Insured Organization**.

4.    This **Liability Coverage** will not be subject to the terms of any other insurance.

**C.    OUTSIDE POSITIONS - LIMIT OF LIABILITY**

If any **Claim** against an **Insured Person** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for any **Loss**, for such **Claim** will not exceed the largest single available limit of liability under such coverage.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAGE AND HOUR LAW ENDORSEMENT

This endorsement modifies the following:

**Employment Practices Liability**

---

**It is agreed that:**

1.	The following is added to section **III. CONDITIONS**, **C**. **LIMITS OF LIABILITY**, 1. of the Liability Coverage Terms and Conditions:

	However, the Company's maximum limit of liability for **Defense Expenses** for all  **Wage and Hour Law Claims** is further limited by the following:

	The Company's maximum limit of liability for **Defense Expenses** for all **Wage and Hour Law Claims** under the Employment Practices Liability coverage will not exceed the Wage and Hour Law Claim Limit of Liability for all **Wage and Hour Law Claims** set forth in ITEM 5 of the Declarations, which amount is included within and not in addition to, any applicable limit of liability.

2.	The following is added to section **III. CONDITIONS**, **D. ADDITIONAL DEFENSE COVERAGE** of the Liability Coverage Terms and Conditions:

	The Company's maximum limit of liability for **Defense Expenses** for all **Wage and Hour Law Claims** under the Employment Practices Liability coverage that are paid pursuant to the **Additional Defense Limit of Liability** will not exceed the Wage and Hour Law Claim Limit of Liability for all **Wage and Hour Law Claims** set forth in ITEM 5 of the Declarations. Such **Defense Expenses** will be part of, and not in addition to, the Wage and Hour Law Claim Limit of Liability for all **Wage and Hour Law Claims** set forth in ITEM 5 of the Declarations and such Wage and Hour Law Claim Limit of Liability for all **Wage and Hour Law Claims** will be reduced and may be exhausted by payment of such **Defense Expenses** under the  **Additional Defense Limit of Liability**.

3.	The following is added to ITEM 5. of the Declarations:

	**Wage and Hour Law**
	**Claim Limit of Liability**          $ 100,000    for all **Wage and Hour Law Claims**

4.	The following is added to section **II. DEFINITIONS** of the Employment Practices Liability coverage part:

	*Wage and Hour Law Claim* means any **Employment Claim** for an alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that **Wage and Hour Law Claim** will not include **Claims** for **Retaliation** or any actual or alleged violation of the Equal Pay Act.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

---

5.  The following is added to section **II. DEFINITIONS**, **Y. Wrongful Employment Practice** of the Employment Practices Liability coverage part:

**Wrongful Employment Practice** also means the violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**.

6.  The following is deleted from section **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS,** of the Employment Practices Liability coverage part:

13.  The Company will not be liable for **Loss** for any **Claim** for violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that this exclusion will not apply to:

a. **Claims** for **Retaliation**; or

b. any actual or alleged violation of the Equal Pay Act.

7.  The following is added to section **III. EXCLUSIONS, B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES** of the Employment Practices Liability coverage part:

The Company will not be liable for **Loss**, other than **Defense Expenses** up to the Wage and Hour Law Claim Limit of Liability set forth in ITEM 5 of the Declarations, for any **Claim** for the violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that this exclusion will not apply to:

a.  **Claims** for **Retaliation**; or

b.  any actual or alleged violation of the Equal Pay Act.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EMPLOYMENT NETWORK AND INFORMATION SECURITY OFFENSE COVERAGE ENDORSEMENT**

This endorsement modifies the following:

**Employment Practices Liability**

---

**It is agreed that:**

1.       The following is added to section **II. DEFINITIONS, Y. Wrongful Employment Practice**:

*Wrongful Employment Practice* also means any actual or alleged **Employment Network and Information Security Offense** by any **Insureds** in their capacity as such.

2.       The following are added to section **II. DEFINITIONS**:

*Employment Network and Information Security Offense* means:

1.       the failure to prevent unauthorized access to, or use of, data containing **Private Employment Information** of any past, present or future **Employee** or any applicant for employment with the **Insured Organization**, or

2.       the failure to notify any past, present or future **Employee** or any applicant for employment with the **Insured Organization** of any actual or potential unauthorized access to, or use of, data containing **Private Employment Information** of any such past, present or future **Employee** or applicants for employment with the **Insured Organization**, if such notification is required by any state or federal regulation or statute.

*Private Employment Information*  means any information regarding any past, present or future **Employee** or any applicant for employment with the **Insured Organization**, collected or stored by an **Insured** for the purpose of establishing, maintaining or terminating the employment relationship.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## OUTSIDE ENTITY TO INCLUDE ANY NON-PROFIT ENTITY ENDORSEMENT

This endorsement modifies the following:

**Employment Practices Liability**

---

**It is agreed that**:

The following replaces section **II. DEFINITIONS**, **O. Outside Entity**:

O.       ***Outside Entity*** means any corporation or organization:

1.        other than the **Insured Organization,** which is a non-profit entity; or

2.        specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND PRIOR AND PENDING EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following replaces section **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS, A.4.**:

4.    The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**; provided that this exclusion shall not apply to any unemployment compensation proceeding or any workers compensation proceeding in which a **Wrongful Act** has not been alleged.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2011 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INSURED PERSON REDEFINED TO INCLUDE INDEMNIFIED INDEPENDENT CONTRACTOR ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

1.  The following replaces section *II. DEFINITIONS*, **K. Insured Person**:

    **K.**  ***Insured Person*** means any natural person who was, is or becomes an **Employee**, duly elected or appointed member of the board of directors, officer, member of the board of trustees, member of the board of regents, member of the board of governors, natural person partner, **LLC Manager** or a functional equivalent thereof of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such, or while serving in an **Outside Position**.

    **Insured Person** also means any **Independent Contractor** of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such, but only if and to the extent the **Insured Organization** provides indemnification to such natural person in the same manner as that provided to **Employees**.

    In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

2.  The following replaces section *IV. CONDITIONS*, **B. OTHER INSURANCE 2.**:

    2.  Except as stated in paragraph 3. of section IV. CONDITIONS B., this **Liability Coverage** will apply only as excess insurance over, and will not contribute with any insurance that applies to any **Claim**:

        a.  against any **Independent Contractor** or leased or temporary worker: or

        b.  for a **Third Party Wrongful Act**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2011 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SECTION 510 OF ERISA ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

---

**It is agreed that:**

1.    The following replaces section *III. EXCLUSIONS,* **A. EXCLUSIONS APPLICABLE TO ALL LOSS, A.9.**:

9.    The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or **Outside Employee** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA; provided that this exclusion will not apply to **Claims** for **Retaliation** or **Claims** for any actual or alleged violation of Section 510 of the Employee Retirement Income Security Act of 1974.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMPLOYMENT-RELATED DISPARAGEMENT AND FALSE IMPRISONMENT ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following is added to section ***II. DEFINITIONS***, **Y. Wrongful Employment Practice**:

***Wrongful Employment Practice*** also means any actual or alleged employment-related disparagement and also means any actual or alleged false imprisonment.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## WORKPLACE VIOLENCE EXPENSES ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| | |
|---|---|
| **Workplace Violence Expenses Limit of Liability:** | $250,000 for all **Workplace Violence Expenses**, which amount is in addition to, and not part of, any applicable limit of liability. |

2. The following is added to section **I. INSURING AGREEMENT** of the **Liability Coverage**:

   The Company will reimburse the **Insured Organization**, **Workplace Violence Expenses** incurred by the **Insured Organization** as a result of any **Workplace Violence Event;**

   1. first occurring during the **Policy Period**; and,
   2. reported to the Company as soon as practicable after an **Executive Officer** becomes aware such **Workplace Violence Event** has occurred, but in no event later than 90 days after the expiration of the **Policy Period**;

   up to the amount of the **Workplace Violence Expenses** Limit of Liability set forth in ITEM 5 of the Declarations of this **Liability Coverage**.

3. The following is added to section **II. DEFINITIONS** of the **Liability Coverage**:

   **Premise** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

   **Workplace Violence Event** means any intentional:

   1. use of deadly force; or
   2. threat of deadly force with the display of a lethal weapon;

   which occurs on or in the **Premise** and which did or could result in bodily injury or death to an **Insured Person**.

   **Workplace Violence Expenses** means the reasonable fees, costs, and expenses incurred and paid by the **Insured Organization** for:

   1. the services of an independent security consultant for 90 days following a **Workplace Violence Event**;
   2. the services of an independent public relations consultant for 90 days following a **Workplace Violence Event**;
   3. counseling services provided to employees by an independent consultant on the **Premises** for up to 120 days following a **Workplace Violence Event**;
   4. the services of an independent security guard(s) and other reasonable costs to secure the **Premises** for up to 15 days following a **Workplace Violence Event**; or
   5. the services of an independent private forensic analyst for 120 days following a **Workplace Violence Event**.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 107756394

© 2015 The Travelers Indemnity Company. All rights reserved.

4.  The following is added to section **III. EXCLUSIONS** of the **Liability Coverage**:

The Company will not be liable for **Workplace Violence Expenses** based upon or arising out of a **Workplace Violence Event** arising out of war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, or confiscation, nationalization, requisition, or destruction of, or damage to, property by or under the order of any government, public or local authority; provided that this exclusion will not apply to any "act of terrorism" as defined in the Terrorism Risk Insurance Act of the United States of America as amended.

5.  The following is added to section **III. CONDITIONS**, **B. RETENTION**, of the Liability Coverage Terms and Conditions:

No retention shall apply to **Workplace Violence Expenses** Coverage.

6.  The following is added to section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, of the Liability Terms and Conditions:

The Company's maximum limit of liability for all **Workplace Violence Events** under the Employment Practices Liability coverage will not exceed the Workplace Violence Expenses Limit of Liability set forth in ITEM 5 of the Declarations.

The Workplace Violence Expenses Limit of Liability will be in addition to, and not part of, the **Liability Coverage Limit of Liability** as set forth in ITEM 5 of the Declarations.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company.  All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

**PRIOR NOTICE EXCLUSION APPLIES WHEN NOTICE OF CLAIM OR POTENTIAL CLAIM IS ACCEPTED ENDORSEMENT**

This endorsement changes the following:

**Employment Practices Liability**

---

**It is agreed that:**

The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 6.:

The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time; provided this exclusion applies only if such notice was accepted under such policy of insurance.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND WRONGFUL EMPLOYMENT PRACTICE DEFINITION ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following is added to section **II. DEFINITIONS**, **Y. Wrongful Employment Practice**:

**Wrongful Employment Practice** also means negligent employment reference.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND WRONGFUL ACT DEFINITION ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following is added to section **II. DEFINITIONS**, **X. Wrongful Act**:

**Wrongful Employment Practice** or **Third Party Wrongful Act** includes such practice or act carried out by any means, including any electronic means of communication, such as the Internet, email, instant messaging, social networking services or blogs.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following replaces section **II. DEFINITIONS**, **D. Employee**, 2.:

who is a volunteer or temporary worker, including interns; or

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF WORKPLACE HARASSMENT ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

The following replaces section **II. DEFINITIONS**, **W. Workplace Harassment**:

**Workplace Harassment** means any actual or alleged harassment, including bullying, other than **Sexual Harassment**, which creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive work environment.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## IMMIGRATION CLAIMS ENDORSEMENT

This endorsement changes the following:

**Employment Practices Liability**

**It is agreed that:**

1. The following is added to ITEM 5. of the Declarations:

   **Immigration Claim Limit of
   Liability**                     $100,000              for all **Immigration Claims**

2. The following is added to section **I. INSURING AGREEMENT** of the **Liability Coverage**:

   The Company will pay, on behalf of the **Insured**, **Defense Expenses** resulting from any **Immigration Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

3. The following is added to section **II. DEFINITIONS** of the **Liability Coverage**:

   ***Immigration Claim*** means a civil or criminal investigation of any **Insured** brought by or on behalf of any federal, state or local governmental, regulatory or administrative agency for an actual or alleged violation of the responsibilities, obligations or duties imposed on an **Insured** by the Immigration Reform and Control Act of 1986 or any other similar federal or state laws or regulations in connection with the actual or alleged hiring or harboring of illegal aliens.

4. The following is added to section **II. DEFINITIONS**, **F. Employment Claim**:

   **Employment Claim** also means an **Immigration Claim** but solely as respects coverage provided herein.

5. The following is added to section **III. CONDITIONS**, **C**. **LIMITS OF LIABILITY**, 1. of the Liability Coverage Terms and Conditions:

   The Company's maximum limit of liability for **Defense Expenses** for all **Immigration Claims** under the Employment Practices Liability coverage will not exceed the Immigration Claim Limit of Liability for all **Immigration Claims** set forth in ITEM 5 of the Declarations, which amount is included within and not in addition to, any applicable limit of liability.

6. The following is added to section **III. CONDITIONS**, **D. ADDITIONAL DEFENSE COVERAGE** of the Liability Coverage Terms and Conditions:

   Additional Defense Coverage is not applicable to **Immigration Claims**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.



*FIDUCIARY LIABILITY*

***THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.***

## I.      INSURING AGREEMENTS

**A.**    The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Act**.

**B.**    The Company will pay on behalf of the **Insured**, **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice**; provided that participation by the **Insured** in any **Settlement Program** commences during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## II.     DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in this section II. DEFINITIONS:

**A.**    ***Administration* means:**

1.    giving counsel, advice, or notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Benefits**;

2.    interpreting **Employee Benefits**;

3.    handling records in connection with **Employee Benefits**; or

4.    effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Benefits** program.

**B.**    ***Claim* means:**

1.    a written demand for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by filing of charges;

4.    a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons or similar document, including a fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or a similar government agency that is located outside of the United States, including, in the United Kingdom, the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, or any successor body thereto;

5.    an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an **Insured** for a **Wrongful Act**.

A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives

written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

**C.**      ***Employee Benefits*** means benefits provided through an **Employee Benefit Plan** or a **Multiemployer Plan,** and also includes benefits provided under workers' compensation insurance, unemployment insurance, Social Security, disability insurance, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and amendments thereto.

**D.**      ***Employee Benefit Plan*** means**:**
1. any **Welfare Plan** which was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**;
2. any **Pension Plan**, including an **Employee Stock Ownership Plan**, which was, or is, sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization** and which existed on or before the Inception Date set forth in ITEM 2 of the Declarations;
3. any group or group-type insurance program, including a Health Savings Account (HSA) program, that meets the safe harbor conditions set forth in 29 C.F.R. 2510.3-1(j)(1), or any benefit plan that is not subject to Title I of **ERISA**, including any fringe benefit or excess benefit plan, that was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; or
4. any **Pension Plan** for which coverage is provided pursuant to section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN of this **Liability Coverage.**

**E.**      ***Employee Stock Ownership Plan*** means any plan so defined in Section 407(d)(6)(A) of ERISA, or any similar or related federal, state or local law or regulation.

**F.**      ***ERISA*** means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder or any similar common or statutory law.

**G.**      ***ESOP Administration*** means**:**
1. giving notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Stock Ownership Plan** benefits;
2. interpreting **Employee Stock Ownership Plan** benefits;
3. handling records in connection with **Employee Stock Ownership Plan** benefits; or
4. effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Stock Ownership Plan**.

**H.**      ***Executive Officer*** means a member of the board of directors or governors, officer, member of the board of trustees, natural person general partner, principal, risk manager, **LLC Manager**, in-house general counsel of the **Insured Organization** or a functional equivalent thereof. **Executive Officer** also includes any natural person trustee of any **Employee Benefit Plan**.

**I.**      ***HIPAA*** means the Health Insurance Portability and Accountability Act of 1996, as amended.

**J.**      ***Insured*** means the **Insured Persons**, the **Insured Organization**, and any **Employee Benefit Plan.**

**K.**      ***Insured Organization*** means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**L.**      ***Insured Person*** means any natural person who was, is now or becomes a trustee, member of the board of directors or governors, management committee member, general partner, officer, **LLC Manager**, in-house general counsel, member of an **Employee Benefit Plan** committee, or employee of the **Insured Organization** or of an **Employee Benefit Plan**, while acting in his or her capacity as a fiduciary of an **Employee Benefit Plan** or as a person performing **Administration** or **ESOP Administration**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**M.**   *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and post judgment interest; and legal fees and expenses awarded pursuant to a court order or judgment; and solely with respect to section I. INSURING AGREEMENTS B. of this **Liability Coverage**, **Settlement Fees**.  **Loss** does not include:

1.   civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.;  civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of  **HIPAA**; or, in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof); sanctions; liquidated damages; payroll or other taxes; or damages or types of relief deemed uninsurable under applicable law;

2.   payment of medical benefits, pension benefits, severance, or **Employee Benefits** which are or may become due, except to the extent that such sums are payable as a personal obligation of an **Insured Person**, because of such **Insured Person's Wrongful Act**; provided that this exclusion will not apply to:

   a.   the Company's obligation to defend any **Claim**, if applicable, or to pay, advance or reimburse **Defense Expenses**, regarding a **Claim** seeking such benefits; or

   b.   that portion of any damage, settlement or judgment covered as **Loss** under this **Liability Coverage** that represents a loss to any **Employee Benefit Plan**, or loss to any account of a participant in any **Employee Benefit Plan**, by reason of a change in value of any investments held by such **Employee Benefit Plan** or such account, including investments in the securities of the **Insured Organization**, notwithstanding that such portion of any such damage, settlement or judgment has been characterized by plaintiffs, or held by a court of law, to be "benefits"; or

3.   any amount allocated to non-covered loss pursuant to section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

**N.**    *Multiemployer Plan* means a **Pension Plan** or **Welfare Plan** maintained pursuant to one or more collective bargaining agreements to which the **Insured Organization** and at least one other employer is required to contribute.

**O.**    *Pension Plan* means any plan so defined in Section 3(2) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**P.**   *Settlement Fees* mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insured** becomes legally obligated to pay as a result of a **Wrongful Act**.  **Settlement Fees** will not include any costs or expenses other than such fees, penalties or sanctions.

**Q.**   *Settlement Program* means any voluntary compliance resolution program or similar voluntary settlement program, administered by the Internal Revenue Service or Department of Labor of the United States, including the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance program, and the Voluntary Fiduciary Correction program, entered into by the **Insured Organization**.

**R.**   *Settlement Program Notice* means a prior written notice to the Company by the **Insured** of the **Insured's** intent to enter into a **Settlement Program**.

**S.**    ***Subsidiary*** means**:**

1.  any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.  any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.  any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.  subject to the provisions set forth in section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**T.**    ***Welfare Plan*** means any plan so defined in Section 3(1) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**U.**    ***Workplace Misconduct*** means:

1.  any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

2.  any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

3.  any actual or alleged demotion of, refusal to train or promote an employee of the **Insured Organization**;

4.  any other act or omission by which an **Insured** allegedly treats one employee of the **Insured Organization** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying employees of the **Insured Organization** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act;

5.  any adverse employment action with regard to an employee of the **Insured Organization** on account of such employee's exercise or attempted exercise of rights protected by law, including the Family Medical Leave Act, or on account of the employee of the **Insured Organization** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law; or

6.  any actual or constructive termination of an employment relationship with the **Insured Organization** in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

**V.**   *Wrongful Act*  means**:**

1.    any actual or alleged breach of fiduciary duty by or on behalf of the **Insured** with respect to any **Employee Benefit Plan**, including:

a.    any actual or  alleged breach of  duties, obligations and responsibilities imposed by **ERISA,** COBRA, **HIPAA,** or by any similar or related federal, state, local, or foreign law or regulation, in the discharge of the **Insured's** duties with respect to an **Employee Benefit Plan**; or

b.    any other matter claimed against an **Insured** solely because of the **Insured's** status as a fiduciary of an **Employee Benefit Plan**; or

2.    any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **Administration** of **Employee Benefits.**

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the  **Policy Period**.

---

## III.    EXCLUSIONS

**A.**    **EXCLUSIONS APPLICABLE TO ALL LOSS**

1.    The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, or humiliation.

3.    The Company will not be liable for **Loss** for any **Claim**:

a.    based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b.    based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**, or

c.    brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

provided this exclusion will not apply to any **Claim** by or on behalf of a beneficiary of, or participant in, any **Employee Benefit Plan** based upon, arising from or in consequence of the diminution in value of any securities owned by the **Employee Benefit Plan** in any organization, other than the **Insured Organization**, if such diminution in value is allegedly as a result of a **Pollutant**.

4.    The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, other than an **Employee Benefit Plan**, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

5.    The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation, or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation other than COBRA, **HIPAA** or **ERISA**.

6.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

7.  The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

8.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

9.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Workplace Misconduct**, other than **Claims** asserted under **ERISA**.

**B.    EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

    a.    committing any intentionally dishonest or fraudulent act or omission;

    b.    committing any willful violation of any statute, rule, law; or

    c.    gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

    provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

2.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

**C.    EXCLUSIONS APPLICABLE TO INSURING AGREEMENT B**

The Company will pay no **Settlement Fees** or **Defense Expenses** with respect to any **Claim** or investigation in connection with a **Settlement Program**, of which any **Insured** first became aware or received notice prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

---

*IV.    SEVERABILITY OF EXCLUSIONS*

No conduct of any **Insured** will be imputed to any other **Insured** to determine the application of any of the exclusions set forth in section III. EXCLUSIONS above.

## V.    CONDITIONS

### A.    SETTLEMENT

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for 30% of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for 30% of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

### B.    ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN

If, during the **Policy Period**, the **Insured Organization** acquires or forms an **Employee Benefit Plan**, which is then solely sponsored by the **Insured Organization** exclusively for the benefit of the employees of the **Insured Organization**, this **Liability Coverage** will provide coverage for that acquired or formed **Employee Benefit Plan** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Coverage**, but only for **Claims** for **Wrongful Acts** which occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Employee Benefit Plan**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within 90 days after the effective date of such acquisition or formation.  Coverage for the acquired or formed **Employee Benefit Plan** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided that: (1) the total assets of the acquired or formed **Employee Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed 30% of the total plan assets shown on the most recent **Application** submitted by the **Insured Organization**, or (2) the acquisition or formation occurs fewer than 90 days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, if such acquired or formed **Employee Benefit Plan** is an **Employee Stock Ownership Plan** that is not part of, and is separate from, any other **Pension Plan**, the coverage provided pursuant to this section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN to such **Employee Stock Ownership Plan** will be limited to any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **ESOP Administration** of **Employee Benefits**.

### C.    MERGER OF PLANS

If, during the **Policy Period**, an **Employee Benefit Plan** is merged with another **Employee Benefit Plan**, this **Liability Coverage** will continue to provide coverage for both plans, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

If, during the **Policy Period**, an **Employee Benefit Plan** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Liability Coverage** ("Uncovered Plan"), this **Liability Coverage** will continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**, but only for **Claims** for **Wrongful Acts** which occurred prior to the date of such merger.

©2009 The Travelers Companies, Inc. All Rights Reserved

**D.    SALE OF PLAN**

If, prior to or during the **Policy Period**, any **Employee Benefit Plan** is sold, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**. The coverage provided pursuant to this section V. CONDITIONS D. SALE OF PLAN will apply only:

1.    for **Claims** for **Wrongful Acts** which occurred prior to the date of such sale;

2.    while such plan was sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; and

3.    if notice of such sale is given to the Company prior to the end of such **Policy Period**.

**E    TERMINATION OF PLAN**

If before or during the **Policy Period** any **Employee Benefit Plan** is terminated, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

**F.    OTHER  INSURANCE**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with any other valid and collectible insurance available to the **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**.  This **Liability Coverage** will not be subject to the terms of any other insurance.

**G.    ORDER OF PAYMENTS**

If **Loss**, other than **Defense Expenses**, from any **Claim** exceeds the remaining applicable limit of liability as set forth in ITEM 5 of the Declarations:

1.    the Company will first pay such **Loss** for such **Claim** for which the **Insured Organization** is not permitted by law to indemnify any **Insured Person**, or is permitted or required to indemnify such **Insured Person** but does not do so by reason of **Financial Insolvency**; then

2.    to the extent that any amount of the applicable limit of liability remains available, the Company will pay such **Loss** for such **Claim** incurred by the **Insured Organization** directly or through indemnification.

Upon written request of the **Insured Organization** by and through any **Executive Officer**, the Company will either pay or withhold payment of **Loss** from such **Claim** pursuant to the order of payments set forth herein, as applicable. In the event of a written request to withhold payment, the Company will make any future payment only for unindemnified **Loss** from any such **Claim** as specified in 1. above, unless otherwise so instructed upon written request by and through an **Executive Officer** of the **Insured Organization**.

**H.    SETTLEMENT PROGRAM LIMIT OF LIABILITY AND RETENTION**

The Company's maximum limit of liability for all **Settlement Fees** and **Defense Expenses** in connection with a **Settlement Program Notice** will be the amount set forth in ITEM 5 of the Declarations as the Settlement Program Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.  However, if ITEM 5 of the Declarations indicates that Additional Defense Coverage is applicable, **Defense Expenses** incurred in connection with a **Settlement Program Notice** will apply first to and reduce the remaining **Additional Defense Limit of Liability**; provided that the Settlement Program Limit of Liability will be reduced and may be exhausted by payment of such **Defense Expenses** under the **Additional Defense Limit of Liability**.

**Settlement Fees** and **Defense Expenses** incurred with respect to a **Settlement Program Notice** will be subject to the applicable Retention set forth in ITEM 5 of the Declarations.  If a **Claim** results in a **Settlement Program Notice**, the applicable Retentions will be applied separately to such **Claim** and **Settlement Program Notice**, respectively, but the sum of such Retentions will not exceed the largest of such Retentions.

I.   **SETTLEMENT PROGRAM EXTENDED REPORTING PERIOD AND RUN-OFF EXTENDED REPORTING PERIOD**

1. The Extended Reporting Period described in section III. CONDITIONS O. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of such termination or nonrenewal.

2. The Run-Off Extended Reporting Period described in section III. CONDITIONS K. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Run-Off Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Run-Off Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of the **Change of Control.**

J.   **HIPAA LIMIT OF LIABILITY**

The Company's maximum limit of liability for all civil money penalties under the privacy provisions of **HIPAA** will be the amount set forth in ITEM 5 of the Declarations as the HIPAA Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.

K.   **INSURED'S DUTIES IN THE EVENT OF A SETTLEMENT PROGRAM NOTICE**

All **Settlement Program Notices** must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt. The **Insured** will not enter into a **Settlement Program** or incur any **Defense Expenses** in connection with a **Settlement Program Notice** or **Settlement Fees** without the Company's prior written consent, such consent not to be unreasonably withheld. The Company will not be liable for any such **Defense Expenses** or **Settlement Fees** to which it has not consented.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## WAIVER OF RECOURSE ENDORSEMENT

This endorsement modifies the following:

**Fiduciary Liability**

**It is agreed that:**

In the case of a breach of a fiduciary obligation by an **Insured**, the Company has a right of recourse against such **Insured** and it is agreed that, in consideration of a separate premium paid to the Company with funds from a source other than assets of an **Employee Benefit Plan**, the Company waives such right of recourse.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DELETE WORKPLACE MISCONDUCT EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

The following is deleted from section ***III. EXCLUSIONS***, **A**. **EXCLUSIONS APPLICABLE TO ALL LOSS, 10**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Workplace Misconduct**, other than **Claims** asserted under **ERISA**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## DEFENSE EXPENSES FOR SETTLOR ACT CLAIMS ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

1.     The following is added to section **II. DEFINITIONS**, **V. Wrongful Act**:

**Wrongful Act** also means a **Settlor Act**.

2.     The following is added to section **II. DEFINITIONS**:

*Settlor Act Claim* means any **Claim** against an **Insured** for any actual or alleged **Settlor Act**.

*Settlor Act* means any actual or alleged breach of duties, obligations and responsibilities imposed by  **ERISA**, COBRA, or **HIPAA**, in the discharge of the **Insured's** duties in a settlor capacity with respect to an **Employee Benefit Plan**.

3.     The following is added to **III. EXCLUSIONS**, **B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**:

The Company will not be liable for, other than **Defense Expenses**, that part of **Loss** attributable to a **Settlor Act Claim**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HEALTHCARE EXCHANGE ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1.    The following is added to **II. DEFINITIONS**, **C. Employee Benefits**:

       **Employee Benefits** also means benefits available to employees of the **Insured Organization** through a **Healthcare Exchange**.

2.    The following is added to **II. DEFINITIONS**:

       *Healthcare Exchange* means any public, private, or government sponsored entity established to facilitate the purchase of health insurance in accordance with the Patient Protection and Affordable Care Act.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2014 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

BENEFIT DETERMINATION APPEALS AND PRELIMINARY INVESTIGATIONS ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1.  The following replaces section **I. INSURING AGREEMENTS**, **A.**:

    The Company will pay on behalf of the **Insured**, **Loss** for:

    1.  any **Claim**, other than a **Preliminary Investigation**, first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Act**; or

    2.  any **Preliminary Investigation**, first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended reporting Period.

2.  The following replaces section **II. DEFINITIONS**, **B.**:

    *Claim* means:

    1.  a written demand for monetary damages or non-monetary relief;

    2.  a civil proceeding commenced by service of a complaint or similar pleading;

    3.  a criminal proceeding commenced by filing of charges;

    4.  a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons, or similar document;

    5.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

    6.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding; or

    7.  a **Benefit Determination Appeal**;

    against an **Insured** for a **Wrongful Act**; or

    8.  a **Preliminary Investigation**.

    A **Claim** , other than a **Preliminary Investigation**, is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim**, during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

    If an **Insured** elects coverage for a **Preliminary Investigation**, such **Preliminary Investigation** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Preliminary**

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2015 The Travelers Indemnity Company. All rights reserved.

**Investigation**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Preliminary Investigation**, during the **Policy Period**, but no **Executive Officer** receives written notice of such **Preliminary Investigation** until after the **Policy Period** has expired, then such **Preliminary Investigation** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

3. The following is added to section **II. DEFINITIONS**:

*Benefit Determination Appeal* means a written appeal made by an employee, participant, or beneficiary of an adverse benefit determination by an **Insured** with respect to an **Employee Benefit Plan** pursuant to the Department of Labor's claim procedure regulation 29 C.F.R. § 2560.503-1(h) or a similar claim procedure pursuant to applicable law.

*Preliminary Investigation* means any:

    1.  fact-finding investigation of an Insured; or

    2.  request for an interview with an **Insured Person**,

solely as respects any **Employee Benefit Plan**, whether or not a **Wrongful Act** is alleged; commenced in writing by the United States Department of Labor, Pension Benefit Guaranty Corporation, or a similar government agency located outside of the United States, including the United Kingdom Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, or any successor body thereto.

**Preliminary Investigation** does not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production, or audit.

*Related Preliminary Investigations* mean all **Preliminary Investigations** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

4. The following is added to the first paragraph of section **III. CONDITIONS**, **F. INSURED'S DUTIES IN THE EVENT OF A CLAIM** of the Liability Coverage Terms and Conditions:

Provided that, if an **Executive Officer** elects coverage for a **Preliminary Investigation**, such **Executive Officer** must give the Company written notice of the **Preliminary Investigation** as soon as practicable after such **Executive Officer** first becomes aware of such **Preliminary Investigation**, but no later than: (i) 90 days after the Expiration Date of the **Policy Period** set forth in ITEM 2 of the Declarations; or (ii) the expiration of any applicable **Extended Reporting Period** or **Run-Off Extended Reporting Period**.

If an **Executive Officer** elects coverage for a **Preliminary Investigation**, such **Executive Officer** must: (i) include with any notice of a **Preliminary Investigation** the name of the agency making the request and, to the best of the **Executive Officer's** knowledge, a description of the nature and subject matter identified by the agency in the **Preliminary Investigation**; and (ii) provide to the Company such other information and cooperation as the Company may reasonably request, including additional information about the subject matter and nature of the **Preliminary Investigation** as it is learned.

5. The following is added to section **III. CONDITIONS**, **K. CHANGE OF CONTROL** of the Liability Coverage Terms and Conditions:

If, during the **Policy Period**, a **Change of Control** occurs, then coverage for **Preliminary Investigations** under this **Liability Coverage** will continue, but only for any **Preliminary Investigations** based upon facts or circumstances occurring prior to the **Change of Control**.

6. The following replaces the first paragraph of section **III. CONDITIONS** , **O. EXTENDED REPORTING PERIOD** of the Liability Coverage Terms and Conditions:

At any time prior to or within 60 days after the effective date of termination or cancelation of any **Liability Coverage** for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the

© 2015 The Travelers Indemnity Company. All rights reserved.

Declarations following the effective date of such termination or cancelation, regarding **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancelation are **Insureds**, but only for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, occurring prior to the effective date of such termination or cancelation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions: (i) such Extended Reporting Period will not provide new, additional, or renewed limits of liability; and (ii) the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancelation;

7.  The following is added to section **III. CONDITIONS, H. RELATED CLAIMS** of the Liability Coverage Terms and Conditions:

    **RELATED PRELIMINARY INVESTIGATIONS**

    All **Related Preliminary Investigations** are deemed one **Preliminary Investigation**, and such **Preliminary Investigation** is deemed to be first made on the date the earliest of such **Preliminary Investigations** is first made, regardless of whether such date is before or during the **Policy Period**.

    Any **Claim** arising out of the same or substantially similar facts or circumstances as a **Preliminary Investigation**, for which notice has been provided pursuant to section III. CONDITIONS, F. INSURED'S DUTIES IN THE EVENT OF A CLAIM, 2., Notice of Preliminary Investigation, will be deemed to be first made on the date such **Preliminary Investigation** is first made, regardless of whether such date is before or during the **Policy Period**.

8.  The following replaces section **III. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 9.:

    The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act**, or **Preliminary Investigations** based upon facts or circumstances, by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

9.  The following replaces the first paragraph of section **V. CONDITIONS, B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN** of the **Liability Coverage**:

    If, during the **Policy Period**, the **Insured Organization** acquires or forms an **Employee Benefit Plan**, that is solely sponsored by the **Insured Organization** exclusively for the benefit of its employees, then this **Liability Coverage** will provide coverage for such **Employee Benefit Plan** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Coverage**, but only for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, that occur when the **Insured Organization** is the sole sponsor with regard to the **Employee Benefit Plan**; provided written notice of such acquisition or formation has been given to the Company, and specific application submitted on the Company's form in use at the time, together with any documentation and information as the Company may require, all within 90 days after the effective date of such acquisition or formation. Coverage for the acquired or formed **Employee Benefit Plan** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

10. The following replaces the second paragraph of section **V. CONDITIONS, C. MERGER OF PLANS** of the **Liability Coverage**:

    If, during the **Policy Period**, an **Employee Benefit Plan** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Liability Coverage** ("Uncovered Plan"), then this **Liability Coverage** will continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**, but only for **Claims** for **Wrongful Acts**, or for **Preliminary Investigations** based upon facts or circumstances which occurred prior to the date of such merger.

© 2015 The Travelers Indemnity Company. All rights reserved.

11.  The following replaces section 1. of **V. CONDITIONS**, **D. SALE OF PLAN** of the **Liability Coverage**:

for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances which occurred prior to the date of such sale;

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## PPACA, SECTION 502(C), SECTION 507, AND SECTION 4975 CIVIL MONEY PENALTIES ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| | | |
|---|---|---|
| **PPACA Penalties Limit of Liability:** | $250,000 | which amount is included within, and not in addition to, any applicable Limit of Liability. |
| **Section 502(c) Limit of Liability:** | $250,000 | which amount is included within, and not in addition to, any applicable Limit of Liability. |
| **Section 507 Penalties Limit of Liability:** | $250,000 | which amount is included within, and not in addition to, any applicable Limit of Liability. |
| **Section 4975 Penalties Limit of Liability:** | $250,000 | which amount is included within, and not in addition to, any applicable Limit of Liability. |

2. The following is added to section **III. CONDITIONS**, **B. RETENTION** of the Liability Coverage Terms and Conditions:

   However, no Retention will apply to any **Claim** under Insuring Agreement A set forth in ITEM 5 of the Declarations that seeks only **PPACA Penalties**, **Section 502(c) Penalties**, **Section 507 Penalties**, or **Section 4975 Penalties**.

3. The following is added to section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, 1. of the Liability Coverage Terms and Conditions:

   However, the Company's maximum limit of liability for all:

   (1) **PPACA Penalties** will be the PPACA Civil Money Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable Limit of Liability.

   (2) **Section 502(c) Penalties** will be the Section 502(c) Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable Limit of Liability;

   (3) **Section 507 Penalties** will be the Section 507 Civil Money Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable Limit of Liability; and

   (4) **Section 4975 Penalties** will be the Section 4975 Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability.

4. The following is added to section **II. DEFINITIONS** of the **Liability Coverage**:

   ***PPACA Penalties*** means civil money penalties or fines imposed on any **Insured** pursuant to the Patient Protection and Affordable Care Act, as amended, including any rules or regulations promulgated thereunder. **PPACA Civil Money Penalties** do not include any civil money penalties imposed on any **Insured** pursuant to section 4980H of the Internal Revenue Code, as amended.

   ***Section 502(c) Penalties*** means civil penalties imposed on any **Insured** pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended, including such penalties imposed on any **Insured** pursuant to the Pension Protection Act of 2006, as amended.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

***Section 507 Penalties*** means civil money penalties imposed on any **Insured** pursuant to Section 507 of Title V of the Pension Protection Act of 2006, as amended.

***Section 4975 Penalties*** means the 15% or less tax imposed on any **Insured** as a penalty pursuant to Section 4975 of the Internal Revenue Code, as amended.

5.   The following replaces the first paragraph of section **II. DEFINITIONS**, **M.** of the **Liability Coverage**:

***Loss*** means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay, compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and post judgment interest; and legal fees and expenses awarded to a plaintiff in a court order or judgment under ERISA section 502(g); and solely with respect to section I. INSURING AGREEMENTS, B. of this **Liability Coverage**, **Settlement Fees**, provided **Loss** other than **Defense Expenses** does not include:

6.   The following replaces section **II. DEFINITIONS**, **M**. **Loss**, 1. of the **Liability Coverage**:

civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.; **PPACA Penalties**; **Section 502(c) Penalties**; **Section 507 Penalties**; civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of **HIPAA**; in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof; or, in Ireland, civil penalties imposed by the Republic of Ireland's Pensions Authority); sanctions; liquidated damages; payroll or other taxes (except **Section 4975 Penalties**); or damages or types of relief deemed uninsurable under applicable law.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PRIOR ACTS EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

The following is added to **EXCLUSIONS APPLICABLE TO ALL LOSS:**

The Company will have no liability for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** committed or alleged to have been committed, in whole or in part, prior to the applicable Retroactive Date set forth below.

| Liability Coverage | Retroactive Date |
|---|---|
| **Private Company Directors and Officers Liability** | **12/31/2021** |
| **Employment Practices Liability** | **12/31/2021** |
| **Fiduciary Liability** | **12/31/2021** |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND INSURED'S DUTIES IN EVENT OF A CLAIM CONDITION ENDORSEMENT – REPLACE EXECUTIVE OFFICER DESIGNATION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

Section **III. CONDITIONS, F. INSURED'S DUTIES IN EVENT OF A CLAIM,** is replaced by the following:

F.    **INSURED'S DUTIES IN THE EVENT OF A CLAIM**

The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by **CEO, CFO, HR Manager, Risk Manager, General Counsel or the functional equivalents thereof;**. If **CEO, CFO, HR Manager, Risk Manager, General Counsel or the functional equivalents thereof;** becomes aware that a **Claim** has been made against any **Insured,** the **Insured,** as a condition precedent to any rights under this **Liability Policy,** must give to the Company written notice of the particulars of such **Claim,** including all facts related to any alleged **Wrongful Act,** the identity of each person allegedly involved in or affected by such **Wrongful Act,** and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

All notices under this subsection must be sent by mail or  prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon  receipt. The  **Insured**  agrees  not  to  voluntarily settle any **Claim,** make any settlement offer, assume or admit any liability or,except at the **Insured's** own cost, voluntarily make  any  payment,  pay  or incur any **Defense Expenses**, or assume any obligation or incur  any  other  expense,  without  the  Company's  prior  written  consent,  such  consent  not  to  be unreasonably withheld. The  Company  is  not  liable  for  any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND SUBSIDIARY TO INCLUDE SCHEDULED ENTITY(IES) ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability**

**It is agreed that:**

The following is added to the definition of **Subsidiary**:

>*Subsidiary* also means the following scheduled entity or entities:

>Johns Lyng Texas, LLC
>
>Johns Lyng Florida, LLC
>
>Johns Lyng California, LLC
>
>Johns Lyng Colorado, LLC
>
>Johns Lyng Tennessee, LLC
>
>Advanced Roofing & Sheetmetal, LLC
>
>Steamatic of Nashville, LLC
>
>Steamatic North Texas, LLC
>
>Steamatic of Northwest Houston, LLC

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

LIA-7198 Ed. 01-10 Printed in U.S.A.
©2010 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INITIAL PUBLIC OFFERING EXCLUSION (BROAD) ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

1.  The following is added to section **III. DEFINITIONS** of the **Liability Coverage:**

    ***Initial Public Offering Filing*** means the filing by the **Insured Organization** of an offering memorandum or registration statement including a Form S-1 under the Securities Act of 1933 or foreign equivalent,  with the Securities Exchange Commission or foreign equivalent.

    ***Initial Public Offering*** means the actual offer, sale, or trading of securities in connection with an **Initial Public Offering Filing.**

2.  The following replaces section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS,** 11. of the **Liability Coverage:**

    11.    The Company will not be liable for **Loss** for any **Claim** based on or arising out of the sale or trading of securities pursuant to an **Initial Public Offering**, including any ongoing reporting requirements under Securities Exchange Act of 1934 or foreign equivalent provided, that this exclusion will not apply to:

    a.    any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 or foreign equivalent (an "Exempt Transaction"); or

    b.    the failure of the **Insured Organization** to undertake or complete an **Initial Public Offering**; or

    c.     a **Wrongful Act** relating to the **Insured Organization's** preparation for any **Initial Public Offering**, including any presentations made by the **Insured Organization** or **Executive Officers** in connection with such offering.

    This exclusion shall not apply until the actual trading of securities in connection with an **Initial Public Offering**.

    In addition, if the **Named Insured** provides notice of an **Initial Public Offering** within 30 days of the **Initial Public Offering Filing** thereof to the Company along with any additional information which the Company may request, the Company shall offer to the **Insured Organization** a proposal for coverage for such resulting **Initial Public Offering** subject to any additional terms and conditions,and payment of any additional premium, described in such proposal.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND CONDUCT EXCLUSION FOR UNDERLYING ACTION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following replaces section **IV. EXCLUSIONS, B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**, 1. of the **Liability Coverage**:

1.    The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based on or arising out of any **Insured**:

   a.    committing any intentionally dishonest or fraudulent act or omission;

   b.    committing any willful violation of any statute, rule, or law; or

   c.    gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

   provided that this exclusion will not apply unless a judgment or other final adjudication in the underlying action establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## REDUCED LIMITS FOR EMPLOYED LAWYERS CLAIMS AND EMPLOYED LAWYERS EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

1.  The following is added to section ***III. CONDITIONS***, **C. LIMITS OF LIABILITY**, 1. Liability Coverage Limit of Liability, of the Liability Coverage Terms and Conditions:

    However, the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Employed Lawyers Claims** is further limited by the following:

    The Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Employed Lawyers Claims** under the **Liability Coverage** will be the Employed Lawyers Claims Limit of Liability for all **Employed Lawyers Claims** set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to any applicable limit of liability.

2.  The following is added to section ***III. CONDITIONS***, **D. ADDITIONAL DEFENSE COVERAGE**, of the Liability Coverage Terms and Conditions:

    The Company's maximum liability for **Defense Expenses** for all **Employed Lawyer Claims** paid pursuant to the **Additional Defense Limit of Liability** will not exceed the Employed Lawyer Claims Limit of Liability set forth in ITEM 5 of the Declarations. Such **Defense Expenses** will be part of, and not in addition to, the Employed Lawyer Claims Limit of Liability set forth in ITEM 5 of the Declarations and such Employed Lawyer Claims Limit of Liability will be reduced and may be exhausted by payment of such **Defense Expenses** under the **Additional Defense Limit of Liability**.

3.  The following are added to the ***DEFINITIONS*** section of the **Liability Coverages**:

    ***Employed Lawyer*** means any employee of the **Insured Organization** who is admitted to practice law and who the **Insured Organization** employs on a full time, salaried basis. The status of an individual as an **Employed Lawyer** shall be determined as of the date of the alleged **Wrongful Act**.

    ***Employed Lawyer Claim*** means any **Claim** for a **Wrongful Act** by any **Employed Lawyer** in the rendering of, or failure to render, professional legal service for the **Insured Organization** in the **Employed Lawyer's** capacity as a lawyer for the **Insured Organization**, but only if such **Employed Lawyer** is named in a **Claim** that is also brought and continuously maintained against any:

    1.  **Insured Organization**;

    2.  one or more past, present or future duly elected or appointed member of the board of directors, officer, or a functional equivalent to a member of the board of directors or officer of the **Insured Organization**; or

    3.  estate, heir, legal representative, or assign of such natural person named in 2., in the event of the death, incapacity or bankruptcy of an **Insured Person**.

    **Employed Lawyers Claim** does not include any **Wrongful Act** in connection with any activities by such **Employed Lawyer** that:

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

1.       are not related to such **Employed Lawyer's** employment with the **Insured Organization**;

2.       are not rendered on behalf of the **Insured Organization** at the **Insured Organization's** written request; or

3.       are performed by the **Employed Lawyer** for others, whether or not for a fee.

4.       The following is added to the ***EXCLUSIONS***, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, section of the **Liability Coverages**:

The Company will not be liable for **Loss** for any **Employed Lawyer Claim** based on or arising out of any fact, circumstance, situation, event, or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding as of **December 31, 2022** or activity by an **Employed Lawyer** as an officer or director of any entity, other than the **Insured Organization**;

5.       The following is added to the ***CONDITIONS***, **C. PRESUMPTION OF INDEMNIFICATION**, section of the **Liability Coverages**:

The **Insured Organization** will be conclusively deemed to have indemnified any **Employed Lawyer** for coverage that is provided by this endorsement to the extent that such indemnification is permitted or required pursuant to applicable common or statutory law, by contract or charter, or by-law of the **Insured Organization**.

6.       The following is added to the ***CONDITIONS***, **D. OTHER INSURANCE AND INDEMNIFICATION**, section of the **Liability Coverages**:

Coverage provided under this endorsement is specifically excess over any other lawyer's professional insurance, legal malpractice, or errors and omissions insurance and will only drop down and be primary insurance in the event of exhaustion of such other insurance due solely to losses paid there under.

7.       The following is added to ITEM 5 of the Declarations:

Employed Lawyers Claims Limit of Liability:        **$1,000,000** for all Employed Lawyers Claims

Employed Lawyers Claims Limit of Liability:        **$1,000,000** for each Employed Lawyers Claim

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.



*CRIME*

---

### CRIME TERMS AND CONDITIONS

#### PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY

**CONSIDERATION CLAUSE**

**IN CONSIDERATION** of the payment of the premium stated in the Declarations, and subject to the Declarations and pursuant to all the terms, conditions, exclusions and limitations of this **Crime Policy**, the Company will pay the **Insured** for direct loss that the **Insured** sustains which is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by the **Insured** during the **Policy Period** or during the Extended Period to Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss.

---

### *I.    INSURING AGREEMENTS*

This **Crime Policy** provides coverage under each of the following Insuring Agreements. Notwithstanding the aforesaid, if ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered,*" then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.

**A.    FIDELITY**

    1.    Employee Theft

        The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

    2.    ERISA Fidelity

        The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by **Theft** or **Forgery** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

    3.    Employee Theft of Client Property

        The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** sustained by the **Insured's Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

**B.    FORGERY OR ALTERATION**

    The Company will:

        1.    pay the **Insured** for the **Insured's** direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

---

a.  made by, drawn by, or drawn upon, the **Insured**, or purport to have been so made or drawn; or

b.  made or drawn by one acting as the **Insured's** agent, or purport to have been so made or drawn; and

2.  reimburse the **Insured** for reasonable legal defense expenses that the **Insured** has paid if the **Insured** is sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement B. on the basis that it has been **Forged** or altered. Reimbursement of such legal expenses is conditioned upon the **Insured's** receipt of the Company's prior written consent to defend against such suit. The amount of any legal expenses reimbursed under Insuring Agreement B. is in addition to the applicable Single Loss Limit of Insurance for Insuring Agreement B.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer is treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement B.

For purposes of this Insuring Agreement B., the term "check" includes a "substitute check" as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

## C.    ON PREMISES

The Company will pay the **Insured** for:

1.  the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by **Theft**, committed by a person present inside such **Premises** or **Financial Institution Premises**;

2.  the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by disappearance, damage or destruction;

3.  the **Insured's** direct loss of, or direct loss from damage to, **Other Property** located inside the **Premises**:
    a.  directly caused by an actual or attempted **Robbery**; or
    b.  in a safe or vault, directly caused by an actual or attempted **Safe Burglary**; and

4.  the **Insured's** direct loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the **Premises** or is liable for damage to it; or

5.  the **Insured's** direct loss of, or loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the locked safe, vault, cash register, cash box or cash drawer or is liable for damage thereto.

## D.    IN TRANSIT

1.  The Company will pay the **Insured** for the **Insured's** direct loss of **Money** or **Securities** directly caused by **Theft**, disappearance, damage or destruction while in transit outside the **Premises** and in the care and custody of:

  a. **a Messenger**, including while temporarily within the living quarters of a **Messenger**; or

  b. an armored motor vehicle company.

 2. The Company will pay the **Insured** for the **Insured's** direct loss of, or the **Insured's** direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Robbery** while in transit outside the **Premises** and in the care and custody of:

  a. **a Messenger**; or

  b. an armored motor vehicle company.

 3. The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Theft** of the **Insured's Other Property** while it is temporarily within the living quarters of a **Messenger**.

Coverage under this Insuring Agreement D. begins immediately upon receipt of the **Money**, **Securities** or **Other Property** by the transporting party and ends immediately upon delivery to the designated recipient or its agent.

**E.** **MONEY ORDERS AND COUNTERFEIT MONEY**

The Company will pay the **Insured** for the **Insured's** direct loss directly caused by the **Insured's** good faith acceptance of:

 1. original money orders, issued or purportedly issued by any post office, express company or bank located in the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises**, that are not paid upon presentation; or

 2. **Counterfeit Money**, of the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises** that is acquired during the regular course of business;

in exchange for merchandise, **Money** or services.

**F.** **COMPUTER CRIME**

 1. Computer Fraud

The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**.

 2. Computer Program and Electronic Data Restoration Expense

The Company will pay the **Insured** for reasonable **Restoration Expense** that the **Insured** incurs to restore or replace damaged or destroyed **Computer Programs** or **Electronic Data** stored within the **Insured's Computer System** directly caused by a **Computer Violation**.

For purposes of this Insuring Agreement F.2., a **Single Loss** involving **Computer Program** and **Electronic Data Restoration Expense** applies to reasonable **Restoration Expense** incurred by the **Insured** between the time the **Insured Discovers** the damage or destruction and the time the

**Insured's Computer Program** or **Electronic Data** is restored to the level of operational capability that existed immediately preceding a **Computer Violation**. Recurrence of the same **Computer Virus** after the **Insured's Computer Program** or **Electronic Data** has been restored constitutes a separate **Single Loss**.

Payment of reasonable **Restoration Expense** applies:

a. only to **Computer Programs** and **Electronic Data** which the **Insured** owns or leases, or for which the **Insured** is legally liable; and

b. only if the **Insured** is unable to reproduce such **Computer Programs** or **Electronic Data** from back-up data copies.

Payment of reasonable **Restoration Expense** will be made to the **Insured** upon the completion of the restoration of the damaged or destroyed **Computer Programs** or **Electronic Data**.

If a **Single Loss** is covered under both Insuring Agreements F.1. and F.2., then only the Retention for a **Single Loss** under Insuring Agreement F.1. will be applicable and the payment of **Restoration Expense** under Insuring Agreement F.2. will be part of, and not in addition to, the Single Loss Limit of Insurance for Insuring Agreement F.1.

**G. FUNDS TRANSFER FRAUD**

The Company will pay the **Insured** for the **Insured's** direct loss of **Money** and **Securities** contained in the **Insured's Transfer Account** directly caused by **Funds Transfer Fraud**.

**H. PERSONAL ACCOUNTS PROTECTION**

1. Personal Accounts Forgery or Alteration

The Company will pay the **Insured**, on behalf of the **Insured's Management Staff Member**, for loss incurred by the **Insured's Management Staff Member**, directly caused by **Forgery** or alteration of, on or in any written **Covered Personal Instruments** that are:

a. drawn upon personal accounts of the **Insured's Management Staff Membe**r, or purported to have been so drawn; or

b. made or drawn by one acting as an agent of the **Insured's Management Staff Member**, or purport to have been so made or drawn.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer will be treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement H.

For purposes of this Insuring Agreement H.1. the term "check" includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

2. Identity Fraud Expense Reimbursement

The Company will reimburse the **Insured**, on behalf of the **Insured's Management Staff Member**, for **Identity Fraud Expense** incurred by the **Insured's Management Staff Member** as a direct result of any **Identity Fraud**.

©2009 The Travelers Companies, Inc. All Rights Reserved

I.    **CLAIM EXPENSE**

The Company will pay the **Insured** for reasonable **Claim Expenses** incurred and paid by the **Insured** to establish the existence, amount and preparation of the **Insured's** proof of loss in support of a covered claim for loss under any Insuring Agreement of this **Crime Policy**.

The following conditions specifically apply to this Insuring Agreement I.:

1.    any **Claim Expenses** payable to the **Insured** are only applicable to any covered loss which exceeds the Single Loss Retention for the Insuring Agreement that is the subject of a claim under this **Crime Policy**;

2.    **Claim Expenses** that are payable to the **Insured** are in addition to the Single Loss Limit of Insurance for the Insuring Agreement that is the subject of a claim under this **Crime Policy**; and

3.    **Claim Expenses** payable to the **Insured** will be paid to the **Insured** at the same time as the payment of the valid and collectible loss under the Insuring Agreement that is the subject of a claim under this **Crime Policy**.

---

II.    *GENERAL AGREEMENTS*

A.    **JOINT INSURED**

1.    If the **Insured** consists of more than one entity, then the **First Named Insured** acts for itself and for every other **Insured** for all purposes of this **Crime Policy**.

2.    If any **Insured**, or a partner or **Management Staff Member** of that **Insured**, has knowledge of any information relevant to this **Crime Policy**, that knowledge is considered knowledge of every **Insured**.

3.    An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

4.    The Company will not pay the **Insured** more for loss or losses sustained by more than one **Insured** than the amount the Company would pay if all loss or losses had been sustained by one **Insured**.

5.    Payment by the Company to the **First Named Insured** for loss sustained by any **Insured**, or payment by the Company to the **Employee Benefit Plan** for loss sustained under Insuring Agreement A.2, fully releases the Company on account of such loss.

6.    If this **Crime Policy** or any of its Insuring Agreements are canceled or terminated as to any **Insured**, loss sustained by that **Insured** is covered only if **Discovered** by the **Insured** during the period of time provided in the Extended Period To Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss; provided, this extended period to discover loss terminates as to that **Insured** immediately upon the effective date of any other insurance obtained by that **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

B.    **ADDITIONAL OFFICES**

If the **Insured** establishes any additional offices, other than by consolidation with, merger with, purchase of, or acquisition of assets or liabilities of another organization while this **Crime Policy** is in effect, such offices are automatically covered by this **Crime Policy** from the date of such establishment without the requirement of notice to the Company or the payment of additional premium for the remainder of the **Policy Period**.

C.    **CONSOLIDATION, MERGER OR PURCHASE OF ASSETS**

If, during the **Policy Period**, the **Insured** merges with, purchases or acquires the assets or liabilities of another entity, this **Crime Policy** will provide coverage for that merged, purchased, or acquired entity, subject to all other terms and conditions herein, but only for loss **Discovered** by the **Insured** after the effective date of such merger, purchase, or acquisition; provided, the **Insured** gives the Company written notice of such merger, purchase, or acquisition, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such merger, purchase, or acquisition. Coverage for the merged, purchased, or acquired entity will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company. Any **Employee Benefit Plan** or **Sponsored Plan** acquired as above will be included as **Insureds** as specified in Item 1 of the Declarations.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed 30% of the total assets of all **Insureds** as reflected in the **Insured's** most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

D.    **ACQUISITIONS**

If, during the **Policy Period**, the **Insured** acquires a **Subsidiary**, this **Crime Policy** will provide coverage for such **Subsidiary** and its respective **Management Staff Members**, **Employee Benefit Plans**, and **Sponsored Plans**, subject to all other terms and conditions of this **Crime Policy**, provided written notice of such acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such acquisition. Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired **Subsidiary** do not exceed 30% of the **Insured's** total assets as reflected in the **Insured's** most recent fiscal year-end financial statement; or (2) the acquisition occurs less than 90 days prior to the end of the **Policy Period**.

E.    **CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to any **Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

III.    *DEFINITIONS*

Wherever appearing in this **Crime Policy**, the following words and phrases appearing in bold type have the meanings set forth in this Section III. DEFINITIONS:

A.    *Change of Control* means:

1.    the acquisition of any **Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of any **Insured** into or with another entity such that the **Insured** is not the surviving entity; or

2.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate more than 50% of the board of directors or board of managers or to exercise a majority control of the board of directors, board of managers, or a functional equivalent thereof of any **Insured**.

B.  **Claim Expenses** means reasonable fees, costs and expenses of outside accountants, attorneys, consultants or experts retained by the **Insured** to determine the amount and extent of loss covered under this **Crime Policy**. The reasonableness of such expenses will be determined by the Company. The phrase does not mean or include any of the **Insured's** internal corporate fees, costs (direct or indirect), obligations or **Employee** wages and salaries.

C.  **Client** means an entity designated as a **Client** by endorsement to this **Crime Policy** for which the **Insured** performs services as specified in a written agreement, but only while the written agreement is in effect.

D.  **Client's Premises** means the interior of that portion of any building the **Insured's Client** occupies in conducting its business.

E.  **Computer Fraud** means:

The use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**:

   1.  to a person (other than a **Messenger**) outside the **Premises** or **Financial Institution Premises**; or
   2.  to a place outside the **Premises** or **Financial Institution Premises**.

F.  **Computer Program** means a set of related electronic instructions that direct the operations and functions of a **Computer System** or devices connected to it that enable the **Computer System** or devices to receive, process, store, retrieve, send, create or otherwise act upon **Electronic Data**.

G.  **Computer System** means a computer and all input, output, processing, storage and communication facilities and equipment that are connected to such a device and that the operating system or application software used by the **Insured** are under the direct operational control of the **Insured**. Off-line media libraries are deemed to be part of such **Computer System**.

H.  **Computer Violation** means:

   1.  a **Computer Virus** designed to damage or destroy a **Computer Program** or **Electronic Data**; or
   2.  vandalism by a natural person, including an **Employee**, who has gained unauthorized electronic access to the **Insured's Computer System**.

I.  **Computer Virus** means a set of unauthorized instructions, programmatic or otherwise:

   1.  directed solely against the **Insured**; and
   2.  that propagate themselves through the **Computer System** or networks;

provided such instructions were maliciously introduced by a natural person.

J.  **Counterfeit** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

K.  **Covered Instruments** means:

   1.  checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum certain in **Money**; and
   2.  written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to the **Insured**, the **Insured's Employees** or the **Insured's Management Staff Members** for business purposes.

L.  **Covered Personal Instruments** means:

   1.  checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in **Money**; and

---

2.      written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to a **Management Staff Member** for personal use.

M.   ***Credit, Debit or Charge Card*** means any card, plate or other similar device used for the purpose of obtaining **Money**, property, labor or services on credit or for immediate payment. The terms do not mean a note, check, draft, money order or other negotiable instrument.

N.   ***Crime Policy*** means, collectively, the Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto.

O.   ***Digital Signature*** means an electronic identifier created by computer, within, attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.

P.   ***Discover, Discovered,*** or ***Discovery*** means the moment when the **Insured**, any partner in the **Insured**, or **Management Staff Member**:

1.      first become(s) aware of facts that would cause a reasonable person to assume that a loss of a type covered by this **Crime Policy** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or

2.      first receive(s) notice of a claim against the **Insured** alleging facts which, if true, would constitute a loss under this **Crime Policy**,

whichever occurs first.

Q.   ***Electronic Data*** means facts or information converted to a form:

1.      usable in a **Computer System**;

2.      that does not provide instructions or directions to a **Computer System**; or

3.      that is stored on electronic processing media for use by a **Computer Program**.

R.   ***Electronic Signature*** means a **Digital Signature**, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

S.   ***Employee*** means:

1.      any natural person:

a.      while in the **Insured's** service or for 60 days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;

b.      who the **Insured** compensates directly by salary, wages or commissions; and

c.      who the **Insured** has the right to direct and control while performing services for the **Insured**;

2.      any natural person who is temporarily furnished to the **Insured**:

a.      to substitute for an **Employee** as set forth in paragraph 1. above, who is on medical, military or other leave of absence; or

b.      to meet seasonal or short-term workload conditions;

while that person is subject to the **Insured's** direction and control and performing services for the **Insured**; provided, any such natural person who has care and custody of property outside the **Premises** is specifically excluded from this definition;

3.      any natural person, other than a temporary **Employee** described in paragraph 2. above, who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

4.      any natural person:

a.      who is a member of the board of directors, member of the board of trustees or **LLC Manager** while acting as a member of any of the **Insured's** elected or appointed committees, including any member of such committee, to perform on the **Insured's** behalf, specific, as distinguished from general, directorial acts;

b.      who is a non-compensated officer;

c.      other than a non-compensated fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee** or officer;

d.      while acting as a non-compensated fund solicitor during fund raising campaigns;

e.      who is a former **Employee**, member of the board of directors, partner, **LLC Manager**, or member of the board of trustees retained as a consultant while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

f.      who is a guest student or intern pursuing studies or duties in any of the **Insured's** offices or **Premises**; while such person is subject to the **Insured's** direction and control and performing services for the **Insured**;

g.      who is a volunteer, while such person is subject to the **Insured's** direction and control and is performing services for the **Insured**, or

5.      any attorney retained by the **Insured**, and any employee of such attorney, while performing legal services for the **Insured**.

*Employee* also means any individual described in paragraphs 1-5 above while such person is on medical, military, or other leave of absence from the **Insured**. Coverage applies to any such **Employee** while on leave, regardless of whether such person remains subject to the **Insured's** direction and control during the time of leave.

*Employee* does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative or other person of the same general character not specified in paragraphs 1. through 5. above.

T.      *Employee Benefit Plan* means an employee welfare benefit plan or an employee pension benefit plan as more fully set forth in Title 1, Section 3 of the Employee Retirement Income Security Act of 1974 and any amendments thereto (ERISA) and which is solely sponsored by an **Employee Benefit Plan Sponsor**.

U.      **Employee Benefit Plan Sponsor** means:

1.      the **First Named Insured**,

2.      any **Subsidiary**, or

3.      any other entity listed in Item 1. of the Declarations.

V.    ***Fiduciary*** means any natural person who is a trustee, an officer, an **Employee** or an administrator of any **Employee Benefit Plan**; and any person, or a member of the board of directors, an officer, an **Officer-Shareholder**, a member of the board of trustees, an **LLC Manager**, or an **Employee** while that person is handling **Money**, **Securities** and **Other Property** that belongs to any **Employee Benefit Plan**.

Fiduciary does not mean any agent, broker, independent contractor, broker/dealer, registered representative, investment advisor, custodian or other person or entity of the same general character.

W.    ***Financial Institution*** means:
   1.    a bank, trust company, savings bank, credit union, savings and loan association or similar thrift institution; or
   2.    a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution.

X.    ***Financial Institution Premises*** means the interior of that portion of any building occupied by a **Financial Institution** (including any night depository chute and any safe maintained by such **Financial Institution**), transfer agent or registrar or similarly recognized place of safe deposit.

Y.    ***First Named Insured*** means the entity first named in ITEM 1 of the Declarations.

Z.    ***Forgery***, or ***Forged*** means the signing of the name of another person or organization with a handwritten signature physically affixed directly to a **Covered Instrument** or **Covered Personal Instrument**, without authority and with the intent to deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose.

AA.    ***Funds Transfer Fraud*** means:

   1.    an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from the **Transfer Account** which instruction purports to have been transmitted by the **Insured**, but was in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent;
   2.    a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged** or altered by someone other than the **Insured**  without the **Insured's** knowledge or consent; or
   3.    an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured**, which purports to have been transmitted by an **Employee**, but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** consent.

BB.    ***Identity Fraud*** means the act of knowingly transferring or using, without lawful authority, a means of identification of a **Management Staff Member** with the intent to commit, aid, or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable jurisdiction.

CC.    ***Identity Fraud Expense*** means:

   1.    costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

   2.    costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

3.   costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

4.   lost wages, up to a maximum payment of $1,000. per week for a maximum period of five (5) weeks, as a result of absence from employment:

   a.   to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;
   b.   to complete fraud affidavits or similar documents; or
   c.   due to wrongful incarceration arising solely from someone having committed a crime in the **Management Staff Member's** name; provided, that lost wages will not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

5.   loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

6.   reasonable attorney fees incurred, with the Company's prior written consent, for:
   a.   defense of lawsuits brought against the **Insured's Management Staff Member** by financial institutions, merchants, other credit grantors or their collection agencies;
   b.   the removal of any criminal or civil judgments wrongly entered against the **Insured's Management Staff Member**; or
   c.   challenging the accuracy or completeness of any information in a consumer credit report; and

7.   costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

*Identity Fraud Expense* does not include any expense or loss not listed in paragraphs 1. through 7. of this Definition CC..

DD.   *Insured* means:

   1.   for the purposes of Insuring Agreement A.2., any and all **Employee Benefit Plans**;
      a.   which have been established or maintained by an **Employee Benefit Plan Sponsor** as of the inception date of this **Crime Policy**, or
      b.   which have been created or acquired by an **Employee Benefit Plan Sponsor** after the inception date of this **Crime Policy**, subject to the provisions of General Agreements C and D.

   or

   2.   for the purposes of all other Insuring Agreements:
      a.   the **First Named Insured**,
      b.   any **Subsidiary**,
      c.   any **Sponsored Plan,** or
      d.   any other entity listed in Item 1. of the Declarations.

EE.   *LLC Manager* means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of a limited liability company.

FF.   *LLC Member* means any natural person who has an ownership interest in a limited liability company.

GG.    ***Management Staff Member*** means the **Insured's** proprietor, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **LLC Manager**, or **LLC Member**.

HH.    ***Messenger*** means any **Management Staff Member**, or relative thereof, any **Officer-Shareholder**, or any **Employee**, duly authorized, while having care and custody of covered property outside the **Premises**.

II.    ***Money*** means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

JJ.    ***Officer-Shareholder*** means any officer who has a 25% or greater ownership interest in any one or more **Insureds**.

KK.    ***Other Property*** means any tangible property other than **Money** and **Securities** that has intrinsic value.

LL.    ***Policy Period*** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations. In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Crime Policy**.

MM.    ***Premises*** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

NN.    ***Restoration Expense*** means reasonable costs incurred by the **Insured** to reproduce **Computer Programs** or **Electronic Data** and enable the **Insured** to restore the **Insured's Computer System** to the level of operational capability that existed immediately preceding a **Computer Violation**.

   **Restoration Expense** does not include:

   1.    the **Insured's** internal corporate costs and expenses, including **Employee** remuneration and any costs related to any legal action;

   2.    expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** recorded on media, including magnetic or optical media if there are no analyses files, specifications or backups of **Computer Programs** or **Electronic Data** held outside the **Premises**;

   3.    expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** if the **Insured** knowingly used illegal copies of programs;

   4.    expenses incurred to render the **Computer Programs** and **Electronic Data** usable by replacement processing equipment;

   5.    expenses incurred to design, update or improve **Computer Programs** or **Electronic Data** or to perfect their operation or performance;

   6.    expenses incurred as a result of alteration in **Computer Programs** and **Electronic Data** held on magnetic media due to the effect of magnetic fields, incorrect usage of the **Computer Programs** and **Electronic Data**, or the obsolescence of the **Computer System**;

   7.    the **Insured's** lost revenue, sales or profits; or

   8.    expenses incurred by any customer.

OO.    ***Robbery*** means the unlawful taking of **Money**, **Securities** and **Other Property** from the care and custody of the **Insured**, the **Insured's** partners or any other person (except any person acting as a watchperson or janitor) by one who has:

   1.    caused or threatened to cause that person bodily harm; or

   2.    committed an unlawful act witnessed by that person.

PP.    ***Safe Burglary*** means the unlawful taking of:

   1.    **Money**, **Securities** and **Other Property** from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

2.    a safe or vault from inside the **Premises**.

QQ.    **Securities** means written negotiable and non-negotiable instruments or contracts representing **Money** or property including:

1.    tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2.    evidences of debt issued in connection with any **Credit**, **Debit or Charge Card**, which cards are not issued by the **Insured**;

but does not include **Money**.

RR.    **Single Loss** means:

1.    for purposes of Insuring Agreement A.:

a.    an individual act;

b.    the combined total of all separate acts; or

c.    a series of related acts;

committed by an **Employee** or committed by more than one **Employee** acting alone or in collusion with other persons both during and before the **Policy Period**;

2.    for purposes of Insuring Agreements B. and H.1., all loss caused by any person, or loss in which that person is involved, whether the loss involves one or more written **Covered Instruments** or **Covered Personal Instruments**; and

3.    for purposes of all other Insuring Agreements:

a.    any act or series of related acts or events involving one or more persons; or

b.    any act, acts or events involving a person or group of persons acting together;

whether identified or not, both during and before the **Policy Period**.

SS.    **Sponsored Plan** means any employee benefit plan or employee pension benefit plan solely sponsored by any **Insured** that is not subject to the terms of ERISA.

TT.    **Subsidiary** means:

1.    any corporation, partnership, limited liability company or other entity, organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint, or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent; or

2.    subject to the provisions set forth in Section II. GENERAL AGREEMENTS D. ACQUISITIONS, of the Crime Terms and Conditions, any entity that the **Insured** acquires or forms during the **Policy Period** in which the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent.

**Subsidiary** does not include any entity in which any **Insured** is engaged as a participant in any type of joint venture unless such entity is specifically scheduled as an additional **Insured** by endorsement to this **Crime Policy**.

UU.    **Theft** means:

1.    under Insuring Agreement A.3., the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the deprivation of a **Client**;

2.    under Insuring Agreements C. or D., the intentional unlawful taking of **Money** and **Securities** to the **Insured's** deprivation.

3.    under all other Insuring Agreements, the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the **Insured's** deprivation.

VV.    ***Transfer Account*** means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

1.    by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

2.    by means of written instructions (other than those described in Insuring Agreements B. and H.1.) establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.


## IV.    EXCLUSIONS

A.    This **Crime Policy** will not apply to loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing.

B.    This **Crime Policy** will not apply to loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority.

C.    This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by the **Insured**, the **Insured's** natural person partners, any **LLC Member** or **Officer-Shareholder**, whether acting alone or in collusion with others; provided, this Exclusion C. will not apply to loss covered under Insuring Agreement A.2..

D.    This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by any **Employee** or **Fiduciary** whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2., A.3., F.2., or H..

E.    This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Funds Transfer Fraud**, unless covered under Insuring Agreements A.1., A.2., A.3., or G..

F.    This **Crime Policy** will not apply to loss resulting directly or indirectly from the **Insured's** acceptance of money orders or **Counterfeit Money**, unless covered under Insuring Agreements A.1., A.2., A.3. or E..

G.    This **Crime Policy** will not apply to loss or damages resulting directly or indirectly from the input of **Electronic Data** by a natural person having the authority to enter the **Insured's Computer System**, unless covered under Insuring Agreements A.1., A.2., A.3., F.2. or G..

H.    This **Crime Policy** will not apply to loss resulting directly or indirectly from forged, altered or fraudulent documents or written instruments used as source documentation in the preparation of **Electronic Data**, unless covered under Insuring Agreements A.1., A.2., or A.3..

I.    This **Crime Policy** will not apply to any expenses incurred by the **Insured** in establishing the existence or the amount of any loss covered under this **Crime Policy**, unless covered under Insuring Agreement I..

J.    This **Crime Policy** will not apply to loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by the **Insured** as the result of any loss covered under this **Crime Policy**.

K.    This **Crime Policy** will not apply to damages of any type, except the **Insured's** direct compensatory damages resulting from a loss covered under this **Crime Policy**.

L.      This **Crime Policy** will not apply to indirect or consequential loss of any nature, including fines, penalties, multiple or punitive damages.

M.      This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction or disclosure of any intangible property or confidential information including:

  1.      trade secret information, confidential processing methods or other confidential information or intellectual property of any kind, or **Electronic Data** unless otherwise covered under Insuring Agreement F.2.; or

  2.      **Computer Programs**.

N.      This **Crime Policy** will not apply to loss of, or damage to, manuscripts, records, accounts, microfilm, tapes or other records, whether written or electronic, or the cost of reproducing any information contained in such lost or damaged records, except when covered under Insuring Agreements C., D., or F.2..

O.      This **Crime Policy** will not apply to loss, or that part of any loss, the proof of which as to its existence or amount is dependent solely upon:

  1.      an inventory computation or physical count; or

  2.      a profit and loss computation;

provided that where the **Insured** establishes wholly apart from such computations or physical count that the **Insured** has sustained a loss covered under Insuring Agreements A.1., A.2, A.3. or F.1., then the **Insured** may offer the **Insured's** inventory records and an actual physical count of inventory in support of other evidence as to the amount of loss claimed.

P.      This **Crime Policy** will not apply to loss resulting directly or indirectly from trading whether or not in the name of the **Insured** or whether or not in a genuine or fictitious account, unless covered under Insuring Agreement A.1, A.2. or A.3..

Q.      This **Crime Policy** will not apply to loss resulting directly or indirectly from fire, except:

  1.      loss of or damage to **Money** or **Securities**; or

  2.      damage to any safe or vault caused by the application of fire thereto in connection with any actual or attempted **Safe Burglary** when covered under Insuring Agreement C..

R.      This **Crime Policy** will not apply to loss resulting directly or indirectly from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an **Employee**, except when covered under Insuring Agreement E..

S.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** while in the custody of any **Financial Institution**, trust company, or similarly recognized place of safe deposit or armored motor vehicle company unless the loss is in excess of the amount recovered or received by the **Insured** under the **Insured's** contract, if any, with, or insurance carried by, any of the aforementioned.

T.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** held by an armored motor vehicle company for the **Insured**, and which is stored by such company overnight inside buildings used in the conduct of its business.

U.      This **Crime Policy** will not apply to loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident.

V.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** resulting directly or indirectly from kidnap, extortion or ransom payments (other than **Robbery**) surrendered to any person as a result of a threat.

W.      This **Crime Policy** will not apply to loss resulting directly or indirectly from **Forgery** or alteration, except when covered under Insuring Agreements A.1., A.2., A.3., B., or H..

X.      This **Crime Policy** will not apply to loss resulting directly or indirectly from **Computer Fraud**, except when covered under Insuring Agreements A.1., A.2., A.3., F.1., or H.1..

Y.    This **Crime Policy** will not apply to loss under Insuring Agreements C. or D. resulting directly or indirectly from:

    1.    an accounting or arithmetical error or omission;

    2.    the loss of property from within any money operated device, unless the amount of **Money** deposited in it is recorded by a continuous recording device;

    3.    anyone, acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

    4.    damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them; or

    5.    damage to the **Premises** or its exterior or to containers of covered property by vandalism or malicious mischief.

Z.    This **Crime Policy** will not apply to loss resulting directly or indirectly from the diminution in value of **Money**, **Securities** or **Other Property**.

AA.    This **Crime Policy** will not apply to loss arising from any **Credit**, **Debit or Charge Card** if the **Insured**, the **Insured's Employee** or **Management Staff Member** has not fully complied with the provisions, conditions or other terms under which any card was issued.

BB.    This **Crime Policy** will not apply to loss sustained by any **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**, occurring at any time during which such entity was not a **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**.

CC.    This **Crime Policy** will not apply to loss sustained by the **Insured** or any **Subsidiary** to the extent it results in a benefit, gain or transfer to the **Insured** or any **Subsidiary**, except to the extent that such loss is covered under Insuring Agreement A.2..

---

## V.    CONDITIONS

## A.    GENERAL CONDITIONS

1.    Territory Covered

Except as indicated in Item 5. of the Declarations,

    a.    the Company will cover loss the **Insured** sustains anywhere in the world, and

    b.    the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to Sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

2.    Cooperation

The **Insured** must cooperate with the Company in all matters pertaining to this **Crime Policy** as stated in its terms, conditions and limitations.

3.    Extended Period to Discover Loss

The Company will pay the **Insured** for loss that the **Insured** sustained prior to the effective date of cancellation or termination of this **Crime Policy**, which is **Discovered** by the **Insured**:

    a.    no later than 90 days from the date of cancellation or termination; and

    b.    as respects any **Employee Benefit Plan**, no later than one (1) year from the date of cancellation or termination.

---

Notwithstanding the above, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

4.    Other Insurance

This **Crime Policy** applies only as excess insurance over, and will not contribute with: (1) any other valid and collectible insurance available to any **Insured** unless such insurance is written specifically excess of this **Crime Policy** by reference in such other policy to the Policy Number of this **Crime Policy**; and (2) indemnification to which any **Insured** is entitled from any other entity other than any **Insured**. As excess insurance, this **Crime Policy** will not apply or contribute to the payment of any loss to the **Insured** until the amount of such other insurance or indemnity has been exhausted by loss covered thereunder. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this **Crime Policy** will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This **Crime Policy** will not be subject to the terms of any other insurance.

Any loss that is applicable to this Condition A.4. is subject to both the applicable Single Loss Limit of Insurance and applicable Single Loss Retention shown in ITEM 5 of the Declarations.

If this **Crime Policy** replaces prior insurance that provided the **Insured** with an extended period of time after the termination or cancellation of such prior insurance in which to **Discover** loss, then, and only with respect to loss **Discovered** during such extended period but sustained prior to the termination of such prior insurance, the coverage afforded by this **Crime Policy** applies as follows:

a.    the Company will have no liability for such loss, unless the amount of such loss exceeds the limit of insurance of that prior insurance; provided, that in such case, the Company will pay the **Insured** for the excess of such loss subject to the terms and conditions of this **Crime Policy**; and

b.    any payment the Company makes to the **Insured** for such excess loss will not be greater than the difference between the limit of insurance of the **Insured's** prior insurance and the applicable Single Loss Limit of Insurance of this **Crime Policy**. The Company will not apply the applicable Single Loss Retention to such excess loss.

5.    Ownership of Property; Interests Covered

a.    The property covered under this **Crime Policy** except as provided in 5.b. below is limited to property:

i.    that the **Insured** owns or leases;

ii.    that the **Insured** holds for others:

(a)    on the **Insured's Premises** or the **Insured's Financial Institution Premises**; or

(b)    while in transit and in the care and custody of a **Messenger**; or

iii.    for which the **Insured** is legally liable, except for property located inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Policy** must be presented by the **Insured**.

b.    If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:

i.      that the **Insured's Client** owns or leases;

ii.     that the **Insured's Client** holds for others; or

iii.    for which the **Insured's Client** is legally liable;

while the property is inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization, including the **Insured's Client**. Any claim for loss by the **Insured's Client** that is covered under this **Crime Policy** must be presented by the **Insured**.

6.      Representation, Concealment, Misrepresentation or Fraud

No statement made by the **Insured**, whether contained in the application, underwriting information or otherwise, is deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

This **Crime Policy** is void in any case of fraud by the **Insured** as it relates to this **Crime Policy** at any time. This **Crime Policy** is also void if the **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

a.      this **Crime Policy**;

b.      the **Money**, **Securities** or **Other Property**;

c.      the **Insured's** interest in the **Money**, **Securities** or **Other Property**; or

d.      a claim under this **Crime Policy**.

7.      Premiums

The **First Named Insured** is responsible for the payment of all premiums and will be the payee for any return premiums the Company pays.

8.      Transfer of Rights and Duties Under this **Crime Policy**

Rights and duties under this **Crime Policy** may not be transferred without the Company's written consent except in the case of the death of a natural person **Insured**. If such person dies, then the decedent's rights and duties will be transferred to the decedent's legal representative, but only while acting within the scope of duties as the decedent's legal representative. Until a legal representative is appointed, anyone having proper temporary custody of the decedent's property will have all rights and duties but only with respect to that property.

## B.    PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT

1.      Limit of Insurance

a.      Policy Aggregate Limit of Insurance

If ITEM 5 of the Declarations indicates that this **Crime Policy** includes a Policy Aggregate Limit of Insurance, then the Company's total liability for all loss **Discovered** during the **Policy Period** will not exceed such Policy Aggregate Limit of Insurance. The Policy Aggregate Limit of Insurance will be reduced by the amount of any payment made under the terms of this **Crime Policy**. If the Policy Aggregate Limit of Insurance is exhausted by any payment made for loss **Discovered** during the **Policy Period**, the Company will have no further liability for loss regardless of when **Discovered** and whether or not previously reported to the Company.

If applicable, the Policy Aggregate Limit of Insurance will be reinstated to the extent of any net recovery pursuant to Condition B.6. that is received by the Company during the **Policy Period** and before the Crime Policy Aggregate Limit of Insurance is exhausted. Recovery from reinsurance or indemnity, or both, for the Company's benefit will not be deemed a recovery as used herein. In the event that a loss of **Securities** is settled by the Company through the use of a Lost Securities Bond, such loss will not reduce the Crime Policy Aggregate Limit of Insurance, but any payment under the Lost Securities Bond reduces the Policy Aggregate Limit of Insurance under this **Crime Policy**.

The provisions of this Condition B.1.a. will not be applicable to Insuring Agreement A.2.

If ITEM 5 of the Declarations indicates that this **Crime Policy** does not include a Crime Policy Aggregate Limit of Insurance, then payment of loss under this **Crime Policy** will not reduce the Single Loss Limit of Insurance for other **Single Losses**.

b.    Single Loss Limit of Insurance

The maximum Single Loss Limit of Insurance for each Insuring Agreement will not exceed the applicable amount set forth in ITEM 5 of the Declarations for such Insuring Agreement.

c.    Special Limit of Insurance for Specified Other Property

The Company's liability for loss under Insuring Agreements C. and D. is limited as follows

i.      the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss** involving precious metals, precious or semi-precious stones, pearls, furs, or completed articles made of or containing such enumerated materials that constitute more than half the value of such articles;

ii.     the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss**, including damage to manuscripts, drawings or records of any kind, or the cost of reconstructing them or reproducing any information contained in them;

The Special Limit of Insurance for Specified Other Property is part of, and not in addition to, any applicable limit of liability.

d.    Identity Fraud Expense Reimbursement Single Loss Limit of Insurance

The maximum limit of insurance per the **Insured's Management Staff Member** for each **Identity Fraud** covered under Insuring Agreement H.2. will not exceed the applicable Single Loss Limit of Insurance stated in ITEM 5 of the Declarations. All acts incidental to an **Identity Fraud**, any series of **Identity Frauds**, and all **Identity Frauds** arising from the same method of operation, whether committed by one or more persons, will be deemed to arise out of one act and will be treated as one **Identity Fraud**. If an act causes a covered loss under Insuring Agreement H.2. to more than one **Management Staff Member**, the applicable Single Loss Limit of Insurance and Retention under Insuring Agreement H.2. applies to each **Management Staff Member** separately.

e.    Loss Covered Under More Than One Insuring Agreement of this  **Crime Policy**

Subject to any applicable Crime Policy Aggregate Limit of Insurance, if any **Single Loss** is comprised of loss covered under more than one Insuring Agreement, the most the Company will pay the **Insured** for such **Single Loss** is the lesser of:

i.      the actual amount of such **Single Loss**; or

ii.     the sum of the Single Loss Limits of Insurance applicable to such Insuring Agreements applying to such loss.

2.    Single Loss Retention

The Company will not pay the **Insured** for any **Single Loss** unless the amount of such **Single Loss** exceeds the Single Loss Retention shown in Item 5 of the Declarations. The Company will pay the **Insured** the amount of any **Single Loss** in excess of the Single Loss Retention, up to the Single Loss Limit of Insurance for the applicable Insuring Agreement.

If more than one Single Loss Retention applies to the same **Single Loss**, then only the highest Single Loss Retention will be applied.

No Single Loss Retention applies to any legal expenses paid to the **Insured** solely under Insuring Agreement B.

3.    The Insured's Duties in the Event of a Loss

After the **Insured Discovers** a loss or a situation that may result in loss of or loss from damage to **Money**, **Securities** or **Other Property** that exceeds 25% of the Single Loss Retention, the **Insured** must:

a.     notify the Company as soon as possible;

b.     notify law enforcement authorities if the **Insured** has reason to believe that any loss, except for loss covered under Insuring Agreements A.1., A.2., A.3., or F.2., involves a violation of law;

c.     submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured's** answers;

d.     give the Company a detailed, sworn proof of loss within 120 days; and

e.     cooperate with the Company in the investigation and settlement of any claim.

Proof of loss under Insuring Agreement B. and H.1. must include: (1) an affidavit of **Forgery** setting forth the amount and cause of loss; and (2) the original written **Covered Instruments** or **Personal Covered Instruments** or a copy of such written instruments.

4.    Valuation / Settlement

Subject to the applicable limit of insurance provision (Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance) the Company will pay the **Insured** for:

a.     loss of **Money** but only up to and including its face value, and, at the Company's option, pay for loss of **Money** issued by any country other than the United States of America:

    i.     at face value in the **Money** issued by that country; or

    ii.    in the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**;

b.     loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**, and at the Company's option:

    i.     pay the **Insured** the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all the **Insured's** rights, title and interest in those **Securities**; or

ii.    pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**; provided, the Company will be liable only for the cost of the Lost Securities Bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was **Discovered**;

c.    loss of, or loss from damage to, **Other Property** or **Premises** including its exterior for the replacement cost without deduction for depreciation; provided, the Company will pay the **Insured** the lesser of the following:

i.    the applicable Single Loss Limit of Insurance;

ii.    the cost to replace **Other Property** or **Premises** including its exterior with property of comparable material and quality, and used for the same purpose; or

iii.    the amount  the **Insured** actually spends that is necessary to repair or replace such property;

provided, the Company will, at its option, pay the **Insured** for loss of, or loss from damage to, **Other Property** or **Premises** including its exterior, in the **Money** of the country in which the loss occurred, or in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**.

The Company will not pay the **Insured** on a replacement cost basis for any loss or damage until such property is actually repaired or replaced, and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. If the lost or damaged property is not repaired or replaced, the Company will pay the **Insured** actual cash value on the day the loss was **Discovered**.

Any property that the Company pays the **Insured** for or replaces becomes the Company's property.


5.    Records

The **Insured** must keep records of all **Money**, **Securities**, and **Other Property** under this **Crime Policy** so the Company can verify the amount of any loss.


6.    Recoveries

a.    All recoveries for payments made under this **Crime Policy** should be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

i.    first, to the **Insured** to reimburse the **Insured** for loss sustained that would have been paid under this **Crime Policy** but for the fact that it is in excess of the applicable Single Loss Limit(s) of Insurance;

ii.    second, to the Company in satisfaction of amounts paid or to be paid to the **Insured** in settlement of the **Insured's** covered claim;

iii.    third, to the **Insured** in satisfaction of any Single Loss Retention; and

iv.    fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Policy**.

b.    The value of all property received by the **Insured** from any source whatever and whenever received, in connection with any matter from which a loss has arisen, will be valued as of the date received and will be deducted from the covered loss.

c.    Recoveries do not include any recovery:

    i.    from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit; or

    ii.    of original **Securities** after duplicates of them have been issued.

7.    Transfer of the Insured's Rights of Recovery Against Others to the Company

The **Insured** must transfer to the Company all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the Company has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

8.    Legal Action Against the Company

The **Insured** may not bring any legal action against the Company involving loss:

a.    unless the **Insured** has complied with all the terms of this **Crime Policy**;

b.    until 90 days after the **Insured** has filed proof of loss with the Company; and

c.    unless brought within two (2) years from the date the **Insured Discovers** the loss.

If any limitation in this Condition B.8. is deemed to be inconsistent with applicable law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

9.    Liberalization

If the Company adopts any revision to the Crime Terms and Conditions of this **Crime Policy** that would broaden coverage and such revision does not require an additional premium or endorsement and the revision is adopted within 45 days prior to or during the **Policy Period**, the broadened coverage will apply to this **Crime Policy** as of the date the revision is approved for general use by the applicable department of insurance.

**C.    EMPLOYEE BENEFIT PLAN PROVISIONS – INFLATION GUARD**

In compliance with certain provisions of ERISA:

1.    if any **Employee Benefit Plan** is insured jointly with any other entity under this **Crime Policy**, the **Insured** must select a Single Loss Limit of Insurance for Insuring Agreement A.2. that is sufficient to provide an amount of insurance for each **Employee Benefit Plan** that is at least equal to that required if each **Employee Benefit Plan** were insured separately;

2.    if the **Insured** is an entity other than an **Employee Benefit Plan**, any payment the Company makes to the **Insured** for loss sustained by any **Employee Benefit Plan** will be held by such **Insured** for the use and benefit of the **Employee Benefit Plan(s)** sustaining the loss; and

3.    if two or more **Employee Benefit Plans** are covered under this **Crime Policy**, any payment the Company makes for loss:

a.    sustained by two or more **Employee Benefit Plans**; or

b.      of commingled **Money**, **Securities** or **Other Property** of two or more **Employee Benefit Plans**;

that arises out of a **Single Loss** is to be shared by each **Employee Benefit Plan** sustaining loss, in the proportion that the limit of insurance required under ERISA for each such **Employee Benefit Plan**, bears to the total of those limits of insurance.

4.      If, at the inception date of this **Crime Policy**, or a preceding policy written by the Company that provided ERISA fidelity coverage for **Employee Benefit Plans**, the **Insured** has or had a Single Loss Limit of Insurance under such ERISA fidelity coverage for **Employee Benefit Plans** that is or was equal to or greater than the limit of insurance required under ERISA, the Single Loss Limit of Insurance under Insuring Agreement A.2. will equal the greater of the amount of the limit of insurance required by ERISA or the Single Loss Limit of Insurance set forth in Item 5. of the Declarations for Insuring Agreement A.2.

## D.      CANCELLATION OR TERMINATION

1.      The **Insured** may cancel:

a.      this **Crime Policy** in its entirety;

b.      an Insuring Agreement; or

c.      coverage for any **Insured**;

by mailing or delivering to the Company advance written notice of cancellation.

2.      The Company may cancel:

a.      this **Crime Policy** in its entirety;

b.      an Insuring Agreement; or

c.      coverage for any **Insured**;

by mailing or delivering to the **First Named Insured** written notice of cancellation at least 20 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or 60 days before the effective date of cancellation if the Company cancels for any other reason.

The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the **Company**. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels this **Crime Policy**, the refund will be pro rata. If the **Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

3.      This **Crime Policy** terminates:

a.      in its entirety immediately upon the expiration of the **Policy Period**;

      b.      in its entirety immediately upon exhaustion of the Policy Aggregate Limit of Insurance, if applicable; provided, that no **Crime Policy** termination under this Condition D.3.b. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.;

      c.      in its entirety immediately upon the voluntary liquidation or dissolution of the **First Named Insured**; provided, that no **Crime Policy** termination under this Condition D.3.c. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.; or

      d.      as to any **Subsidiary** immediately upon the **Change of Control** of such **Subsidiary**.

4.      This **Crime Policy** terminates as to any **Employee**:

      a.      as soon as the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of $10,000; or

      b.      60 days after the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in the **Insured's** service, during the term of employment by the **Insured** or prior to employment by the **Insured**, provided such dishonest or fraudulent non-employment related act involved **Money**, **Securities** or **Other Property** is in an amount in excess of $10,000.

## E.    CHANGES

Only the **First Named Insured** is authorized to make changes in the terms of this **Crime Policy** and solely with the Company's prior written consent. This **Crime Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Crime Policy**. Notice to any representative of the **Insured** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Crime Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Crime Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Crime Policy** issued by the Company.

## F.    ENTIRE AGREEMENT

The Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto, constitute the entire agreement between the **Insured** and the Company.

## G.    HEADINGS

The titles of the various paragraphs of this **Crime Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

©2009 The Travelers Companies, Inc. All Rights Reserved

> **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED DUTIES IN THE EVENT OF LOSS ENDORSEMENT
## (KNOWLEDGE BY CORPORATE OFFICIALS)

This endorsement modifies the following coverage:

**Crime**

---

**It is agreed that:**

Solely with respect to the coverage shown above:

1.  Section III. DEFINITIONS P. *Discover*, *Discovered*, or *Discovery* is replaced by the following:

    P.    *Discover*, *Discovered*, or *Discovery* means the moment when any Corporate Official designated in the SCHEDULE below:

    1.  first become(s) aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Policy** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or

    2.  first receive(s) notice of an actual or potential claim against the **Insured** alleging facts which if true would constitute a loss under this **Crime Policy**.

    Notwithstanding the use of the phrases, "**Discovered** by the **Insured**," and, "the **Insured Discovers**," throughout this **Crime Policy**, **Discovery** is limited to any Corporate Official designated in the SCHEDULE below and any such phrases will be read consistent with this limitation.

2.  Section II. GENERAL AGREEMENTS A.2. is replaced by the following:

    A.  JOINT INSURED:

    2.  If any Corporate Official designated in the SCHEDULE below has knowledge of any information relevant to this **Crime Policy**, that knowledge is considered knowledge of every **Insured**.

SCHEDULE

**Corporate Official:**

**CEO, CFO, HR Manager, Risk Manager, General Counsel or the functional equivalents thereof;**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **107756394**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ENDORSEMENT AMENDING GENERAL AGREEMENT C. – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS

This endorsement changes the following:

**Crime**

It is agreed that solely with respect to the coverage shown above:

The following replaces the second paragraph of section ***II. GENERAL AGREEMENTS***, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS:

> The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed 35% of the total assets of all **Insureds** as reflected in the **Insured's** most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2012 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

The following replaces section *III. DEFINITIONS*, **S. Employee**, 1.a.:

1.      any natural person:

      a.      while in the **Insured's** service or for 90 days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

CRI-19024 Ed. 04-12                                                                                                  Page 1 of 1
© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REPLACE GENERAL AGREEMENT E. - CHANGE OF CONTROL - NOTICE REQUIREMENTS ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

The following replaces section **II. GENERAL AGREEMENTS**, **E. CHANGE OF CONTROL – NOTICE REQUIREMENTS**:

**E.      CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to the **First Named Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2013 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT – ADDING FINANCIAL INTEREST COVERAGE AND SANCTIONS CONDITION AND AMENDING TERRITORY CONDITION

This endorsement changes the following:

**Crime**

**It is agreed that:**

1.  The following is added to section **III. DEFINITIONS**:

    ***Financial Interest*** means the **First Named Insured's** insurable interest in an **Insured** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **First Named Insured's**:

    1.  ownership of the majority of the outstanding securities or voting rights of the **Insured** representing the present right to elect, appoint, or exercise a majority control over such **Insured's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

    2.  indemnification of, or representation that it has an obligation to indemnify, the **Insured** for loss sustained by such **Insured**; or

    3.  election or obligation to obtain insurance for such **Insured**.

2.  The following replaces section **V. CONDITIONS**, **A. GENERAL CONDITIONS**, 1., Territory Covered:

    1.  Territory Covered

        a.  Except as indicated in Item 5. of the Declarations,

            i.   the Company will cover loss the **Insured** sustains anywhere in the world, and

            ii.  the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

        b.  This **Crime Policy** does not apply to:

            i.   loss sustained by an **Insured** domiciled; or

            ii.  loss of **Other Property** located,

            in any country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

        c.  In the event an **Insured** sustains loss referenced in b. above to which this **Crime Policy** would have applied, the Company will reimburse the **First Named Insured** for its loss, on account of its **Financial Interest** in such **Insured**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2015 The Travelers Indemnity Company. All rights reserved.

3.      The following is added to section **V. CONDITIONS**, **B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT**:

In the event the Company reimburses the **First Named Insured** on account of its **Financial Interest** in an **Insured**, as a condition precedent to exercising rights under this **Crime Policy**, the **First Named Insured** will cause the **Insured** to comply with the conditions of this **Crime Policy**.

4       The following is added to section **V. CONDITIONS**:

**SANCTIONS**

This **Crime Policy** will provide coverage for any loss or expenses, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition or restriction.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDATORY ENDORSEMENT FOR CERTAIN ERISA CONSIDERATIONS

This endorsement changes the following:

**Crime**

It is agreed that:

1. The following replaces section **I. INSURING AGREEMENTS**, A. 2. ERISA Fidelity:

   2. ERISA Fidelity

   The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by acts of **Fraud or Dishonesty** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

2. The following is added to section **III. DEFINITIONS**:

   ***Fraud or Dishonesty*** has the meaning set forth in Title 29, Code of Federal Regulations, Section 2580.412-9.

   ***Handled or Handling*** mean "handle", "handled", "handles" or "handling" as these terms are set forth in Title 29, Code of Federal Regulations, Section 2580.412-6.

3. The following replaces section **III. DEFINITIONS**, V.

   V. ***Fiduciary*** means:

   1. any natural person who is a trustee, officer, **Employee**, or an administrator, of any **Employee Benefit Plan**; or

   2. any natural person who is a member of the board of directors, member of the board of trustees, a partner, an **LLC Manager**, an **LLC Member**, an **Officer-Shareholder**, an officer, or an **Employee**, of any **Employee Benefit Plan Sponsor**; while that person is **Handling Money**, **Securities**, or **Other Property** that belongs to an **Employee Benefit Plan**.

   **Fiduciary** does not mean any agent, broker, independent contractor, third party administrator, broker-dealer, registered representative, investment advisor, custodian, or other person or entity of the same general character.

4. The following replaces section **IV. EXCLUSIONS**, M and Z:

   M. This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction, or disclosure of any intangible property or confidential information, including:

   1. trade secret information, confidential processing methods, or other confidential information or intellectual property of any kind, or **Electronic Data**, unless otherwise covered under Insuring Agreement F.2.; or

   2. **Computer Programs**,

   provided that this exclusion will not apply to loss that is otherwise covered under Insuring Agreement A. 2., ERISA Fidelity caused by a **Fiduciary's** access to, use of, or disclosure of, such intangible property or confidential information to commit acts of **Fraud or Dishonesty**.

   Z. This **Crime Policy** will not apply to loss resulting directly or indirectly from the diminution in value of **Money**, **Securities**, or **Other Property**, provided that this exclusion will not apply to loss that is otherwise covered under Insuring Agreement A. 2., ERISA Fidelity caused by a **Fiduciary's** acts of **Fraud or Dishonesty**.

---

Issuing Company:     **Travelers Casualty and Surety Company of America**

Policy Number:     **107756394**

© 2017 The Travelers Indemnity Company. All rights reserved.

5.  The following replaces section **V. CONDITIONS, A. GENERAL CONDITIONS**, 3. Extended Period to Discover Loss:

3. Extended Period to Discover Loss

The Company will pay the **Insured** for loss that the **Insured** sustained prior to the effective date of cancellation or termination of this **Crime Policy**, which is **Discovered** by the **Insured**:

    a.  no later than 90 days from the date of cancellation or termination; and

    b.  as respects any **Employee Benefit Plan**, no later than one year from the date of cancellation or termination.

Notwithstanding the above, with respect to all Insuring Agreements other than Insuring Agreement A.2. ERISA Fidelity, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**. With respect to Insuring Agreement A.2. ERISA Fidelity, the extended period to Discover Loss terminates upon the effective date of any other insurance obtained by the **Employee Benefit Plan Sponsor** or the **Employee Benefit Plan** that offers the same coverage afforded by this **Crime Policy** in an amount no less than the minimum amount required under ERISA section 412 and that provides coverage for loss sustained prior to its effective date.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TELECOMMUNICATION FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| | Single Loss Limit of Insurance | Single Loss Retention |
|---|---|---|
| **Telecommunication Fraud** | $100,000 | $5,000 |

2. The following is added to section **I. INSURING AGREEMENTS**:

   **TELECOMMUNICATION FRAUD**

   The Company will pay the **Insured** for its **Telecommunication Charges** directly caused by **Telecommunication Fraud**.

3. The following are added to section **III. DEFINITIONS**:

   Whenever appearing in this **Crime Policy**, the following words and phrases appearing in bold type have the meanings set forth in this Section III. DEFINITIONS:

   *Telecommunication Charges* mean amounts charged to the **Insured** by its telephone service provider.

   *Telecommunication Fraud* means the unauthorized access to, or use of, the **Insured's** telephone system by a person or entity other than an **Employee**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### SOCIAL ENGINEERING FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1. The following is added to ITEM 5. of the Declarations:

| Insuring Agreement | Single Loss Limit of Insurance | Single Loss Retention |
|---|---|---|
| **Social Engineering Fraud** | $100,000 | $5,000 |

2. The following **INSURING AGREEMENT** is added to section **I. INSURING AGREEMENTS**:

   **SOCIAL ENGINEERING FRAUD**

   The Company will pay the **Insured** for the **Insured's** direct loss from the transferring, paying or delivering of **Money** or **Securities**, directly caused by **Social Engineering Fraud**.

3. The following are added to section **III. DEFINITIONS**:

   *Authorized Person* means an **Officer-Shareholder**, sole proprietor, director, trustee, natural person partner, **LLC Manager** or **LLC Member** who is authorized by the **Insured** to transfer, pay, or deliver **Money** or **Securities** or to instruct **Employees** or other **Authorized Persons** to transfer, pay, or deliver **Money** or **Securities**.

   *Communication* means an electronic, telegraphic, cable, teletype, telephonic voice, telefacsimile, or written instruction received by an **Employee** or **Authorized Person** that:

   1. directs the **Employee** or **Authorized Person** to transfer, pay, or deliver **Money** or **Securities**;
   2. contains a misrepresentation of a material fact; and
   3. is relied upon by the **Employee** or **Authorized Person**, believing the material fact to be true.

   *Social Engineering Fraud* means the intentional misleading of an **Employee** or **Authorized Person** by a natural person impersonating:

   1. a **Vendor**, or that **Vendor's** attorney;
   2. a **Client**, or that **Client's** attorney;
   3. an **Employee**; or
   4. an **Authorized Person**,

   through the use of a **Communication**.

   *Vendor* means an entity or natural person that has provided goods or services to the **Insured** under a genuine, pre-existing, written agreement or other agreed-upon arrangement.

   **Vendor** does not include any **Financial Institution**, asset manager, armored motor vehicle company, or similar entity.

4. The following replaces section **III. DEFINITIONS**, G. **Computer System**:

   G. *Computer System* means:

   1. any computer; and
   2. any input, output, processing, storage, or communication device, or any related network, cloud service, operating system, or application software, that is connected to, or used in connection with, such computer,

   that is rented by, owned by, leased by, licensed to, or under the direct operational control of, the **Insured**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

5. Solely with respect to the Social Engineering Fraud Insuring Agreement, the following replaces section **III. DEFINITIONS**, C. **Client**:

    C. ***Client*** means an entity or natural person for which the **Insured** provides goods or performs services, for a fee, or as specified in a pre-existing written agreement, but only while the written agreement is in effect.

6. The following replaces section **III. DEFINITIONS**, E. **Computer Fraud**:

    E. ***Computer Fraud*** means an intentional, unauthorized, and fraudulent entry or change of data or computer instructions directly into a **Computer System**:

        1. by a natural person or entity, other than an **Employee**, **Authorized Person**, independent contractor, or any individual under the direct supervision of the **Insured**, including any such entry or change made via the internet, provided that such entry or change causes **Money**, **Securities**, or **Other Property** to be transferred, paid, or delivered from inside the **Premises** or from the **Insured's Financial Institution Premises**, to a place outside the **Premises** or the **Insured's Financial Institution Premises**; or

        2. made by an **Employee** or **Authorized Person** acting in good faith upon an intentional, unauthorized, and fraudulent instruction received from a computer software contractor who has a written agreement with the **Insured** to design, implement, or service **Computer Programs** for a **Computer System** covered under section **I. INSURING AGREEMENTS, F. COMPUTER CRIME** .

    For purposes of this definition, an intentional, unauthorized, and fraudulent entry or change of data or computer instructions does not include such entry or change made by an **Employee**, **Authorized Person**, independent contractor, or any individual under the direct supervision of the **Insured** made in reliance upon any fraudulent electronic, cable, teletype, telephonic voice, telefacsimile, or written instruction, except as defined in E.2. above. An intentional, unauthorized, and fraudulent entry or change of data or computer instructions also does not include such entry or change that involves the use, or purported use, of any **Credit, Debit, or Charge Card** or any access, convenience, identification, stored value, or other similar cards, including the information contained on such cards.

    **Computer Fraud** does not include **Social Engineering Fraud** or **Funds Transfer Fraud**.

7. The following replaces section **III. DEFINITIONS**, AA. **Funds Transfer Fraud**:

    AA. ***Funds Transfer Fraud*** means:

        1. an electronic, telegraphic, cable, teletype, or telephone instruction, fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay, or deliver **Money** or **Securities** from the **Transfer Account** , which instruction purports to have been transmitted by the **Insured** but was in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent; or

        2. a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay, or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged**, or altered by someone other than the **Insured** without the **Insured's** knowledge or consent.

    **Funds Transfer Fraud** does not include **Social Engineering Fraud**.

8. The following replaces section **III. DEFINITIONS**, DD. **Insured**:

    DD. ***Insured*** means:

        1. for the purposes of Insuring Agreement A.2. and the Social Engineering Fraud Insuring Agreement, any and all **Employee Benefit Plans**:

           a. which have been established or maintained by an **Employee Benefit Plan Sponsor** as of the inception date of this **Crime Policy**; or

           b. which have been created or acquired by an **Employee Benefit Plan Sponsor** after the inception date of this **Crime Policy**, subject to the provisions of General Agreements C. and D.

        2. for the purposes of all Insuring Agreements, except Insuring Agreement A.2.:

           a. the **First Named Insured**,

           b. any **Subsidiary**,

           c. any **Sponsored Plan**, or

           d. any other entity listed in Item 1. of the Declarations.

© 2019 The Travelers Indemnity Company. All rights reserved.

9.  The following replaces section **IV. EXCLUSIONS**, G., H., and R.:

G.  This **Crime Policy** will not apply to loss or damages resulting directly or indirectly from the input of **Electronic Data** by a natural person having the authority to enter the **Computer System**, unless covered under Insuring Agreements A.1., A.2., A.3., F.1., but only when covered under section III. DEFINITIONS, E., **Computer Fraud**, 2., F.2., G., or the Social Engineering Fraud Insuring Agreement.

H.  This **Crime Policy** will not apply to loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter **Electronic Data** or send instructions, provided this does not apply to Insuring Agreements A.1., A.2., A.3., or the Social Engineering Fraud Insuring Agreement.

R.  This **Crime Policy** will not apply to loss resulting directly or indirectly from:

1.  the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether genuine or fictitious; or

2.  any other giving or surrendering of, or voluntary parting with, **Money**, **Securities** or **Other Property**, whether or not induced by any dishonest or fraudulent act, except when covered under:

    a.  Insuring Agreement A.;

    b.  Insuring Agreement E.;

    c.  Insuring Agreement F1., or

    d.  the Social Engineering Fraud Insuring Agreement.

10.  Solely with respect to the Social Engineering Fraud Insuring Agreement, the following replaces section **IV. EXCLUSIONS**, T.:

T.  This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property**:

1.  while in the mail; or

2.  while in the custody of any messenger, carrier for hire, or armored motor vehicle company.

11.  Solely with respect to the Social Engineering Fraud Insuring Agreement, the following are added to section **IV. EXCLUSIONS**:

This **Crime Policy** will not apply to:

a.  loss or damage due to **Theft** by an **Employee**, **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, or acceptance of money orders or **Counterfeit Money**;

b.  loss due to any investment in **Securities**, or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;

c.  loss due to the failure, malfunction, illegitimacy, inappropriateness, or inadequacy of any product or service;

d.  loss resulting directly or indirectly from the failure of any party to perform in whole or in part under any contract;

e.  loss due to any non-payment of or default upon any loan, extension of credit, or similar promise to pay;

f.  loss due to any party's use of or acceptance of any **Credit**, **Debit or Charge Card** or any access, convenience, identification, stored value or other similar card or instrument, including the information contained on such cards, whether or not genuine; or

g.  loss due to items of deposit which are not finally paid for any reason, including forgery or any other fraud; however, this exclusion does not apply to United States Government checks or drafts that are returned by the United States Government for any reason after the funds for said checks or drafts have been credited to the **Insured's** account at a **Financial Institution**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### DELETE EXCLUSION FOR PRIOR LOSSES INVOLVING SUBSIDIARIES ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

Section **IV. EXCLUSIONS**, BB. is deleted.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2020 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BLANKET CLIENT AND SERVICE BROKER / AMEND DEFINITION OF EMPLOYEE / AMEND CLIENT PROPERTY LOCATION ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1. The following is added to section **III. DEFINITIONS**:

   ***Service Broker*** means an entity, person or association with which the **Insured** has a written agreement for the **Insured** to perform services for **Clients** that are specified in the written agreement, but only while the written agreement is in effect.

2. The following replaces section **III. DEFINITIONS, C. Client**:

   C. ***Client*** means an entity, person or association for which the **Insured** performs services as specified in a written agreement between the **Insured** and:

   1. such entity, person or association; or
   2. a **Service Broker**,

   but only while the written agreement remains in effect.

3. Section **III. DEFINITIONS, D. Client Premises** is deleted.

4. Solely with respect to section **I. INSURING AGREEMENTS, A. FIDELITY 3. Employee Theft of Client Property** , the following replaces the final paragraph of section **III. DEFINITIONS, S. Employee**:

   **Employee** does not mean any agent, broker, factor, commission merchant, consignee, representative or other person of the same general character not specified in paragraphs 1. through 5. above.

5. The following replaces section **V. CONDITIONS, A.5.b.**:

   b. If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:

   i. that the **Insured's Client** owns or leases;
   ii. that the **Insured's Client** holds for others; or
   iii. for which the **Insured's Client** is legally liable.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization, including the **Insured's Service Broker** or **Client**. Any claim for loss by the **Insured's Client** that is covered under this **Crime Policy** must be presented by the **Insured**.

At the written request of the **Insured**, loss payable under Insuring Agreement A.3. Employee Theft of Client Property, if any, will be payable jointly to the **Insured** and the **Insured's Client**, as their interests may appear.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### AMEND EXTENDED PERIOD TO DISCOVER LOSS ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

**It is agreed that:**

Solely with respect to the coverage shown above:

Section V. CONDITIONS A.3.a. is replaced with the following:

    a.       no later than **120**  days from the date of cancellation or termination; and

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 107756394

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## COLORADO CANCELLATION OR TERMINATION ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1.    The following replaces section ***V., CONDITIONS***, **D.2.**:

      2.    The Company may cancel:

          a.    this **Crime Policy** in its entirety;
          b.    an Insuring Agreement; or
          c.    coverage for any **Insured**;

      by mailing or delivering to the **First Named Insured** written notice of cancellation at least 20 days (number of days must equal or exceed 20 days) before the effective date of cancellation if the Company cancels for nonpayment of premium; or 60 days (number of days must equal or exceed 60) days before the effective date of cancellation if the Company cancels for any reason scheduled below. The Company may cancel for any of the following reasons:

          a.    nonpayment of premium
          b.    false statement knowingly made on the application for insurance, or
          c.    substantial change in the exposure or risk from what was indicated on the application.

      The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the Company. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due, computed on a pro-rata basis. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

2.    The following is added to section ***V., CONDITIONS***, **D. CANCELLATION OR TERMINATION**:

      5.    The Company will not be required to renew this **Crime Policy** upon its expiration. If the Company elects not to renew, the Company will provide to the **First Named Insured** written notice to that effect at least 30 days (number of days must equal or exceed 30 days) before the Expiration Date set forth in ITEM 2 of the Declarations if the Company is nonrenewing for nonpayment of premium, or 45 days (number of days must equal or exceed 45 days) in advance if the Company is nonrenewing for any other reason. All cancellation and nonrenewal notices will be sent by first class mail.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

©2013 The Travelers Indemnity Company, Inc. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## COLORADO CANCELLATION OR TERMINATION ENDORSEMENT – NONPAYMENT OF PREMIUM

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1.  The following replaces section **_V., CONDITIONS_**, **D.2.**:

    2.  The Company may cancel this **Crime Policy** for failure to pay a premium when due by mailing or delivering to the **First Named Insured** written notice of cancellation at least **20** days (number of days must equal or exceed 20 days) before the effective date of cancellation, unless the Company receives payment in full within 20 days of the **First Named Insured's** receipt of such notice of cancellation. The Company will have the right to the premium amount for the portion of the **Policy Period** during which this **Crime Policy** was in effect.

        The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the Company. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date unless the Company receives payment in full within 20 days of the **First Named Insured's** receipt of such notice of Cancellation. If notice is mailed, proof of mailing will be sufficient proof of notice.

2.  The following is added to section **_V., CONDITIONS_**, **D. CANCELLATION OR TERMINATION**:

    5.  The Company will not be required to renew this **Crime Policy** upon its expiration. If the Company elects not to renew this **Crime Policy**, the Company will deliver or mail to the **First Named Insured** written notice to that effect **30** days (number of days must equal or exceed 30 days) before the Expiration Date set forth in ITEM 2 of the Declarations.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND CANCELLATION AS TO ANY EMPLOYEE ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

The following replaces section **V. CONDITIONS D.4.**:

4.      This **Crime Policy** terminates as to any **Employee**:

      a.      as soon as the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of $25,000.; or

      b.      60 days after the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in the **Insured's** service, during the term of employment by the **Insured** or prior to employment by the **Insured**, provided such dishonest or fraudulent non-employment related act involved **Money, Securities** or **Other Property** in an amount in excess of $25,000.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2013 The Travelers Indemnity Company. All rights reserved.

Liability Insuring Agreements ......................................... 1
 Privacy And Security. ....................................................1
 Media. ...........................................................................1
 Regulatory Proceedings. ..............................................1
Breach Response Insuring Agreements ............................ 1
 Privacy Breach Notification. ..........................................1
 Computer And Legal Experts. .......................................1
 Betterment. ...................................................................1
 Cyber Extortion. ............................................................1
 Data Restoration. ..........................................................1
 Public Relations. ...........................................................1
Cyber Crime Insuring Agreements..................................... 1
 Computer Fraud. ...........................................................1
 Funds Transfer Fraud. ..................................................1
 Social Engineering Fraud. .............................................2
 Telecom Fraud. .............................................................2
Business Loss Insuring Agreements .................................. 2
 Business Interruption. ...................................................2
 Dependent Business Interruption. .................................2
 Reputation Harm. ..........................................................2
Definitions ......................................................................... 2
  Accounting Costs. ........................................................2
  Additional Insured. .......................................................2
  Adverse Media Report. .................................................2
  Approved Provider. .......................................................2
  Automatic ERP. ............................................................2
  Betterment Costs. .........................................................2
  Business Interruption Loss. ..........................................3
  Change Of Control. .......................................................3
  Claim. ...........................................................................3
  Client. ...........................................................................3
  Computer And Legal Expert Costs. ..............................3
  Computer Fraud. ..........................................................4
  Computer System. ........................................................4
  Confidential Information. ...............................................4
  Covered Material. .........................................................4
  Cyber Extortion Costs. .................................................4
  Cyber Extortion Threat. ................................................4
  Defense Costs. .............................................................4
  Discover, Discovered, Discovery. .................................5
  Employee. .....................................................................5
  Executive Officer. .........................................................5
  Extra Expense. .............................................................5
  First Party Event. ..........................................................5
  First Party Insuring Agreements. ..................................6
  First Party Loss. ...........................................................6
  Funds Transfer Fraud. ..................................................6
  Impacted Parties. .........................................................6
  Income Loss. ................................................................6
  Independent Contractor. ...............................................7

Insured. .........................................................................7
Insured Entity. ...............................................................7
Insured Person. .............................................................7
IT Provider. ....................................................................7
IT Provider Breach. ........................................................7
Loss. ..............................................................................7
Media Act. ......................................................................8
Merchant Service Agreement. ........................................8
Money. ...........................................................................8
Notification. ....................................................................8
Optional ERP. ................................................................8
Other Property. ..............................................................8
Payment Card Contract Penalties. .................................8
Payment Card Security Standards. ................................9
Period Of Indemnity. ......................................................9
Period Of Restoration. ...................................................9
Policy Period. .................................................................9
Pollutant. ........................................................................9
Potential Claim. ..............................................................9
Privacy And Security Act. ..............................................9
Privacy Breach. ..............................................................9
Privacy Breach Notification Costs. .................................9
Privacy Policy. ................................................................9
Public Relations Costs. ................................................10
Ransom. .......................................................................10
Regulatory Costs. .........................................................10
Regulatory Proceeding. ................................................10
Reputation Harm. .........................................................10
Restoration Costs. ........................................................10
Run-Off Period. .............................................................10
Securities. .....................................................................10
Security Breach. ...........................................................10
Social Engineering Fraud. ............................................11
Subsidiary. ....................................................................11
System Failure. .............................................................11
Telecom Charges. .........................................................11
Telecom Fraud. .............................................................11
Vendor. .........................................................................11
Virtual Currency. ...........................................................11
Virus. ............................................................................11
Wait Period. ..................................................................11
Wrongful Act. ................................................................11
Exclusions ...................................................................... 12
Assumed Liability. ........................................................12
Bodily Injury. ................................................................12
Conduct. .......................................................................12
Cyber Crime. ................................................................12
Government Action. ......................................................13
Infrastructure. ...............................................................13
Insured vs. Insured. ......................................................13

Intellectual Property. ...................................................13
Labor Disputes. ...........................................................13
Licensing And Royalties. ..............................................13
Ownership Rights. .......................................................13
Physical Peril. ..............................................................13
Pollution. .....................................................................14
Prior Acts. ....................................................................14
Prior Matters. ..............................................................14
Property Damage. ........................................................14
Securities Laws. ...........................................................14
Unlawful Collection. ....................................................15
Unsolicited Communications. .....................................15
War. ..............................................................................15

**Limits And Retentions** ...............................................15
Limit Of Insurance. .....................................................15
Retention. ....................................................................15

**Other Conditions** .......................................................16
Allocation. ...................................................................16
Cancelation And Nonrenewal. ....................................16
Change Of Structure. ..................................................16
Claim Defense. ............................................................16
Cyber Crime And Business Loss Change. ...................17
ERP – Automatic. ........................................................17
ERP – Optional. ...........................................................17
Extended Discovery Period. .........................................17
Income Loss Appraisal. ...............................................18
Notice Of Claim. .........................................................18
Notice Of First Party Event. ........................................18
Other Insurance. .........................................................18
Property Covered. ........................................................18
Recovery And Subrogation. .........................................19
Related Claims. ...........................................................19
Representations. ..........................................................19
Settlement. ..................................................................19
Subsidiaries. ................................................................19
Suits Against The Insurer – Cyber Crime. ..................20
Valuation Under First Party Insuring Agreements. ............20



**CyberRisk Coverage**

Only the Insuring Agreements with Limits shown in the CyberRisk Declarations apply.

## Liability Insuring Agreements

| | |
|---|---|
| **Privacy And Security.** | The Insurer will pay *Loss* on behalf of the *Insured*, resulting from a *Claim* that is first made during the *Policy Period*, or any applicable extended reporting period, for a *Privacy And Security Act*. |
| **Media.** | The Insurer will pay *Loss* on behalf of the *Insured*, resulting from a *Claim* that is first made during the *Policy Period*, or any applicable extended reporting period, for a *Media Act*. |
| **Regulatory Proceedings.** | The Insurer will pay *Defense Costs* and *Regulatory Costs* on behalf of the *Insured*, resulting from a *Regulatory Proceeding* that is first commenced during the *Policy Period*, or any applicable extended reporting period, for a *Privacy And Security Act* or *Media Act*. |

## Breach Response Insuring Agreements

| | |
|---|---|
| **Privacy Breach Notification.** | The Insurer will reimburse, or pay on behalf of, the *Insured* for *Privacy Breach Notification Costs* resulting from an actual or suspected *Privacy Breach* that is *Discovered* during the *Policy Period*, or any extended discovery period. |
| **Computer And Legal Experts.** | The Insurer will reimburse, or pay on behalf of, the *Insured* for *Computer And Legal Expert Costs* resulting from an actual or suspected:<br>1. *Privacy Breach*;<br>2. *Security Breach*; or<br>3. *Cyber Extortion Threat*,<br>that is *Discovered* during the *Policy Period*, or any extended discovery period. |
| **Betterment.** | The Insurer will reimburse the *Insured* for *Betterment Costs*, following a *Security Breach* that is *Discovered* during the *Policy Period*. |
| **Cyber Extortion.** | The Insurer will reimburse, or pay on behalf of, the *Insured* for *Cyber Extortion Costs*, resulting from a *Cyber Extortion Threat* that is *Discovered* during the *Policy Period*. |
| **Data Restoration.** | The Insurer will reimburse, or pay on behalf of, the *Insured* for *Restoration Costs*, directly caused by a *Security Breach* that is *Discovered* during the *Policy Period*. |
| **Public Relations.** | The Insurer will reimburse, or pay on behalf of, the *Insured* for *Public Relations Costs*, resulting from an actual or suspected:<br>1. *Privacy And Security Act*; or<br>2. *Media Act*,<br>that is *Discovered* during the *Policy Period*, or any extended discovery period. |

## Cyber Crime Insuring Agreements

| | |
|---|---|
| **Computer Fraud.** | The Insurer will pay the *Insured Entity* for its direct loss of *Money*, *Securities*, or *Other Property*, directly caused by *Computer Fraud* that is *Discovered* during the *Policy Period*. |
| **Funds Transfer Fraud.** | The Insurer will pay the *Insured Entity* for its direct loss of *Money* or *Securities*, directly caused by *Funds Transfer Fraud* that is *Discovered* during the *Policy Period*. |

© 2020 The Travelers Indemnity Company. All rights reserved.

*Cyber Crime Insuring Agreements continued from previous page.*

| | |
|---|---|
| **Social Engineering Fraud.** | The Insurer will pay the *Insured Entity* for its direct loss of *Money* or *Securities*, directly caused by *Social Engineering Fraud* that is *Discovered* during the *Policy Period*. |
| **Telecom Fraud.** | The Insurer will pay the *Insured Entity* for its *Telecom Charges*, directly caused by *Telecom Fraud* that is *Discovered* during the *Policy Period*. |

## Business Loss Insuring Agreements

| | |
|---|---|
| **Business Interruption.** | The Insurer will pay the *Insured* for its *Business Interruption Loss* that is directly caused by any of the following, if *Discovered* during the *Policy Period*: |

1.  A *Security Breach* that results in a total or partial interruption of a *Computer System*.
2.  A *System Failure*, if applicable.
3.  The voluntary shutdown of a *Computer System* by the *Insured*, if it is reasonably necessary to minimize the *Loss* caused by a *Security Breach* or *Privacy Breach* in progress.

| | |
|---|---|
| **Dependent Business Interruption.** | The Insurer will pay the *Insured* for its *Business Interruption Loss*, directly caused by an *IT Provider Breach* that is *Discovered* during the *Policy Period*. |
| **Reputation Harm.** | The Insurer will pay the *Insured* for its *Reputation Harm*, directly caused by an *Adverse Media Report* or *Notification* that: |

1.  first occurs during, or within 60 days after, the *Policy Period*; and
2.  directly relates to a *Privacy Breach* or *Security Breach* that is *Discovered* during the *Policy Period*.

## Definitions

| | |
|---|---|
| *Accounting Costs.* | Means the reasonable fees or costs of a forensic accounting firm, incurred by the *Insured Entity*, to calculate *Income Loss*, even if such calculation shows there has been no *Income Loss*. |
| *Additional Insured.* | Means a person or entity, not otherwise an *Insured*, with whom the *Insured Entity* has entered into a written agreement to include as an *Insured*, but only for *Wrongful Acts*: |

1.  by, or on behalf of, the *Insured Entity* under such agreement; and
2.  that occur after the *Insured Entity* has executed such agreement.

| | |
|---|---|
| *Adverse Media Report.* | Means any communication of an actual or potential *Privacy Breach* or *Security Breach* by a media outlet. Multiple *Adverse Media Reports* regarding the same *Privacy Breach* or *Security Breach* are deemed one *Adverse Media Report*. |
| *Approved Provider.* | Means a service provider approved by the Insurer in writing to the *Insured*. |
| *Automatic ERP.* | Means a 90-day extended reporting period starting on the effective date this Coverage is canceled or not renewed. |
| *Betterment Costs.* | 1.  Means the reasonable costs incurred and paid by the *Insured*, with the Insurer's written consent, for hardware or software to improve a *Computer System* after a *Security Breach*, if: |

    a.  the *Security Breach* has been stopped or contained, and resulted in covered *Computer And Legal Expert Costs*;

    b.  the *Approved Provider* that provided computer services in response to such *Security Breach*:

        i.  has identified a weakness in a *Computer System* that caused, or contributed to, the *Security Breach*; and

        ii.  recommends the improvements to prevent a future *Security Breach* from exploiting such weakness; and

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

| | |
|---|---|
| | c.  such improvements are incurred and paid for by the *Insured* within the earlier of 90 days after: |
| |      i.  the recommendation by the *Approved Provider*; or |
| |      ii.  the end of the *Policy Period*. |
| | Costs for improvements that are subject to a license, lease, or subscription will be limited to the pro rata portion of such costs for the first 12 months. |
| | 2.  Does not include wages, benefits, or overhead of any *Insured*. |

*Business Interruption Loss.*
1. Means:
   a. *Income Loss* and *Extra Expense* incurred or paid by the *Insured Entity* during the *Period Of Restoration*; and
   b. *Accounting Costs*, if the *Insured Entity's* business operations are interrupted beyond the *Wait Period*.
2. Does not include loss arising out of harm to the *Insured Entity's* reputation.

*Change Of Control.* Means when:
1. more than 50% of the Named Insured's assets are acquired; or
2. the Named Insured is merged with, or consolidated into, another entity, and the Named Insured is not the surviving entity.

*Claim.* Means:
1. a written demand for monetary or nonmonetary relief,  including injunctive relief, commenced by an *Insured's* receipt of such written demand;
2. a civil proceeding, commenced by the service of a complaint or similar pleading;
3. an arbitration, mediation, or similar alternative dispute resolution proceeding, commenced by the service of an arbitration petition or similar legal document;
4. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding, commenced by an *Insured's* receipt of such written request; or
5. for the Regulatory Proceedings Insuring Agreement only, a *Regulatory Proceeding*, commenced by:
   a. the filing of charges;
   b. the filing of an investigative order;
   c. the service of a summons; or
   d. the service or filing of a similar document,

   against an *Insured* for a *Wrongful Act*. Except under Other Conditions, Notice Of Claim, a *Claim* is deemed made when commenced.

*Client.* Means a person or entity to whom the *Insured Entity*:
1. provides goods; or
2. performs services,
for a fee, or under a written agreement.

*Computer And Legal Expert Costs.*
1. Means the reasonable fees or costs incurred or paid by the *Insured* for services recommended and provided by an *Approved Provider*, to:
   a. conduct a forensic analysis to determine the existence and cause of a *Privacy Breach*, *Security Breach*, or *Cyber Extortion Threat*;
   b. determine whose *Confidential Information* was lost or stolen; or accessed or disclosed without authorization;
   c. contain or stop a *Privacy Breach* or *Security Breach* in progress;
   d. certify the *Computer System* meets *Payment Card Security Standards*, if a *Security Breach Discovered* during the *Policy Period* results in noncompliance with such standards, but only for the first certification; or

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

e.   provide legal services to respond to a *Privacy Breach* or *Security Breach*.

2.   Does not include *Defense Costs* or *Privacy Breach Notification Costs*.

*Computer Fraud.*
1.   Means an intentional, unauthorized, and fraudulent entry or change of data or computer instructions, directly into or within, a *Computer System*, that:
   a.   is not made by an *Insured Person*, an *Independent Contractor*, or any other person under the direct supervision of the *Insured*; and
   b.   causes *Money*, *Securities*, or *Other Property* to be transferred, paid, or delivered from inside the *Insured Entity's* premises or the *Insured Entity's* financial institution premises to a place outside of such premises.

2.   Does not include *Social Engineering Fraud*.

*Computer System.*
Means a computer and connected input, output, processing, storage, or communication device, or related network, operating system, website, or application software, that is:
1.   under the operational control of, and owned by, licensed to, or leased to:
   a.   the *Insured Entity*; or
   b.   an *Insured Person*, while authorized by, and transacting business on behalf of, the *Insured Entity*, except under the Betterment or Data Restoration Insuring Agreements, or any Cyber Crime Insuring Agreement; or

2.   operated by an *IT Provider*, but only the portion of such computer system used to provide hosted computer resources to the *Insured Entity*, except under the Betterment or Business Interruption Insuring Agreements.

*Confidential Information.*
Means a third party's or *Insured Person's* private or confidential information that is in the care, custody, or control of the *Insured Entity*, or a service provider acting on behalf of the *Insured Entity*.

*Covered Material.*
1.   Means content that is created or disseminated, via any form or expression, by, or on behalf of, the *Insured Entity*.
2.   Does not include:
   a.   tangible product designs; or
   b.   content created or disseminated by the *Insured Entity* on behalf of a third party.

*Cyber Extortion Costs.*
1.   Means, with the Insurer's prior written consent:
   a.   *Ransom*, in direct response to a *Cyber Extortion Threat*;
   b.   reasonable amounts incurred or paid by the *Insured* in the process of paying, or attempting to pay, *Ransom*; or
   c.   reasonable amounts incurred or paid by the *Insured*, recommended by an *Approved Provider*, to mitigate *Ransom*.

2.   Does not include *Computer And Legal Expert Costs* or *Restoration Costs*.

*Cyber Extortion Threat.*
Means a threat to:
1.   access or disclose:
   a.   *Confidential Information*; or
   b.   an *Insured Entity's* information without authorization; or
2.   commit or continue a *Security Breach*,
made against the *Insured Entity* for *Ransom*.

*Defense Costs.*
1.   Means reasonable fees and costs incurred by the Insurer, or the *Insured* with the Insurer's prior written consent, in the:
   a.   investigation;
   b.   defense;
   c.   settlement; or

*Definitions continued from previous page.*

       d.   appeal,

of a *Claim*.

2.   Includes up to $1,000 per day for loss of earnings due to an *Insured Person's* attendance in court, if at the Insurer's request.

3.   Does not include wages, benefits, or overhead of the Insurer or of the *Insured*.

**Discover, Discovered, Discovery.** Means when an *Executive Officer* first becomes aware of facts that would cause a reasonable person to assume that a *First Party Loss* has been or will be incurred, regardless of when the act or acts causing or contributing to such *First Party Loss* occurred, even though the exact amount or details of such *First Party Loss* may not then be known.

**Employee.**
1.   Means a natural person while their labor is engaged and directed by the *Insured Entity*, and who is:

    a.   a full-time, part-time, seasonal, or temporary worker compensated directly by the *Insured Entity* through wages, salaries, or commissions;

    b.   a volunteer, student, or intern; or

    c.   a worker whose services have been leased to the *Insured Entity* by a labor leasing firm under a written agreement.

2.   Does not include any:

    a.   agent;

    b.   broker;

    c.   consignee;

    d.   independent contractor; or

    e.   representative,

of the *Insured Entity*.

**Executive Officer.** Means a natural person while acting as the *Insured Entity's*:
1.   chief executive officer;
2.   chief financial officer;
3.   chief information security officer;
4.   risk manager;
5.   in-house general counsel; or
6.   the functional equivalent of 1 through 5.

**Extra Expense.** Means reasonable costs incurred by the *Insured Entity*, with the Insurer's written consent, that:
1.   result from a *First Party Event*;
2.   are in excess of the *Insured Entity's* normal operating costs;
3.   are intended to reduce *Income Loss*; and
4.   would not have been incurred had there been no *First Party Event*.

**First Party Event.**
1.   Means:

    a.   *Computer Fraud*;

    b.   *Cyber Extortion Threat*;

    c.   *Funds Transfer Fraud*;

    d.   *IT Provider Breach*;

    e.   *Media Act*;

    f.   *Privacy Breach*;

    g.   *Security Breach*;

    h.   *Social Engineering Fraud*;

    i.   *System Failure*; or

    j.   *Telecom Fraud*.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

|   |   |
|---|---|
| | 2.  *First Party Events* that have a common: |
| |     a.  nexus; |
| |     b.  set of facts; |
| |     c.  circumstance; |
| |     d.  situation; |
| |     e.  event; or |
| |     f.  decision, |
| |     are deemed a single *First Party Event.* |

*First Party Insuring Agreements.* Means the:

1. Breach Response Insuring Agreements;
2. Business Loss Insuring Agreements; and
3. Cyber Crime Insuring Agreements.

*First Party Loss.*

1. Means:
   a. *Betterment Costs;*
   b. *Business Interruption Loss;*
   c. *Computer And Legal Expert Costs;*
   d. *Cyber Extortion Costs;*
   e. *Money;*
   f. *Other Property;*
   g. *Privacy Breach Notification Costs;*
   h. *Public Relations Costs;*
   i. *Reputation Harm;*
   j. *Restoration Costs;*
   k. *Securities;* or
   l. *Telecom Charges.*
2. Other than *Accounting Costs,* does not include amounts:
   a. to establish *First Party Loss;* or
   b. to prepare the *Insured Entity's* Proof of Loss.

*Funds Transfer Fraud.*

1. Means a fraudulent instruction that:
   a. is electronically sent to a financial institution that is not an *Insured,* at which the *Insured Entity* maintains an account;
   b. directs the transfer, payment, or delivery of *Money* or *Securities* from the *Insured Entity's* account;
   c. is purportedly sent by the *Insured Entity;*
   d. is sent by someone, other than an *Insured;* and
   e. is sent without the *Insured Entity's* knowledge or consent.
2. Does not include *Social Engineering Fraud.*

*Impacted Parties.* Means the persons or entities whose *Confidential Information* was, or is suspected to have been, stolen or lost, or accessed or disclosed without authorization.

*Income Loss.*

1. Means pretax net profit the *Insured Entity* did not earn, and net loss the *Insured Entity* incurred, because of a *First Party Event.* Continuing normal and necessary operating expenses and payroll are part of the pretax net profit or net loss calculation.
2. Does not include:
   a. *Extra Expense;*
   b. contractual penalties;

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

    c.   costs incurred to replace or improve a *Computer System* to a level of functionality beyond what existed prior to the *First Party Event*;

    d.   costs incurred to identify or remediate computer system errors or vulnerabilities;

    e.   interest or investment income; or

    f.   loss incurred due to unfavorable business conditions not related to the *First Party Event*.

**Independent Contractor.**  Means a natural person, other than an *Employee*, while performing services for the *Insured Entity* under a written agreement.

**Insured.**  Means:

1. *Insured Persons*;
2. *Insured Entities*; or
3. for the Liability Insuring Agreements only, also includes *Additional Insureds*.

**Insured Entity.**  Means:

1. the Named Insured; or
2. *Subsidiaries*.

**Insured Person.**  Means:

1. *Employees*;
2. natural persons while:
   a. officers;
   b. partners;
   c. the sole proprietor;
   d. in-house general counsel; or
   e. members of a board of directors, trustees, or governors,
   of the *Insured Entity*; or
3. for the Liability Insuring Agreements only, also includes *Independent Contractors*.

**IT Provider.**  Means an entity while under a written agreement with the *Insured Entity* to provide it with:

1. hosted computer application services;
2. cloud services or computing;
3. electronic data hosting, back-up, storage, and processing;
4. co-location services;
5. platform-as-a-service; or
6. software-as-a-service.

**IT Provider Breach.**  Means:

1. unauthorized access to;
2. use of authorized access to cause intentional harm to;
3. a denial-of-service attack against; or
4. the introduction of a *Virus* into,
an *IT Provider's* computer system, resulting in total or partial interruption.

**Loss.**

1. Means:
   a. *Defense Costs*;
   b. damages, judgments, settlements, or prejudgment or postjudgment interest, that an *Insured* is legally obligated to pay as a result of a *Claim*, including:
      i. court awarded legal fees; and

*Definitions continued from previous page.*

      ii.    punitive or exemplary damages, or the multiple portion of a multiplied damage award, to the extent insurable under the most favorable applicable law;

    c.    *Payment Card Contract Penalties;*

    d.    for the Regulatory Proceedings Insuring Agreement, means *Regulatory Costs;* or

    e.    for *First Party Insuring Agreements,* means *First Party Loss.*

2.    *Loss* does not include voluntary payments made by the *Insured* with respect to a *Claim.*

3.    *Loss,* other than *Defense Costs,* does not include:

    a.    civil or criminal fines, penalties, sanctions, or taxes, except for:

        i.    *Payment Card Contract Penalties;* or

        ii.    *Regulatory Costs;*

    b.    amounts uninsurable under applicable law;

    c.    restitution, return, or disgorgement of any profits;

    d.    liquidated damages in excess of the amount for which the *Insured* would be liable absent the liquidated damages provision of a contract; or

    e.    the cost of complying with injunctive or nonmonetary relief.

**Media Act.**  Means, in *Covered Material:*

1.    the unauthorized use of copyright, title, slogan, trademark, trade dress, service mark, domain name, logo, or service name;

2.    the unauthorized use of a literary or artistic format, character, or performance;

3.    a violation of an individual's right of privacy or publicity;

4.    defamation, libel, slander, trade libel, or other tort related to disparagement or harm to the reputation or character of any person or entity;

5.    the misappropriation of ideas under an implied contract;

6.    improper deep-linking or framing; or

7.    unfair competition, when alleged in connection with 1 through 6.

**Merchant Service Agreement.**  Means a contract between the *Insured Entity* and an acquiring bank, or other acquiring institution, that establishes the terms and conditions for accepting and processing payment card transactions.

**Money.**  1.    Means:

    a.    currency, coins, or bank notes in circulation;

    b.    bullion;

    c.    *Virtual Currency;*

    d.    traveler's checks;

    e.    certified or cashier's checks; or

    f.    money orders.

2.    Does not include *Securities.*

**Notification.**  Means written notice to *Impacted Parties* about a *Privacy Breach* or *Security Breach.* Multiple *Notifications* about the same *Privacy Breach* or *Security Breach* are deemed one *Notification.*

**Optional ERP.**  Means an extended reporting period for the time shown in the Optional ERP Endorsement starting on the effective date this Coverage is:

1.    canceled; or

2.    not renewed.

**Other Property.**  Means tangible property, other than *Money* or *Securities* that has intrinsic value.

**Payment Card Contract Penalties.**  Means fines, penalties, or assessments imposed under a *Merchant Service Agreement* against an *Insured Entity* for noncompliance with *Payment Card Security Standards.*

*Definitions continued from previous page.*

| | |
|---|---|
| *Payment Card Security Standards.* | Means the Payment Card Industry Data Security Standard (PCI-DSS), or similar standard, to which the *Insured Entity* has agreed in a *Merchant Service Agreement*. |
| *Period Of Indemnity.* | Means the Period Of Indemnity shown in the CyberRisk Declarations. It begins on the earlier of the date of the first:<br>1.  *Notification;* or<br>2.  *Adverse Media Report,*<br>whichever is earlier. |
| *Period Of Restoration.* | Means the period of time that begins after the *Wait Period* ends, and ends on the earlier of:<br>1.  the expiration of the Period Of Restoration shown in the CyberRisk Declarations; or<br>2.  when the *Insured Entity's* business operations have been restored for a consecutive 24-hour period to the level of operation that existed immediately before the *First Party Event.* |
| *Policy Period.* | Means the Policy Period shown in the Declarations, which is subject to the cancelation of this Policy. |
| *Pollutant.* | Means a solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed. |
| *Potential Claim.* | Means conduct or circumstances that could reasonably be expected to give rise to a *Claim.* |
| *Privacy And Security Act.* | Means:<br>1.  the failure to prevent a *Privacy Breach;*<br>2.  the failure to destroy *Confidential Information;*<br>3.  a violation of law, when alleged in connection with 1 or 2;<br>4.  the failure to provide *Notification* required by law;<br>5.  the failure to comply with a *Privacy Policy;*<br>6.  the unauthorized, unlawful, or wrongful collection of *Confidential Information;* or<br>7.  the failure to prevent a *Security Breach,* directly resulting in the:<br>   a.  alteration or deletion of *Confidential Information;*<br>   b.  transmission of a *Virus* into a computer or network system that is not a *Computer System;*<br>   c.  participation in a denial-of-service attack directed against a computer or network system that is not a *Computer System;* or<br>   d.  failure to provide an authorized user with access to a *Computer System.* |
| *Privacy Breach.* | Means the loss or theft of, or unauthorized access to or disclosure of, *Confidential Information.* |
| *Privacy Breach Notification Costs.* | Means reasonable costs or fees incurred or paid by an *Insured Entity,* voluntarily or as required by agreement or law, for:<br>1.  printing and delivering notice to;<br>2.  providing credit or identity monitoring for up to 24 months, or longer where required by law, to;<br>3.  call center services for;<br>4.  the costs to purchase an identity fraud insurance policy to benefit natural persons who are; or<br>5.  with the Insurer's prior written consent, other services to mitigate *Loss* or provide notice to, *Impacted Parties,* if recommended and provided by an *Approved Provider.* |
| *Privacy Policy.* | Means the *Insured Entity's* publicly available written policies or procedures regarding *Confidential Information.* |

*Definitions continued from previous page.*

| | |
|---|---|
| *Public Relations Costs.* | Means reasonable costs or fees for public relations services recommended and provided by an *Approved Provider* to mitigate or prevent negative publicity. |

*Ransom.*
1. Means:
   a. *Money;*
   b. *Securities;* or
   c. the fair market value of property or services,
   paid or surrendered by, or on behalf of, the *Insured.*
2. Will be valued as of the date paid or surrendered.

*Regulatory Costs.*
Means:
1. civil money fines;
2. civil penalties; or
3. amounts deposited in a consumer redress fund,
imposed in a *Regulatory Proceeding*, to the extent insurable under the most favorable applicable law.

*Regulatory Proceeding.*
Means an administrative or regulatory proceeding, or a civil investigative demand, brought by a domestic or foreign governmental entity.

*Reputation Harm.*
Means damage to the *Insured Entity's* reputation incurred during the *Period Of Indemnity* that results in *Income Loss*, other than the value of:
1. coupons;
2. price discounts;
3. prizes;
4. awards; or
5. consideration given by the *Insured* in excess of the contracted or expected amount.

*Restoration Costs.*
1. Means the reasonable amounts incurred or paid by the *Insured*, with the Insurer's prior written consent:
   a. to restore or recover damaged or destroyed computer programs, software, or electronic data stored within a *Computer System*, to its condition immediately before a *Security Breach;* or
   b. to determine that such computer programs, software, or electronic data cannot reasonably be restored or recovered.
2. Does not include:
   a. costs to recover or replace computer programs, software, or electronic data that the Insured did not have a license to use;
   b. costs to design, update, or improve the operation of computer programs or software;
   c. costs to recreate work product, research, or analysis; or
   d. wages, benefits, or overhead of the *Insured.*

*Run-Off Period.*
Means the period starting on the date of the *Change Of Control* to the end of the *Policy Period.*

*Securities.*
Means written agreements representing *Money* or property, other than *Virtual Currency.*

*Security Breach.*
Means:
1. the unauthorized access to;
2. the use of authorized access to cause intentional harm to;
3. a denial-of-service attack against; or
4. the introduction of a *Virus* into,
a *Computer System.*

*Definitions continued from previous page.*

| | |
|---|---|
| *Social Engineering Fraud.* | Means intentionally misleading an *Insured Person*, by providing an instruction that: |

1. is not made by an *Insured*;
2. is purportedly from a *Vendor*, *Client*, or *Insured Person*;
3. directs the *Insured Person* to transfer, pay, or deliver *Money* or *Securities*;
4. contains a misrepresentation of material fact; and
5. is relied upon by the *Insured Person*, believing the material fact to be true.

*Subsidiary.* Means:

1. an entity while the Named Insured owns more than 50% of the outstanding securities or voting rights representing the right to select the entity's board of directors, or functional equivalent;
2. a nonprofit entity while the Named Insured exercises management control over such entity; or
3. an entity while the Named Insured owns exactly 50%, as a joint venture, and while an *Insured Entity* controls the entity's management and operations under a written agreement.

*System Failure.* Means an accidental, unintentional, and unplanned total or partial interruption of a *Computer System*, not caused by:

1. a *Security Breach*; or
2. a total or partial interruption of a third party computer system or network.

*Telecom Charges.* Means amounts charged to the *Insured Entity* for telephone services by its telephone service provider.

*Telecom Fraud.* Means the unauthorized access to, or use of, the *Insured Entity's* telephone system by a person or entity other than an *Insured Person*.

*Vendor.* Means a person or entity that provides goods or services to the *Insured Entity* under an agreement.

*Virtual Currency.*
1. Means a publicly available digital or electronic medium of exchange used and accepted as a means of payment.
2. Does not include:
   a. coupons;
   b. discounts;
   c. gift cards;
   d. rebates;
   e. reward points; or
   f. similar mediums of exchange.

*Virus.* Means malicious code that could destroy, or change the integrity or performance of, electronic data, software, or operating systems.

*Wait Period.* Means the Wait Period shown in the CyberRisk Declarations. It begins when a total or partial interruption to an *Insured Entity's* business operations is caused by a *First Party Event*. A separate *Wait Period* applies to each unrelated *First Party Event*.

*Wrongful Act.*
1. Means any:
   a. *Media Act*; or
   b. *Privacy And Security Act*.
2. All *Wrongful Acts* that share a common:
   a. nexus;
   b. set of facts;
   c. circumstance;

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

    d.   situation;

    e.   event; or

    f.   decision,

are deemed a single *Wrongful Act* that occurred at the time the first such *Wrongful Act* occurred.

## Exclusions

**Assumed Liability.**

1. The Insurer will not pay *Loss* arising out of liability assumed by an *Insured*.
2. This does not apply:
   a. when the *Insured* would have been liable in the absence of such assumption of liability;
   b. to a *Claim* for *Payment Card Contract Penalties*;
   c. to *Privacy Breach Notification Costs*; or
   d. to any privacy or confidentiality obligation that the *Insured* has agreed to under a *Privacy Policy* or nondisclosure agreement.

**Bodily Injury.**

1. The Insurer will not pay *Loss* for:
   a. bodily injury;
   b. sickness;
   c. disease;
   d. death; or
   e. loss of consortium.
2. This does not apply to:
   a. emotional distress;
   b. mental anguish;
   c. humiliation; or
   d. loss of reputation.

**Conduct.**

1. The Insurer will not pay *Loss* arising out of an *Insured's*:
   a. intentionally dishonest or fraudulent act or omission; or
   b. willful violation of law or regulation.
2. This does not apply to:
   a. *Defense Costs*; or
   b. *Loss* other than *Defense Costs*, unless a final nonappealable adjudication in the underlying action establishes such conduct occurred.
3. In applying this exclusion, knowledge or conduct of an *Insured* will not be imputed to another *Insured*, except that knowledge or conduct of an *Executive Officer* will be imputed to the *Insured Entity*.

**Cyber Crime.**

The Cyber Crime Insuring Agreements do not apply to:

1. indirect or consequential loss;
2. potential income, including interest and dividends, not realized by an *Insured* or *Client*;
3. loss of confidential information;
4. loss of intellectual property;
5. loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, or other cards;
6. loss resulting from a fraudulent instruction, if the sender or anyone acting in collusion with the sender, ever had authorized access to the *Insured's* password, PIN, or other security code;
7. amounts the *Insured* incurs without a legal obligation to do so;

© 2020 The Travelers Indemnity Company. All rights reserved.

*Exclusions continued from previous page.*

8. loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter electronic data or send instructions, provided this does not apply to the Social Engineering Fraud Insuring Agreement;

9. loss resulting from the failure of any party to perform under any contract; or

10. loss due to any nonpayment of, or default upon, any loan, extension of credit, or similar promise to pay.

**Government Action.** The Insurer will not pay *Loss* arising out of:

1. seizure;
2. confiscation;
3. nationalization;
4. requisition; or
5. destruction of property,

by or under the order of domestic or foreign government authority.

**Infrastructure.** The Insurer will not pay *Loss* arising out of a total or partial interruption or failure of any:

1. satellite;
2. electrical or mechanical system;
3. electric, gas, water, or other utility;
4. cable, telecommunications, or Internet service provider; or
5. other infrastructure,

except when such is under the *Insured's* control.

**Insured vs. Insured.**
1. The Insurer will not pay *Loss* for a *Claim* brought by or on behalf of:
   a. an *Insured*; or
   b. an entity that, at the time the *Wrongful Act* occurs, or the date the *Claim* is made:
      i. is owned, operated, or controlled by any *Insured*; or
      ii. owns, operates, or controls any *Insured*.
2. This does not apply to a *Claim*:
   a. by an *Insured Person* for contribution or indemnity, if resulting from another covered *Claim*; or
   b. by or on behalf of an *Insured Person* or *Additional Insured* who did not commit or participate in the *Wrongful Act*.

**Intellectual Property.** The Insurer will not pay *Loss* arising out of an *Insured's* misappropriation, infringement, or violation of:

1. copyrighted software;
2. patent rights or laws; or
3. trade secret rights or laws.

**Labor Disputes.** The Insurer will not pay *Loss* under the Business Loss Insuring Agreements arising out of labor disputes.

**Licensing And Royalties.** The Insurer will not pay *Loss* arising out of any obligation to pay licensing fees or royalties.

**Ownership Rights.** The Insurer will not pay *Loss* for a *Claim* by, or on behalf of, an independent contractor, joint venturer, or venture partner arising out of disputes over ownership rights in *Covered Material*.

**Physical Peril.** The Insurer will not pay *Loss* arising out of:

1. fire, smoke, or explosion;
2. lightning, wind, rain, or hail;

*Exclusions continued from previous page.*

3.  surface water, waves, flood, or overflow of any body of water;
4.  earthquake, earth movement, or earth sinking;
5.  mudslide, landslide, erosion, or volcanic eruption;
6.  collapse, wear and tear, rust, corrosion, or deterioration;
7.  magnetic or electromagnetic fields;
8.  extremes of temperature or humidity; or
9.  any similar physical event or peril.

**Pollution.**   The Insurer will not pay *Loss* arising out of:

1.  the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of a *Pollutant*;

2.  a request, demand, order, or statutory, or regulatory requirement that an *Insured* or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess, the effects of, a *Pollutant*; or

3.  testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, a *Pollutant*.

**Prior Acts.**   The Insurer will not pay *Loss* arising out of a *Wrongful Act* that occurs prior to the Retro Date shown in the CyberRisk Declarations.

**Prior Matters.**   The Insurer will not pay *Loss* arising out of any fact, circumstance, situation, event, or *Wrongful Act*:

1.  that is, or reasonably would be regarded as, the basis for a *Claim* under the Liability Insuring Agreements about which any *Executive Officer* had knowledge prior to the Knowledge Date shown in the CyberRisk Declarations;

2.  that, prior to the Inception date shown in the Declarations, was the subject of any notice of claim, or circumstance, given by or on behalf of any *Insured* and accepted under any policy of insurance that this Coverage directly renews, replaces, or succeeds in time; or

3.  previously alleged in a civil, criminal, administrative, or regulatory proceeding against any *Insured* prior to the P&P Date shown in the CyberRisk Declarations.

**Property Damage.**   1.   The Insurer will not pay *Loss* under the Liability or Breach Response Insuring Agreements for the:

   a.   damage to;
   b.   destruction of;
   c.   loss of; or
   d.   loss of use of,
   any tangible property.

2.   The Insurer will not pay *Loss* under the Cyber Crime or Business Loss Insuring Agreements arising out of the:

   a.   damage to;
   b.   destruction of;
   c.   loss of; or
   d.   loss of use of,
   any tangible property, other than loss of *Other Property* covered under the Computer Fraud Insuring Agreement.

**Securities Laws.**   The Insurer will not pay *Loss* arising out of:

1.  a violation of a securities law or regulation; or

2.  except under the Cyber Crime Insuring Agreements:

   a.   the ownership of;
   b.   the sale or purchase of; or
   c.   the offer to sell or purchase,
   stock or other securities.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Exclusions continued from previous page.*

| | | |
|---|---|---|
| **Unlawful Collection.** | 1. | The Insurer will not pay *Loss* arising out of the collection of *Confidential Information* in violation of law. |
| | 2. | This does not apply to *Defense Costs*. |
| **Unsolicited Communications.** | 1. | The Insurer will not pay *Loss* arising out of a violation of a law that restricts or prohibits unsolicited communications. |
| | 2. | This does not apply to a *Security Breach* under the Breach Response Insuring Agreements. |
| **War.** | 1. | The Insurer will not pay *Loss* arising out of: |
| | | a. war, including undeclared or civil war; |
| | | b. warlike action, including action in hindering or defending against an actual or expected attack, by any government, military force, sovereign, or other authority using military personnel or other agents; or |
| | | c. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. |
| | 2. | This does not apply to an actual or threatened attack against a *Computer System* with intent to cause harm, or further social, ideological, religious, political, or similar objectives, except when in support of 1a through 1c. |

## Limits And Retentions

| | | |
|---|---|---|
| **Limits Of Insurance.** | 1. | The most the Insurer will pay for all *Loss* is the CyberRisk Aggregate Limit shown in the CyberRisk Declarations. |
| | 2. | The most the Insurer will pay for all *Loss* under an Insuring Agreement is the applicable Limit for such Insuring Agreement shown in the CyberRisk Declarations; but: |
| | | a. The most the Insurer will pay for all *Payment Card Contract Penalties* is the Payment Card Costs Limit shown in the CyberRisk Declarations, which is within and will reduce the Privacy And Security Limit. |
| | | b. The most the Insurer will pay for all *Business Interruption Loss* that results from a *System Failure* is the System Failure Limit shown in the CyberRisk Declarations, which is within and will reduce the Business Interruption Limit. |
| | | c. Payment of *Loss* under the Dependent Business Interruption Insuring Agreement and Reputation Harm Insuring Agreement is within and will reduce, the remaining Business Interruption Limit. |
| | | d. The most the Insurer will pay for all *Accounting Costs* is the Accounting Costs Limit shown in the CyberRisk Declarations, which is within and will reduce the Limit for the applicable Business Loss Insuring Agreement. |
| | | e. If a Betterment Coparticipation percentage is shown in the CyberRisk Declarations, such percentage of *Betterment Costs* will be paid by the *Insured*. The Insurer will pay the remaining *Betterment Costs*, up to the Betterment Limit shown in the CyberRisk Declarations. |
| | 3. | The most the Insurer will pay for all *Loss* with respect to an *Additional Insured* is the limit agreed to in the agreement between such *Additional Insured* and the *Insured Entity*, or the applicable Limit shown in the CyberRisk Declarations, whichever is less. |
| | 4. | If the CyberRisk Declarations indicates that a Shared Limit applies, the most the Insurer will pay under all Shared Coverages is the Shared Limit shown in the Shared Limit Declarations. |
| | 5. | Once the CyberRisk Aggregate Limit or Shared Limit is exhausted, the premium is fully earned, and all obligations of the Insurer, including any duty to defend, will cease. |
| **Retention.** | 1. | The Insurer will only pay *Loss* once the applicable Retention shown in the CyberRisk Declarations has been paid by the *Insured*. |
| | 2. | Except for the Betterment Insuring Agreement, if multiple Retentions apply to: |

© 2020 The Travelers Indemnity Company. All rights reserved.

*Limits And Retentions continued from previous page.*

        a.   a *Claim*;

        b.   a *First Party Event*; or

        c.   *Claims* and *First Party Events* that share a common nexus, set of facts, circumstance, situation, event, or decision,

        the *Insured* will not pay more than the amount of the largest applicable Retention.

3. The *Insured Person* is deemed indemnified by the *Insured Entity* to the extent permitted or required by law, written agreement, or the by-laws of the *Insured Entity*. For the Liability Insuring Agreements, no Retention will apply to an *Insured Person* if indemnification by the *Insured Entity* is:

        a.   not permitted by law; or

        b.   not possible due to the financial insolvency of such *Insured Entity*.

4. The Insurer may pay any amount of Retention. In such event, the *Insured* agrees to repay the Insurer such amounts.

## Other Conditions

**Allocation.**

1. Subject to Other Conditions, Settlement, if an *Insured* incurs:

        a.   *Loss* jointly with others who are not covered for a *Claim*; or

        b.   *Loss* covered and loss not covered by this Coverage because a *Claim* includes both covered and uncovered matters,

        then the *Insured* and the Insurer will use their best efforts to allocate such amount between covered *Loss* and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters.

2. If the CyberRisk Declarations shows that the Insurer has the duty to defend *Claims*, all *Defense Costs* will be allocated to covered *Loss*.

**Cancelation And Nonrenewal.**

1. The Insurer will cancel this Coverage only if premium is not paid when due. If nonpayment occurs, the Insurer will give at least 20 days written notice of cancelation to the Named Insured. Unless payment is received when due, this Coverage will be canceled.

2. The Named Insured may cancel any part of this Coverage by giving advanced written notice to the Insurer, stating when such cancelation will be effective.

3. If any part of this Coverage is canceled, the Insurer will refund the unearned premium on a pro rata basis.

4. The Insurer is not required to renew this Coverage upon its expiration. If the Insurer elects not to renew, it will provide the Named Insured written notice to that effect at least 60 days before the Expiration date shown in the Declarations.

**Change Of Structure.**

1. Under the Liability and Breach Response Insuring Agreements, if a *Change Of Control* occurs during the *Policy Period*, the coverage will continue for the *Run-Off Period*.

2. Coverage during the *Run-Off Period* is only for *Wrongful Acts* or *First Party Events* occurring before such *Change Of Control*.

3. Under the Cyber Crime and Business Loss Insuring Agreements, if an entity ceases to be an *Insured Entity* during the *Policy Period*, *First Party Loss* is only covered if:

        a.   such *First Party Loss* is sustained; and

        b.   the applicable *First Party Event* is *Discovered*,

        prior to the time such entity ceased to be an *Insured Entity*.

4. The Named Insured may request to extend the time of the *Run-Off Period*.

**Claim Defense.**

1. If the CyberRisk Declarations shows that the Insurer has the duty to defend *Claims*, the Insurer:

        a.   has the right and duty to defend covered *Claims*, even if groundless or false;

        b.   has the right to select defense counsel for such *Claims*; and

© 2020 The Travelers Indemnity Company. All rights reserved.

    c.  has no duty to defend, or to continue to defend, *Claims* after the applicable Limit has been exhausted.

2.  If the CyberRisk Declarations shows that the Insurer does not have the duty to defend *Claims*:

    a.  the *Insured* has the duty to defend *Claims*;

    b.  the Insurer has the right to participate in the selection of defense counsel;

    c.  the Insurer has the right to participate in the investigation, defense, and settlement of such *Claims*;

    d.  subject to the applicable Limit, the Insurer will reimburse the *Insured* for *Defense Costs*;

    e.  upon written request, the Insurer will advance *Defense Costs*; and

    f.  advanced *Defense Costs* will be repaid to the Insurer to the extent that the *Insured* is not entitled to such payment.

3.  With respect to a *Claim*, the *Insured* will not, without the Insurer's prior written consent:

    a.  make an offer to settle, or settle, a *Claim*;

    b.  admit liability; or

    c.  except at the *Insured's* own cost, make a voluntary payment, pay or incur *Defense Costs* or other expense, or assume any obligation.

**Cyber Crime And Business Loss Change.**  The Cyber Crime and Business Loss Insuring Agreements will end upon:

1.  a *Change Of Control*; or

2.  the voluntary liquidation or dissolution of the Named Insured.

**ERP –Automatic.**

1.  The *Automatic ERP* applies without additional premium.

2.  *Claims* resulting from *Wrongful Acts* that occur prior to cancelation or nonrenewal can be made and reported to the Insurer during the *Automatic ERP*. Such *Claim* is deemed reported on the last day of the *Policy Period*.

3.  The most the Insurer will pay for *Loss* resulting from *Claims* reported during the *Automatic ERP* is the remaining portion of the applicable Limit shown in the CyberRisk Declarations as of the effective date of cancelation or nonrenewal.

**ERP –Optional.**

1.  The Named Insured may elect to purchase an *Optional ERP* shown in the CyberRisk Declarations for any reason other than nonpayment of premium. The *Optional ERP* will only take effect if:

    a.  the Insurer receives written notice of such election no later than 90 days after cancelation or nonrenewal; and

    b.  the additional premium for the *Optional ERP* is paid when due.

2.  *Claims* or *Potential Claims* resulting from *Wrongful Acts* that occur prior to cancelation or nonrenewal can be made and reported to the Insurer during the *Optional ERP*. Such *Claim* or *Potential Claim* is deemed reported on the last day of the *Policy Period*.

3.  For the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements, *First Party Loss* that results from a *First Party Event* occurring prior to cancelation or nonrenewal can be *Discovered* during the *Optional ERP*. Such *First Party Event* is deemed *Discovered* on the last day of the *Policy Period*.

4.  The premium due for the *Optional ERP* is shown in the CyberRisk Declarations. Such premium is fully earned at the start of the *Optional ERP*.

5.  The most the Insurer will pay for *Loss* resulting from *Claims* made, or *First Party Events Discovered*, during the *Optional ERP* is the remaining portion of the applicable Limit shown in the CyberRisk Declarations as of the effective date of cancelation or nonrenewal.

6.  When the *Optional ERP* applies, it replaces the *Automatic ERP* and the Extended Discovery Period for the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements.

**Extended Discovery Period.**

1.  For the *First Party Insuring Agreements*, the *Insured* has an extended period of time to *Discover* a *First Party Loss* arising out of a *First Party Event* that occurred prior to the effective date of cancelation. Such *First Party Event* will be deemed *Discovered* on the last day of the *Policy*

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

*Period.* This period begins on the effective date such *First Party Insuring Agreement* is canceled. It ends on the earlier of:

    a.   90 days; or

    b.   the effective date of similar coverage purchased by the *Insured*, even if such insurance does not provide coverage for loss sustained prior to its effective date.

2.   When *Optional ERP* is purchased, it replaces the Extended Discovery Period for the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements.

**Income Loss Appraisal.**  If, after submission of the Proof of Loss, the Insurer and *Insured* do not agree on the amount of *Income Loss*, each party will select an appraiser. If the appraisers do not agree, they will select an umpire. Each appraiser will submit the amount of *Income Loss* to the umpire. Agreement by the umpire and at least one of the appraisers as to the amount of *Income Loss* is binding.

Each party will:

1.   pay its own appraiser, except when covered as *Accounting Costs*, and

2.   share the fees and costs of the umpire equally.

**Notice Of Claim.**  1.   If an *Insured* gives the Insurer written notice of a *Potential Claim* during the *Policy Period*, or any extended reporting period, then a *Claim* subsequently arising from such *Potential Claim* will be deemed made on the last day of the *Policy Period*. Such notice must include a description of the anticipated allegations of *Wrongful Acts*, potential damages, and the names of potential claimants and *Insureds* involved.

2.   Once an *Executive Officer* becomes aware that a *Claim* has been made, the *Insured* must give the Insurer written notice of such *Claim* as soon as practicable. If such *Claim* involves facts that are subject to a court order or law enforcement hold, the *Insured* must give the Insurer written notice of such *Claim* as soon as practicable once such order or hold is not in effect. Such notice must include a copy of the *Claim* or description of its particulars.

3.   All notices under this section must be sent to the Insurer at an address shown in the Declarations.

**Notice Of First Party Event.**  1.   Upon the *Discovery* of a *First Party Event*, the *Insured* must give the Insurer written notice of the particulars of such first party event, as soon as practicable.

2.   If such *First Party Event* causes *First Party Loss* under the Cyber Crime or Business Loss Insuring Agreements in an amount more than 25% of the applicable Retention, the *Insured* must:

    a.   give the Insurer a detailed, sworn Proof of Loss within 120 days;

    b.   submit to an examination Under Oath, and give the Insurer a signed statement of the *Insured's* answers; and

    c.   notify law enforcement, if such *First Party Event* violates law.

3.   Demands for payment of *First Party Loss* must be provided to the Insurer by the *Insured Entity*.

4.   All notices and demands must be sent to the Insurer at an address shown in the Declarations.

**Other Insurance.**  1.   The Breach Response and Business Loss Insuring Agreements are primary insurance.

2.   The Liability and Cyber Crime Insuring Agreements are excess over, and will not contribute with, any other valid and collectible insurance available to the *Insured*. This applies even if such other insurance is stated to be primary, excess, or otherwise, unless such other insurance states by specific reference that it is excess over this Coverage.

**Property Covered.**  Coverage under the Cyber Crime Insuring Agreements is limited to property:

1.   the *Insured Entity*:

    a.   owns;

    b.   leases; or

    c.   holds for others; or

2.   for which the *Insured Entity* is legally liable, except property located inside premises of the *Insured Entity's* client or such client's financial institution.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

**Recovery And Subrogation.**
1. The Insurer has no duty to recover amounts paid under this Coverage.
2. Amounts recovered from a third party, less costs incurred in obtaining such recovery, will be applied in this order:
   a. to the Insurer for any Retention it paid on behalf of an *Insured*;
   b. to the *Insured* for *Loss* the Insurer did not pay because the applicable Limit was exhausted;
   c. to the Insurer for *Loss* it paid;
   d. to the *Insured* for any Retention it paid; and then
   e. to the *Insured* for any uncovered loss it paid.
3. Recoveries do not include amounts from insurance or reinsurance.
4. The Insurer is subrogated to, and the *Insured* must transfer to the Insurer, all of the *Insured's* rights of recovery against any person or organization for *Loss* the Insurer has paid under this Coverage. The *Insured* agrees to:
   a. execute and deliver instruments and papers;
   b. do everything necessary to secure such rights; and
   c. do nothing to impair or prejudice those rights.
5. Subrogation will not apply if the *Insured*, prior to the date of a *Wrongful Act* or a *First Party Event*, waived its rights to recovery.
6. Any of the *Insured Entity's* property that the Insurer pays for becomes the Insurer's property.

**Related Claims.**
Multiple *Claims* arising out of the same *Wrongful Act* are a single *Claim* that is deemed first made on the date the earliest of such *Claims* is made, whether before or during the *Policy Period*.

**Representations.**
1. The Insurer has issued this coverage in reliance on the accuracy and completeness of the representations that the *Insured* made to the Insurer.
2. If any such representation is untrue, and:
   a. was material to the acceptance of the risk; and
   b. is material to a covered *Loss*,
   then this coverage will not apply to such *Loss* with respect to:
   i. an *Insured Person* who knew; or
   ii. an *Insured Entity*, if an *Executive Officer* knew,
   that such representation was untrue on the Inception date shown in the Declarations.

**Settlement.**
The Insurer may, with the written consent of the *Insured*, settle a *Claim*. If the Insurer and claimant agree to settle a *Claim* but the *Insured* withholds its consent, the *Insured* will be responsible for 20% of all:
1. *Defense Costs* incurred after the date the *Insured* withheld its consent; and
2. *Loss*, other than *Defense Costs*, in excess of such settlement offer.

**Subsidiaries.**
If a *Subsidiary* is acquired or created by an *Insured Entity* during the *Policy Period*, and its revenues are:
1. less than 35% of the total annual revenues of such *Insured Entity*, then it will be covered for *Wrongful Acts* or *First Party Events* that occur after its acquisition or creation; or
2. are at least 35% of the total annual revenues of such *Insured Entity*, then it will be covered for:
   a. *Wrongful Acts* that occur after its acquisition or creation, for *Claims* made; or
   b. *First Party Events* that occur after its acquisition or creation and that are *Discovered* and reported,
   within 90 days of its acquisition or creation, or the end of the *Policy Period*, whichever is earlier. Additional coverage may be negotiated at the time of acquisition or creation.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

**Suits Against The Insurer – Cyber Crime.**

The *Insured Entity* may not bring any legal action against the Insurer involving a *First Party Event* covered under the Cyber Crime Insuring Agreements:

1. until 60 days after the *Insured Entity* has filed Proof of Loss; and
2. unless such legal action is commenced within two years from the date the *Insured Entity* *Discovers* the *First Party Event*.

**Valuation Under First Party Insuring Agreements.**

1. *Money*, except *Virtual Currency*, is valued in the U.S. dollar equivalent determined at the rate of exchange published by The Wall Street Journal:
   a. for the Cyber Crime Insuring Agreements, on the date the *First Party Event* was *Discovered*; and
   b. for the Breach Response and Business Loss Insuring Agreements, on the date of payment of *First Party Loss*.
2. *Securities* are valued at market value as of the close of business on the date the *First Party Event* was *Discovered*; and at its discretion, the Insurer will:
   a. pay the *Insured Entity* such value;
   b. replace such *Securities* in kind, in which case the *Insured Entity* must assign to the Insurer all rights, title, and interest in such *Securities*; or
   c. pay the cost of a Lost Securities Bond required when issuing duplicates of the *Securities*. Such Lost Securities Bond will have a penalty no more than the value of the *Securities* at the close of business on the date the *First Party Event* was *Discovered*.
3. *Virtual Currency* is valued in the U.S. dollar equivalent determined at the rate of exchange:
   a. for the Cyber Crime Insuring Agreements, on the date the *First Party Event* was *Discovered*; and
   b. for the Breach Response and Business Loss Insuring Agreements, on the date of payment of *First Party Loss*.
4. *Other Property* is valued for the lesser of:
   a. the actual cash value of the *Other Property* on the date the *First Party Event* was *Discovered*; or
   b. the cost to replace *Other Property* with comparable property, but only after such property is actually replaced.

This endorsement changes the CyberRisk Coverage.

# Conviction Reward Endorsement

There are three changes described below:

1.  The following is added to **Cyber Crime Insuring Agreements**:

    **Conviction Reward.** The Insurer will pay the *Insured Entity* for *Conviction Reward Costs* following a *First Party Event* that is *Discovered* during the *Policy Period.*

2.  The following is added to **Definitions**:

    *Conviction Reward Costs.* Means the reasonable amount paid by the *Insured Entity*, with the Insurer's prior written consent, for information that leads to the arrest and conviction of a natural person responsible for a *First Party Event*.

3.  The following is added to the **CyberRisk Declarations**:

    |                       | Limit    | Retention |
    |-----------------------|----------|-----------|
    | Conviction Reward:    | $25,000  | 0         |

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

This endorsement changes the CyberRisk Coverage.                    **Bricked Equipment Endorsement**

There are three changes described below:

1.  The following is added to **Definitions**, *Extra Expense*:

    Includes such reasonable costs incurred by the *Insured Entity*, with the Insurer's written consent, to replace any *Bricked Equipment* with functionally equivalent equipment, if such *Bricked Equipment* is inoperable:

    1.  directly as a result of a *Security Breach*; and
    2.  if reasonable attempts to restore such *Bricked Equipment* fail.

    Such costs may include newer versions or models of such *Bricked Equipment.*

2.  The following is added to **Definitions**:

    *Bricked Equipment.* Means any inoperable computer, input, output, processing, storage, or communication device:

    1.  owned by;
    2.  leased to;
    3.  licensed to; or
    4.  under the direct operational control of,

    the *Insured Entity* , or an *Insured Person,* while authorized by, and transacting business on behalf of, the *Insured Entity.*

3.  The following is added to **Exclusions**, **Property Damage** 2:

    This does not apply to *Business Interruption Loss* resulting from the loss of use of a *Computer System*.

© 2019 The Travelers Indemnity Company. All rights reserved.

<div align="right">

**Vendor Or Client Payment Fraud
Endorsement**

</div>

This endorsement changes the CyberRisk Coverage.

There are ten changes described below:

1. The following is added to **Cyber Crime Insuring Agreements**:

   **Vendor Or Client Payment Fraud.**

   The Insurer will pay the *Insured Entity* for *Vendor Or Client Payment Fraud Loss* that arises out of a *Security Breach* that is discovered during the Policy Period.

2. The following is added to **Definitions**:

   *Vendor Or Client Payment Fraud.* Means an instruction that intentionally misleads a *Vendor* or *Client*, when such instruction:
   1. is not made by an *Insured*;
   2. is purportedly from an *Insured*;
   3. directs such *Vendor* to perform services or deliver goods, or such *Client* to deliver payment to, an unintended recipient;
   4. contains a misrepresentation of material fact; and
   5. is relied upon by such *Vendor* or *Client*, believing the material fact to be true.

   *Vendor Or Client Payment Fraud Loss.* Means:
   1. *Money* owed to the *Insured Entity* but not collected for services rendered or goods delivered to a *Client,* or
   2. the amount the *Insured Entity* paid a *Vendor* for goods or services the *Insured Entity* did not receive;
   directly caused by *Vendor Or Client Payment Fraud.*

3. The following is added to **Definitions**, *Computer Fraud*:

   Does not include *Vendor Or Client Payment Fraud.*

4. The following is added to **Definitions**, *First Party Event*:

   Includes *Vendor Or Client Payment Fraud.*

5. The following is added to **Definitions**, *First Party Loss*:

   Includes *Vendor Or Client Payment Fraud Loss.*

6. The following is added to **Definitions**, *Funds Transfer Fraud*:

   Does not include *Vendor Or Client Payment Fraud.*

7. The following replaces **Exclusions**, *Cyber Crime*, 8:

   loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter electronic data or send instructions, provided this does not apply to the Social Engineering Fraud or the Vendor Or Client Payment Fraud Insuring Agreements.

8. The following is added to **Other Conditions**, **Property Covered**:

   This does not apply to the Vendor Or Client Payment Fraud Insuring Agreement.

9. The following is added to **Other Conditions**:

   **Property Covered – Vendor Or Client Payment Fraud**

   Coverage under the Vendor Or Client Payment Fraud Insuring Agreement is limited to:
   1. *Money* owed to the *Insured Entity* but not collected for services rendered or goods delivered to a *Client,* or
   2. the amount the *Insured Entity* paid a *Vendor* for goods or services the *Insured Entity* did not receive.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2019 The Travelers Indemnity Company. All rights reserved.

10.  The following is added to the Declarations:

Vendor Or Client Payment Fraud Limit                    Vendor Or Client Payment Fraud Retention

$100,000                                                $5,000

© 2019 The Travelers Indemnity Company. All rights reserved.

**Dependent Business Interruption – System Failure Endorsement**

This endorsement changes the CyberRisk Coverage.

There are five changes described below:

1. The following is added to **Business Loss Insuring Agreements**, **Dependent Business Interruption**:

   The Insurer will also pay the *Insured* for its *Business Interruption Loss*, directly caused by an *IT Provider System Failure* that is *Discovered* during the *Policy Period*.

2. The following is added to **Definitions**, *First Party Event*:

   Includes an *IT Provider System Failure*.

3. The following is added to **Definitions**:

   *IT Provider System Failure.* Means an accidental, unintentional, and unplanned total or partial interruption of an *IT Provider's* computer system not caused by an *IT Provider Breach*.

4. The following is added to **Exclusions**, **Property Damage**, 2:

   This does not apply to *Business Interruption Loss* resulting from the loss of use of an *IT Provider's* computer system.

5. The following is added to **Limits And Retentions**, **Limits Of Insurance**, 2:

   The most the Insurer will pay for *Business Interruption Loss* that results from an *IT Provider System Failure* is the Dependent Business Interruption - System Failure Limit shown in the CyberRisk Declarations, which is within and will reduce the Dependent Business Interruption Limit.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2020 The Travelers Indemnity Company. All rights reserved.

**Dependent Business Interruption - Outsource Provider With System Failure Endorsement**

This endorsement changes the CyberRisk Coverage.

There are five changes described below:

1.  The following is added to **Business Loss Insuring Agreements**, **Dependent Business Interruption**:

    **Dependent Business Interruption - Outsource Provider - System Failure.**

    The Insurer will pay the *Insured* for its *Business Interruption Loss*, directly caused by an *Outsource Provider Breach* or *Outsource Provider System Failure* that is *Discovered* during the *Policy Period*.

2.  The following is added to **Definitions**, *First Party Event*:

    Includes an *Outsource Provider Breach* and *Outsource Provider System Failure*.

3.  The following are added to **Definitions**:

    *Outsource Provider.* Means a provider, other than an *IT Provider*, that:
    1.  provides goods to, or performs services for, the *Insured* under a written contract; and
    2.  the *Insured* does not own, operate, or control.

    *Outsource Provider Breach.* Means:
    1.  the unauthorized access to;
    2.  the use of authorized access to cause intentional harm to;
    3.  a denial-of-service attack against; or
    4.  the introduction of a *Virus* into,
    an *Outsource Provider's* computer system, resulting in an interruption of such computer system.

    *Outsource Provider System Failure.* Means an accidental, unintentional, and unplanned interruption of an *Outsource Provider's* computer system not caused by an *Outsource Provider Breach*.

4.  The following is added to **Exclusions**, **Property Damage**, 2:

    This does not apply to *Business Interruption Loss* resulting from the loss of use of an *Outsource Provider's* computer system.

5.  The following is added to **Limits And Retentions**, **Limits Of Insurance**, 2:

    The most the Insurer will pay for all *Business Interruption Loss* that results from an *Outsource Provider Breach* or *Outsource Provider System Failure* is the Dependent Business Interruption - Outsource Provider - System Failure Limit shown in the CyberRisk Coverage Declarations, which is within and will reduce the Dependent Business Interruption Limit.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**

© 2020 The Travelers Indemnity Company. All rights reserved.

This endorsement changes the following:

CyberRisk

**Add Specified Insured Entity Endorsement**

The following is added to **Definitions**, *Insured Entity*:

Includes the following:

Johns Lyng Texas, LLC

Johns Lyng Florida, LLC

Johns Lyng California, LLC

Johns Lyng Colorado, LLC

Johns Lyng Tennessee, LLC

Advanced Roofing & Sheetmetal, LLC

Steamatic of Nashville, LLC

Steamatic North Texas, LLC

Steamatic of Northwest Houston, LLC

Issuing Company:  **Travelers Casualty and Surety Company of America**
Policy Number:  **107756394**

AFE-19015 Ed. 01-19                                                                                                Page 1 of 1
© 2019 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## COLORADO CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement modifies insurance provided under the following if applicable:

**Liability Policy**
**Kidnap and Ransom Policy**
**Identity Fraud Expense Reimbursement Policy**

**It is agreed that:**

The CANCELLATION section of this policy is replaced by the following:

CANCELLATION

The Company may cancel this policy for failure to pay a premium when due, in which case
**(twenty) (20)** days (number of days must equal or exceed twenty (20) days) written notice
shall be given to the **Named Insured or Insurance Representative**, unless payment in full is received within twenty (20) days of the **Named Insured or Insurance Representative's** receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the **Policy Period** during which this policy was in effect.

Subject to the provisions set forth in Liability Coverage Terms and Conditions Section III. CONDITIONS K. CHANGE OF CONTROL, if applicable, the **Named Insured or Insurance Representative** may cancel any coverage by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured or Insurance Representative** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this policy upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured or Insurance Representative** written notice to that effect
**(thirty) (30)** days (number of days must equal or exceed thirty (30) days) before the
Expiration Date set forth in ITEM 2 of the Declarations if we are nonrenewing for nonpayment of premium, or
**(Forty-five) (45)** days (number of  days  must equal or exceed forty-five (45) days) in advance
if we are nonrenewing for any other reason.  All cancellation and nonrenewal notices will be sent  by first class mail.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **107756394**